BLOOD HURST & O'REARDON, LLP
TIMOTHY G. BLOOD (149343)
LESLIE E. HURST (178432)
ALEKSANDR J. YARMOLINETS (276707)
501 West Broadway, Suite 1490
San Diego, CA  92101
Tel: 619/338-1100
619/338-1101 (fax)
tblood@bholaw.com
lhurst@bholaw.com
ayarmolinets@bholaw.com

LANGER GROGAN & DIVER, PC
IRV ACKELSBERG (*pro hac vice forthcoming*)
JOHN J. GROGAN (*pro hac vice forthcoming*)
1717 Arch Street, Suite 4020
Philadelphia, PA  19103
Tel: 215/320-5660
215/320-5703 (fax)

Attorneys for Plaintiffs

[Additional counsel appear on signature page]

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JODY ALIFF, MARIE SMITH, HEATHER TURREY, individually, and on behalf of all others similarly situated, | Case No. **'20 CV0697 DMS AHG** |
| | **CLASS ACTION** |
| Plaintiffs, | |
| | **CLASS ACTION COMPLAINT** |
| v. | |
| VERVENT, INC. fka FIRST ASSOCIATES LOAN SERVICING, LLC; ACTIVATE FINANCIAL, LLC; DAVID JOHNSON; CHRISTOPHER SHULER; LAWRENCE CHIAVARO; DEUTSCHE BANK TRUST COMPANY AMERICAS, | **JURY TRIAL DEMANDED** |
| Defendants. | |

*BLOOD HURST & O' REARDON, LLP*

001163358

BLOOD HURST & O' REARDON, LLP

## I. **Preliminary Statement**

1. Plaintiffs are former students who were victimized by one of the nation's largest and most notorious, for-profit school chains, the now-bankrupt company ITT Education Services, Inc. ("ITT"), which left them heavily indebted for a largely worthless post-secondary "education." Despite ITT's 2016 bankruptcy, Plaintiffs are still being victimized by a sham, abusive student loan program named "PEAKS" that Deutsche Bank developed exclusively for ITT and that the Defendants named herein are still operating today.

2. From its inception in 2009, the PEAKS program was a scheme structured by Deutsche Bank and carried out through a trust Deutsche Bank established ("the PEAKS Trust"), for which Deutsche Bank (through various of its subsidiaries) played several roles, earning itself substantial fee income. The principal purpose of the PEAKS program was to generate cash for ITT and to enable ITT to maintain the appearance of having a nonfederal, independent source of tuition revenue—a requirement of participation in the federal financial aid system, the company's main source of income—through the imposition of highly disadvantageous debt on ITT students already burdened by substantial student loan debt they had little likelihood of repaying.

3. The structure and operation of the PEAKS program was as follows:

- An independent bank, serving as a "straw" lender, made student loans exclusively to students of ITT based on virtually no underwriting criteria;

- The loans were instantly purchased by the PEAKS Trust (created by Deutsche Bank), using more than $300 million raised by Deutsche Bank's sale of senior interests in the future cash flows generated by the pool of loans;

- ITT obtained only 72% of the proceeds of the loans, the remaining 28% being used to cover expenses and, at Deutsche Bank's insistence, ITT's mandatory purchase of junior notes, subordinate to the senior interests;

000163358

- In addition to the required subordinated investment in the loans to be made to its students, ITT provided an all-encompassing guaranty to the senior note holders, covering all principal, interest and fees owed by the student borrowers who, all participants knew, had little capacity to repay the loans. (ITT did not report the full extent of this guaranty liability in its audited, public financial statements.); and

- As a result, ITT was able to show the non-federal cash flow essential to continued receipt of federal student loan dollars (and, thus, to keep its scheme alive); but what appeared to be loans granted by an independent lender were actually elaborately disguised loans made by ITT itself.

4.    For their part, the Defendants named herein incurred little or no risk of nonpayment by the student borrowers and, at least in the short run, received substantial fee income for the services they provided to ITT's scheme, fees that they have continued to earn even after ITT's bankruptcy. Besides the fact that the loans were made to borrowers with little repayment ability, the terms of the loans were themselves unconscionable and abusive. The interest rate, which went has high as 17.5%, was accrued daily; there was an undisclosed 10% origination fee; and even though the loan agreement provided that borrowers could raise any school-related claims against any assignee of the loan, the actual holder of the loans (the PEAKS Trust) was carefully stripped of any assets from which such claims could be paid. Moreover, these predatory loans were originated only as a result of a company-wide, systematic pattern of deception, compulsion and fraud perpetrated by ITT personnel and designed to force or fool ITT students into becoming PEAKS loan borrowers.

5.    Starting in December 2011, after the PEAKS loans had already been made, and as existing loans in the PEAKS pool were steadily going delinquent, Defendant First Associates Loan Servicing (now known as "Vervent, Inc.") assumed the role of loan servicer for the PEAKS program, meaning that it collected the loans on behalf of ITT (as Guarantor) and Defendant Deutsche Bank Trust Company

BLOOD HURST & O' REARDON, LLP

000163358

Americas ("DBTCA") as the PEAKS Indenture Trustee and Secured Party. Vervent is still playing that role today, but on behalf of DBTCA alone.

6. As the PEAKS loan delinquencies grew, ITT itself made millions of dollars of PEAKS loan payments in order to avoid triggering its guaranty obligations, which payments, while known to First Associates, were concealed from the borrowers and from ITT's shareholders.

7. Eventually, as the PEAKS scheme became known to federal and state regulators and its shareholders and as the ITT guaranty obligations grew, ITT's finances unraveled, all of its schools closed, and, in September 2016, it filed a chapter 7 bankruptcy. PEAKS loan collections continued notwithstanding the ITT bankruptcy because they were obligations owed to a non-debtor.

8. The ITT bankruptcy has yielded some relief for the ITT students, who were the primary victims of ITT's systematic fraud. As a result of a class action on behalf of students, any remaining tuition-related obligations owed to ITT has been discharged. As a result of litigation filed by the bankruptcy trustee regarding an ITT private student loan program pre-dating the PEAKS program, any remaining balances owed by students under that program have been cancelled. And, the bankruptcy trustee has also filed suit against Deutsche Bank entities to try to recover payments made by ITT to Deutsche Bank.

9. Realizing that future revenue from PEAKS loan repayments could be at risk, First Associates—with DBTCA's knowledge and agreement—came up with a new, collateral scheme designed to maximize any remaining, possible PEAKS loan repayments, using an in-house, wholly owned collection company named Activate Financial, LLC. In 2018 and 2019, Activate Financial began sending out collection notices to PEAKS borrowers—many of whom no longer had enforceable repayment obligations due to the expiration of the statute of limitations—in order to increase collection pressure by, among other things, creating the false impression that the loans had been transferred to an outside collection company and through "special offers" of

BLOOD HURST & O' REARDON, LLP

000163358

discounted payoffs. For the PEAKS loans that are in default, Activate Financial, under the direction of Vervent, unlawfully collects on this unpaid debt, further enriching Defendants.

10.    Plaintiffs seek to represent a nationwide class of similarly situated PEAKS loan borrowers who have made payments on their loans; on behalf of a subclass who made payments to Activate Financial; on behalf of a California class to whom Activate Financial sent collection notices; and injunctive relief, including an injunction on behalf of the general public pursuant to the McGill Rule (*McGill v. Citibank, N.A.*, 2 Cal. 5th 945 (2017)). Plaintiffs seek actual and/or treble damages of no more than $4,999.00 individually and for each of the members of the class, plus reasonable attorney's fees and costs, under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968, the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1691, *et seq.*, and under California state law.

## II.    **Jurisdiction and Venue**

11.    Plaintiffs bring this action pursuant to 18 U.S.C. § 1964, which confers jurisdiction upon this Court over Plaintiffs' claims brought under RICO; and pursuant to 15 U.S.C. § 1692k(d) which confers jurisdiction over Plaintiffs' claims under the FDCPA. The jurisdiction of this Court also arises under 28 U.S.C. § 1331. Supplemental jurisdiction over the state law claims exists pursuant to 28 U.S.C. § 1367.

12.    Venue is proper in this District pursuant to 18 U.S.C. § 1965(a)—which provides for venue in any district in which a RICO defendant transacts his affairs— and 28 U.S.C. § 1391(b), in that a substantial part of the events giving rise to Plaintiffs' claims occurred in this District and the defendants are subject to personal jurisdiction in this District.

## II.    **The Parties**

13.    Plaintiff Jody Aliff is an adult person residing in Van Nuys, California. He was an ITT student.

BLOOD HURST & O' REARDON, LLP

000163358

14.    Plaintiff Marie Smith is an adult person residing in St. Louis, Missouri. She was an ITT student.

15.    Plaintiff Heather Turrey is an adult person residing in Lancaster, California. She was an ITT student.

16.    Defendant Vervent, a Delaware corporation, is a product of an October 2019 merger between First Associates and Portfolio Financial Servicing Co., Inc. Vervent is headquartered and conducts its business in San Diego, California. Since most of the conduct relevant to the action occurred prior to the recent merger, Vervent and First Associates are used interchangeably unless otherwise specified. Since 2011, First Associates has functioned (and Vervent now functions) as the servicer of the PEAKS program loans.

17.    Defendant Activate Financial is a Utah limited liability company. As of July 19, 2019, First Associates served as Activate Financial's manager, and both companies operated out of the same office. On information and belief, pursuant to First Associates' October 2019 merger, Vervent now serves as Activate Financial's manager, and both companies continue to operate from the same office. Since the merger, Activate Financial has been controlled and operated by Vervent. Activate Financial is a debt collector that is currently collecting unpaid balances on PEAKS program loans. Its principal purpose is the collection of debts, it regularly collects and attempts to collect, directly or indirectly, debts alleged to be due another, and is a "debt collector" within the meaning of 15 U.S.C. § 1692a(6). Moreover, it regularly engages in the collection of consumer debt and is a debt collector covered by the Rosenthal Fair Debt Collection Practices Act. Cal. Civ. Code §§ 1788-1788.33.

