UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JODY ALIFF, MARIE SMITH, HEATHER TURREY, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>VERVENT, INC. fka FIRST ASSOCIATES LOAN SERVICING, LLC; ACTIVATE FINANCIAL, LLC; DAVID JOHNSON; CHRISTOPHER SHULER; LAWRENCE CHIAVARO; DEUTSCHE BANK TRUST COMPANY AMERICAS,<br><br>Defendants. | Case No.:  20-cv-00697-DMS-AHG<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO COMPEL ARBITRATION** |

Pending before the Court are two separate motions to compel arbitration: one filed by Defendant Deutsche Bank Trust Company Americas ("DBTCA"), and one filed by Defendants Vervent, Inc., Activate Financial, LLC, David Johnson, Christopher Shuler, and Lawrence Chiavaro (the "Vervent Defendants").  Plaintiffs filed an opposition, and DBTCA and the Vervent Defendants each filed a reply.  For the following reasons, the Court grants DBTCA's motion and denies the Vervent Defendants' motion.

# I.

# BACKGROUND

Plaintiffs are former students who attended for-profit schools run by ITT Education Services, Inc. ("ITT"). (Compl. ¶ 1). Plaintiffs' disputes arise out of the "PEAKS" student loan program, which they allege left them "heavily indebted" for a "largely worthless" education from ITT. (*Id.*).

Plaintiffs allege DBTCA designed the PEAKS loan program for ITT. (*Id.* ¶ 42). Liberty Bank, N.A., issued PEAKS loans to ITT students and subsequently sold the loans to a trust ("the PEAKS Trust") established by DBTCA. (*Id.* ¶¶ 2, 3, 26). Vervent, Inc., formerly known as First Associates, Inc., is the loan servicer for the PEAKS loan program. (*Id.* ¶¶ 5, 16). Activate Financial, LLC is an "in-house" collection agency owned and controlled by Vervent and individuals who are executives of Vervent: David Johnson, Christopher Shuler and Lawrence Chiavaro. (*Id.* ¶¶ 9, 18–20; Vervent Defs.' Mot. to Dismiss 7). Plaintiffs allege that Defendants continue to operate the PEAKS loan program and unlawfully collect on PEAKS loan debt. (Compl. ¶¶ 1–9).

Plaintiff Jody Aliff attended ITT schools in California during the period 2008 to 2013. (*Id.* ¶ 82). While attending ITT, Aliff obtained two PEAKS loans and subsequently made several payments on those loans, with the last payments made in approximately April 2015. (*Id.* ¶¶ 84–85).

Plaintiff Marie Smith attended an ITT school in Missouri during the period 2008 to 2012. (*Id.* ¶ 90). She has "no recollection of ever applying for or obtaining a PEAKS loan," but believes her purported liability arose when she signed papers agreeing to pay for her cap and gown. (*Id.* ¶ 92). She alleges that if she executed a PEAKS loan agreement, her signature was procured by fraud. (*Id.*). Following her graduation, Smith began receiving calls about a PEAKS loan, and in early 2019, she received a notice from Activate Financial requesting payment on a PEAKS student loan obligation. (*Id.* ¶ 93–95). After receiving a second notice in April 2019, Smith called Activate Financial, spoke with a

representative about her account, and subsequently mailed a payment to Activate Financial. (*Id.* ¶¶ 96–97).

Plaintiff Heather Turrey attended an ITT school in California during the period 2008 to 2011.  (*Id.* ¶ 99).  Turrey alleges she has no recollection of ever applying for or agreeing to a PEAKS loan, and that if a PEAKS loan was obtained on her behalf, it was procured by fraud.  (*Id.* ¶ 101).  After leaving ITT, Turrey began receiving payment demands on a PEAKS loan.  (*Id.* ¶ 102).  In response to these demands, Turrey made payments on the PEAKS loan from approximately 2012 to April 2017.  (*Id.* ¶ 103).  Turrey continued to receive calls and notices regarding her alleged PEAKS loan, including notices from Activate Financial in 2019 and 2020.  (*Id.* ¶¶ 104–08).

On April 10, 2020, Plaintiffs filed this putative class action, alleging five claims: (1) violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"); (2) violation of the Fair Debt Collection Practices Act ("FDCPA"); (3) violation of California's Rosenthal Fair Debt Collection Practice Act (the "Rosenthal Act"); (4) violation of California's Unfair Competition Law ("UCL"); and (5) negligent misrepresentation.  Plaintiffs seek damages, attorneys' fees and costs, injunctive relief, and a public injunction under *McGill v. Citibank, N.A.*, 393 P.3d 85 (Cal. 2017).  Plaintiffs' proposed class is defined as all individuals who attended an ITT school and "have a balance owed on a PEAKS loan, or made any payment on a PEAKS loan."  (Compl. ¶ 111).

Defendants move to enforce the arbitration agreement included in Plaintiffs' PEAKS loan agreements (the "Loan Agreements").  The Loan Agreements provide, in pertinent part:

> … Except as expressly provided below, *I agree that any claim, dispute, or controversy arising out of or that is related to (a) my Loan, my Application, this Loan Agreement (including without limitation, any dispute over the validity of this arbitration provision)*, or my Disclosure Statement or (b) any relationship resulting from my Loan, or any activities in connection with my Loan, or (c) the disclosures provided or required to be provided in connection with my Loan (including, without limitation, the Disclosure Statement), or the underwriting, servicing or collection of my Loan, or (d) any insurance or other

service related to my Loan, or (e) any other agreement related to my Loan or any such service, or (f) breach of this Loan Agreement or any other such agreement, whether based on statute, contract, tort or any other legal theory (any "Claim") *shall be, at my or your election, submitted to and resolved on an individual basis by binding arbitration under the Federal Arbitration Act* before the American Arbitration Association (AAA) under its Commercial Arbitration Rules including the Supplementary Procedures for Consumer-Related Dispute, in effect at the time the arbitration is brought. …

… I WILL NOT HAVE THE RIGHT TO PARTICIPATE AS A REPRESENTATIVE OR MEMBER OF ANY CLASS OF CLAIMANTS PERTAINING TO ANY CLAIM SUBJECT TO ARBITRATION.

