BLOOD HURST & O'REARDON, LLP
TIMOTHY G. BLOOD (149343)
LESLIE E. HURST (178432)
501 West Broadway, Suite 1490
San Diego, CA 92101
Tel: 619/338-1100
619/338-1101 (fax)
tblood@bholaw.com
lhurst@bholaw.com

LANGER GROGAN & DIVER, PC
IRV ACKELSBERG (*pro hac vice*)
JOHN J. GROGAN (*pro hac vice*)
1717 Arch Street, Suite 4020
Philadelphia, PA 19103
Tel: 215/320-5660
215/320-5703 (fax)
iackelsberg@langergrogan.com
jgrogan@langergrogan.com

Attorneys for Plaintiffs

[Additional counsel appear on signature page]

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JODY ALIFF, et al., | Case No. 3:20-cv-00697-DMS-AHG |
| Plaintiffs, | <u>**CLASS ACTION**</u> |
| v. | **PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| VERVENT, INC. fka FIRST ASSOCIATES LOAN SERVICING, LLC; ACTIVATE FINANCIAL, LLC; DAVID JOHNSON; CHRISTOPHER SHULER; LAWRENCE CHIAVARO; DEUTSCHE BANK TRUST COMPANY AMERICAS, | Date: February 25, 2022<br>Time: 1:30 p.m.<br><br>District Judge Dana M. Sabraw<br>Courtroom 13A, 13th Floor (Carter-Keep)<br>Magistrate Judge Allison H. Goddard<br>Chambers Room 3B, (Schwartz) |
| Defendants. | Complaint Filed: April 10, 2020<br>Trial Date: June 5, 2023 |
| | <u>**JURY TRIAL DEMANDED**</u> |

BLOOD HURST & O' REARDON, LLP

# **TABLE OF CONTENTS**

**Page(s)**

I.   INTRODUCTION ................................................................... 1

II.  STATEMENT OF THE CASE ................................................. 3

    A.   Procedural Posture of the Case ..................................... 3

    B.   The Disputed and Undisputed Facts .............................. 4

III. ARGUMENT ........................................................................ 9

    A.   Because There Are Material Issues of Fact Regarding Defendants' Knowledge of the Fraudulent Nature of the PEAKS Loan Program, They Are Not Entitled to Summary Judgment on Plaintiff's Damage Claim for Violation of 18 U.S.C. §1962(d) (Count One) ........................................................ 9

        1.   Applicable Legal Standard ............................................ 9

        2.   Plaintiff Alleges Mail and Wire Fraud as Predicate Acts, Not Usury ................................................................. 10

        3.   There is no Exemption From RICO for Servicing Loans When Those Loans are Part of a Fraudulent Scheme ................. 10

        4.   Plaintiff's Allegations that Defendants Facilitated a Mail and Wire Fraud Scheme Do Not Hinge on What Defendants Describe as a "Failure to Disclose Theory" ............... 14

        5.   There is A Direct Causal Nexus Between the Predicate Acts and Plaintiff's Injury .................................................. 16

        6.   There Are Genuine Issues of Material Fact Regarding the Individual Defendants' Liability under 18 U.S.C. § 1962(d) ................................................................................. 17

        7.   Defendants' Motion is Premature ............................... 18

    B.   Summary Adjudication of the UCL Claim Should Be Denied ............ 20

    C.   Defendants' Arguments as to the Remaining Counts in the FAC Should Be Deferred until Plaintiff Is Allowed to Substitute New Named Plaintiffs with Standing to Raise Those Claims .................... 21

IV.  CONCLUSION ................................................................... 23

BLOOD HURST & O' REARDON, LLP

i

Case No. 3:20-cv-00697-DMS-AHG

PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

00187467

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Adams v. Cty. of Maricopa*,
   2022 WL 42472 (9th Cir. Jan. 5, 2022) ............................................................... 8

*Am. Ad Mgmt. v. GTE Corp.*,
   92 F.3d 781 (9th Cir. 1996) ............................................................................ 9

*Am. Philatelic Soc'y v. Claibourne*,
   3 Cal. 2d 689 (1935) ....................................................................................20

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ...........................................................................8, 9, 12

*Annulli v. Panikkar*,
   200 F.3d 189 (3d Cir. 1999) ......................................................................... 10

*Anza v. Ideal Steel Supply Corp.*,
   547 U.S. 451 (2006) ....................................................................................15

*Atkinson v. Anadarko Bank & Trust Co.*,
   808 F.2d 438 (5th Cir. 1987) ........................................................................ 11

*Banks v. ACS Educ.*,
   638 Fed. Appx. 587 (9th Cir. 2016) ................................................................ 10

*Blue Shield of Va. v. McCready*,
   457 U.S. 465 (1982) ....................................................................................16

*Brice v. Haynes Inv., LLC*,
   2021 WL 2936733 (N.D. Cal. July 13, 2021) .......................................... 12, 16

*Bridge v. Phoenix Bond & Indem. Co.*,
   553 U.S. 639 (2008) ..............................................................................15, 16

*Brittingham v. Mobil Corp.*,
   943 F.2d 297 (3d Cir. 1991) ......................................................................... 11

*Burns v. Town of Palm Beach*,
   999 F.3d 1317 (11th Cir. 2021) .....................................................................17

*Chaset v. Fleer/Skybox Int'l*,
    300 F.3d 1083 (9th Cir. 2002) ........................................................... 15

*In re Chrysler-Dodge-Jeep EcoDiesel Mktg., Sales Pracs., & Prod.*
    *Liab. Litig.*,
    295 F. Supp. 3d 927 (N.D. Cal. 2018) ................................................ 10

*Clark v. Capital Credit & Collection Servs.*,
    460 F.3d 1162 (9th Cir. 2006) ........................................................... 21

*Crawford–El v. Britton*,
    523 U.S. 574. (1998) ........................................................................... 18

*Cullen v. Whitman Med. Corp.*,
    188 F.R.D. 226 (E.D. Pa. 1999) ........................................................ 12

*Daniels v. Select Portfolio Servicing, Inc.*,
    246 Cal. App. 4th 1150 (2016) ................................................... 19, 20

*In re Duramax Diesel Litig.*,
    298 F. Supp. 3d 1037 (E.D. Mich. 2018) .......................................... 11

*Emcore Corp. v. PricewaterhouseCoopers LLP*,
    102 F. Supp. 2d 237 (D. N.J. 2000) ................................................... 17

*Gomez v. Guthy-Renker, LLC*,
    2015 WL 4270042 (C.D. Cal. July 13, 2015) .................................... 10

*Grauberger v. St. Francis Hosp.*,
    169 F. Supp. 2d 1172 (N.D. Cal. 2001) ............................................ 10

*Holmes v. Sec. Inv. Prot. Corp.*,
    503 U.S. 258 (1992) ........................................................................... 16

*In re HomeAdvisor, Inc. Litig.*,
    491 F. Supp. 3d 879 (D. Colo. 2020) ................................................ 11

*Howard v. Foster*,
    208 F. Supp. 3d 1152 (D. Nev. 2016) ............................................... 18

*Jaguar Cars, Inc. v. Royal Oaks Motor Car Co.*,
    46 F.3d 258 (3d Cir. 1995) ................................................................ 11

*Kraus v. Trinity Mgmt. Servs., Inc.*,
    23 Cal. 4th 116 (2000) ............................................................... 19, 20

*Kruse by and through Kruse v. Repp*,
    543 F. Supp. 3d 654 (S.D. Iowa 2021) ................................................................ 11