18.    Vervent (and earlier, First Associates) determines which PEAKS loan Activate Financial will attempt to collect and controls the means and manner by which those debts are collected. Through its surrogate, Activate Financial, Vervent regularly collects and attempts to collect, directly or indirectly, debts alleged to be due another, is a "debt collector" within the meaning of 15 U.S.C. § 1692a(6) and it regularly

000163358

BLOOD HURST & O' REARDON, LLP

engages in the collection of consumer debt and is a debt collector covered by the Rosenthal Fair Debt Collection Practices Act. Cal. Civ. Code §§ 1788-1788.33.

19.    Defendant David Johnson is Vervent's CEO, the position he held with First Associates at all relevant times. Mr. Johnson is also a member and owner of Activate Financial. Upon information and belief, he resides in this District.

20.    Defendant Lawrence Chiavaro is Vervent's Executive Vice President, the position he held with First Associates at all relevant times. Mr. Chiavaro is also a member and owner of Activate Financial. Upon information and belief, he resides in this District.

21.    Defendant Christopher Shuler is Vervent's Senior Vice President of Sales, the position he held with First Associates until the merger. During all relevant time, he also served as and continues to serve as Activate Financial's President. Upon information and belief, he resides in this District.

22.    Defendant Deutsche Bank Trust Company Americas ("DBTCA") is a New York banking corporation with its offices at 60 Wall Street, New York, New York. DBTCA is a co-participant in all conduct alleged.

## III.    Other Involved Entities

23.    ITT Educational Services, Inc. was a public corporation that owned a chain of for-profit technical schools and that served as Guarantor of the PEAKS program. It no longer operates, having filed a chapter 7 bankruptcy in the Southern District of Indiana on September 16, 2016, Case No. 16-7207-JMC-7A. The chapter 7 trustee of that liquidating estate is Deborah J. Caruso. ITT is not named as a defendant in this action.

24.    PEAKS Trust 2009-1 is a statutory trust organized and existing under the laws of Delaware and is the nominal creditor to whom PEAKS loans are owed. It is a trust having no current assets, all of them having been pledged to DBTCA, as the PEAKS Trust trustee, for the benefit of the investors in the PEAKS loan-secured bonds. PEAKS Trust is not named as a defendant.

BLOOD HURST & O' REARDON, LLP

CLASS ACTION COMPLAINT

25. Other Deutsche Bank entities besides DBTCA were involved in the design of the PEAKS program for ITT and in the marketing of investments in Peaks senior notes.

26. Liberty Bank, N.A. is a national banking association. Liberty Bank issued the loans, which it sold to the PEAKS Trust as part of the PEAKS program. Liberty Bank is not named as a defendant. Deutsche Bank set the minimum credit requirements and loan qualifications Liberty Bank used during the PEAKS program.

27. Access Group, Inc., is a Pennsylvania non-profit corporation, currently operating under the name AccessLex Institute. Access Group served as the initial PEAKS program loan servicer, until it was replaced by First Associates in December 2011.

IV.    **The Facts**

A.    **Deutsche Bank Designed the PEAKS Program to Facilitate ITT's Fraudulent "Education" Business**

28. Until its 2016 bankruptcy filing, ITT was the publicly traded owner of one of the nation's largest chains of for-profit post-secondary schools. ITT's schools—most of which operated under the brand name "ITT Technical Institute"—operated in all 50 states and the District of Columbia.

29. As of 2010, ITT had 88,000 students, mostly in 2-year associate's degree programs. The company's tuition revenue that year—mostly from federal financial aid—was $1.6 billion. *See* Staff of S. Comm. on Health, Educ., Labor and Pensions, No. 112-37: For Profit Higher Education: The Failure to Safeguard the Federal Investment and Ensure Student Success (Comm. Print Jul. 30, 2012) ("Senate Report"), at 515.

30. A U.S. Senate investigation found that ITT typically charged students over $44,000 for a two-year program, more than four times the cost of a comparable program at a public college, and that, in order to convince students to sign up, ITT

BLOOD HURST & O' REARDON, LLP

7

CLASS ACTION COMPLAINT

recruiters were trained to mislead students about the cost of attending the company's schools. Senate Report at 525.

31.    ITT relentlessly pitched itself to students as a sound investment that would provide a healthy return to them in the form of guaranteed or near-guaranteed entry-level employment in a lifelong career. According to the Senate Report, *id.* at 520, ITT spent an extraordinary 19% of its revenue on marketing, advertising and recruiting activity. At the same time, it deliberately and severely underinvested in the resources needed to deliver on its inflated promises, leaving students who managed to finish ITT programs with an expensive but valueless credential and substantial student loan debt.

32.    Over the course of its troubled history, ITT was responsible for creating over $7 billion in student loan debt, both federal and private, with more than 80% of this debt having defaulted. ITT students, who earn on average the same or less than high school graduates with no college education, cannot sustain this debt. Moreover, student loan debt cannot be discharged easily in bankruptcy.

33.    ITT's students were typically low-income and had poor credit profiles—ITT's Chief Financial Officer estimated that the average ITT student had earnings of $18,000/year and a credit score of less than 600. As a result, the company business model depended on finding outside funding for its recruits. This mainly involved Department of Education grants and loans, which consistently accounted for most of the company's revenues.

34.    In order to maintain access to the federal financial aid pipeline, ITT had to comply with various federal regulatory requirements. It needed to be authorized by each state in which it operated, to be accredited by an accrediting agency recognized by the Department of Education, and most importantly, ITT needed to comply with federal financial aid program integrity rules or risk the loss of all of its federal revenue. These rules included the following:

BLOOD HURST & O' REARDON, LLP

000163358

- The "90/10 Rule," under which ITT could receive no more than 90% of its revenue from federal financial aid programs. *See* 34 C.F.R. § 668.28;

- The "Cohort Default Rule," providing that no more than 30% of students default on loans within 3 years of concluding their enrollment. *See* 34 C.F.R. § 668.217; and

- The "Gainful Employment Rule," under which ITT's programs had to prepare students for gainful employment in a recognized occupation, as measured by the ratio of their loan debt to their income. *See* 34 C.F.R. § 668.6.

35.    Prior to 2008, ITT and its students generally relied on an unaffiliated third-party lender to provide private education loans to pay the 10% of tuition to meet the 90/10 Rule. This third-party lender established its own underwriting criteria, interacted with student borrowers at arms-length without any involvement from ITT, and independently made decisions about whether or not to extend loans in each instance. Through such independent underwriting, the 90/10 Rule provided some "check and balance" for the federal program.

36.    By 2008, however, traditional private student loan lenders ceased making loans as a result of the international financial collapse, thereby placing ITT's business model in jeopardy. As a response to that crisis, ITT created a "Temporary Credit Program" that provided students with zero-interest, short-term loans for the balance of the tuition not covered by federal financial aid. ITT granted Temporary Credit without any genuine underwriting in order to ensure that the students' enrollment was maintained long enough to obtain the federal financial aid associated with their enrollment.

37.    Even though the Temporary Credit Program enabled ITT to keep students enrolled—and thereby maintain the flow of federal financial aid dollars—the income from this temporary tuition credit could not be counted towards the company's 10% obligation under the 90-10 rule. Moreover, because of the low likelihood of students ever being able to repay Temporary Credit obligations, ITT was

Blood Hurst & O' Reardon, LLP

CLASS ACTION COMPLAINT

1  forced to discount the value of these obligations on its financial statements, thereby
2  producing negative effects on its reported income.

3      38.    According to the complaint in a now-settled class action filed by ITT
4  students in the ITT bankruptcy, *Jorge Villalba et al. v. ITT Educational Services, Inc.*,
5  *et al.*, Adversary No. 17-50003 (Bankr. S.D. Ind.), ITT falsely told students that the
6  Temporary Credit was a grant, and would not have to be repaid. Later, after ITT had
7  successfully created its own private loan programs, including the PEAKS program at
8  issue in this litigation, it directed its employees to tell students they either had to pay
9  the full balance of their Temporary Credit obligation or agree to high interest
10 replacement loans under these loan programs.

11     39.    In order to induce investment banks like Deutsche Bank to assist it in
12 creating new private student loan programs that would repay the Temporary Credit
13 obligations and generate additional nonfederal revenue, ITT agreed to risk sharing
14 arrangements that enabled banks to make loans they otherwise would not have made
15 given the poor credit profiles of ITT students.

16     40.    The first of these ITT-guaranteed loan programs was named CUSO. It
17 involved a group of credit unions that made loans to ITT's students. Originally
18 launched in 2009, CUSO made a total of $141 million in private loans to ITT's
19 students, subject to substantial guarantees granted by ITT.

20     41.    Defendant First Associates was the servicer of these CUSO loans. It
21 billed, collected and remitted student payments, and received a fee for performing this
22 service.

23     42.    As ITT exhausted the cash generated by the CUSO loan program,
24 Deutsche Bank stepped in to help ITT organize an even larger student loan program,
25 the PEAKS program. The PEAKS program, which Deutsche Bank designed
26 exclusively for ITT, contained even more onerous guarantees. By virtue of these
27 guarantees, the PEAKS program was essentially a massive loan *made to ITT* that was
28

*Left margin:* BLOOD HURST & O' REARDON, LLP

structured to appear as a bona fide private student loan program providing credit to needy students.