(Exs. A–D to Declaration of Stephanie Rodriguez ("Rodriguez Decl."), ¶ N) (emphasis added).

Defendants argue that Plaintiffs' claims are subject to the above mandatory arbitration agreement. Plaintiffs oppose the motion, arguing there is insufficient evidence to prove the existence of an enforceable arbitration agreement, and even if an agreement does exist, that the Vervent Defendants lack the right to enforce it.

## II.

## LEGAL STANDARD

The Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*, governs the enforcement of arbitration agreements involving interstate commerce. *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 232–33 (2013). "The overarching purpose of the FAA ... is to ensure the enforcement of arbitration agreements according to their terms so as to facilitate streamlined proceedings." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 344 (2011). "The FAA 'leaves no place for the exercise of discretion by the district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration has been signed.' " *Kilgore v. KeyBank, Nat. Ass'n*, 718 F.3d 1052, 1058 (9th Cir. 2013) (quoting *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985)) (emphasis in original). Accordingly, the Court's role under the FAA is to determine "(1) whether a valid agreement to arbitrate exists, and if it does, (2) whether the

agreement encompasses the dispute at issue." *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000).  If both factors are met, the Court must enforce the arbitration agreement according to its terms.

Arbitration is a matter of contract, and a party "cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Tracer Research Corp. v. Nat'l Envtl. Servs. Co.*, 42 F.3d 1292, 1294 (9th Cir. 1994) (citation omitted).  A court must therefore determine whether there is an agreement to arbitrate before ordering arbitration. *Wagner v. Stratton Oakmont, Inc.*, 83 F.3d 1046, 1048 (9th Cir. 1996).  State law applies in determining which contracts are binding and enforceable under the FAA, if that law governs the validity, revocability, and enforceability of contracts generally. *Arthur Anderson LLP v. Carlisle,* 556 U.S. 624, 630–31 (2009).

## III.

## DISCUSSION

Defendants argue Plaintiffs' claims must be arbitrated subject to the arbitration provisions in the Loan Agreements and the FAA, the arbitrator must determine issues of arbitrability, and Plaintiffs' claims must proceed on an individual basis rather than on behalf of a class.  In response, Plaintiffs contend no arbitration agreement exists, and even assuming it does, the Vervent Defendants cannot enforce the arbitration provisions.

**A. Arbitration of Plaintiffs' Claims Against DBTCA**

1. Existence of Arbitration Agreement

In response to Defendants' motion to compel arbitration, Plaintiffs argue that no arbitration agreement exists because there is no evidence they agreed to enter into the Loan Agreements containing the arbitration provisions, they were never shown the arbitration provisions, and they never received copies of the Loan Agreements.  DBTCA argues that Plaintiffs entered into the Loan Agreements and are thus bound by the arbitration provisions as signatories.

"Although challenges to the validity of a contract with an arbitration clause are to be decided by the arbitrator, challenges to the very existence of the contract are, in general,

properly directed to the court." *Kum Tat Ltd. v. Linden Ox Pasture, LLC*, 845 F.3d 979, 983 (9th Cir. 2017) (internal citations omitted).  A party seeking to compel arbitration must "prov[e] the existence of an agreement to arbitrate by a preponderance of the evidence." *Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 565 (9th Cir. 2014).  State contract law controls the issue of whether the parties have agreed to arbitrate.  *Id.*

DBTCA asserts that Ohio law governs, pursuant to the terms of the Loan Agreements.  Plaintiffs argue that the applicability of that choice of law provision depends on whether the parties agreed in the first place to be bound by the Loan Agreements' terms, and that because Plaintiffs never agreed to those terms, California law applies to Plaintiffs Aliff and Turrey and Missouri law applies to Plaintiff Smith.  The Court finds that regardless of which state's law applies, the evidence establishes that an agreement to arbitrate exists.  *See Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014) (stating court "need not engage in this circular inquiry" of whether choice-of-law provision applies to disputed arbitration agreement when both states' law "dictate the same outcome").

Contract formation requires mutual consent, which is determined through the reasonable meaning of the parties' words and conduct.  *See Knutson*, 771 F.3d at 565) (under California law, "[c]ourts must determine whether the outward manifestations of consent would lead a reasonable person to believe the offeree has assented to the agreement" (citing *Meyer v. Benko*, 127 Cal. Rptr. 846, 848 (Cal. Ct. App. 1976)); *Bruzzese v. Chesapeake Expl., LLC*, 998 F. Supp. 2d 663, 673 (S.D. Ohio 2014) (under Ohio law, meeting of the minds determined by objective standard);  *Walker v. Rogers*, 182 S.W.3d 761, 768 (Mo. Ct. App. 2006) (contract formation must be based on parties' "objective outward acts").  A party's signature indicates its assent to the contract.  *See Parklawn Manor, Inc. v. Jennings-Lawrence Co.*, 197 N.E.2d 390, 394 (Ohio 1962) ("A signature to a contract is evidence that the parties' minds met on the terms of the contract as executed.");  *Pinnacle Museum Tower Ass'n v. Pinnacle Mkt. Dev. (US), LLC*, 282 P.3d 1217, 1224 (Cal. 2012) (stating acceptance of arbitration agreement may be express where

1    party signs agreement and arbitration clause may be binding even if party never read
2    clause);  *Baier v. Darden Restaurants*, 420 S.W.3d 733, 738 (Mo. Ct. App. 2014) ("A
3    party's signature on a contract remains the common, though not exclusive, method of
4    demonstrating agreement.") (internal citation and quotation marks omitted).