*Kryvoshey v. AHMSI Default Servs.*,
    2019 WL 947546 (Cal. Ct. App. Feb. 27, 2019) .................................................. 19

*Longwell Textiles Ltd. v. Matrix Int'l Textile Inc.*,
    2020 WL 5991615 (C.D. Cal. Sept. 4, 2020) ...................................................... 18

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) ........................................................................................... 8

*Painters & Allied Trades Dist. Council 82 Health Care Fund v. Takeda*
    *Pharms. Co. Ltd.*,
    943 F.3d 1243 (9th Cir. 2019) ........................................................................... 15

*Parker & Parsley Petroleum Co. v. Dresser Indus.*,
    972 F.2d 580 (5th Cir. 1992) ............................................................................. 10

*People v. Toomey*,
    157 Cal. App. 3d 1 (1984) .................................................................................. 20

*Phillips v. Ford Motor Co.*,
    435 F.3d 785 (7th Cir. 2006) ............................................................................. 21

*Poller v. Columbia Broad. Sys., Inc.*,
    368 U.S. 464 (1962) ........................................................................................... 12

*Reves v. Ernst & Young*,
    507 U.S. 170 (1993) ........................................................................................... 17

*Richards v. McKee*,
    2013 WL 5819549 (E.D. Mich. Sept. 5, 2013) ................................................. 18

*Rodriguez v. McKinney*,
    156 F.R.D. 112 (E.D. Pa. 1994) ....................................................................... 12

*Rosario v. Livaditis*,
    963 F.2d 1013 (7th Cir. 1992) ..................................................................... 12, 15

*Salinas v. U.S.*,
    522 U.S. 52 (1997) ................................................................................... 9, 10, 12

*In re Sea Legend LLC*,
    2019 WL 8889971 (C.D. Cal. June 11, 2019) ................................................... 15

BLOOD HURST & O' REARDON, LLP

*Smith v. OSF HealthCare Sys.*,
933 F.3d 859 (7th Cir. 2019) ...................................................................... 18

*Tracey v. First Am. Title Ins. Co.*,
935 F. Supp. 2d 826 (D. Md. 2013) ............................................................. 11

*U.S. v. Fernandez*,
388 F.3d 1199 (9th Cir. 2004) ................................................................ 9, 13

*U.S. v. Garlick*,
240 F.3d 789 (9th Cir. 2001) ....................................................................... 13

*U.S. v. Neff*,
787 Fed. Appx. 81 (3d Cir. 2019) ............................................................... 11

*U.S. v. Niebla-Torres*,
847 F.3d 1049 (9th Cir. 2017) ..................................................................... 12

*U.S. v. Zemlyansky*,
908 F.3d 1 (2d Cir. 2018) ............................................................................ 10

**Statutes**

18 U.S.C.
§ 1962(c) ................................................................................................... 9, 17
§ 1962(d) ................................................................................................ *passim*
§ 1964(c) ........................................................................................................ 15

15 U.S.C. § 1692k ............................................................................................. 21

Cal. Civ. Code §§ 1788-1788.33 ...................................................................... 21

**Rules**

Fed. R. Civ. P.
30(b)(6) ......................................................................................................... 20
56 .......................................................................................................... 17, 18
56(a) ............................................................................................................... 8
56(d) ............................................................................................................. 17

**Other Authorities**

*Actions Involving State of Mind*,
10B Fed. Prac. & Proc. Civ. § 2730 (4th ed.) ............................................... 9

Case No. 3:20-cv-00697-DMS-AHG

PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

BLOOD HURST & O' REARDON, LLP

00187467

*Contract Actions*, 10B Fed. Prac. & Proc. Civ. § 2730.1 (4th ed.) ..........................9

Case No. 3:20-cv-00697-DMS-AHG

PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

BLOOD HURST & O' REARDON, LLP

00187467

BLOOD HURST & O' REARDON, LLP

## I.    INTRODUCTION

This consumer class action seeks damages for the victims of a fraudulent private student loan program named "PEAKS," short for "Program for Education Access and Knowledge." Over the course of almost nine years, Defendants collected tens of millions of dollars in PEAKS loan payments, knowing that the loan program was a sham.

They knew that all the PEAKS loans went to low-income students to pay the balance of tuitions at schools owned by ITT, a notorious for-profit education company.

They knew that PEAKS borrowers had no dealings with the bank that supposedly originated their loans and that, in actuality, ITT determined who received the loans without any real underwriting to assess the students' ability to repay.

They knew that the loans were all originated electronically and that they had no evidence that borrowers had ever been informed of key loan terms, including their interest rate and loan fees, and even the amount actually borrowed.

They knew the loan program was part of a scheme by ITT to pad its balance sheet, while lying to investors and the Department of Education about the supposed independent, unaffiliated source of these private student loan funds, and abusing already debt-burdened students with additional student loan debt they would be unlikely able to repay. Indeed, the loan program was so obviously fraudulent that, as a result of a settlement of civil claims by numerous governmental agencies, all remaining loan balances were canceled in October 2020.

Without disputing any of these facts, Defendants have moved for summary judgment in the middle of discovery, seeking a judicial determination that, in their words, "normal" loan servicing activities, regardless of the nature of the loan program, are immune from legal accountability under RICO's conspiracy provision, 18 U.S.C. § 1962(d). But that claim, Count One of Plaintiff's First Amended Complaint, turns not on the nature of Defendants' loan servicing activities, whether "normal" or not,

PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

00187467

but rather, on whether Defendants knowingly agreed to facilitate a racketeering scheme through those services.

Defendants' knowledge and state of mind are the key elements of liability under Plaintiff's RICO claim. In support of their Motion, Defendants offer only bald assertions that they did not intend to facilitate a RICO scheme. *See* ECF No. 105-2 (Defendants' Separate Statement of Undisputed Facts ("Defs.' Sep. Stmt."), ¶¶ 39, 41 49. As is made plain below, those assertions are hotly disputed, and the evidence Plaintiff has gathered without the benefit of full discovery contradict Defendants' self-serving denials of knowledge. These are genuine issues of material fact that must be resolved by a jury. Defendants' motion for summary judgment on Count One should be denied and discovery allowed to continue.

As to Plaintiff's UCL claim, Defendants miss the mark by arguing that they are entitled to summary judgment because they "never had title to" Plaintiff's loan payments and "never took a 'cut'" of those payments. For an award of restitution under the UCL, there is no requirement that Defendants "had title" or kept money from the plaintiff. Instead, the focus is on Plaintiff's payments as the result of an unlawful business practice, payments in which she has a vested interest. Defendants are liable regardless of whether they passed some of all of money they obtained from PEAKS borrowers to their co-conspirators. Defendants' motion for summary judgment as to Plaintiff's UCL claim should be denied. And as to Defendant Activate, Defendants have once again picked off the named plaintiff with UCL standing, but Plaintiff is prepared to substitute a new plaintiff with standing when permitted.

As to Defendants' arguments concerning the other counts raised in the First Amended Complaint ("FAC"), consideration of these arguments should be deferred. Counts Two, Three and Five allege violations of various federal and state statutory and common law duties applicable to the collection of consumer debt. Due to applicable statutes of limitations, the subclass of PEAKS borrowers entitled to pursue these claims for relief will depend on the timing of their loan payments, requiring that

BLOOD HURST & O' REARDON, LLP

they made payments during the two years preceding the filing of this action. For the second time, Defendants have bought off the two named plaintiffs who did make such payments. By moving to dismiss those claims as to the sole remaining named plaintiff—who cannot assert those claims—Defendants are seeking to exploit their own gamesmanship. This aspect of the Motion should be deferred, to allow Plaintiff to substitute additional class representatives who have standing to raise those additional claims.