43.    As described by the ITT bankruptcy trustee in a pending action seeking to recover tens of millions of dollars from Deutsche Bank and others, *see Deborah J. Caruso v. PEAKS Trust 2009-1, et al.*, Adversary No. 18-50272-JMC (Bankr. S.D. Ind.) (hereafter, "the Bankruptcy Trustee's Complaint"), the PEAKS program was an elaborate scheme that included the following features:

- The loans were originated by an independent financial institution—Liberty Bank—that was functioning as little more than a "straw" for the PEAKS program.

- There were no bona fide underwriting criteria. On the contrary, Liberty approved any loan delivered by ITT, regardless of the borrower's creditworthiness, as long as the borrower (a) had received a Temporary Credit from ITT; (b) had graduated from ITT or was enrolled at ITT in any academic quarter other than the first academic quarter of such student's first academic year; and (c) had not filed for bankruptcy within the last two years immediately prior to the loan application date;

- Liberty incurred no risk in originating the loans. Each loan was purchased by the PEAKS Trust that Deutsche Bank established, for a price of 101.5% of the loan amount, representing a 1.5% fee to the bank for playing this conduit role;

- To finance the purchase of the loans from Liberty Bank, the PEAKS Trust raised over $300 million in "Senior Debt" from Deutsche Bank's institutional investors (the PEAKS Senior Noteholders), which debt matured in January, 2020 and bore interest at LIBOR + 5.5% (with the minimum LIBOR rate being 2%). The money raised by PEAKS was to be used to (a) purchase the PEAKS loans from Liberty Bank, (b) fund a "Reserve Account" to be held by DBTCA and (c) to pay fees associated with the operation of the PEAKS program;

- Although PEAKS purchased the student loans from Liberty Bank, PEAKS did not retain the loans, or any assets. Under an Indenture and Credit Agreement the PEAKS Trust

BLOOD HURST & O' REARDON, LLP

BLOOD HURST & O' REARDON, LLP

purported to "GRANT, CONVEY, PLEDGE, TRANSFER, ASSIGN AND DELIVER" all of its assets (including the Student Loan Notes) to DBTCA as Indenture Trustee and Collateral Agent, which would hold legal title to the Student Loan Notes and other assets, and forward all proceeds to the Senior Noteholders under the PEAKS program;

• Although the Student Loans were used to "pay off" the Temporary Credits owing to ITT, ITT actually received only 72% of the loan proceeds, with the remaining 28% being "loaned" by ITT to PEAKS in return for a non-interest bearing subordinated note payable from eventual collections, if any, from students on their PEAKS loans after all of the Senior Debt owed to the PEAKS Senior Creditors was repaid in full. The amount "loaned" to PEAKS was then transferred by the PEAKS Trust to Deutsche Bank, leaving the PEAKS Trust with no apparent available assets; and

• Under a Guarantee Agreement, ITT agreed that to the extent PEAKS had insufficient funds (*e.g.*, funds in its Reserve Account and loan payments received from ITT students on their PEAKS loans), ITT would have to make a "Guaranteed Payment" equal to (a) all principal and interest payable to the PEAKS Senior Creditors on their Senior Debt; and (b) all fees associated with the PEAKS program.

44.    As further alleged in the Bankruptcy Trustee's Complaint, DBTCA and other Deutsche Bank subsidiaries earned numerous fees under the PEAKS program, including Syndication Agent Fees; Secured Party Fees; Servicing Fees; Administrator Fees; Origination Agent Fees; Indenture Trustee Fees; Owner Trustee Fees; Arranging Fees; Program Manager Fees; and Capitalized Fees.

45.    In short, through this complex transaction, in return for receiving only 72% of the proceeds of the student loans, ITT incurred a liability for the full amount of the Senior Notes, plus interest at LIBOR + 5.5%, plus all the fees payable to Deutsche Bank.

CLASS ACTION COMPLAINT

46.    This massively expensive credit provided to ITT by the PEAKS program was dependent on ITT's success in delivering executed PEAKS loan agreements in the form and containing the terms that Deutsche Bank required.

**B.    The PEAKS Program Exploited ITT's Students**

47.    As designed by Deutsche Bank, student borrowers were subject to an interest rate of Prime Rate +11.5%. When the PEAKS program began, the prime rate was around 3.25%, resulting in an effective interest rate for these students of 14.75%. For students taking out PEAKS loans after April 2011, the interest rate rose to 17.25%. The loans were for ten years and interest was calculated daily, with unpaid interest being capitalized every month into the loan principal.

48.    From the outset of the program, it was understood by all participants that student borrowers, already burdened by substantial federal student loan debt, had a low likelihood of being able to repay the PEAKS loans in full. In fact, over 50% of all borrowers had FICO scores less than 600. Thus, borrowers were being put into high-interest loans that, because student loans are nondischargeable in bankruptcy, would likely burden them perpetually.

49.    Moreover, students were charged undisclosed origination fees which was as high as 10%.

50.    Another feature of the PEAKS program was that Deutsche Bank structured the risk sharing arrangement so as to effectively remove the risk of liability to student borrowers defrauded by ITT, which under the FTC's Holder Rule (16 C.F.R. § 433.2), the PEAKS program was supposed to subject any holder of the PEAKS portfolio.

51.    To ostensibly comply with Holder Rule, the PEAKS loan agreements included the following notice:

> **NOTICE. ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES**

BLOOD HURST & O' REARDON, LLP

000163358

**OBTAINED WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.**

52.    What this meant, in theory, was that the PEAKS Trust, as the assignee of Liberty Bank, was supposed to remain potentially liable to Plaintiffs and the other class members up to the amount of any payments they made, as a partial redress for any fraud committed by ITT. However, what Plaintiffs and the other class members would not (and could not) have known was that the PEAKS Trust had pledged all the loans to DBTCA and that the Trust had no assets from which to pay any future liability to students, thereby rendering illusory the Plaintiffs' and the other class members' rights under the Holder Rule.

53.    No ITT student armed with all relevant facts would have ever knowingly agreed to enter into these unconscionable and abusive loan obligations. For that reason, ITT employed systematic fraud, deception and extortion to put students into PEAKS loan obligations.

54.    According to the Consumer Financial Protection Bureau, *see Consumer Financial Protection Bureau v. ITT Educational Services, Inc.*, Case No. 1:14-cv-00292-SEB-TAB (S.D. Ind.), ITT instructed and incentivized its financial aid staff to use tactics such as emailing students, calling them at home, tracking them down in person around campus, pulling them from class, barring them from class, and withholding course materials, diplomas, and transcripts, to pressure students to meet with financial aid staff so that their Temporary Credits could be repackaged into private PEAKS loans. Students who resisted signing the PEAKS loan documents were told that, unless they signed, they would have to withdraw from the school. The financial aid staff at ITT campuses were compensated based in part on how many students they were able to fool or force into the PEAKS program.

55.    This deception and coercion were so extreme that, in some cases, as Plaintiffs allege below, ITT personnel managed to electronically sign PEAKS loan

BLOOD HURST & O' REARDON, LLP

000163358

BLOOD HURST & O' REARDON, LLP

agreements without the consent of the supposed borrower. The students were not given copies of the completed applications and loan agreements.

56.     The original servicer of the PEAKS loans, by agreement between ITT and DCTCA, was the Access Group. However, in December 2011, ITT and Deutsche Bank replaced Access Group with First Associates, pursuant to an Agreement for Servicing Private Student Loans between the PEAKS Trust, DCTCA, and First Associates, dated December 10, 2011 (hereafter "the Servicing Agreement").

57.     Under this Agreement, First Associates would earn a monthly servicing fee in excess of 1% of the aggregate value of the outstanding balance in the PEAKS Trust loan portfolio. It earned this fee *regardless of its performance in collecting payments from the student borrowers*, at least with regard to loans less than 180-days delinquent. As for loans passing that default trigger, First Associates could still earn percentage commissions on any recoveries it could extract from borrowers.

58.     Due to the predictably high delinquencies in PEAKS loan repayments, and, in an effort to avoid the default trigger that would require it to fund its guarantee under the PEAKS program, ITT made approximately $15 million in minimum loan payments (*i.e.*, interest only) on behalf of the PEAKS borrowers during the period 2012-2014, which payments were concealed from ITT's shareholders at the time they were made. Due to their roles in the program, DCTCA and First Associates would have been aware of both the magnitude of borrower delinquencies and ITT's payments.

59.     ITT's payments on the PEAKS loans, while delaying the guarantee trigger, actually *increased* the amount ITT would eventually have to pay on the guarantee because interest on the unpaid principal continued to accrue in the PEAKS portfolio, with this interest being capitalized into the principal owed to the senior bondholders, resulting in an increase in ITT's long-term guarantee liability.

CLASS ACTION COMPLAINT

60.    As the sham nature of the PEAKS program began to surface, ITT was hit with a series of private and governmental civil investigations and lawsuits, including the following:

a.    On May 18, 2012, ITT received a Civil Investigative Demand ("CID") from the Consumer Financial Protection Bureau ("CFPB"), describing the purpose of the underlying investigation as being "to determine whether for profit post-secondary companies, student loan origination and servicing providers, or other unnamed persons have engaged or are engaging in unlawful acts or practices relating to the advertising, marketing and origination of private student loans."

b.    On October 30, 2012, the Massachusetts Attorney General issued a Civil Investigative Demand investigating allegations of ITT "engaging in unfair or deceptive practices in connection with . . . the financing of education."

c.    On February 8, 2013, ITT's former management received a subpoena from the SEC, requesting the production of documents and communications regarding the CUSO and PEAKS programs.

d.    In early 2013, several securities fraud class actions were filed against ITT by its shareholders, *In re ITT Education Services, Inc., Securities Litigation*, Civil Action No. 13-cv-1620-JPO (S.D.N.Y.).

e.    In February 2014, the CFPB filed an enforcement action against ITT, seeking broad injunctive relief and restitution for student loan borrowers, *Consumer Financial Protection Bureau v. ITT Educational Services, Inc.*, Case No. 1:14:cv-292 (S.D. Ind.).

f.    In August 2014, the SEC notified ITT that its staff had made a preliminary determination to file an enforcement action against the company, a case that the Commission did eventually file, *United States Securities and Exchange Commission v. ITT Educational Services, Inc.*, Case No. 15-cv-00758 (S.D. Ind.).