5          First, DBTCA's evidence demonstrates the existence of an agreement to arbitrate.
6    In support of its motion, DBTCA submits the declaration of Stephanie Rodriguez, a project
7    manager for Vervent, and e-signed Loan Agreements for each of the three Plaintiffs.  (Exs.
8    A–D to Rodriguez Decl.).  The Rodriguez Declaration provides records of the date, time,
9    and IP address associated with each e-signature (Rodriguez Decl. ¶¶ 12–13), as well as
10   payment history records showing that Plaintiffs each made payments on their PEAKS
11   loans.  (Exs. E–G to Rodriguez Decl.).  The Loan Agreements contain the relevant
12   arbitration provisions as detailed above.  (*See* Exs. A–D to Rodriguez Decl., ¶ N).

13         Plaintiffs challenge the Rodriguez Declaration and its attached exhibits as
14   inadmissible, arguing they lack foundation and are hearsay.  The Court disagrees and finds
15   the documents admissible as business records.  *See* Fed. R. Evid. 803(6).  Rodriguez
16   declares she is familiar with Vervent's record-keeping system with respect to the PEAKS
17   loan records.  (Rodriguez Decl. ¶ 3).  She states that in the normal course of Vervent's
18   business, it commonly takes over loan accounts from other servicing companies, onboards
19   those loan files, and maintains records of the loan agreements and payment histories for
20   each loan it services.  (*Id.* ¶¶ 4–5, 8).  Rodriguez further avers that Plaintiffs' PEAKS loan
21   files were transferred from the prior loan servicer, Access Group, to Vervent in 2011, and
22   that she was involved in the onboarding of those files.  (*Id.* ¶¶ 3, 7).  Vervent reviewed the
23   files, incorporated them into its own system, and relied on them while conducting its
24   business.  (*Id.*).  Vervent had no basis to believe the prior servicer had not kept the files in
25   the normal course of business.  (*Id.*).  The Rodriguez Declaration thus provides sufficient
26   foundation for the attached exhibits and satisfies the requirements of Rule 803(6).  *See In*
27   *re Harms*, 603 B.R. 19, 29 (B.A.P. 9th Cir. 2019) (citing *United States v. Ray*, 930 F.2d
28   1368, 1370 (9th Cir. 1990), *as amended on denial of reh'g* (Apr. 23, 1991) (discussing

Rule 803(6) requirements); *Moore v. Universal Prot. Serv., LP*, No. EDCV192124JGBSPX, 2020 WL 2518030, at \*5 (C.D. Cal. May 15, 2020) (admitting arbitration agreements with electronic signature, date, and time stamp as business records); *Starace v. Lexington Law Firm*, No. 118CV01596DADSKO, 2019 WL 2642555, at \*4 (E.D. Cal. June 27, 2019) (finding business records admissible to show arbitration agreement); *Trevino v. Acosta, Inc.*, No. 17-CV-06529 NC, 2018 WL 3537885, at \*4 (N.D. Cal. July 23, 2018) (noting that electronically signed arbitration agreements are admissible where human resources personnel familiar with the record-keeping practice authenticate the record). By signing the Loan Agreements, Plaintiffs agreed to be bound by the terms, which included an arbitration agreement. (Exs. A–D to Rodriguez Decl.; *see id.* ¶ N). The Court finds that the Rodriguez Declaration and signed Loan Agreements establish mutual assent to an agreement to arbitrate.

Second, the Court finds that Plaintiffs' own conduct and allegations further demonstrate their assent to the Loan Agreements and the arbitration agreement. Plaintiffs allege in their Complaint that they are parties to the Loan Agreements, specifically that they "are natural persons who are obligors under PEAKS student loan agreements" (Compl. ¶ 156), and Plaintiffs' putative class is individuals who received PEAKS loans while attending ITT schools. (*Id.* ¶ 111). *See Cayanan v. Citi Holdings, Inc.*, 928 F. Supp. 2d 1182, 1203 (S.D. Cal. 2013) (finding evidence, including plaintiff's own admissions, established that plaintiff entered into arbitration agreement when she obtained loans, despite her statements that she did not remember signing the agreement). Further, in addition to the fact that the Loan Agreements bear Plaintiffs' e-signatures, Plaintiffs made payments on their PEAKS loans (Compl. ¶¶ 85, 97, 103; Exs. E–G to Rodriguez Decl.), which indicates their intent to be bound by the Loan Agreements. *See Knutson*, 771 F.3d at 565 (noting mutual assent may be manifested by conduct under California law); *Advance Sign Grp., LLC v. Optec Displays, Inc.*, 722 F.3d 778, 784 (6th Cir. 2013) (finding manifestation of mutual assent under Ohio law where each party made a promise or began

8

to render performance);  *Heritage Roofing, LLC v. Fischer*, 164 S.W.3d 128, 134 (Mo. Ct. App. 2005) (stating assent can be established through conduct).

Therefore, the Court finds DBTCA has proven by a preponderance of the evidence the existence of an agreement to arbitrate.  To the extent Plaintiffs challenge their signatures and the circumstances under which the loans were obtained, these allegations go to the validity of the Loan Agreements as a whole, not to the threshold issue of whether an agreement exists.  *See Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 68–69 (2010) (recognizing fraud, duress, and unconscionability as "generally applicable contract defenses").  Such challenges to the contract's validity, as discussed below, must be resolved in arbitration.

2. Enforcement of Arbitration Agreement

Having established that an agreement to arbitrate exists, DBTCA next argues Plaintiffs' claims are subject to arbitration under the FAA pursuant to the Loan Agreements' terms.  In their Opposition, Plaintiffs agree the Loan Agreements contain the relevant arbitration provisions.  (Pls.' Opp'n 17).  Plaintiffs do not dispute that DBTCA can enforce the Loan Agreements' provisions as the trustee of PEAKS Trust and assignee of the PEAKS loans, which were originated by Liberty Bank, an original signatory to the Loan Agreements.[1]  Plaintiffs further do not contest the applicability of the FAA to the language in the Loan Agreements.  The Court finds that the arbitration agreement contained in the Loan Agreements encompasses the dispute at issue.  Accordingly, Plaintiffs' claims against DBTCA must be heard by an arbitrator.