## II.    STATEMENT OF THE CASE

### A.    Procedural Posture of the Case

The procedural history of this case is somewhat tortured. Defendants have now filed two early motions for summary judgment after having twice succeeded in settling with some, but not all, of the named plaintiffs.

The original Complaint in this matter was filed on April 10, 2020 on behalf of three former ITT students with PEAKS loans: Jody Aliff, Marie Smith and Heather Turrey. ECF No. 1. Defendants filed an Answer on April 26, 2021. ECF No. 70.[1] After Defendants took the depositions of the three Plaintiffs, they settled with Mr. Aliff and Ms. Smith, whose claims were later dismissed voluntarily. ECF Nos. 89 and 90.

On July 28, 2021, Defendants filed their first motion for summary judgment as to the sole remaining plaintiff, Ms. Turrey. ECF No. 85. On the same day, Plaintiffs filed a Motion for Leave to file a proposed First Amended Complaint ("FAC") to add new plaintiffs Tara Chambers and Phillip Fernandez. ECF No. 84. On July 30, 2021,

---

[1]    The first year of the litigation focused mainly on resolving separate motions to compel arbitration filed by these Defendants and by Deutsche Bank, which was also named in the original complaint as a party defendant. This Court resolved both motions on September 24, 2020, granting Deutsche Bank's motion and denying Defendants' motion. ECF No. 43. Defendants appealed to the Ninth Circuit. ECF No. 45. This Court's denial of Defendants' motion to compel arbitration was ultimately affirmed by the Ninth Circuit, which issued its mandate on January 10, 2022.

BLOOD HURST & O'REARDON, LLP

00187467

BLOOD HURST & O' REARDON, LLP

1  Plaintiffs also filed their Motion for Class Certification in accordance with the then

2  operative scheduling order. ECF No. 87. On October 28, 2021, this Court granted the

3  motion for leave to amend and stayed Defendants' summary judgment motion as moot

4  (ECF No. 97) and on November 1, 2021, issued its First Amended Scheduling Order

5  (ECF No. 98). That Order set a fact discovery deadline of July 25, 2022.[2]

6        On December 3, 2021, Defendants filed a motion to dismiss the FAC. ECF No.

7  100. During the period for responsive briefing on that motion, Defendants reached a

8  settlement with both of the newly named plaintiffs, Ms. Chambers and Mr.

9  Fernandez.[3] On January 7, 2022, two days before Plaintiffs' Opposition to the motion

10  to dismiss was due, Defendants withdrew that motion (ECF No. 104) and filed their

11  second motion for summary judgment against Plaintiff Turrey who, as a result of the

12  individual settlements was, once again, the sole remaining plaintiff (ECF No. 105).

13  That is the Motion now pending before the Court. Meanwhile, Plaintiff has already

14  identified additional PEAKS Borrowers who are willing to take the place of Ms.

15  Chambers and Mr. Fernandez should the Court grant Plaintiff leave to file a Second

16  Amended Complaint. Declaration of Irv Ackelsberg in Support of Plaintiff's

17  Opposition to Defendants' Motion for Summary Judgment ("Ackelsberg Decl."), ¶8.

18      **B.**    **The Disputed and Undisputed Facts**

19        With their Motion, Defendants have submitted declarations by Defendants

20  David Johnson and Lawrence Chiavaro and some discovery material in order to

21  establish 49 itemized facts listed in their Separate Statement of Undisputed Facts that

22  they assert in opposition to Count One of the FAC. As Plaintiff indicates in her point-

23  by-point Response to this Separate Statement, many of these facts are undisputed, like

24  the timing of Defendants' entrance into the PEAKS program, some of the

25

26  [2]    Although the Scheduling Order also set a briefing schedule for class

27  certification motion, the Court later stayed that motion. *See* ECF No. 111.

   [3]    Notices of voluntary dismissal as to Ms. Chambers and Mr. Fernandez were

28  filed on February 3, 2022. ECF Nos. 113 and 114.

characteristics of the program and the fact that she herself did not make a loan payment after 2017. Other facts included in the Separate Statement are irrelevant: for example, that Ms. Turrey is not claiming her PEAKS loan was usurious (Defs.' Sep. Stmt., ¶ 21); that she is earning more in her hourly wage than she did before she attended ITT (*id.*, ¶¶ 29-31); and, for reasons stemming from the particular RICO claim asserted in Count One of the FAC, that Defendants were not a "part of any criminal enterprise." Defs.' Sep. Stmt., ¶¶ 39, 41, 48. However, there is one key fact in Defendant's list that is very much disputed, namely, their assertion that that they were unaware of any underlying fraud in the PEAKS Program. Fact No. 49.

To establish that this fact is in dispute—indeed, the critical factual dispute that will be the subject of the trial in this case—Plaintiff has submitted her own Statement of Undisputed Facts ("Pltf.'s Sep. Stmt."), summarizing separately submitted declarations and discovery material, *see* Declarations of Irv Ackelsberg and Heather Turrey (and attached exhibits).

The factual material presented by Plaintiff demonstrates that Defendants knew from the beginning of their entrance into the PEAKS program that this was not a bona fide private student loan program. They had a working knowledge of the business of their client, ITT, having already started to service an earlier ITT-sponsored private loan program. Pltf.'s Sep. Stmt., ¶ 11. Despite the fact that ITT was publicly describing PEAKS as an "unaffiliated" source of tuition payments, Defendants knew it was ITT, not an independent lender, who determined who got the loans and ITT, as Guarantor, was on the hook for the entire $300 million made available to it by the PEAKS Trust. *Id.*, ¶¶ 8(c), 15. They knew that representing PEAKS as an "unaffiliated," independent source of private student loan funds was necessary for ITT to be able to credit the loan proceeds it received toward the 10% portion of its "90/10" obligation to the Department of Education. *Id.*, ¶¶ 9, 11.

Defendants also knew that there was no underwriting done by the bank that "originated" the loans, or anyone else, and that owing a "Temporary Credit"

BLOOD HURST & O' REARDON, LLP

obligation to ITT was all that was necessary for an ITT student to qualify for a PEAKS loan. *Id.*, ¶¶ 8(d), 19. They knew the loan application process was done electronically on the website of Access Group, the so-called "Origination Agent," and that, in Ms. Turrey's case, that process lasted all of five minutes. *Id.*, ¶¶ 11, 16, 17, 18.[4] They also knew that the loan documentation they were provided was suspiciously deficient in that there was no evidence that borrowers were ever informed, let alone had agreed to, the high interest rates (which were also variable, and calculated on a daily basis), origination fees, or even the actual amount borrowed. *Id.*, ¶¶ 20-27. Moreover, they knew the loan agreements told borrowers they could not assert claims against ITT as a defense to loan repayment, before telling them that federal law gave them the right to do just that. *Id.*, ¶ 28.

Within the first year of their servicing responsibilities, ITT's fraudulent purposes became even clearer, when, in an effort to conceal the immediate, exploding defaults in loan repayments by the recently graduating PEAKS borrowers—itself an indication of the absence of any underwriting attention to ability-to-pay—ITT began wiring roughly $1 million per month to Defendants with instructions to apply the money to identified PEAKS accounts nearing the 180-day delinquency threshold. Defendants knew that at 180 days the loans would default and would be removed from PEAKS portfolio, not only putting at risk ITT's guarantee obligation to the PEAKS Trust, but also lowering the size of their own monthly servicing fee, which was measured by the size of the portfolio. *Id.*, ¶¶ 33-39.[5]

---

[4]    Ms. Turrey has no recollection of applying for a PEAKS loan, nor did she have any documentation of any such application when she graduated. *See* Declaration of Heather Turrey, ¶¶ 5-8.