61.    On October 19, 2015, the Department of Education announced that ITT was being placed under "heightened cash monitoring."

BLOOD HURST & O' REARDON, LLP

CLASS ACTION COMPLAINT

62.    On April 20, 2016, ITT's accrediting body issued a show-cause letter why ITT's accreditation should not be withdrawn, noting the existence of substantial unresolved litigation and investigations of a variety of issues related to ITT's student lending practices and misrepresentations.

63.    On September 6, 2016, ITT announced that it was shutting down its academic operations.

64.    On September 16, 2016, the company filed a Chapter 7 bankruptcy. Case No. 16-07207-JMC-7A (S.D. Ind.).

65.    The ITT bankruptcy filing, as well as the numerous investigations of and lawsuits against ITT generated extensive publicity. Moreover, students received individual notices about the bankruptcy.

66.    Following the bankruptcy filing, First Associates continued collecting what it could on the CUSO and PEAKS loan portfolios.

67.    Over the course of the proceedings in the ITT Chapter 7 liquidation, the former students have obtained several forms of relief.

68.    As a result of the settlement of a class action filed by ITT's students in the bankruptcy proceedings, *Villalba et al. v. ITT Educational Services, Inc., et al.*, Adv. No. 17-50003, all remaining debt owed by students to ITT was dissolved.

69.    In addition, in a settlement of an adversary proceeding filed by the Chapter 7 Trustee, *Caruso v. Student CU Connect CUSO, et al.*, Adv. No. 17-50101, all CUSO loan balances were also dissolved, resulting in the end of any fees and commissions flowing to First Associates as a result of CUSO collections.

70.    On September 7, 2018, the Chapter 7 Trustee filed a similar, separate adversary proceeding again the PEAKS Trust, Deutsche Bank, and others. *Caruso v. PEAKS Trust-2009-1, et al.*, Adv. No. 18-50272. In her complaint, the Trustee characterizes the PEAKS program as:

> a for-profit education version of the sub-prime mortgage lending catastrophe, in which students rather than new homeowners were

Blood Hurst & O' Reardon, LLP

17

000163358

> the victim. For the benefit of ITT insiders and Defendants, the PEAKS program allowed ITT to defraud students and evade regulators, while shielding the fruits of ITT's fraud from claims of students through a complicated structure involving multiple trusts and a circuitous flow of funds.

To date, no relief has been accorded PEAKS borrowers, who continue to be billed by Vervent and Activate Financial.

### C.    Vervent's Ploy to Increase Their PEAKS Servicer Fee Income through the Use of a Purportedly Independent Debt Collector

71.    Despite the collapse of ITT and the 2016 bankruptcy filing, First Associates and DBTCA continued collecting on the PEAKS loans and continued deriving fee income from these collections.

72.    However, in light of the CUSO settlement and the bankruptcy trustee's initiation of similar litigation against DBTCA and the other Deutsche Bank entities involved in PEAKS, the Defendants devised a new collection scheme to extract as much money as they could from PEAKS borrowers in advance of any possible cancellation of the remaining PEAKS loan obligations, focusing particularly on those students who had not been paying First Associates.

73.    Central to this scheme was the use by First Associates of an in-house, separate debt collection entity that (a) would communicate with borrowers and create the misleading impression that their delinquent PEAKS obligations were now in the hands of an outside collector, and (b) would offer offers of cash compromises to induce nonpaying borrowers to make some amount of payments. The idea was to collect as much as they could from confused and/or frightened borrowers—even from those whose obligations were no longer enforceable due to the expiration of statutes of limitation—before the PEAKS cash flows diminished or, possibly, ended.

74.    This separate debt collector was called Activate Financial, using an LLC entity that First Associates had previously established. Activate Financial operated out of the First Associates office in San Diego. Defendant Christopher Shuler, a

Senior Vice President of First Associates, was named President of the in-house, separate company.

75.    DBTCA approved this plan by First Associates because First Associates, as servicer of the PEAKS portfolio, was accountable to DBTCA—at least following the ITT bankruptcy filing—with regard to everything it did as servicer, and DBTCA earned fees from anything First Associates would be able to collect through Activate Financial.

76.    Beginning in roughly December 2018, Defendants started sending out collection notices to PEAKS borrowers, with the heading, "Your Account Has Been Placed With Us For Collection," requesting "your full payment" of the quoted total balance on the loan. Other than the fact that Activate Financial, like First Associates, had a San Diego post office box, there was nothing in the notice that disclosed or suggested that this communication was actually coming from the same office that had been collecting the loan for years.

77.    In its initial and subsequent communications with Plaintiffs and the class, Activate Financial collected and attempted to collect on alleged debts on which the statute of limitations has expired. In many of these communications, Activate Financial offered to settle the debt. Nowhere in these communications did Activate Financial communicate or attempt to communicate that the statute of limitations had run and therefore Activate Financial could not lawfully sue to collect the alleged debt. Defendants also knew (or should have known) that if they could induce any minimal payments towards these dormant accounts, the statute of limitations would restart.

78.    Nowhere in its communications with Plaintiffs and with class members, did Activate Financial disclose that there were credible allegations of fraud against ITT, including allegations that the PEAKS loans themselves had been procured by fraud, which allegations, if proved, could a defense to any further loan repayment. To the contrary, in its communications with Plaintiffs and with class members, Activate Financial depicted the alleged debts as valid and enforceable.

BLOOD HURST & O' REARDON, LLP

000163358

79.    Nowhere in its communications with Plaintiffs and with class members, did Activate Financial disclose that there was a currently pending bankruptcy action against DBTCA and other Deutsche Bank entities which might result in the dissolution of the Plaintiffs and class members' alleged debt.

80.    In addition, Activate Financial sent communications to Plaintiffs and the class making a series of supposedly special offers to "settle" the obligation at a set percentage of the balance due. All of these offers were characterized as being subject to a 30-day time limit.

81.    Any such offers that were made did not, in fact, have any time-limited aspect to them. On the contrary, Defendants would accept any payments they could get, regardless of any supposed time deadlines.

**C.    Facts Pertaining to the Named Plaintiffs**

*Jody Aliff*

82.    Plaintiff Jody Aliff attended ITT schools at the San Dimas and Orange campuses in California during the period 2008-2013. Mr. Aliff obtained an associate's degree and thereafter a bachelor's degree in information systems and cyber security.

83.    Mr. Aliff spent significant time, effort and money to obtain the degrees from ITT, with the goal of obtaining a degree that would enhance his career and job prospects. Mr. Aliff incurred roughly $120,000 in student loan debt while attending ITT, including approximately $13,000 in PEAKS loans. He currently works as a computer repairman for a bank in Los Angeles. The job does not require a bachelor's degree and his co-workers do not have bachelor's degrees.

84.    Mr. Aliff obtained his first PEAKS loan in approximately 2010, when funding from other private loan sources evaporated. Prior to the first PEAKS loan, ITT provided funding to Mr. Aliff via Temporary Credits. However, Mr. Aliff was informed he could not continue to his second-year courses unless he obtained a PEAKS loan, which he did. Thereafter, Mr. Aliff was told he could not graduate and receive his associate's degree unless he obtained a second PEAKS loan, which he did.

BLOOD HURST & O' REARDON, LLP

His PEAKS loans were for approximately $5,000 and approximately $8,000, and totaled approximately $13,000.

85.    Mr. Aliff paid the amounts he was able to on his PEAKS loans. These amounts were first paid to First Associates Loan Servicing. The few payments Mr. Aliff was able to make totaled no more than $300. His last payments were made in approximately April 2015.

86.    After he was unable to continue payments, Mr. Aliff received numerous telephone calls from First Associates regarding payment on his PEAKS loan. These calls came frequently, over a period of years, and he told the collector that given his income he could not afford to pay the loans. At one point, Mr. Aliff sought and obtained a one-year deferment, in hopes his income would sufficiently increase, and he could make payments. When he could not make payments, the calls and payment demands from First Associates continued.

87.    Beginning around 2018, Mr. Aliff began receiving notices from Activate Financial. The notices informed him that his student loan obligation to PEAKS Loan Trust 2009-1 had been placed with Activate Financial for collection. From that point to the present, Mr. Aliff received and still receives calls, letters and emails from Activate Financial demanding payment on the PEAKS loans. At no time did Activate Financial inform Mr. Aliff that the statute of limitations had run on his PEAKS loans or that Activate Financial could not bring legal action seeking payment of the loans.

88.    For instance, notices dated May 9, 2019 and February 3, 2020, claimed a balance due of $8,168.12 on the one PEAKS loan and a balance due of $5,340.31 on the other PEAKS loan. The notices stated that Activate Financial was willing to accept total payments for each loan of $4,084.06 and $2,670.16, respectively, if both payments were made in lump sums within 30 days. The notices did not inform him that the statute of limitations had passed, and the loans could not be collected through legal proceedings. The letters listed San Diego as Activate Financial's address and requested that payment be mailed to San Diego, California.

21

CLASS ACTION COMPLAINT

89.    The most recent collection notices sent to Mr. Aliff were dated March 11, 2020. These notices stated that Activate Financial was willing to accept total payments for each loan of $2,042.03 and $1,335.08, respectively if made in three or fewer payments and the offer was accepted within 30 days. The notices did not inform him that the statute of limitations had passed and that the debt was time barred.