---

[1] The arbitration agreement in the Loan Agreements is between the borrower and "the Lender, its officers, directors, and employees, and its affiliates, subsidiaries and parents, and any officers or directors and employees of such entities."  (Exs. A–D to Rodriguez Decl., ¶ N).  The "Lender" is defined as Liberty Bank, N.A., its successors and assigns, and any other holder of the loan. (*Id.*, introductory paragraph).  Liberty Bank assigned its rights under the PEAKS loans to the PEAKS Trust, which was established by DBTCA. (Compl. ¶¶ 2, 3, 24, 26, 52).

If a valid agreement to arbitrate exists, and it encompasses the dispute at issue, "the [FAA] requires the court to enforce the arbitration agreement in accordance with its terms." *Kilgore*, 673 F.3d at 955–56. "[P]arties can agree to arbitrate 'gateway' questions of 'arbitrability,' such as … whether their agreement covers a particular controversy." *Rent-A-Center*, 561 U.S. at 68–69. Where the parties have "clearly and unmistakably" delegated such gateway issues to the arbitrator, the validity of the arbitration agreement is a question for the arbitrator to decide, rather than the court. *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986). For arbitration agreements under the FAA, "the court is to make the arbitrability determination by applying the federal substantive law of arbitrability absent clear and unmistakable evidence that the parties agreed to apply non-federal arbitrability law." *Brennan v. Opus Bank*, 796 F.3d 1125, 1129 (9th Cir. 2015) (internal citations and quotation marks omitted).

The Ninth Circuit has held "language 'delegating to the arbitrators the authority to determine the validity or application of any of the provisions of the arbitration clause[ ] constitutes an agreement to arbitrate threshold issues concerning the arbitration agreement.' " *Mohamed v. Uber Techs., Inc.*, 848 F.3d 1201, 1208 (9th Cir. 2016) (quoting *Momot v. Mastro*, 652 F.3d 982, 988 (9th Cir. 2011)). Here, the language of the Loan Agreements evidences clear and unmistakable intent to delegate the threshold questions of arbitrability to an arbitrator. (*See* Exs. A–D to Rodriguez Decl., ¶ N (providing that parties agree to arbitrate "any dispute over the validity of this arbitration provision" under the FAA)). Moreover, the arbitration provision provides that any dispute will be resolved "before the American Arbitration Association (AAA) under its Commercial Arbitration Rules including the Supplementary Procedures for Consumer-Related Disputes." (Exs. A–D to Rodriguez Decl., ¶ N). "[I]ncorporation of the AAA Rules constitutes clear and unmistakable evidence that contracting parties agreed to arbitrate arbitrability." *Brennan*, 796 F.3d at 1130. The Court finds the parties agreed to arbitrate the gateway issue of arbitrability.

1
2
3
4
5
6
7
8
9
10

Plaintiffs invoke *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395 (1967) to suggest the validity of the agreement to arbitrate must be determined by the district court and separately from the contract as a whole. (Pls.' Opp'n 5–6 & n.2). Although a federal court can adjudicate a claim of "fraud in the inducement of *the arbitration clause itself*," the FAA's statutory language "does not permit the federal court to consider claims of fraud in the inducement of the contract generally." *Prima Paint*, 388 U.S. at 403–04 (emphasis added).   Indeed, unless the nonmovant "challenge[s] the delegation provision specifically, [courts] must treat it as valid under § 2 [of the FAA], and must enforce it under §§ 3 and 4 [of the FAA], leaving any challenge to the validity of the Agreement as a whole for the arbitrator." *Rent-A-Center*, 561 U.S. at 72.

11
12
13
14
15
16
17
18

Plaintiffs do not dispute that the Loan Agreements contained arbitration provisions (Pls.' Opp'n 17), nor do they challenge those provisions specifically as unenforceable. Rather, Plaintiffs claim the Loan Agreements were procured by fraud.   Therefore, because Plaintiffs' challenge is to the contract as a whole, and the arbitration agreement provides for arbitration of gateway issues, the Court will enforce the agreement.   *See Tompkins v. 23andMe, Inc.*, 840 F.3d 1016, 1032 (9th Cir. 2016) (citing *Rent-A-Center*, 561 U.S. at 71, 72) (explaining when a plaintiff's legal challenge is that a contract as a whole is unenforceable, court must enforce arbitration agreement).

19
20
21
22
23
24
25

Because a valid agreement to arbitrate between Plaintiffs and DBTCA exists, and the agreement encompasses the dispute at issue, the Court must enforce the arbitration agreement according to its terms. *See Kilgore*, 673 F.3d at 955–56.  DBTCA requests that the Court enforce the provisions requiring Plaintiffs to arbitrate their claims on an individual basis.  (DBTCA's Mot. to Dismiss 16–17).  Plaintiffs do not dispute that the Loan Agreements require individual arbitration or otherwise contest the issue.[2]

26
27
28

---

[2] The Court need not decide whether the issue of class arbitration was delegated to the arbitrator, since neither party raised it.  *Cf. Shivkov v. Artex Risk Sols., Inc.*, ---F.3d ----, 2020 WL 5405687, at *13 (9th Cir. Sept. 9, 2020) (holding class arbitration is a gateway issue for court to decide absent delegation and parties did not delegate class arbitration).

11

1  Accordingly, Plaintiffs' claims against DBTCA under Counts 1 and 4, including any

2  challenge to the validity of the Loan Agreements as a whole, shall be resolved in arbitration

3  on an individual basis.

4  **B. Vervent Defendants' Right to Enforce Arbitration as a Non-Signatory**

5  In response to the Vervent Defendants' motion to compel arbitration, Plaintiffs argue

6  that even if Plaintiffs entered into the Loan Agreements, the Vervent Defendants may not

7  enforce the arbitration provisions because they are not parties to the Loan Agreements.

8  The Vervent Defendants argue that the issue of whether they can enforce the arbitration

9  agreement is delegated to the arbitrator, and even if it is not, that they can compel

10  arbitration as agents of DBTCA, or alternatively, under a theory of equitable estoppel.