[5]    Defendants earned a flat "servicing fee" in the amount of 1.025% per year, multiplied against the aggregate balance of the PEAKS portfolio, not counting loans that reach default status. Pltf.'s Sep. Stmt., ¶ 54. Thus, by booking the $16 million of payments by ITT as being made by the borrowers over the course of a year and half, they were earning more than $200,000 ($16 million x .0125) they had no right to earn.

PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

BLOOD HURST & O' REARDON, LLP

1    Defendants did not merely look the other way; they actively assisted ITT over

2    a period of sixteen months, from October 2012 to January 2014, in falsely reporting

3    those payments as being made by the borrowers, who were not even told why their

4    delinquencies mysteriously disappeared. *Id.*, ¶¶ 33-39. To help ITT extend the reach

5    of these illicit payments, Defendants agreed to waive accrued late fees so that this

6    portion of the delinquent debt would not need to be paid, even though they had no

7    authority to do so without the consent of the Trust, the owner of those fee claims. *Id.*,

8    ¶ 36.

9    When these $16 million in so-called "ITT Recovery Payments" came to light,

10   the Trust ended up forcing ITT to pay an additional $40 million in guarantee

11   payments. *Id.*, ¶ 39.

12   Around the same time, Defendants began having to respond to a series of

13   investigative subpoenas from the SEC, the CFPB and by a multi-state group of

14   Attorney Generals. *Id.*, ¶ 40. These investigations led to SEC and CFPB civil actions

15   against ITT, which, in great detail, described the fraudulent purposes and methods

16   underlying the PEAKS program. *Id.*, ¶¶ 41-44.[6] Following these legal challenges to

17   PEAKS, and as ITT's guarantee liabilities to PEAKS Trust continued to rise in the

18   face of continued loan defaults, ITT was forced to restate its financial statements to

19   disclose PEAKS not as an "unaffiliated" program but, instead, a completely on-

20   balance-sheet liability. It also found itself subject to increased scrutiny by the

21   Department of Education. *Id.*, ¶¶ 42-45. Soon thereafter ITT collapsed, filing for

22   Chapter 7 bankruptcy in September 2016. *Id.*, ¶ 47.

23   However, none of these events caused Defendants to pause their vigorous

24

25   _____

26   [6]    To any genuinely good-faith reader, the CFPB's description of ITT directing
     commissioned financial aid personnel to use whatever means they could to get
27   students to sign up for PEAKS loans, *see* Pltf.'s Sep. Stmt., ¶ 44, lends plausibility to
     Plaintiff Turrey's and other borrowers' claims that they never knowingly agreed to
28   take out a PEAKS loan.

BLOOD HURST & O' REARDON, LLP

collection activity directed to the PEAKS loan victims. *Id.*, ¶¶ 46, 48. Echoing the position in Defendants' Motion, Defendants concluded that as long as no governmental authority was challenging their own servicing activities or instructing them to stop collecting, they were free to proceed in a "business as usual" fashion. *Id.*, ¶ 48. In fact, they intensified their collection pressure on PEAKS borrowers by taking off the shelf an inactive, in-house debt collection company, Defendant Activate Financial, which began sending out collection letters to the PEAKS borrowers in default, including Plaintiff Turrey, in a last-ditch effort to extract as much as they could from the borrowers who were likely the most financially challenged. *Id.*, ¶ 49.

As for the personal knowledge and participation of the individual defendants, David Johnson and Lawrence Chiavaro, it is undisputed that they were the ones in the company with the most knowledge about ITT and were the ones interacting directly with ITT. *Id.*, ¶¶ 12-13. They were financially motivated to look the other way regarding the obvious signs of fraud, since at the time they entered the PEAKS program they were a small start-up company barely meeting payroll, and within the first year, had a viable business that received more than half of its revenues from PEAKS. *Id.*, ¶ 32. It is also undisputed that Johnson is the CEO of both Vervent and Activate Financial (Ackelsberg Decl., ¶ 7); that he participated in implementing the "ITT Recovery Payments" scheme, (Pltf.'s Sep. Stmt., ¶ 34); and was personally interviewed by CFPB investigators. *Id.*, ¶ 46. The actual agreement to enter into the PEAKS program was executed by Chiavaro, who was then in charge of the ITT account. *Id.*, ¶ 13. Neither Johnson nor Chiavaro has yet been deposed. Ackelsberg Decl., ¶ 7.

In short, while Defendants' knowledge remains a fact in dispute, the evidence supporting the existence of such knowledge is extensive. At best, Defendants' motion is premature.

Case No. 3:20-cv-00697-DMS-AHG

PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

## III.   ARGUMENT

### A.   Because There Are Material Issues of Fact Regarding Defendants' Knowledge of the Fraudulent Nature of the PEAKS Loan Program, They Are Not Entitled to Summary Judgment on Plaintiff's Damage Claim for Violation of 18 U.S.C. §1962(d) (Count One)

#### 1.   Applicable Legal Standard

Summary Judgement is appropriate only if the movant shows that there is "no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material when it affects the outcome of the case, and a "genuine issue" of material fact arises if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986). Only where the "record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). [7]

The party opposing summary judgment "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 586-87. "[C]onclusory, self-serving affidavit[s], lacking detailed facts and any supporting evidence" are not sufficient to ground summary judgment practice. *See Adams v. Cty. of Maricopa*, 2022 WL 42472, at *2 (9th Cir. Jan. 5, 2022). [8] Moreover, "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge ... on a motion for summary judgment ... The evidence of the non-movant is to be believed, and all justifiable

---

[7]   All citations, internal quotation marks and footnote are omitted and emphasis is added.

[8]   Although normally cited in connection with a non-moving party's opposition to summary judgment, here, Defendants offer no more than their "say so" that they did not agree to facilitate a RICO scheme and make no effort to provide the "detailed fact and supporting evidence" to support their blanket denial of knowledge and agreement. Defs.' Sep. Stmt., ¶¶ 31, 41, 49.

inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 265. Where, as here, a critical issue is the state of the defendant's knowledge or state of mind, which are essential to claims of participation in a conspiracy, summary judgement is generally disfavored. *See generally Am. Ad Mgmt. v. GTE Corp.*, 92 F.3d 781 (9th Cir. 1996); *Actions Involving State of Mind*, 10B Fed. Prac. & Proc. Civ. § 2730 (4th ed.) (collecting cases); *Contract Actions*, 10B Fed. Prac. & Proc. Civ. § 2730.1.

### 2. Plaintiff Alleges Mail and Wire Fraud as Predicate Acts, Not Usury

Defendants' first argument (Mem. at 5-6) is based on a misreading of the First Amended Complaint. Plaintiff's RICO claims are based on predicate acts of mail and wire fraud, not usury or collection of an unlawful debt. FAC, ¶ 142 ("ITT and its top executives directed the Enterprise, operating the affairs of the PEAKS Loan Enterprise through a pattern of racketeering, *namely wire and mail fraud*"). Accordingly, Defendants' arguments that the PEAKS loans were not usurious are legally irrelevant and provide no basis for summary judgement.

### 3. There is no Exemption From RICO for Servicing Loans When Those Loans are Part of a Fraudulent Scheme

Defendants argue that as a "matter of law" their loan servicing activity cannot ground a RICO claim. Mem. at 6-7. This is flatly wrong.