**Marie Smith**

90.    Plaintiff Marie Smith attended an ITT school in St. Louis, MO during the period 2008-2012, receiving, first, an associate's degree and then, based on an offered discount, a bachelor's degree in graphics design.

91.    Ms. Smith worked hard in the program, motivated by an intense desire to better herself. In retrospect, however, she realizes that the educational resources she was provided were sparse and that the credential she obtained had negligible value. She is still living in poverty, working in a retail store for wages just above the minimum-wage level, and is actually in worse financial position for having attended ITT in that she is carrying approximately $72,000 in federal student loan debt that she will likely never have the capacity to repay.

92.    She has no recollection of ever applying for or obtaining a PEAKS loan, although she does recall having to take out a CUSO loan to supplement the federal loans and grants. She thinks the purported PEAKS liability arose when she was told, after she had completed all her courses, that she was short $500 to pay for her cap and gown, and that she had to sign papers agreeing to pay this money in the future to ITT. If, indeed, she executed a PEAKS loan agreement, her signature was procured by fraud.

93.    After graduation, she remembers getting frequent calls about the CUSO loan and then, when she also started getting calls about a supposed PEAKS loan, she realized the calls were coming from the same call center.

CLASS ACTION COMPLAINT

BLOOD HURST & O' REARDON, LLP

000163358

94.    These calls came frequently, over a period of years, and she told the collector over and over that she had no means to pay these obligations. Nonetheless the calls continued.

95.    In early 2019, Ms. Smith received a notice from Activate Financial, telling her that her student loan obligation to PEAKS Trust "has been placed with us for collection," claiming a balance due of $805.76. The letter listed San Diego as Activate Financial's address and requested that payment be mailed to San Diego, CA.

96.    This letter was followed up by another notice, in April 2019, stating that "[o]ur client, PEAKS TRUST 2009-1 will allow you to settle your account" in return for 12 monthly payments of $33.27. Subsequently, Ms. Smith called Activate Financial and spoke with a person who she believes was located in its California office about her account.

97.    Later, in April 2019, Plaintiff mailed a payment of $33.27 to Activate Financial, in San Diego, California.

98.    Plaintiff believes and therefore avers that this was the only payment she ever made on account of the supposed PEAKS loan, meaning that, at the time of the 2019 notices from Activate Financial, the statute of limitations had already expired.

***Heather Turrey***

99.    Plaintiff Heather Turrey attended an ITT school in Sylmar, California during the period 2008-2011. Because she transferred some credits from another school, Ms. Turrey was able to obtain both associate's and bachelor's degrees in criminal justice in this time period.

100.    Ms. Turrey worked hard throughout her time at ITT, with the goal of obtaining credentials that would enhance her work and career prospects in her chosen field of criminal justice. She remained at ITT for her bachelor's degree on the promise and understanding that her degree would be appropriately accredited. Only after graduating did she learn ITT was not accredited by the Western Association of Schools and Colleges (WASC) and as a result she faced significantly limited job

BLOOD HURST & O' REARDON, LLP

23

CLASS ACTION COMPLAINT

prospects. She has been unable to obtain a job in the field of criminal justice because she lacks an appropriately accredited degree.

101. Ms. Turrey has no recollection of ever applying for or agreeing to a PEAKS loan. The signature on the PEAKS loan application and agreement is an electronic signature which Ms. Turrey did not authorize. The personal references listed on the application further indicate the loan application was not completed or approved by Ms. Turrey. If Ms. Turrey in fact obtained a PEAKS loan, the loan was procured by fraud.

102. After leaving ITT, Ms. Turrey learned about the PEAKS loan when she began receiving payment demands on an almost $4,000 PEAKS loan. Ms. Turrey sought but was unable to obtain information regarding if or how the PEAKS loan was ever applied to pay her tuition at ITT. To date, Ms. Turrey does not know if the PEAKS loan money was ever applied to her tuition or used to otherwise reduce her payment obligations to ITT.

103. In response to the payment demands, Ms. Turrey made payments on the PEAKS loan from approximately 2012 to April 2017 in an amount totaling about $2,500.

104. After she ceased paying on the loan, Ms. Turrey received frequent calls from PEAKS loans attempting to collect yet more money from her on a loan procured by fraud.

105. In November 2017, Ms. Turrey received a notice from PEAKS Private Student Loans asserting her purported PEAKS loan was in default and had been sent to the default department.

106. In January 2019, Ms. Turrey received a notice from Defendant Activate Financial, telling her that her student loan obligation to PEAKS Loan Trust 2009-1 had been placed with Activate Financial for collection. The notice claimed a balance due of $3,913.76 and asserted her last payment date has been in April 2017. The letter

000163358

listed San Diego as Activate Financial's address and requested that payment be mailed to San Diego, CA.

107. This letter was followed up by another notice, in February 2020. The notice stated that Activate Financial "is willing to accept a $1,956.88 payment" if made in a lump sum within 30 days.

108. This letter was followed up by another notice, in March 2020. This notice stated that Activate Financial "is willing to accept a $978.44" if made in three payments of $326.15 and the offer is accepted within 30 days.

109. Neither Activate Financial, nor any other Defendant, ever informed her that the statute of limitations had passed and that the debt was time-barred.

## V.    Class Action Allegations

110. Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of a class of similarly situated individuals. They seek class certification under Rule 23(b)(2) and (3).

111. The proposed nationwide class is defined as: all individuals who (i) attended any ITT campus, and (ii) have a balance owed on a PEAKS loan, or (iii) made any payment on a PEAKS loan within the applicable statutes of limitations and until notice is provided to the class.

112. Plaintiffs also seek certification of two subclasses:

   a. A nationwide subclass of all individuals to whom Activate Financial directed a written communication in an attempt to collect on a PEAKS loan; and

   b. A subclass of all individuals to whom Activate Financial directed a written communication in an attempt to collect on a PEAKS loan while these individuals were residing in California.

113. The class is so numerous that joinder of all individuals in the class would be impracticable. According to the CFPB's 2014 complaint against ITT, No. 14-cv-00292-SEB (S.D. Ind.), between July and December 2011 alone, ITT managed to get 8,600 of its students into PEAKS loans. On information and belief, there were

BLOOD HURST & O' REARDON, LLP

000163358

thousands of students signed up prior to July 2011. The precise number and identity of the thousands of class members can be easily ascertained from Defendants' records concerning PEAKS loan borrowers.

114.   Plaintiffs are adequate representatives of the class and their claims are typical of those of the class. There are no issues or defenses unique to Plaintiffs, and Plaintiffs have no conflicts with members of the class. Counsel for Plaintiffs are experienced in prosecution of complex class action litigation and have appeared as counsel and as lead counsel in class actions across the United States. These firms provide an unusual level of specialized knowledge that will complement each other and constitute a Plaintiffs' team with exceptional skill. Langer, Grogan & Diver PC is a Philadelphia-based class action firm that successfully handled consumer fraud actions under RICO. The Law Offices of Paul Arons is a Washington firm specializing in class actions under the FDCPA. Blood Hurst & O'Reardon LLP is a California-based class action firm, located in this District, that is a nationally recognized class action law firm specializing in consumer protection statutes nationwide and including California's Unfair Competition law.

115.   There are issues of fact and law common to the class that will predominate over any individual issues.

116.   The common issues of fact include:

> a.   Whether PEAKS was a bona fide student loan program, or, as Plaintiffs allege, a sham, lacking any genuine underwriting, designed as a financial subterfuge for ITT to defraud students, its investors and the Department of Education;
>
> b.   The extent of Defendants' knowledge of ITT's fraudulent scheme, of the sham nature of the PEAKS program and of the tactics used by ITT to get students into PEAKS loans;
>
> c.   Whether the design of the PEAKS program deliberately made it impossible for borrowers to ever assert their school-related claims against the assignee of their loan obligations, and the extent this result was intentional;

BLOOD HURST & O' REARDON, LLP

000163358

BLOOD HURST & O' REARDON, LLP

d. Whether Defendants Vervent (First Associates) and Activate Financial misrepresented to borrowers the legal nature of PEAKS loan obligations or other material facts;

e. The reasons why First Associates shifted some or all of its collection activity on PEAKS loan obligations to Activate Financial;

f. Whether the PEAKS Trust ever "placed" collections with Activate Financial;

g. Whether Vervent/First Associates has been directing the actions of Activate Financial;

h. The extent to which the nationwide collection activity of Vervent/First Associates and Activate Financial took place in California;

i. Deutsche Bank's knowledge of the shift of PEAKS collections to a seemingly different debt collector and the extent of its approval or facilitation of that conduct;

j. The extent to which the PEAKS loan obligations were already subject to expired statutes of limitation; and

k. The amount of collections made by Defendants from the class before and after the shift to the use of Activate Financial.

117. The common issues of law include:

a. Whether ITT and Activate Financial are "enterprises" within the meaning of RICO;

b. Whether the Defendants formed an association in fact engaged in the collection of PEAKS loan obligations and the extent to which they directed or participated in the affairs of this PEAKS Collection Enterprise;

c. Whether Defendants Vervent, Johnson and Shuler participated in the operation, management and control of the enterprise Activate Financial;

d. Whether the Defendants directed or participated in the affairs of any of the alleged enterprises through a pattern of mail fraud;

27

000163358

e. Whether the Defendants, with knowledge of the ITT's fraudulent scheme, agreed to facilitate and assist the scheme and thereby conspired with those running ITT in violation of RICO;

f. Whether Deutsche Bank conspired with Vervent/First Associates regarding the use of Activate Financial to collect PEAKS loans;

g. Whether Vervent is a "debt collector" within the meaning of the FDCPA, 15 U.S.C. § 1692a(6);

h. Whether Vervent is a "debt collector" within the meaning of the Rosenthal Fair Debt Collection Practices Act, Cal. Civ. Code § 1788.2(c);

i. Whether Activate Financial is a "debt collector" within the meaning of the FDCPA, 15 U.S.C. § 1692a(6);

j. Whether Activate Financial is a "debt collector" within the meaning of the Rosenthal Fair Debt Collection Practices Act, Cal. Civ. Code § 1788.2(c); and

k. Whether the collection activity violated the FDCPA, including but not limited to 15 U.S.C. §§ 1692e, 1692f, and 1692j, and/or California law.

118. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The individual claims of the class members are too small to warrant their bringing individual actions. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances here. To the best of plaintiffs' knowledge, there is no other action brought on behalf of the class against the Defendants.

CLASS ACTION COMPLAINT

BLOOD HURST & O' REARDON, LLP

000163358

119.   The class also may be certified because Defendants have acted or refused to act on grounds generally applicable to the class, thereby making appropriate final declaratory and/or injunctive relief with respect to the members of the class as a whole.

120.   Plaintiffs seeks injunctive and equitable relief on behalf of the class, on grounds generally applicable to the entire class, to enjoin and prevent Defendants from engaging in the acts described, and requiring Defendants to provide full restitution to Plaintiffs and class members.

121.   Unless a class is certified, Defendants will retain monies received as a result of its conduct that were taken from Plaintiffs and class members.  Unless a class wide injunction is issued, Defendants will continue to commit the violations alleged herein.

## VI.   Claims for Relief

### COUNT ONE

### RICO, 18 U.S.C. § 1962(c) and (d)
### Against All Defendants

122.   Plaintiffs incorporate by reference all previous paragraphs as though set forth herein.

### Enterprise No. 1: ITT

123.   As a corporation, ITT was an "enterprise" within the meaning of 18 U.S.C. § 1961(4).

124.   Operating through this enterprise, the managers of ITT engaged in an ongoing, deliberate and systematic scheme to defraud the thousands of people they enrolled into ITT's sham educational programs.

125.   During the final years that ITT schools remained in operation, a principal component of the systematic fraud engaged in by ITT managers was the PEAKS loan program described above, that Deutsche Bank designed, and that that Deutsche Bank

and Vervent (formerly First Associates) managed for the benefit of ITT and themselves.

126. The PEAKS program was itself a fraudulent scheme, dependent on, among other things, (a) the deceptive and abusive practices engineered by ITT to fool or induce its students to add abusively priced, nondischargeable, PEAKS obligations onto their already unmanageable debt burdens and (b) the concealment from these students of the evisceration of their rights under the FTC Holder Rule to obtain some manner of repayment from the intended assignee of the PEAKS loan obligations.

127. The PEAKS program generated hundreds of millions of dollars for ITT's sham educational programs as well as fees to Deutsche Bank and the other Defendants through the systematic use of both the mails and the interstate wire system, in the form of periodic loan statements, collection notices and payments.

128. In violation of 18 U.S.C. § 1962(c), the ITT managers involved in the planning and implementation of the PEAKS program did direct and participate in the affairs of the ITT enterprise through a pattern of mail and wire fraud, which continued through the September 2016 bankruptcy filing.

129. In violation of 18 U.S.C. § 1962(d), Deutsche Bank and Vervent conspired to violate 18 U.S.C. § 1962(c), in that, with actual or constructive knowledge of the fraudulent nature of ITT's sham educational programs and of the PEAKS program itself, they agreed to facilitate and service the scheme and have, for years, earned substantial revenues from the scheme.

130. More specifically, with regard to DBTCA's knowledge of ITT's fraudulent scheme and its agreement to facilitate and assist the scheme, Deutsche Bank was the principal designer of the PEAKS program. Through the use of several of its subsidiaries and affiliates, including DBTCA, Deutsche Bank assumed and undertook important roles in the functioning of the PEAKS program, and most critically, used its market position and expertise to induce investments of more than $300 million into the program.

BLOOD HURST & O' REARDON, LLP

000163358

131.  Prior to entering into and embarking on the creation of the PEAKS program for ITT, Deutsche Bank, a sophisticated actor in the financial markets, engaged in due diligence regarding ITT and the for-profit education industrial sector, meaning that when Deutsche Bank embarked on creating the PEAKS program, it did so with sophisticated, specialized knowledge.

132.  The design of the program evinces Deutsche Bank's knowledge as to the program's fraudulent nature and purpose for at least the following reasons:

  a. At the time Deutsche Bank created the PEAKS program, it knew that ITT was under dire financial strain and that its practice of issuing Temporary Credits to its students threatened to undermine ITT ongoing viability unless those credits could be converted to a private loan program.

  b. At the time Deutsche Bank created the PEAKS program, it knew that ITT's primary source of revenue was federal student loans. It further knew that in order to receive any federal loan revenue, ITT had to maintain compliance with the 90-10 rule, *i.e.*, that at least 10% of its revenues had to be from non-federal sources that were independent of ITT itself. At the time it created the PEAKS program, Deutsche Bank knew that ITT was not in compliance with the 90-10 rule.

  c. At the time Deutsche Bank created the PEAKS program it knew that the Temporary Credits ITT had issued to its students were non-interest-bearing loans and as such were fully dischargeable in bankruptcy. Nonetheless, Deutsche Bank knew that the plan it created for ITT would require students to be induced to exchange these no-interest, dischargeable credits for high interest, fee laden, non-dischargeable private student loans.

  d. Under the underwriting criteria developed by Deutsche Bank, any student with a Temporary Credit obligation owed to ITT was eligible for a PEAKS loan, even for students with FICO scores less than 600, who were already burdened with crushing student loan debt. As a result, the PEAKS program had effectively no bona fide underwriting criteria.

  e. Deutsche Bank left it entirely to ITT to manage the task of getting students into PEAKS loan obligations, effectively turning a blind eye to the tactics ITT would use to do so.

BLOOD HURST & O' REARDON, LLP

CLASS ACTION COMPLAINT

f. At the time Deutsche Bank created the PEAKS program it knew that the risk of default on any loan product issued to ITT students was extremely high and that the likelihood of the loans performing was exceedingly low. In light of that assessment, Deutsche Bank conditioned its creation of the PEAKS program on ITT granting all-encompassing guarantees of all the cash flows needed to pay the senior investors and all of the program fees were guaranteed in full by ITT, even if such guarantees, if fully disclosed, would undermine ITT's ability to use PEAKS-generated revenue towards its 10% obligation under the 90-10 rule.

g. Deutsche Bank demanded that ITT receive only 72% of the loan proceeds with the remaining 28% being loaned to ITT in return for non-interest-bearing subordinate notes payable from eventual collections, if any, from student payments, payable only after the senior note holders, *i.e.,* Deutsche Bank investors were paid in full. Still further, Deutsche Bank demanded that ITT pledge all of its assets to guarantee sufficient payment of all principal, interest and fees owed to the PEAKS senior note holders and to Deutsche Bank and its subsidiaries.

h. To place these guarantees in context, at the time that Deutsche Bank created the PEAKS program, it already knew that the predecessor ITT private student loan program, CUSO, had required that ITT guarantee only 35% of principal, interest and fees due. Yet, in creating the PEAKS program, Deutsche Bank demanded that ITT guarantee 100% of principal, interest and fees due. That is, DB knew at the time it created the PEAKS program that the underlying risk of repayment on the student loans was so low that a 100% guarantee was required.

i. At the time it created the PEAKS program, Deutsche Bank knew or should have known that ITT's control and ultimate financial responsibility for the PEAKS program rendered it, under applicable accounting rules, and as reflected in 2010 letters from the U.S. Securities and Exchange Commission, a *variable interest entity* or VIE, and that the guarantees and liabilities associated with the program should have been reported on ITTs financial statements as obligations of ITT, even though they were not so reported.

j. At the time it created the PEAKS program, Deutsche Bank knew that the PEAKS program, as a VIE, was essentially a program of ITT. However, using its expertise, Deutsche Bank created and structured

BLOOD HURST & O' REARDON, LLP

000163358

the program such that the program would appear to students, ITT shareholders, and the Department of Education as a wholly separate, independent, source of private funds.

k. Further, at the time Deutsche Bank created the PEAKS program, it knew that ITT had a notorious reputation as a fraudulent trade school, and that, as a result, the likelihood of students asserting claims against ITT in the future was high. It further knew that, unlike other securitized, loan-based financial portfolios, all of the loans under the program arose from this one educational institution.

l. With that awareness, Deutsche Bank purposely undertook to ensure that such students could not ever successfully assert any school-related claims or defenses against the PEAKS program, notwithstanding student borrowers' rights under the FTC Holder Rule, 16 C.F.R. § 433.2. While the PEAKS loan agreements Deutsche Bank required did contain the requisite protective language under the FTC Holder Rule, Deutsche Bank structured the programs so that, in fact, any claims asserted under the Rule would lie only against an assets-less PEAKS Trust.

133.   For its part, First Associates is a sophisticated actor in the student loan servicing business. It would not have undertaken the role of servicer of PEAKS loans without engaging in substantial due diligence regarding ITT and the PEAKS program. Moreover, as the existing servicer of CUSO loans, it already was aware of ITT's unusual level of control over and risk in a similar supposedly independent, private student loan program, and of borrowers' financial difficulties in making payments.

134.   Deutsche Bank and First Associates knew that ITT itself made $15 million in payments on behalf of delinquent PEAKS borrowers, in order to delay its guarantees coming due. They also knew that these payments were not disclosed to the student borrowers, nor were they disclosed to ITT shareholders.