11  The Vervent Defendants are not parties to the Loan Agreements and the arbitration

12  agreement contained therein, nor do they contend they are.  (*See supra* n.1 (defining parties

13  to Loan Agreements)).  Thus, the issue is whether, as non-signatories, they may enforce

14  arbitration against the signatory Plaintiffs.

15  "[A] litigant who is not a party to an arbitration agreement may invoke arbitration

16  under the FAA if the relevant state contract law allows the litigant to enforce the

17  agreement."  *Kramer v. Toyota Motor Corp.*, 705 F.3d 1122, 1128 (9th Cir. 2013) (citing

18  *Arthur Andersen*, 556 U.S. at 632); *see Comer v. Micor, Inc.*, 436 F.3d 1098, 1101 (9th

19  Cir. 2006) ("[N]on-signatories of arbitration agreements may be bound by the agreement

20  under ordinary contract and agency principles.") (internal citation omitted).  Here, although

21  the Loan Agreements contain a choice-of-law provision stating that Ohio law will govern,

22  the relevant state law is California law.  "A choice-of-law clause, like an arbitration clause,

23  is a contractual right and generally may not be invoked by one who is not a party to the

24  contract in which it appears."  *In re Henson*, 869 F.3d 1052, 1059 (9th Cir. 2017) (internal

25  citation and quotation marks omitted); *see also Nguyen*, 763 F.3d at 1175 (explaining that

26  whether a choice-of-law provision applies depends on whether the parties agreed to be

27  bound by the contract in which it appears).  The Vervent Defendants, as non-signatories,

28  never agreed with Plaintiffs that Ohio law would govern a dispute between them.

Accordingly, the Court applies the choice-of-law principles of the forum state, which is California. *See In re Henson*, 869 F.3d at 1059. Under California's choice-of-law analysis, the Court will apply another state's law only if a proponent identifies an applicable rule of law in a potentially concerned state that "materially differs from the law of California." *Washington Mut. Bank, FA v. Superior Court*, 15 P.3d 1071, 1080 (Cal. 2001). The Vervent Defendants cite to federal arbitration cases from several circuit courts and California district courts that apply general principles of agency and equitable estoppel. Although the Vervent Defendants refer to the Ohio definition of "agent," they do not argue that Ohio law materially differs from that of California. The Court therefore looks to California state contract law principles to determine whether the Vervent Defendants, as non-signatories, can compel arbitration. *See In re Henson*, 869 F.3d at 1059–60.

### 1. Delegation

The Vervent Defendants argue first that the arbitrator, not the Court, must decide whether they have the right to enforce the arbitration agreement. Although generally "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration," *Chiron Corp.*, 207 F.3d at 1131, arbitration is a matter of contract, and thus the "strong public policy in favor of arbitration does not extend to those who are not parties to an arbitration agreement." *Kramer*, 705 F.3d at 1126 (internal citation and quotation marks omitted). "[T]he question 'who has the primary power to decide arbitrability' turns upon what the parties agreed about *that* matter." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995) (emphasis in original). In the "absence of clear and unmistakable evidence that Plaintiffs agreed to arbitrate arbitrability with nonsignatories," the district court has authority to decide the issue of whether a non-signatory can compel arbitration. *Kramer*, 705 F.3d at 1127.

The Ninth Circuit's decision in *Kramer* is instructive here. There, Toyota—a non-signatory to purchase agreements between the plaintiffs and various car dealerships— attempted to enforce the agreements' arbitration clause. *Id.* at 1123–24. Toyota argued that the arbitrator should decide the issue of whether a non-signatory could compel

arbitration because the purchase agreements provided that the arbitrator would decide gateway issues such as the interpretation, scope, and applicability of the arbitration provision. *Id.* at 1127. The Ninth Circuit rejected this argument, finding that the district court properly decided arbitrability because the language of the purchase agreements "evidence[d] Plaintiffs' intent to arbitrate arbitrability with the [car dealerships] and no one else." *Id.*

Here, although Plaintiffs and DBTCA agreed to arbitrate arbitrability, as discussed above, the Loan Agreements do not contain clear and unmistakable evidence that Plaintiffs and *the Vervent Defendants* agreed to arbitrate arbitrability. The terms of the arbitration provision are limited to Plaintiffs and the Lender. (*See supra* n.1). Plaintiffs signed agreements acknowledging that "any claim … shall be, *at my or your* election, submitted to and resolved on an individual basis by binding arbitration." (Exs. A–D to Rodriguez Decl., ¶ N) (emphasis added). The Loan Agreements provide that for the purposes of Paragraph N, "the terms 'you,' 'your,' 'yours' and 'Lender' include the Lender, its officers, directors, and employees, and its affiliates, subsidiaries, and parents, and any officers, directors, and employees of such entities." The Vervent Defendants are the loan servicers; they are not the Lender, "its successors and assigns, [or] any other holder of the loan." (Exs. A–D to Rodriguez Decl., introductory paragraph).

The Loan Agreements' arbitration provisions are limited to disputes which may be submitted to arbitration "at my or your election"—i.e., at either the election of Plaintiffs or DBTCA as Liberty Bank's assignee. They do not provide that a third party may elect to submit a loan-related dispute to arbitration. *See Kramer*, 705 F.3d at 1127 (reasoning that language "[e]ither you or we may choose to have any dispute between you and us decided by arbitration" evidenced plaintiffs' intent to arbitrate only with signatory defendants). Therefore, the Vervent Defendants' ability to enforce arbitration for any dispute arising out of Plaintiffs' loans "is simply not within the scope of the arbitration agreement." *Mundi v. Union Sec. Life Ins. Co.*, 555 F.3d 1042, 1045 (9th Cir. 2009) (finding arbitration provision in loan agreement between borrower and bank did not extend to dispute between borrower

20-cv-00697-DMS-AHG

and third-party credit insurer); *see Vincent v. BMW of N. Am., LLC*, No. CV 19-6439 AS, 2019 WL 8013093, at *4 (C.D. Cal. Nov. 26, 2019) (concluding even though arbitration provision covered claims relating to third parties, language limiting right to enforce to "you and us" meant plaintiffs did not agree to arbitrate any disputes with third parties).  The Vervent Defendants' argument that the arbitrator must determine whether they can enforce the agreement fails.