Conspiracy liability under 18 U.S.C. § 1962(d) differs from direct RICO liability under 18 USC § 1962(c). *Salinas v. U.S.*, 522 U.S. 52 (1997). Under the standard established in *Salinas*, a defendant may be guilty of a conspiracy to violate the substantive provisions of RICO if it "knowingly agree[d] to facilitate a scheme which includes the operation or management of a RICO enterprise." *U.S. v. Fernandez*, 388 F.3d 1199, 1230 (9th Cir. 2004), *modified*, 425 F.3d 1248 (9th Cir. 2005) (quoting *Smith v. Berg*, 247 F.3d 532, 538 (3d Cir. 2001)).

This standard covers those that knowingly help the operators of a racketeering enterprise further the scheme's purposes. The alleged conspirator need not direct or manage the enterprise. *Fernandez*, 388 F.3d at 1229. The conspirator need not itself

00187467

1  commit any predicate acts (*Salinas*, 522 U.S. at 63) and need not be part of the

2  enterprise at all. *Id.* at 64.[9]

3      The *mens rea* underlying RICO conspirator liability is not the intention to

4  commit fraud, but rather, the knowing agreement to facilitate others' fraudulent

5  schemes. Through that lens, normal innocent-appearing business activities can be

6  transformed into RICO violations if they are done with the knowledge that, in

7  agreeing to provide services to the primary perpetrators, they are agreeing to help

8  facilitate a fraudulent scheme.

9      Defendants' insistence that "normal" or "garden-variety" business activity can

10  never be the basis of a RICO conspiracy claim is wrong as a matter of law.[10] *See, e.g.*,

11

12  [9]    *See also U.S. v. Zemlyansky*, 908 F.3d 1, 12, n.6 (2d Cir. 2018) (Persons outside
13  the enterprise may be found liable under RICO if they "agreed to facilitate a scheme
     by providing tools, equipment, cover or space," so long as "the facilitation was
14  knowing because the defendant was aware of the broader scheme."); *In re Chrysler-*
     *Dodge-Jeep EcoDiesel Mktg., Sales Pracs., & Prod. Liab. Litig.*, 295 F. Supp. 3d 927,
15  983 (N.D. Cal. 2018) (distinguishing between stricter context of assessing direction
16  and control of a RICO enterprise under 1962(c) from conspiracy liability under
     section 1962(d), which involves "simply performing services for the enterprise").
17  [10]   None of the cases cited by the Defendants supports this erroneous statement of
18  the law. *Gomez v. Guthy-Renker, LLC*, 2015 WL 4270042, at *5 (C.D. Cal. July 13,
     2015) involved a situation where, "[c]ompletely unbeknownst" to a service provider,
19  its business customer was engaged in an alleged fraud. Here, in contrast, Plaintiff has
20  submitted extensive factual material supporting the inference that Defendants did
     have knowledge concerning the fraudulent activity of ITT and its PEAKS loan
21  enterprise. Similarly irrelevant are cases Defendants cite that involve alleged
22  wrongdoing that did not include any acts that constitute "racketeering activity" under
     RICO. *See Banks v. ACS Educ.*, 638 Fed. Appx. 587 (9th Cir. 2016) (interpreting
23  complaint as trying to turn FDCPA and FCRA claims into RICO claims without
24  alleging any violations included in the statutory definition of "racketeering activity");
     *Annulli v. Panikkar*, 200 F.3d 189, 199 (3d Cir. 1999) (observing, contrary to
25  Defendants' contention, that RICO mail fraud claims *can* apply to "garden-variety"
26  frauds, but concluding that the plaintiff had failed to allege any RICO predicate acts
     within the statutory period); *Grauberger v. St. Francis Hosp.*, 169 F. Supp. 2d 1172
27  (N.D. Cal. 2001) (holding conclusory allegations of fraud cannot properly convert
28  dispute about hospital charges into a RICO case). *Parker & Parsley Petroleum Co. v.*

*Kruse by and through Kruse v. Repp*, 543 F. Supp. 3d 654 (S.D. Iowa 2021) (denying summary judgment based on claim of innocent provision of legal and banking services and noting that knowledge can be shown by actual knowledge or willful blindness and intent can be inferred by subsequent conduct); *U.S. v. Neff*, 787 Fed. Appx. 81, 92 (3d Cir. 2019) (unpublished) (affirming criminal RICO conviction of a lawyer associated with lending enterprise).

Further, "the weight of authority is that allegations of fraudulent or illegal activity by involved entities do not constitute normal business affairs." *In re HomeAdvisor, Inc. Litig.*, 491 F. Supp. 3d 879, 889 (D. Colo. 2020) (collecting cases); *see also Tracey v. First Am. Title Ins. Co.*, 935 F. Supp. 2d 826, 844 (D. Md. 2013) (finding that the plaintiffs had "alleged more than the performance of ordinary business functions" by alleging that defendant and its agents "deliberately overcharged and misappropriated amounts due for the purchase of title insurance, in violation of Maryland law" because "unlawful acts are not conducted in the ordinary course of business"); *see also In re Duramax Diesel Litig.*, 298 F. Supp. 3d 1037, 1080-81 (E.D. Mich. 2018) ("[W]hen the essential purpose of a particular business relationship is fraud, the related conduct is not ordinary or normal business activities. ... [W]hen both companies are aware of and contribute to the fraud, they cannot argue that they have a routine commercial relationship.").

There is nothing "preposterous," to use Defendants' language, "to think that corporations duly registered by the State of California or Delaware are somehow a criminal enterprise." Mem. at 7. A loan servicer that agrees to collect loan payments in a loan program it knows to be fraudulent can be held liable under 18 U.S.C. §

---

*Dresser Indus.*, 972 F.2d 580 (5th Cir. 1992), also cited by Defendants, was a dismissal for failure to allege a distinct RICO enterprise. Similarly, *Brittingham v. Mobil Corp.*, 943 F.2d 297 (3d Cir. 1991) is also about the requirements for pleading a RICO enterprise, not an issue here, and was effectively overruled, in any case. *See Jaguar Cars, Inc. v. Royal Oaks Motor Car Co.*, 46 F.3d 258, 269 (3d Cir. 1995). The same is true of *Atkinson v. Anadarko Bank & Trust Co.*, 808 F.2d 438 (5th Cir. 1987).

1962(d) for the harms caused to victims of the fraudulent program.[11] In a recently decided case involving an analogous context of allegedly illegal loans and purportedly innocent third parties, the court denied summary judgment. *See Brice v. Haynes Inv., LLC*, 2021 WL 2936733 (N.D. Cal. July 13, 2021), *reversed on other grounds*, 13 F.4th 823 (9th Cir. 2021) (denying summary judgement filed by shareholders and investors in alleged RICO enterprise).

The "agreement" necessary to ground RICO conspirator liability need not be express if its existence can be inferred from words, actions, or the interdependence of the activities and persons involved or other circumstantial evidence. *Salinas*, 522 US at 63. Agreement can be, and most often is, proven by circumstantial evidence. *U.S. v. Niebla-Torres*, 847 F.3d 1049, 1056 (9th Cir. 2017). Here there is both the written Servicing Agreement, signed by Defendant Chiavaro on behalf of First Associates/Vervent, as well as Defendants' continued ratification of this agreement through their continued "business as usual" collection activity, even in the face of their expanding knowledge concerning the fraud imbedded in the PEAKS program.

The critical factual issue in this case is the state of Defendants' knowledge regarding that scheme. Plaintiff has adduced more than sufficient evidence to create a genuine issue of material fact on the issue of what Defendants knew and what they agreed to do. That issue, turning as it ultimately will on the credibility of the Defendants witnesses, especially upon cross-examination, should be resolved by a jury. *See Anderson*, 477 U.S. at 248, 255; *Poller v. Columbia Broad. Sys., Inc.*, 368 U.S. 464, 473 (1962).