135.   Plaintiffs and the members of the Class they seek to represent suffered financial harm as a result of the above-described pattern of mail and wire and fraud, more specifically, the payments they were induced to make on account of PEAKS loan obligations.

CLASS ACTION COMPLAINT

BLOOD HURST & O' REARDON, LLP

000163358

136.   In violation of 18 U.S.C. § 1962(d), Deutsche Bank and Vervent conspired to violate 18 U.S.C. § 1962(c), in that, with actual or constructive knowledge of the fraudulent nature of ITT's sham educational programs and of the PEAKS program itself, they agreed to facilitate and service the scheme and have, for years, earned substantial revenues from the scheme

**Enterprise No. 2: The PEAKS Loan Enterprise**

137.   ITT, DBTCA and other Deutsche Bank entities formed an association-in-fact ("the PEAKS Loan Enterprise") around 2009, having as its purpose the creation of a student loan product that would enable ITT (a) to convert its Temporary Credit liability into cash, (b) create a source of nonfederal funds that would create the appearance of its compliance with the 90-10 rule, (c) have, as a practical matter no underwriting criteria, and (d) exchange onerous ITT guarantees for a few more years of operation of its sham educational institutions while, at the same time, enabling DBTCA and the other Deutsche Bank entities to earn risk-free fee income from the initial transaction and from any loan repayments.

138.   As alleged above, the PEAKS program was largely a sham, designed mainly as a source of extremely expensive and risky credit to ITT. ITT used the PEAKS proceeds to convert its Temporary Credit liability to cash, and depended on a deceptive, misleading and abusive sales campaign to get students to refinance their zero-percent Temporary Credit debt into predatory, nondischargeable student loan obligations, that were structured so as to undermine their federal rights under the FTC Holder Rule and that essentially provided little or no benefit to borrowers.

139.   First Associates (now Vervent) joined the PEAKS Loan Enterprise on or about December 10, 2011 when it assumed the role of servicer for the PEAKS loans. As of that date, the PEAKS Loan Enterprise was described in various written agreements, including an Amended and Restated Trust Agreement and an Agreement for Servicing Private Student Loans. Defendants Johnson, Chiavaro, Shuler, who

BLOOD HURST & O'REARDON, LLP

CLASS ACTION COMPLAINT

were and still are executives in Vervent, joined the enterprise at different times between December 2011 and the present.

140.   In its role as servicer for the PEAKS Loan Enterprise, First Associates handled the relationship with the borrowers, including monthly billings, collections and maintenance of a website. It also served as the custodian of the loan notes. In return for these services, First Associates earned a monthly servicing fee from the loan collections, based on a percentage of the outstanding loan balances.

141.   Although the named creditor on whose behalf First Associates conducted these collections was the Peaks Trust, that "creditor" was, in fact, little more than a figurehead, with no operations and no assets. The real parties in interest underlying the Trust were: the senior note holders; ITT, in its capacity as guarantor and junior note holder; and Deutsche Bank, in its capacity as indenture trustee and collateral agent for the note holders.

142.   Once ITT filed bankruptcy, its involvement in the PEAKS Loan Enterprise ended. However, the PEAKS Loan Enterprise continued functioning, with First Associates now conducting its servicing responsibilities solely for the benefit of DBTCA and the senior bondholders of the PEAKS Trust.

143.   The PEAKS Loan Enterprise included the following "persons" that participated in the direction of the enterprise:

    a.  Vervent (First Associates, which, as the designated servicer, directed the collection operation, managed by, among others, Defendant Johnson, First Associates' Principal and CEO); and

    b.  Deutsche Bank, which, for all practical purposes, at least since the ITT bankruptcy filing, is the party on whose behalf the collections by First Associates and Activate Financial are being conducted.

144.   As described above, by 2018, in the face of increasing signs from the ITT bankruptcy proceeding that the future viability of the fee revenue generated by the PEAKS Loan Enterprise could be in jeopardy, the participants in that enterprise devised a new strategy to try to accelerate PEAKS loan payments. In this further

CLASS ACTION COMPLAINT

enlargement of the scheme to defraud the student victims of ITT and PEAKS, the PEAKS collections were transferred to a supposedly outside collection agency that, in fact, was just First Associates using the façade of its wholly owned company, Activate Financial.

145. The intent was to create the false impression of a change in account status, coupled with the above-described supposedly time limited offers of compromise, in order to extract as much money as possible in the short term from confused or frightened borrowers.

146. The use of the mails has been a component of the PEAKS Loan Enterprise since the PEAKS program was first launched by ITT and Deutsche Bank, and has continued, as First Associates has used the mail to send account statements to, and collect money from, borrowers. The deceptive collection notices sent in the name of Activate Financial were also sent through the mail.

147. In violation of 18 U.S.C. § 1962(c), Defendants Vervent (First Associates), Johnson, Chiavaro, Shuler and DBTCA participated in and directed the affairs of the PEAKS Loan Enterprise through a pattern of "racketeering activity" within the meaning of 18 U.S.C. § 1961(1), more specifically, by using the mails in the execution of the above-described scheme to defraud the PEAKS borrowers as to the nature and character of their repayment obligation, in violation of 18 U.S.C. § 1341 (mail fraud).

### Enterprise No. 3: Activate Financial

148. Activate Financial is a limited liability company and therefore is also an "enterprise" within the meaning of 18 U.S.C. § 1961(4).

149. In violation of 18 U.S.C. § 1962(c), Defendants Vervent (First Associates), Johnson and Schuler participated in and directed the affairs of the Activate Financial Enterprise, more specifically, in the case of First Associates, by directing its operations; in the case of Johnson, as the Principal and CEO of First Associates; and, in the case of Shuler as the First Associates vice president who also

BLOOD HURST & O' REARDON, LLP

CLASS ACTION COMPLAINT

served as the President of Activate Financial. They did so through a pattern of mail fraud, as described above.

150.   Deutsche Bank is also liable for this racketeering activity, as conspirator, in violation of 18 U.S.C. § 1962(d), insofar as the collection activity being conducted by Activate Financial and the offers of compromise were made for Deutsche Bank's benefit and with its agreement.

151.   Plaintiffs and the class they seek to represent were injured as a result of above-described pattern of racketeering activity in the amount of any loan payments they made to Activate Financial.

152.   In violation of 18 U.S.C. § 1964(c), Plaintiffs and the members of the Class have been injured by reason of the above-described pattern and practice of racketeering activity in the amount of any payments made on account of PEAKS loans.

153.   Pursuant to 18 U.S.C. § 1964, Defendants are liable to Plaintiffs for treble damages in an amount less than $5,000 per person, plus reasonable attorney's fees and costs.

## COUNT TWO

### Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692, *et seq.*
### Against Defendants Activate Financial and Vervent

154.   Plaintiffs incorporate by reference all previous paragraphs as though set forth herein.

155.   Activate Financial and Vervent (First Associates) are "debt collectors" within the meaning of 15 U.S.C. § 1692a(6) in that Activate Financial regularly uses the mails in a business the principal purpose of which is the collection of debt, and they both regularly collect and attempt to collect, directly or indirectly, debts alleged to be due another. At all times relevant herein, Activate Financial was an agent of First Associates, which controlled, or had the authority to control, Activate Financial's collection conduct, policies and practices.

BLOOD HURST & O' REARDON, LLP

37

156.   Plaintiffs and the class they seek to represent are "consumers" within the meaning of 15 U.S.C. § 1692a(3) in that they are natural persons who are obligors under PEAKS student loan agreements. The PEAKS loans at issue in this lawsuit were incurred for personal, family or household use and are debts within the meaning of 15 U.S.C. § 1692a(5).

157.   As alleged above, Defendants have used and are using false, deceptive, or misleading representations in connection with the collection of PEAKS loan obligations, including misrepresenting the legal character and status of repayment obligations that are, in fact, subject to cancelation in whole or in part under applicable statutes of limitation and the FTC Holder Rule; using a name designed to create the false impression that the accounts have been purchased or transferred; and threatening to take legal action to collect on the PEAKS loans. Defendants took these actions to extract as much money as possible before the loans are forgiven, in violation of 15 U.S.C. § 1692e.

158.   In attempting to collect the PEAKS loans, these Defendants had an obligation not to withhold material information that would impact a consumer's decision on how to respond to Defendants' payment demands. Specifically, they had an obligation to disclose that there was strong evidence that the PEAKS loans had been procured through fraud, that the validity of the loans was being challenged in court, and that there was a likelihood that the loans would be canceled. Additionally, Plaintiffs allege that the applicable statute of limitations had run on the PEAKS loan that these Defendants were attempting to collect, yet Defendants withheld that material information from Plaintiffs and members of the class.

159.   By its actions in attempting to collect the alleged debts, Defendants violated the FDCPA, including, but not limited to violation of the following sections of the FDCPA, 15 U.S.C. §§ 1692e (deceptive and misleading representations), 1692e(2) (false representation of the character, amount or legal status of any debt), 1692e(5) (threat to take action that cannot legally be taken, or is not intended to be

taken), and 1692e(10) ( false representation or deceptive means to collect or attempt to collect any debt.).

160.   Further, since the debts allegedly incurred by Plaintiffs and the class were invalid since they were procured by fraud, Defendants violated the FDCPA, 15 U.S.C. § 1692f(1) by collecting and attempting to collect debts that were not permitted by law.

161.   Plaintiffs and the class they seek to represent have incurred actual damages as a result of these violations, namely, the payments they made to Activate Financial. In this action, Plaintiffs, on behalf of themselves and the class they seek to represent, are not seeking more than $4,999 per person.

162.   Defendants are liable for actual damages, statutory damages, plus reasonable attorney fees and costs, pursuant to 15 U.S.C. § 1692k(a).