    2. <u>Agency Theory</u>

       Next, the Vervent Defendants contend that as non-signatories, they may enforce the Loan Agreements' arbitration provisions under an agency theory.

       "Agency is one ground upon which a non-signatory may force a signatory to arbitrate." *Chastain v. Union Sec. Life Ins. Co.*, 502 F. Supp. 2d 1072, 1081 (C.D. Cal. 2007) (citing *Letizia v. Prudential Bache Sec., Inc.*, 802 F.2d 1185, 1187 (9th Cir. 1986)); *see Westra v. Marcus & Millichap Real Estate Inv. Brokerage Co.*, 28 Cal. Rptr. 3d 752, 756 (Cal. Ct. App. 2005).  "[I]t is the right to control the means and manner in which the result is achieved that is significant in determining whether a principal-agency relationship exists." [3] *Wickham v. Southland Corp.*, 213 Cal. Rptr. 825, 832 (Cal. Ct. App. 1985); *see Murphy v. DirecTV, Inc.*, 724 F.3d 1218, 1232 (9th Cir. 2013) ("Agency requires that the principal maintain control over the agent's actions." (citing *DeSuza v. Andersack*, 133 Cal. Rptr. 920, 924 (Cal. Ct. App. 1976)); Restatement (Third) of Agency § 1.01 (2006) ("To

---

[3] While the right to control is the most important factor, "secondary" factors to consider in determining whether an independent contractor is acting as an agent include:

> whether the "principal" and "agent" are engaged in distinct occupations; the skill required to perform the "agent's" work; whether the "principal" or "agent" supplies the workplace and tools; the length of time for completion; whether the work is part of the "principal's" regular business; and whether the parties intended to create an agent/principal relationship.

*APSB Bancorp v. Thornton Grant*, 31 Cal. Rptr. 2d 736, 740 (Cal. Ct. App. 1994) (internal citations omitted); *see Jackson v. AEG Live, LLC*, 183 Cal. Rptr. 394, 414 (2015).

establish an agency relationship, an agent must "act on the principal's behalf and subject to the principal's control.").

The Vervent Defendants contend they are agents of DBTCA and the PEAKS Trust, which entitles them to enforce the arbitration agreement. Vervent, previously known as First Associates, became the PEAKS loan servicer pursuant to an Agreement for Servicing Private Student Loans between the PEAKS Trust, DBTCA, and First Associates, dated December 10, 2011 ("the Servicing Agreement"). (Ex. 2 to DBTCA's Mot. to Dismiss, ECF No. 31-5; *see* Compl. ¶¶ 56, 139). The Servicing Agreement provides that "[t]he Servicer shall service, administer and make collections on the Serviced Loans in accordance with the terms hereof." (Servicing Agreement, Art. II., § 2.02(A)).

However, the Servicing Agreement explicitly states "the Servicer is an independent contractor and is not and will not hold itself out to be the agent of the Trust, the Lender, the Trustee, the Secured Party or the Guarantor [ITT] except with respect to the limited agency powers specifically provided herein." (*Id.*, Art. VI, § 6.01). The Servicing Agreement appoints First Associates (now Vervent) as the "agent" of the Trust "*solely* for endorsing and depositing negotiable instruments … made payable to the Trust." (*Id.*, Art. II, § 2.07) (emphasis added). Critically, the Servicing Agreement further specifies that "[t]he Servicer shall be entitled to determine the manner in which the Services are accomplished and shall have the right to effect such changes or modifications to its equipment, computer programs, reports, procedures and techniques as it deems necessary or advisable without the consent of the Trust." (*Id.*, Art. II, § 2.04).

The Court finds that because Vervent retains significant control over the manner of servicing the PEAKS loans, and the Servicing Agreement expressly provides that Vervent shall be an agent solely for endorsing and depositing negotiable instruments, the Vervent Defendants are not agents of DBTCA or the PEAKS Trust for the purpose of enforcing the Loan Agreements' arbitration provisions. *See Murphy*, 724 F.3d at 1233 (finding non-signatory to arbitration agreement was not agent of signatory because signed retailer

agreement between the two "expressly disavowed" agency relationship).  Therefore, the Vervent Defendants cannot enforce the arbitration agreement under an agency theory.

### 3.  Equitable Estoppel

As an alternative to agency theory, the Vervent Defendants contend they may enforce the arbitration agreement under the principles of equitable estoppel.

"Equitable estoppel precludes a party from claiming the benefits of a contract while simultaneously attempting to avoid the burdens that contract imposes." *Comer*, 436 F.3d at 1101 (internal quotation marks and citation omitted).   In *Kramer*, the Ninth Circuit articulated the "two circumstances" in which a non-signatory may enforce an arbitration agreement under the doctrine of equitable estoppel in California, as set forth in *Goldman v. KPMG, LLP*, 92 Cal. Rptr. 3d 534, 551 (Cal. Ct. App. 2009):

> Where a nonsignatory seeks to enforce an arbitration clause, the doctrine of equitable estoppel applies in two circumstances: (1) when a signatory must rely on the terms of the written agreement in asserting its claims against the nonsignatory or the claims are intimately founded in and intertwined with the underlying contract, and (2) when the signatory alleges substantially interdependent and concerted misconduct by the nonsignatory and another signatory and the allegations of interdependent misconduct are founded in or intimately connected with the obligations of the underlying agreement.