---

[11]     Cases involving RICO claims have been successfully employed to obtain relief for the student victims of fraudulent, for-profit schools. *See Rosario v. Livaditis*, 963 F.2d 1013 (7th Cir. 1992); *Cullen v. Whitman Med. Corp.*, 188 F.R.D. 226, 231 (E.D. Pa. 1999); *Rodriguez v. McKinney*, 156 F.R.D. 112 (E.D. Pa. 1994).

BLOOD HURST & O' REARDON, LLP

00187467

**4.  Plaintiff's Allegations that Defendants Facilitated a Mail and Wire Fraud Scheme Do Not Hinge on What Defendants Describe as a "Failure to Disclose Theory"**

Defendants mischaracterize Count One, and effectively challenge RICO theories not raised here. They insist that they could not have violated RICO by failing to disclose to borrowers potential legal defenses because, in their words, they had no duty to inform borrowers of their right to assert defenses to their payment obligations based on complaints about the quality of the education they received from ITT. Mem. at 8. Putting aside the fact that PEAKS borrowers *did* have that right (a right that was deliberately hidden by the drafter of the form PEAKS Application and Loan Agreement who inserted earlier language in bold stating that borrowers did *not* have that right), what Defendants are arguing is that, if they did not themselves commit fraud in connection with this "failure to inform," there is no mail or wire fraud to ground Plaintiff's RICO conspiracy claims. *Id*. Defendants misunderstand mail and wire fraud and what it means to conspire to facilitate a scheme that involves mail and wire fraud.

The elements of mail or wire fraud are (1) a scheme to defraud, (2) the use of the mails or wires to further that scheme, and (3) the specific intent to defraud. *U.S. v. Garlick*, 240 F.3d 789, 792 (9th Cir. 2001). Each use of the mails or the wires in furtherance of a scheme to defraud is a "discrete offense." *Id.* at 793. It is not necessary that those mailings or wire transmissions themselves contained a fraudulent misrepresentation or omission; rather, the use of the mails or wires only had to be "a 'step in the plot.'" *Id.* at 795 (quoting *Schmuck v. U.S.*, 489 U.S. 705, 711 (1989)).

On the other hand, to prove that a defendant conspired to facilitate a mail or wire fraud scheme under RICO requires only facts showing that the defendant knowingly agreed to facilitate that scheme. *Fernandez*, 388 F.3d at 1230. It is not necessary to the RICO claim that Defendants themselves misrepresented anything in

BLOOD HURST & O' REARDON, LLP

BLOOD HURST & O' REARDON, LLP

1   their communications to borrowers.[12]

2   Here the mails and the wire system were used repeatedly throughout the

3   PEAKS loan scheme. The loan applications—supposedly made to an Ohio bank, but

4   actually processed by ITT's co-conspirator, Access Group—were all initiated over

5   the internet on the Access Group website, and, as it now appears, accessed from

6   computers in ITT financial aid offices (*i.e.*, where ITT had maximum control over the

7   process). Pltf.'s Sep. Stmt., ¶¶ 16-18. Each was an act of wire fraud. Similarly, each

8   false report to government regulators; each false financial report to investors; each

9   surreptitious wire of funds by ITT to the Defendants for the purpose of concealing

10  from investors the real levels of borrower defaults; each payment processed; each

11  letter or email message demanding payment; all of these constituted acts of mail

12  and/or wire fraud because they were done as a "step in the process" to carry out an

13  overall scheme to defraud.

14  Defendants are in a difficult spot: they cannot directly argue that the PEAKS

15  loan scheme was not fraudulent because that was the obvious conclusion of the

16  various government investigations that resulted in the cancellation of PEAKS loans.[13]

17  Unable to make that argument, Defendants invent the idea that the mail and wire fraud

18  in this case is limited to their own "failure to disclose." This argument provides no

19  basis for granting summary judgement.

20

21  _____

    [12]    Defendants' focus on the substance of their own communications with
22  borrowers, and their disputing that these communications were deceptive, conflates
    Plaintiff's RICO claims with the other alleged claims, where Defendants' own
23  misrepresentations in their communications with borrowers do become relevant.
    [13]    Defendants argue that, because the CFPB and the SEC, both of which
24  investigated and documented the fraud permeating the PEAKS program, did not take
25  enforcement action against the Defendants, this is somehow an endorsement or an
    assurance that Defendants did nothing wrong. Mem at 3. No reasonable inference can
26  be drawn from any action they government regulators did *not* take. All we know is
    what they did do, *i.e.*, declare the PEAKS program a fraud and ensure that all
27  outstanding PEAKS indebtedness was canceled.
28

BLOOD HURST & O' REARDON, LLP

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**5.    There is A Direct Causal Nexus Between the Predicate Acts and Plaintiff's Injury**

Defendants' cursory argument regarding the supposed missing nexus between Plaintiff's injuries and the predicate acts is without merit. *See* Mem. at 9.

RICO injury must be caused by reason of the violation of the statute. *See generally Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008). "The Supreme Court has interpreted the phrase 'by reason of' in 18 U.S.C. § 1964(c) to require, as elements for a civil RICO recovery, both proximate and but-for causation." *Painters & Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharms. Co. Ltd.*, 943 F.3d 1243, 1248 (9th Cir. 2019), *cert. denied sub nom. Takeda Pharm. Co. Ltd. v. Painters & Allied Trades Dist. Council 82 Health Care Fund*, 141 S. Ct. 86 (2020). *See also Chaset v. Fleer/Skybox Int'l*, 300 F.3d 1083, 1086 (9th Cir. 2002) (noting the injury requirement has two parts: (1) proximate cause; and "concrete" injury.) The "central question" is "whether the alleged violation led directly to the plaintiff's injuries." *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006).

Assessing "proximate cause" in RICO demands commonsense. *Bridge*, 553 U.S. at 654 (proximate cause is "a flexible concept that does not lend itself to a black-letter rule that will dictate the result in every case.") For this reason, proximate cause is usually a factual issue that should be decided at trial. *In re Sea Legend LLC*, 2019 WL 8889971, at *13 (C.D. Cal. June 11, 2019) (citing *Christensen v. Ga.-Pac. Corp.*, 279 F.3d 807, 815 (9th Cir. 2002)).

Here there is no dispute that Plaintiff suffered a "concrete injury" by being saddled with student loan debt and fees. *See Rosario*, 963 F.2d at 1021 (in a RICO case involving for-profit school fraud, noting that foisting student loan indebtedness on the plaintiffs was a concrete injury for RICO purposes). As to proximate cause, the connection between this injury and the racketeering activity, *i.e.*, mail and wire fraud in the service of a scheme to defraud, is easily established because the loans themselves were created over the interstate wire system (Pltf.'s Sep. Stmt., ¶¶ 16, 17)

PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

and a jury could reasonably find that those loans were absolutely essential to the scheme to defraud. The loans served the scheme in two critical ways: (1) the proceeds of the loans helped to fund ITT's ongoing operations; and, (2) they kept alive the deception that ITT had an independent, nonfederal source of tuition revenue. *See Bridge*, 553 U.S. at 658 ("Respondents' alleged injury … is the direct result of petitioners' fraud. It was a foreseeable and natural consequence of petitioners' scheme."). In the words of the Supreme Court, in an analogous context, the loans were certainly, "intertwined with the injury the conspirators sought to inflict." *Blue Shield of Va. v. McCready*, 457 U.S. 465, 484, (1982). *See also Brice*, 2021 WL 2936733, at *6 ("Plaintiffs need not show that any particular defendant here approved a particular loan to a particular plaintiff or class member. Given the fact that the predicate acts stem from the illegal loans themselves, the evidence supports that each of these defendants had requisite knowledge of, agreement to, involvement with, and direction of the operation ... that directly resulted in the usurious loans being provided to each plaintiff/class member and that directly injured each plaintiff/class.").