## COUNT III

### Rosenthal Fair Debt Collection Practice Act, Cal. Civ. Code §§ 1788-1788.33 <u>Against Defendants Activate Financial and Vervent</u>

163.   Plaintiffs incorporate by reference all previous allegations as though set forth herein.

164.   In enacting the Rosenthal Fair Debt Collection Practices Act, Cal. Civ. Code §§ 1788-1788.33 ("RFDCPA"), the California legislature found that "[u]nfair or deceptive collection practices undermine the public confidence which is essential to the continued functioning of the banking and credit system and sound extensions of credit to consumers," that "[t]here is need to ensure that debt collectors and debtors exercise their responsibilities to one another with fairness, honesty and due regard for the rights of the other" and that it was necessary to "prohibit debt collectors from engaging in unfair or deceptive acts or practices in the collection of consumer debts." Cal. Civ. Code § 1788.1.

165.   As alleged above, both Activate Financial and Vervent (First Associates) are debt collectors covered by the RFDCPA and First Associates, as the principal for

BLOOD HURST & O' REARDON, LLP

CLASS ACTION COMPLAINT

Activate Financial that controlled its collection conduct, is liable for Activate Financial' s violations of the RFDCPA.

166. The RFDCPA prohibits unfair and deceptive conduct. *Cavalry SPV I, LLC v. Watkins*, 36 Cal. App. 5th 1070, 1084 (2019). By willfully failing to disclose that there was strong evidence that the PEAKS loans had been procured through fraud, that the validity of the loans was being challenged in court, and that there was a likelihood that the loans would be canceled, these Defendants engaged in conduct likely to deceive Plaintiffs and other consumers, in violation of the RFDCPA. Likewise, it is deceptive to willfully withhold from the consumer that fact that the applicable statute of limitations had run on the PEAKS loan that these Defendants were attempting to collect, yet Defendants withheld that material information from Plaintiffs and from other members of the class.

167. Pursuant to Cal. Civ. Code § 1812.700, in its initial communication with a consumer, a debt collector is required to include the following statement:

> The state Rosenthal Fair Debt Collection Practices Act and the federal Fair Debt Collection Practices Act require that, except under unusual circumstances, collectors may not contact you before 8 a.m. or after 9 p.m. They may not harass you by using threats of violence or arrest or by using obscene language. Collectors may not use false or misleading statements or call you at work if they know or have reason to know that you may not receive personal calls at work. For the most part, collectors may not tell another person, other than your attorney or spouse, about your debt. Collectors may contact another person to confirm your location or enforce a judgment. For more information about debt collection activities, you may contact the Federal Trade Commission at 1-877-FTC-HELP or www.ftc.gov.

Neither Activate Financial, nor Vervent included this notice in their initial communications to Plaintiffs or the class.

168. The conduct of Activate Financial and Vervent, as alleged above, was knowing and willful.

BLOOD HURST & O' REARDON, LLP

169.  Plaintiffs and the class they seek to represent have incurred actual damages as a result of these violations, namely, the payments they made to Activate Financial.

170.  Additionally, the RFDCPA provides that a debt collector who willfully and knowingly violates the RFDCPA for a penalty of not be less than one hundred dollars ($100) nor greater than one thousand dollars ($1,000), for each debtor, as well as costs and reasonable attorneys' fees.  Cal. Civ. Code §§ 1788.30(b)-(c).

## COUNT IV

### California Unfair Competition Law, Cal. Bus & Prof. Code §§ 17200, *et seq.* Against Defendants Activate Financial, Vervent and Deutsche Bank

171.  Plaintiffs incorporate by reference all previous allegations as though set forth herein.

172.  The Unfair Competition Law, ("UCL"), California Business & Professions Code §§ 17200, *et seq.*, prohibits business acts or practices that are (a) unlawful, (b) unfair, or (c) fraudulent. The UCL provides that a court may order equitable relief, including injunctive relief and restitution to affected members of the general public as remedies for any violations of the UCL.

173.  Cal. Bus. & Prof. Code § 17200 prohibits any "unlawful ... business act or practice." Defendants have violated § 17200's prohibition against engaging in unlawful acts and practices by, *inter alia*, making the representations and omissions of material facts, as set forth more fully herein, which misrepresentations and omissions violate 15 U.S.C. § 1692(e), Cal. Civ. Code §§ 1788, *et seq.*, and specifically section 1788.14 which requires specific disclosures in a debt collector's communications when attempting to collect time barred debts, Cal. Civ. Code §§ 1572, 1573, 1709, 1710, 1711, and the common law.

174.  Plaintiffs and the class reserve the right to allege other violations of law which constitute other unlawful business acts or practices. Such conduct is ongoing and continues to this date.

BLOOD HURST & O' REARDON, LLP

41

CLASS ACTION COMPLAINT

175.   Cal. Bus. & Prof. Code § 17200 also prohibits any "unfair ... business act or practice." Defendants' acts, omissions, misrepresentations, practices and non-disclosures as alleged herein constitute "unfair" business acts and practices within the meaning of Cal. Bus. & Prof. Code §§ 17200, *et seq.* in that its conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous as the gravity of the conduct outweighs any alleged benefits attributable to such conduct.

176.   As stated in this complaint, Plaintiffs allege violations of federal and state fair debt collection practice statutes. Plaintiffs thus asserts Defendants' conduct violates the public policy of fair debt collection. This conduct constitutes violations of the unfair prong of Cal. Bus. & Prof. Code §§ 17200, *et seq.*

177.   There were reasonably available alternatives to further Defendants' legitimate business interests, other than the conduct described herein.

178.   Cal. Bus. & Prof. Code § 17200 also prohibits any "fraudulent business act or practice."

179.   Defendants' nondisclosures and misleading statements in the course of their attempted debt collection, as more fully set forth above, were false, misleading and/or likely to deceive the consuming public within the meaning of Cal. Bus. & Prof. Code § 17200.

180.   Defendants' conduct caused and continues to cause substantial injury to Plaintiffs and the other Class members. Plaintiffs have suffered injury in fact and have lost money as a result of Defendants' unfair conduct.

181.   Defendants have thus engaged in unlawful, unfair and fraudulent business acts and practices, entitling Plaintiffs to judgment and equitable relief against Defendants, including restitution. Additionally, pursuant to Cal. Bus. & Prof. Code § 17203, Plaintiffs seek an order and injunction requiring Defendants to immediately cease such acts of unlawful, unfair and fraudulent business practices.

BLOOD HURST & O' REARDON, LLP

CLASS ACTION COMPLAINT

000163358

182.    Plaintiffs, on behalf of the general public, also seek a public injunction in accordance with the McGill Rule (*McGill v. Citibank, N.A.*, 2 Cal. 5th 945 (2017)), requiring Defendants to immediately cease such acts of unlawful, unfair and fraudulent business practices.

## COUNT V

### Negligent Misrepresentation
### <u>Against Defendants Vervent and Activate Financial</u>

183.    Plaintiffs incorporate by reference all previous allegations as though set forth herein.

184.    In communicating with consumers in connection with collecting and attempting to collect PEAKS loans, Vervent and Activate Financial assume a duty to be truthful in their statements to Plaintiffs and class members.

185.    Defendants breached this duty in numerous ways by representing that the PEAKS loan debts were valid and enforceable, and by making the other false representation described above.

186.    Relying on these representations, Plaintiffs and the class have paid money that they were not obligated to pay.

187.    The class alleged herein has paid a combined total of millions of dollars.

## VII.    Prayer for Relief

WHEREFORE, Plaintiffs seek the following relief:

A.    Certification of the alleged class, pursuant to Fed. R. Civ. P. 23(b)(2) and/or (b)(3);

B.    Actual damages for all members of the class, trebled under 18 U.S.C. § 1964(c), but no more than $4,999.00 per person and statutory damages as permitted by the FDCPA and RFDCPA;

C.    Actual damages, statutory damages, and reasonable attorney's fees and costs, pursuant to 15 U.S.C. § 1692k;

BLOOD HURST & O' REARDON, LLP

43

000163358

D.    Actual damages, statutory damages, and reasonable attorney's fees and costs, pursuant to Cal. Civ. Code § 1788.30;

E.    Equitable relief for a subclass of California residents, including injunctive relief prohibiting the ongoing unfair business practices;

F.    A public injunction under the McGill Rule (*McGill v. Citibank, N.A.*, 2 Cal. 5th 945 (2017));

G.    An award of reasonable attorney fees and costs; and

H.    Such other relief as the Court deems fair and reasonable.

Respectfully submitted,

Dated: April 10, 2020

BLOOD HURST & O'REARDON, LLP
TIMOTHY G. BLOOD (149343)
LESLIE E. HURST (178432)
ALEKSANDR J. YARMOLINETS (276707)

By:    *s/ Timothy G. Blood*
       TIMOTHY G. BLOOD

501 West Broadway, Suite 1490
San Diego, CA  92101
Tel: 619/338-1100
619/338-1101 (fax)
tblood@bholaw.com
lhurst@bholaw.com
ayarmolinets@bholaw.com

LANGER GROGAN & DIVER, PC
IRV ACKELSBERG (*pro hac vice forthcoming*)
JOHN J. GROGAN (*pro hac vice forthcoming*)
1717 Arch Street, Suite 4020
Philadelphia, PA  19103
Tel: 215/320-5660
215/320-5703 (fax)

LAW OFFICE OF PAUL ARONS
PAUL ARONS (WA #84970)
685 Spring Street, Suite 104
Friday Harbor, WA  98250
Tel: 360/378-6496
360/378-6498 (fax)
lopa@rockisland.com

*Attorneys for Plaintiffs*

CLASS ACTION COMPLAINT

BLOOD HURST & O' REARDON, LLP

000163358