*Kramer*, 705 F.3d at 1128–29 (internal alteration, citations, and quotation marks omitted). By contrast, "equitable estoppel is inapplicable where a plaintiff's 'allegations reveal no claim of any violation of any duty, obligation, term or condition imposed by the [customer] agreements.' "   *Murphy*, 724 at 1230 (quoting *Goldman*, 92 Cal. Rptr. 3d at 551). "[E]quitable estoppel is particularly inappropriate where plaintiffs seek the protection of consumer protection laws against misconduct that is unrelated to any contract except to the extent that a customer service agreement is an artifact of the consumer-provider relationship itself." *Id.* at 1231 n.7.  The Court thus analyzes Plaintiffs' claims to determine whether their claims support a finding of equitable estoppel under either of the two circumstances set forth in *Kramer* and *Goldman*.  Plaintiffs assert federal statutory claims

under RICO and FDCPA, state statutory claims under the California UCL and Rosenthal Act, and a state tort claim against the Vervent Defendants.

With respect to Plaintiffs' RICO claim, Plaintiffs allege joint misconduct between DBTCA, assignee of the original signatory, and the non-signatory Vervent Defendants, claiming they conspired to violate 18 U.S.C. § 1962. (Compl. ¶¶ 122–153). However, even assuming Plaintiffs' RICO claim alleges interdependent and concerted misconduct, it is not "founded in or intimately connected with the obligations of the underlying agreement." *Kramer*, 705 F.3d at 1128–29. Plaintiffs allege they suffered harm due to Defendants' RICO fraud in the form of the "payments they were induced to make on account of PEAKS loan obligations." (Compl. ¶ 135). However, this harm is not necessarily founded in the underlying obligations of the Loan Agreements. Plaintiffs could have been defrauded by the alleged racketeering scheme even in the absence of signing a Loan Agreement—for instance, if Defendants misled Plaintiffs into believing they had obligations which did not in fact exist.

In support of their FDCPA claim, Plaintiffs plead they are obligors to the Loan Agreements, which qualifies them as consumers under the statute. However, this reference to the Loan Agreements is insufficient to show their claims rely on and are intimately founded in the Agreements' obligations. The language of the "rely on" requirement is "not so broad as to allow Defendant to simply point to the paragraph in the complaint where Plaintiff refers to the contract containing the arbitration clause." *Chastain*, 502 F. Supp. 2d at 1078 (finding equitable estoppel inapplicable because plaintiff's claims were not sufficiently intertwined with agreement); *see Vincent*, 2019 WL 8013093, at *6 (stating under California standard, "merely 'mak[ing] reference to' an agreement with an arbitration clause is not enough") (quoting *Goldman*, 173 Cal. App. 4th at 218). Rather, equitable estoppel is only appropriate "if in substance [the signatory's underlying] complaint [is] based on the [non-signatory's] alleged breach of the obligations and duties assigned to it in the agreement." *Chastain*, 502 F. Supp. 2d at 1078–79 (quoting *American Bankers Ins. Grp., Inc. v. Long*, 453 F.3d 623, 627 (4th Cir. 2006)). Plaintiffs do not rely

18

on any specific written terms of the Loan Agreements in asserting their FDCPA claim, which is a federal statutory claim separate from the underlying contract. *See, e.g.*, *Namisnak v. Uber Techs., Inc.*, --- F.3d ----, 2020 WL 4930650, at *5 (9th Cir. Aug. 24, 2020) (holding equitable estoppel did not apply where plaintiffs' case arose entirely under the ADA and plaintiffs' ADA claims were fully viable without reference to defendant's "Terms and Conditions" containing arbitration agreement); *Chastain*, 502 F. Supp. 2d at 1079  ("This claim is a statutory remedy under the Fair Credit Reporting Act … and is wholly separate from any action or remedy for breach of the underlying mortgage contract that is governed by the arbitration agreement.") (quoting *Brantley v. Republic Mortg. Ins. Co.*, 424 F.3d 392, 396 (4th Cir. 2005)).  As in *Murphy*, the Loan Agreements are an "artifact of the consumer-provider relationship" and the Vervent Defendants' alleged misconduct does not arise from a breach of duty, obligation, term, or condition under the Agreements.  724 F.3d at 1230–31 & n.7.  Indeed, the Vervent Defendants' responsibility to service Plaintiffs' loans arises not from the terms of the Loan Agreements, but from the Servicing Agreement with DBTCA as discussed above.

Turning next to Plaintiffs' claims under California law, the Vervent Defendants' equitable estoppel theory similarly fails.  Plaintiffs' UCL claim is not founded in or intimately connected with the obligations of the Loan Agreements.  The Ninth Circuit has recognized that "[t]he UCL … allow[s] Plaintiffs to sue [Defendant] for misleading consumers regardless of whether or not they signed largely unrelated contracts with [a signatory defendant]." *Murphy*, 724 F.3d at 1231.  Plaintiffs' Rosenthal Act claim, like the federal FDCPA claim, is an independent statutory cause of action that is not intimately intertwined with the Loan Agreements.

In *Murphy*, the Ninth Circuit noted that California cases permitting non-signatories to compel arbitration under an equitable estoppel theory have typically involved breach of contract and other claims intimately connected with the contract.  724 F.3d 1231 n.7 (citing *Boucher v. Alliance Title Co.*, 25 Cal. Rptr. 3d 440, 447 (Cal. Ct. App. 2005); *Metalclad Corp.*, 1 Cal. Rptr. 3d at 337–38).  "Here, in contrast, Plaintiffs do not seek any contract-

related damages; rather, their claims are for violations of consumer protection laws." *Id.* Plaintiffs' first four claims, all of which are causes of action arising under federal and state statutes and not out of the terms of the Loan Agreement itself, do not allow the Vervent Defendants to compel arbitration under a theory of equitable estoppel.

Finally, Plaintiffs' claim of negligent misrepresentation is founded in state tort law, not the Loan Agreements, and as such is also not subject to equitable estoppel. Although Plaintiffs allege that the Vervent Defendants misrepresented the validity of the PEAKS loan debts in attempting to collect, this tort claim is not dependent upon or intimately intertwined with the underlying contract. *Cf. id.* (noting tortious interference with contract as a cause of action that might permit non-signatory to compel arbitration via equitable estoppel). Plaintiffs can allege that the Vervent Defendants are liable for negligent misrepresentation in the course of Vervent's business regardless of whether Plaintiffs are parties to the Loan Agreements. Indeed, Plaintiffs allege that based on the Vervent Defendants' misrepresentations, the putative class made payments despite having no obligation to do so. (Compl. ¶ 186).