In their role as the servicer of PEAKS loan, Defendants had a direct nexus with Plaintiff's out-of-pocket losses, *i.e.*, the loan payments *made to Defendants*. The causation here is straightforward in precisely the sense demanded by the law. It is "what justice demands[] ... some direct relation between the injury asserted and the injurious conduct alleged." *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992) (emphasizing directness of injury and elucidating factors to be considered to assess causation); *Bridge*, 553 U.S. at 658.

### 6. There Are Genuine Issues of Material Fact Regarding the Individual Defendants' Liability under 18 U.S.C. § 1962(d)

Finally, Defendants argue that there are no disputes of material fact regarding the claims against the two named, high-ranking executives, David Johnson and Lawrence Chiavaro. Mem. at 10-11. This is flatly contradicted by the testimony of Defendants' own employees who identify both Mr. Johnson and Mr. Chiavaro as the

ones most deeply involved in the relationship with ITT. *See* Pltf.'s Sep. Stmt., ¶¶ 12-13. Mr. Chiavaro signed the initial agreement with Defendants. *Id.*, ¶ 13. More, with respect to CEO Johnson, the testimony of his own employees places him in the command of the fraudulent "ITT Recovery Payments." *Id.*, ¶ 34. Defendants offer only self-serving, blanket denials of participation in a criminal enterprise. Defs.' Sep. Stmt., ¶¶ 39-41. The issue of their involvement is plainly a disputed material fact precluding summary judgment.

Most of the case law on executive participation arises in considering whether the CEO took enough action to be characterized as managing or controlling the RICO enterprise within the meaning of 18 U.S.C. § 1962(c). Here Johnson and Chiavaro are not alleged to have managed or controlled the enterprise but to have agreed to facilitate it, in violation of 18 U.S.C. § 1962(d). Even under the stricter standard of 1962(c), all that need be shown is that they "have some part in directing those affairs." *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993). Clearly, Johnson and Chiavaro were not "unwitting foot soldiers" in the company they ran. *See Emcore Corp. v. PricewaterhouseCoopers LLP*, 102 F. Supp. 2d 237, 263 (D. N.J. 2000).

### 7.    Defendants' Motion is Premature

Defendants' motion is also premature. As is set forth in the Declaration of Irv Ackelsberg, full discovery has not occurred. For example, there have been no depositions of the individual Defendants and other key witnesses. Ackelsberg Decl., ¶ 7. Those Depositions are now noticed. *Id.*

Rule 56 itself anticipates this circumstance. Under Rule 56(f)(sic),[14] the court may postpone ruling on a summary judgment motion where the non-moving party needs "additional discovery to explore 'facts essential to justify the party's

---

[14]    Rule 56(f) was, by virtue of the 2010 amendments to the Federal Rules, re-cast, without change as Rule 56(d). *See* Rule 56 Advisory Notes and *Burns v. Town of Palm Beach*, 999 F.3d 1317, 1331 n.3 (11th Cir. 2021) (noting that pre-2010 case precedents remain applicable to the current rule).

BLOOD HURST & O' REARDON, LLP

Case No. 3:20-cv-00697-DMS-AHG

PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

opposition.'" *See Crawford–El v. Britton*, 523 U.S. 574, 599 n.20. (1998) (quoting Fed. R. Civ. P. 56(f)). Where full discovery has not been completed, summary judgment practice is disfavored. *Howard v. Foster*, 208 F. Supp. 3d 1152, 1158 (D. Nev. 2016) (citing *Jones v. Blanas*, 393 F.3d 918, 930 (9th Cir. 2004)) (finding an abuse of discretion in district court's denial of request for additional discovery before Rule 56 motion) (citing *Klingele v. Eikenberry*, 849 F.2d 409, 412 (9th Cir. 1988)). Indeed, summary judgment is only appropriate before discovery is completed if further discovery would be fruitless. *Longwell Textiles Ltd. v. Matrix Int'l Textile Inc*., 2020 WL 5991615, at *1 (C.D. Cal. Sept. 4, 2020) (citing *Jonas* and *Klingele*).

Here the original period ordered for discovery is not set to expire until July 25, 2022. Quite rationally, deposition discovery was set to follow after completion of document discovery. *See Smith v. OSF HealthCare Sys*., 933 F.3d 859, 868 (7th Cir. 2019) ("Lawyers in paper-heavy cases like this one know that it generally makes sense not to take a witness's deposition until they have the relevant documents in hand.") The depositions of Johnson and Chiavaro, among others, will be the first time that their blanket denials of knowledge or involvement of any kind in the ITT scheme will be tested against the documentary evidence amassed and which contradicts their claimed ignorance.

These depositions, are critical to assessing the credibility and the state of mind of the Defendants, the central issue in this case. What these men, and those working with them knew or should have known, about ITT and about the PEAKS loan scheme is the ultimate issue under 18 U.S.C. § 1962(d). It makes no sense to permit summary judgment practice *before* this kind of discovery is completed. This is especially so when, as here, Defendants rely so heavily on their own, as yet untested, exculpatory statements. *See Richards v. McKee*, 2013 WL 5819549, at *4 (E.D. Mich. Sept. 5, 2013), report and recommendation adopted, No. 12-14148, 2013 WL 5818562 (E.D. Mich. Oct. 29, 2013) ("Plaintiff's motion relies heavily on his own declarations and allegations in the complaint, but [the opposition] has not yet had the opportunity to

Case No. 3:20-cv-00697-DMS-AHG

PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

00187467

BLOOD HURST & O' REARDON, LLP

BLOOD HURST & O' REARDON, LLP

1    test those assertions in a deposition. Summary judgment is improper at this stage.").

2        **B.    Summary Adjudication of the UCL Claim Should Be Denied**

3        The Unfair Competition Law (UCL) permits a plaintiff to "obtain restitution

4    and/or injunctive relief against unfair or unlawful practices in order to protect the

5    public and restore to the parties in interest money or property taken by means of unfair

6    competition." *Kraus v. Trinity Mgmt. Servs., Inc.*, 23 Cal. 4th 116, 126 (2000).

7    Vervent does not deny it collected loan payments and was paid for doing so. FAC, ¶ 6

8    (Defendants earned $14 million in fees from collecting PEAKS loans.) Vervent

9    nonetheless contends it is not liable for UCL restitution because "Defendants never

10   had title to any of Plaintiffs' loan payments" and "never took a 'cut' of Plaintiffs'

11   payments" but were compensated "based on the total amount of the loans currently in

12   the PEAKS portfolio." Mem. at 21-22. Vervent concludes (without factual support)

13   that it kept no money "traceable to [Turrey], [and] it cannot now return anything to

14   her." *Id.* at 22.

15       Vervent misses the point. For the UCL, "restitution means the return of money

16   to those persons from whom it was taken or who had an ownership interest in it."