Equitable estoppel is not justified here because Plaintiffs are not claiming any benefits of the Loan Agreements while simultaneously attempting to avoid the burdens. *See Kramer*, 705 F.3d at 1134 ("Plaintiffs do not seek to simultaneously invoke the duties and obligations of [Defendant] under the [Loan Agreements], as it has none, while seeking to avoid arbitration. Thus, the inequities that the doctrine of equitable estoppel is designed to address are not present."). Accordingly, the Vervent Defendants, as non-signatories to the Loan Agreements, cannot compel arbitration of Plaintiffs' claims against them. *See Murphy*, 724 F.3d at 1230–31 (declining to enforce arbitration under equitable estoppel theory where plaintiffs did not allege contract-based claims); *Kramer*, 705 F.3d at 1134 (same); *Rajagopalan v. NoteWorld, LLC*, 718 F.3d 844, 847–48 (9th Cir. 2013) (holding defendant could not compel arbitration based on equitable estoppel because plaintiff's RICO and state law claims were separate statutory claims and plaintiff did not allege breach of contract); *Mundi*, 555 F.3d at 1047 (holding defendant could not compel arbitration

based on equitable estoppel because resolution of plaintiff's claim did not require examination of any provisions of loan agreement containing arbitration provision).

**C. Stay of Proceedings Pending Arbitration**

Both DBTCA and the Vervent Defendants request that the Court stay the case pending arbitration. Section 3 of the FAA provides:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

9 U.S.C. § 3.  The Court finds that since DBTCA may enforce the arbitration agreement and the issues between Plaintiffs and DBTCA are referable to arbitration, DBTCA is entitled to a stay under § 3.

However, the Vervent Defendants are not entitled to a mandatory stay under § 3. Circuit courts have rejected non-signatories' attempts to invoke the mandatory stay provision of § 3.  *See AgGrow Oils, L.L.C. v. National Union Fire Ins. Co.*, 242 F.3d 777, 782 (8th Cir. 2001) (finding non-signatory defendant not entitled to a mandatory stay under § 3 because it had no agreement to arbitrate with plaintiffs); *Adams v. Georgia Gulf Corp.*, 237 F.3d 538, 540 (5th Cir. 2001) (finding § 3 generally applies only to parties to the arbitration agreement, and not to those who are not contractually bound by agreement); *IDS Life Ins. Co. v. SunAmerica, Inc.*, 103 F.3d 524, 529 (7th Cir. 1996) (finding § 3 inapplicable to issues between parties with no agreement to arbitrate and stating that parallel judicial and arbitral proceedings are governed by the rules for parallel-proceeding abstention) (citing cases).

"Even though a nonsignatory may not invoke § 3 in moving to stay an action pending arbitration, a district court has discretion to stay third party litigation involving common questions of fact within the scope of an arbitration agreement to which the third party is

not a signatory." *Asahi Glass Co. v. Toledo Eng'g Co.*, 262 F. Supp. 2d 839, 844–45 (N.D. Ohio 2003) (citing *AgGrow Oils*, 242 F.3d at 782; *IDS Life Ins.*, 103 F.3d at 529; *Nederlandse Erts-Tankersmaatschappij, N.V. v. Isbrandtsen Co.*, 339 F.2d 440, 441 (2d Cir. 1964)); *see Sierra Rutile Ltd. v. Katz*, 937 F.2d 743, 750 (2d Cir. 1991) ("It is appropriate, as an exercise of the district court's inherent powers, to grant a stay where the pending proceeding is an arbitration in which issues involved in the case may be determined.") (internal citation and quotation marks omitted).

Indeed, the FAA's goals require courts to "rigorously enforce agreements to arbitrate, even if the result is 'piecemeal' litigation." *Dean Witter Reynolds, Inc.*, 470 U.S. at 221. A "discretionary stay may well be needed to further the strong federal policy favoring agreements to arbitrate." *AgGrow Oils*, 242 F.3d at 782; *see Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 20 n.23 (1983) ("In some cases, ... it may be advisable to stay litigation among the non-arbitrating parties pending the outcome of the arbitration. That decision is one left to the district court ... as a matter of its discretion to control its docket.").

The Court finds Plaintiffs' claims against DBTCA involve common questions of fact with their claims against the Vervent Defendants. Issues involved in Plaintiffs' claims against the Vervent Defendants may be determined in the arbitration proceedings. A stay serves the FAA's policy in favor of arbitration and avoids the risk of prejudice to Plaintiffs in the form of inconsistent judgments. Accordingly, the Court exercises its discretion to stay the proceedings against the Vervent Defendants pending the outcome of Plaintiffs' arbitration with DBTCA.

## IV.

## CONCLUSION AND ORDER

For the reasons set out above, DBTCA's motion to compel arbitration and stay proceedings pending arbitration is granted pursuant to the FAA. Plaintiffs' claims against DBTCA shall proceed in arbitration on an individual basis. The Court stays the litigation of Counts 1 and 4 against DBTCA to permit an arbitrator to decide the questions

of arbitrability, and then, if permissible, to arbitrate the substantive claims. Within 14 days of the completion of the arbitration proceedings, Plaintiffs and DBTCA shall jointly submit a report advising the Court of the outcome of the arbitration and request to dismiss the relevant counts or vacate the stay.

The Vervent Defendants' motion to compel arbitration is denied. The Court, in its discretion, stays the litigation of Counts 1, 2, 3, 4, and 5 against the Vervent Defendants, pending the result of Plaintiffs' arbitration proceedings with DBTCA. Within 14 days of the completion of the arbitration proceedings between Plaintiffs and DBTCA, Plaintiffs shall file a request to vacate the stay of the claims against the Vervent Defendants.

**IT IS SO ORDERED**.

Dated:  September 24, 2020

Hon. Dana M. Sabraw
United States District Judge

20-cv-00697-DMS-AHG