17   *Daniels v. Select Portfolio Servicing, Inc.*, 246 Cal. App. 4th 1150, 1187 (2016). This

18   means Vervent must have obtained something to which it was not entitled, and the

19   victims (the students) must have given up something they were entitled to keep. *Id.*

20   (citing *Day v. AT&T Corp.*, 63 Cal. App. 325, 340 (1998)). There is no requirement

21   that Vervent "had title" to the money it collected (whatever that means) or kept the

22   money. Indeed, Vervent's citations confirm this point of law—Plaintiff is entitled to

23   restitution of "money or property in which … she has a vested interest." *Kryvoshey v.*

24   *AHMSI Default Servs.*, 2019 WL 947546, at *9 (Cal. Ct. App. Feb. 27, 2019). Here,

25   there is no dispute Turrey has a vested interest in the money she paid toward the

26   PEAKS loans.

27       Moreover, there is liability under the UCL against a loan servicer to the extent

28   it "actively participated in a conspiracy to defraud" or was a "co-participant" in a

00187467

business practice that violates the UCL. *Daniels*, 246 Cal. App. 4th at 1188 (citing *People v. Bestline Prods., Inc.*, 61 Cal. App. 3d 879, 918-19 (1976)). *See also Am. Philatelic Soc'y v. Claibourne*, 3 Cal. 2d 689, 696-97 (1935); *People v. Toomey*, 157 Cal. App. 3d 1, 15 (1984). In short, by aiding and abetting the PEAKS loan scheme, Vervent and Activate Financial are liable for all money wrongfully obtained from PEAKS borrowers—regardless that they passed all or some of the money along to their co-conspirators.

Vervent alternatively argues that, at least, Turrey is not entitled to a full refund of her PEAKS loan payments because she obtained value from her ITT degree. Mem. at 22. First, the value (if any) of her ITT degree is irrelevant. Vervent is liable for money "taken by means of unfair competition." *Kraus*, 23 Cal. 4th at 126. Second, the argument at best highlights a disputed issue of fact. Turrey testified her ITT degree (which is not appropriately accredited) has been of no benefit in her chosen career of criminal justice. Turrey Decl., ¶¶ 2, 5.

As to Activate Financial in particular, it contends because Turrey made no payments after receiving an Activate Financial letter, Turrey lacks standing to pursue a UCL claim against it. Mem. at 21. As discussed below, Defendants (for the second time) recently settled with the named plaintiff with standing to pursue the UCL claim against Activate Financial. Plaintiff is prepared to substitute a new plaintiff who made payments after receiving an Activate Financial letter as soon as she is permitted to do so. Ackelsberg Decl., ¶ 8 and Ex. 18.

**C. Defendants' Arguments as to the Remaining Counts in the FAC Should Be Deferred until Plaintiff Is Allowed to Substitute New Named Plaintiffs with Standing to Raise Those Claims**

It is undisputed that, at the end of 2018, Defendants began to use a previously inactive, wholly-owned, debt collection company named Activate Financial LLC and that they used the defaulted PEAKS borrowers as a test group for launching this new line of business. *See* Rule 30(b)(6) testimony of Stephanie Jimenez at 58:13-87:9 (Ackelsberg Decl., Ex. 11). Count Two of the FAC seeks damages for the putative

BLOOD HURST & O' REARDON, LLP

PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

BLOOD HURST & O' REARDON, LLP

class under the Fair Debt Collection Practices Act, 15 U.S.C. § 1692k, against Defendant Activate Financial LLC and its CEO, Defendant David Johnson, for, among other things, collecting on invalid debts, in violation of 15 U.S.C. §§ 1692e, (2), 10 and 1692f(1). Count Three seeks damages under the California equivalent statute, the Rosenthal Fair Debt Collection Practice Act (RFDCPA), Cal. Civ. Code §§ 1788-1788.33. These are strict liability statutes. Collecting, or attempting to collect an invalid debt is an FDCPA or RFDCPA violation, even without knowledge of the invalidity. *Clark v. Capital Credit & Collection Servs.*, 460 F.3d 1162, 1175 (9th Cir. 2006).

In an attempt to exploit their having bought off the class representative with standing to pursue these claims, Defendants' lead argument for obtaining summary judgment on Counts Two and Three is the one-year statute of limitations for such suits. Mem. at 11.[15] But this is sheer gamesmanship that the Court should not tolerate. As Plaintiff argued before, in persuading the Court the first time this happened to grant leave to file the FAC to bring in Ms. Chambers as a substitute for Ms. Smith, "[s]ubstitution of unnamed class members for named plaintiffs who fall out of the case because of settlement or other reasons is a common and normally an unexceptionable ('routine') feature of class action litigation … in the federal courts…." *Phillips v. Ford Motor Co.*, 435 F.3d 785, 787 (7th Cir. 2006). Indeed, Plaintiff has already identified at least one such potential class member willing to take Ms. Chambers' place. *See* Ackelsberg Decl., ¶8. Accordingly, the Court should defer any substantive consideration of the remaining Counts in the FAC to allow Plaintiff

---

[15] Plaintiff Turrey herself received collection letters from Activate Financial, *see e.g.,* Ex. 16 to Ackelsberg Declaration (letter dated March 22, 2019), but did not, in response, send payments. However, her previous co-plaintiff, Tara Chambers, alleged that, after receiving such collection letters, she was persuaded to make payments to Activate Financial. FAC, ¶ 131. Marie Smith, the original co-plaintiff who was also picked off by Defendants, paid nothing on her PEAKS loan until 2019 when she made a payment to Activate Financial. *See* Complaint, ECF No. 1, ¶¶ 90-98.

00187467

the opportunity to request leave to file a Second Amended Complaint.

## IV. CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that Defendants' motion for summary judgment be denied.

Respectfully submitted,

Dated: February 11, 2022

BLOOD HURST & O'REARDON, LLP
TIMOTHY G. BLOOD (149343)
LESLIE E. HURST (178432)

By:      s/  Timothy G. Blood
         TIMOTHY G. BLOOD

501 West Broadway, Suite 1490
San Diego, CA  92101
Tel: 619/338-1100
619/338-1101 (fax)
tblood@bholaw.com
lhurst@bholaw.com

LANGER GROGAN & DIVER, PC
IRV ACKELSBERG (*pro hac vice*)
JOHN J. GROGAN (*pro hac vice*)
1717 Arch Street, Suite 4020
Philadelphia, PA  19103
Tel: 215/320-5660
215/320-5703 (fax)
iackelsberg@langergrogan.com
jgrogan@langergrogan.com

LAW OFFICE OF PAUL ARONS
PAUL ARONS (CA #84970)
685 Spring Street, Suite 104
Friday Harbor, WA  98250
Tel: 360/378-6496
360/378-6498 (fax)
lopa@rockisland.com

*Attorneys for Plaintiffs*

00187467

BLOOD HURST & O' REARDON, LLP

1

**CERTIFICATE OF SERVICE**

2     I hereby certify that on February 11, 2022, I electronically filed the foregoing

3 with the Clerk of the Court using the CM/ECF system which will send notification of

4 such filing to the e-mail addresses denoted on the Electronic Mail Notice List, and I

5 hereby certify that I have mailed the foregoing document or paper via the United

6 States Postal Service to the non-CM/ECF participants indicated on the Electronic

7 Mail Notice List.

8     I certify under penalty of perjury under the laws of the United States of America

9 that the foregoing is true and correct. Executed on February 11, 2022.

10

11                          *s/  Timothy G. Blood*
                                TIMOTHY G. BLOOD

12                          BLOOD HURST & O'REARDON, LLP
                            501 West Broadway, Suite 1490
13                          San Diego, CA  92101
                            Tel: 619/338-1100
14                          619/338-1101 (fax)
                            tblood@bholaw.com
15

16

17

18

19

20

21

22

23

24

25

26

27

28