# EXHIBIT 3

**IMPORTANT NOTICE**

THIS OFFERING IS AVAILABLE ONLY TO INVESTORS WHO ARE EITHER (1) QUALIFIED INSTITUTIONAL BUYERS ("QIBs") AS DEFINED IN RULE 144A PROMULGATED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") OR (2) INSTITUTIONAL "ACCREDITED INVESTORS" ("IAIs") AS DEFINED IN RULE 501(a)(1), (2), (3) or (7) OF REGULATION D UNDER THE SECURITIES ACT.

**IMPORTANT: You must read the following before continuing.** The following applies to the private placement memorandum following this page, and you are therefore advised to read this carefully before reading, accessing or making any other use of the private placement memorandum. In accessing the private placement memorandum, you agree to be bound by the following terms and conditions, including any modifications to them any time you receive any information from us as a result of such access.

NOTHING IN THIS ELECTRONIC TRANSMISSION CONSTITUTES AN OFFER OF SECURITIES FOR SALE IN ANY JURISDICTION WHERE IT IS UNLAWFUL TO DO SO. THIS OFFERING OF THE NOTES WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OR THE SECURITIES LAWS OF ANY STATE OF THE U.S. OR OTHER JURISDICTION AND THE NOTES MAY NOT BE OFFERED OR SOLD EXCEPT PURSUANT TO AN EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND APPLICABLE STATE OR LOCAL SECURITIES LAWS.

EXCEPT AS SET FORTH IN THE PRIVATE PLACEMENT MEMORANDUM, THE FOLLOWING PRIVATE PLACEMENT MEMORANDUM MAY NOT BE FORWARDED OR DISTRIBUTED TO ANY OTHER PERSON AND MAY NOT BE REPRODUCED IN ANY MANNER WHATSOEVER. ANY FORWARDING, DISTRIBUTION OR REPRODUCTION OF THIS PRIVATE PLACEMENT MEMORANDUM IN WHOLE OR IN PART IS UNAUTHORIZED. FAILURE TO COMPLY WITH THIS DIRECTIVE MAY RESULT IN A VIOLATION OF THE SECURITIES ACT OR THE APPLICABLE LAWS OF OTHER JURISDICTIONS.

**Confirmation of your Representation:** In order to be eligible to view this private placement memorandum or make an investment decision with respect to the notes, investors must be either (1) QIBs or (2) IAIs. This private placement memorandum is being sent at your request and by accepting the e-mail and accessing this private placement memorandum, you shall be deemed to have represented to us that (1) you and any customers you represent are either (a) QIBs or (b) IAIs and (2) you consent to delivery of such private placement memorandum by electronic transmission.

You are reminded that this private placement memorandum has been delivered to you on the basis that you are a person into whose possession this private placement memorandum may be lawfully delivered in accordance with the laws of the jurisdiction in which you are located and you may not, nor are you authorized to, deliver this private placement memorandum to any other person.

The materials relating to the offering do not constitute, and may not be used in connection with, an offer or solicitation in any place where offers or solicitations are not permitted by law. If a jurisdiction requires that the offering be made by a licensed broker or dealer and the syndication agent, or any affiliates of the syndication agent, are licensed brokers or dealers in that jurisdiction, the offering shall be deemed to be made by the syndication agent, or any such affiliates, on behalf of the trust in such jurisdiction.

This private placement memorandum has been sent to you in an electronic format. You are reminded that documents transmitted via this medium may be altered or changed during the process of electronic transmission and consequently neither the syndication agent nor any person who controls it nor any director, officer, employee nor agent of it or affiliate of any such person accepts any liability or responsibility whatsoever in respect of any difference between the private placement memorandum distributed to you in electronic format and the hard copy version available to you on request from the syndication agent.

**THIS PRIVATE PLACEMENT MEMORANDUM IS BEING PROVIDED ONLY TO (A) "QUALIFIED INSTITUTIONAL BUYERS" AS DEFINED IN RULE 144A ("QUALIFIED INSTITUTIONAL BUYERS") UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") OR (B) INSTITUTIONAL "ACCREDITED INVESTORS" AS DEFINED IN RULE 501(a)(1), (2), (3) OR (7) OF REGULATION D UNDER THE SECURITIES ACT ("INSTITUTIONAL ACCREDITED INVESTORS"). REPRODUCTION OR FURTHER DISTRIBUTION OF THIS PRIVATE PLACEMENT MEMORANDUM IS FORBIDDEN. THE OFFERING OF THE NOTES DESCRIBED IN THIS PRIVATE PLACEMENT MEMORANDUM WILL NOT BE REGISTERED UNDER THE SECURITIES ACT, ANY UNITED STATES STATE SECURITIES OR "BLUE SKY" LAWS OR ANY SECURITIES LAWS OF ANY OTHER JURISDICTION.**

PRIVATE PLACEMENT MEMORANDUM

# $225,000,000

**Student Loan Asset-Backed Senior Notes**

# PEAKS TRUST 2009-1

**Issuer**

## ITT Educational Services, Inc.

**Guarantor**

## Access Group, Inc.

**Origination Agent, Servicer and Administrator**

**Securities Offered by PEAKS Trust 2009-1 (the "Issuer" or the "Trust")**

- One class of senior notes as shown on the table below (the "**Notes**").

**Assets of the Trust**

- A pool of private education loans or participation interests in private education loans (such student loans, the "**Student Loans**") made to students attending or graduates of educational institutions owned and operated by ITT Educational Services, Inc. (the "**Guarantor**").
- The guaranty (the "**Guarantee**") of payment of the Notes and the Loan made by the Guarantor.

**Credit Enhancement**

- Corporate guaranty of the Guarantor
- Excess interest on the Student Loans
- Overcollateralization
- Reserve account

The Notes are asset-backed securities and, except with respect to the guaranty of payments on the Notes by the Guarantor as more fully described herein, are obligations of the Trust only.

You should carefully consider the risk factors beginning on page 19.

The Notes are not obligations of the originating lender, the origination agent, the servicer, the administrator, the owner trustee, the lender trustee, the secured party, the arranging agent, the syndication agent or any of their respective affiliates.

The Notes and the Student Loans are not guaranteed or insured by the United States or any governmental agency.

Payments on the Notes will be made on the 27th calendar day of each month or if the 27th is not a business day, the next business day. The first payment date for the Notes is March 1, 2010.

The Trust will also be the borrower under a loan (the "**Loan**") with a principal balance of $75,000,000, an interest rate equal to LIBOR plus 5.50% and a final maturity date on the payment date in January 2020. All payments by the Trust from available funds, payments under the Guarantee or from amounts on deposit in the reserve account to the holders of the Notes in respect of principal, interest or call premium will be made pari passu with payments to the lender in respect of principal, interest and call premium on the Loan.

| Notes | Initial Note Balance* | Interest Rate (per annum) | Final Maturity |
|---|---|---|---|
| Senior Notes | $225,000,000 | LIBOR + 5.50% | January 2020 |

* The proceeds of the sale of the Notes and the Loan will be used by the Trust to purchase Student Loans, fund a Reserve Account and pay certain fees.

**Neither the Securities and Exchange Commission nor any other federal regulatory authority or state securities commission has approved, recommended or disapproved the securities described in this private placement memorandum or determined if this private placement memorandum is truthful or complete. No securities commission or regulatory authority has reviewed the accuracy or adequacy of this private placement memorandum. Any representation to the contrary is a criminal offense.**

Other than as provided in this private placement memorandum, no person has been authorized to give any information or to make any representations other than as contained in this private placement memorandum and, if given or made, such information or representations must not be relied upon. This private placement memorandum does not constitute an offer to sell, or a solicitation of an offer to buy, any securities other than the Notes, nor an offer of such securities to any person in any state or other jurisdiction in which it is unlawful to make such offer or solicitation. The delivery of this private placement memorandum at any time does not imply that the information in this private placement memorandum is correct as of any time subsequent to its date.

We are not offering the Notes in any state or other jurisdiction where the offer is prohibited.

The Notes offered by this private placement memorandum will be placed by Deutsche Bank Securities Inc. (the "Syndication Agent") on behalf of the Issuer, and are being offered from time to time in one or more privately negotiated transactions or otherwise at a price to be determined at the time of sale. Neither the Syndication Agent nor any other person will act as an initial purchaser in connection with the offering and sale of the Notes.

## DEUTSCHE BANK SECURITIES INC.

Syndication Agent

January 19, 2010

The information contained in this private placement memorandum is intended for use solely by (i) "qualified institutional buyers" as defined in Rule 144A under the Securities Act ("**Qualified Institutional Buyers**") and (ii) institutional "accredited investors" as defined in Rule 501(a)(1), (2), (3) or (7) of Regulation D under the Securities Act ("**Institutional Accredited Investors**") to whom this document is delivered, and may not be reproduced in whole or in part.

**FOR NEW HAMPSHIRE RESIDENTS: NEITHER THE FACT THAT A REGISTRATION STATEMENT OR AN APPLICATION FOR A LICENSE HAS BEEN FILED UNDER NEW HAMPSHIRE REVISED STATUTES ANNOTATED, CHAPTER 421-B ("RSA 421-B") WITH THE STATE OF NEW HAMPSHIRE NOR THE FACT THAT A SECURITY IS EFFECTIVELY REGISTERED OR A PERSON IS LICENSED IN THE STATE OF NEW HAMPSHIRE CONSTITUTES A FINDING BY THE SECRETARY OF STATE OF NEW HAMPSHIRE THAT ANY DOCUMENT FILED UNDER RSA 421-B IS TRUE, COMPLETE AND NOT MISLEADING. NEITHER ANY SUCH FACT NOR THE FACT THAT ANY EXEMPTION OR EXCEPTION IS AVAILABLE FOR A SECURITY OR A TRANSACTION MEANS THAT THE SECRETARY OF STATE OF NEW HAMPSHIRE HAS PASSED IN ANY WAY UPON THE MERITS OR QUALIFICATIONS OF, OR RECOMMENDED OR GIVEN APPROVAL TO, ANY PERSON, SECURITY OR TRANSACTION. IT IS UNLAWFUL TO MAKE, OR CAUSE TO BE MADE, TO ANY PROSPECTIVE PURCHASER, CUSTOMER OR CLIENT ANY REPRESENTATION INCONSISTENT WITH THE PROVISIONS OF THIS PARAGRAPH.**

**THIS PRIVATE PLACEMENT MEMORANDUM IS FOR YOUR PRIVATE INFORMATION, AND DEUTSCHE BANK SECURITIES INC. (THE "SYNDICATION AGENT") IS NOT SOLICITING ANY ACTION BASED UPON IT. THIS PRIVATE PLACEMENT MEMORANDUM IS NOT TO BE CONSTRUED AS AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY ANY SECURITY IN ANY JURISDICTION WHERE SUCH AN OFFER OR SOLICITATION WOULD BE ILLEGAL. THE NOTES REFERRED TO IN THIS PRIVATE PLACEMENT MEMORANDUM, AND THE ASSETS BACKING THEM, ARE SUBJECT TO MODIFICATION OR REVISION AND ARE OFFERED ON A "WHEN, AS AND IF ISSUED" BASIS. YOU UNDERSTAND THAT, WHEN YOU ARE CONSIDERING THE PURCHASE OF THESE NOTES, A CONTRACT OF SALE WILL COME INTO BEING NO SOONER THAN THE DATE ON WHICH THE NOTES HAVE BEEN PRICED AND WE HAVE CONFIRMED THE ALLOCATION OF NOTES TO BE MADE TO YOU; ANY "INDICATIONS OF INTEREST" EXPRESSED BY YOU, AND ANY "SOFT CIRCLES" GENERATED BY US, WILL NOT CREATE BINDING CONTRACTUAL OBLIGATIONS FOR YOU OR FOR US. AS A RESULT OF THE FOREGOING, YOU MAY COMMIT TO PURCHASE NOTES THAT HAVE CHARACTERISTICS THAT MAY CHANGE, AND YOU ARE ADVISED THAT ALL OR A PORTION OF THE NOTES HAVING THE CHARACTERISTICS DESCRIBED IN THIS PRIVATE PLACEMENT MEMORANDUM MAY NOT BE ISSUED. OUR OBLIGATION TO SELL NOTES TO YOU IS CONDITIONED ON THE NOTES THAT ARE ACTUALLY ISSUED HAVING THE CHARACTERISTICS DESCRIBED IN THIS PRIVATE PLACEMENT MEMORANDUM DELIVERED TO YOU PRIOR TO PRICING. IF WE**

**DETERMINE THAT THAT CONDITION IS NOT SATISFIED IN ANY MATERIAL RESPECT, WE WILL NOTIFY YOU, AND NEITHER THE ISSUER NOR THE SYNDICATION AGENT WILL HAVE ANY OBLIGATION TO YOU TO DELIVER ANY PORTION OF THE NOTES WHICH YOU HAVE COMMITTED TO PURCHASE, AND THERE WILL BE NO LIABILITY BETWEEN US AS A CONSEQUENCE OF SUCH NON-DELIVERY. YOU HAVE REQUESTED THAT THE SYNDICATION AGENT PROVIDE YOU INFORMATION IN CONNECTION WITH YOUR CONSIDERATION OF THE PURCHASE OF THE NOTES DESCRIBED IN THIS PRIVATE PLACEMENT MEMORANDUM. THE INFORMATION CONTAINED HEREIN SUPERSEDES ANY PREVIOUS SUCH INFORMATION DELIVERED TO YOU AND MAY BE SUPERSEDED BY INFORMATION DELIVERED TO YOU PRIOR TO TIME OF SALE. THE SYNDICATION AGENT AND/OR ITS EMPLOYEES MAY FROM TIME TO TIME HAVE A LONG OR SHORT POSITION IN ANY CONTRACT FOR NOTES DISCUSSED IN THIS PRIVATE PLACEMENT MEMORANDUM.**

**INVESTMENT IN THE NOTES INVOLVES THE ASSUMPTION OF CERTAIN RISKS BY THE REGISTERED OWNERS OF THE NOTES. SEE "*RISK FACTORS*" FOR A DISCUSSION OF CERTAIN FACTORS THAT SHOULD BE CONSIDERED BY A PROSPECTIVE PURCHASER IN CONNECTION WITH AN INVESTMENT IN THE NOTES.**

**THE NOTES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OR ANY STATE SECURITIES LAWS OR "BLUE SKY" LAWS AND, UNLESS SO REGISTERED, MAY NOT BE OFFERED OR SOLD EXCEPT PURSUANT TO AN EXEMPTION FROM OR IN A TRANSACTION NOT SUBJECT TO THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS. ACCORDINGLY, THIS PRIVATE PLACEMENT MEMORANDUM IS BEING PROVIDED ON A CONFIDENTIAL BASIS, AND THE NOTES ARE BEING OFFERED AND SOLD, ONLY TO (A) QUALIFIED INSTITUTIONAL BUYERS UNDER RULE 144A OF THE SECURITIES ACT, OR (B) INSTITUTIONAL ACCREDITED INVESTORS UNDER AS DEFINED IN RULE 501(a)(1), (2), (3) or (7) OF REGULATION D OF THE SECURITIES ACT. PROSPECTIVE PURCHASERS SHOULD BE AWARE THAT THEY MAY BE REQUIRED TO BEAR THE FINANCIAL RISKS OF AN INVESTMENT IN THE NOTES FOR AN INDEFINITE PERIOD OF TIME.**

**ALL NOTES WILL BE ISSUED IN FULLY REGISTERED DEFINITIVE FORM.**

**EACH PURCHASER OF NOTES OFFERED HEREBY WILL BE REQUIRED TO ENTER INTO A NOTE PURCHASE AGREEMENT (AS DEFINED BELOW UNDER "*THE TRANSACTION DOCUMENTS*") AND TO MAKE THE ACKNOWLEDGMENTS, REPRESENTATIONS AND AGREEMENTS CONTAINED THEREIN AND TO EXECUTE AN INVESTMENT LETTER DESCRIBED HEREIN. EACH INVESTOR SHOULD CONDUCT AN INDEPENDENT INVESTIGATION OF THE RISKS INVOLVED WITH OWNERSHIP OF THE NOTES AND FAMILIARIZE ITSELF WITH THE AFFAIRS OF THE ISSUER AND THE GUARANTOR.**

**THIS PRIVATE PLACEMENT MEMORANDUM IS BEING PROVIDED FOR INFORMATIONAL USE SOLELY IN CONNECTION WITH THE CONSIDERATION OF THE PURCHASE OF THE NOTES. ITS USE FOR ANY OTHER PURPOSE IS NOT AUTHORIZED. IT MAY NOT BE COPIED OR REPRODUCED IN WHOLE OR IN PART, NOR MAY IT BE DISTRIBUTED NOR MAY ANY OF ITS CONTENTS BE DISCLOSED TO ANYONE OTHER THAN THE PROSPECTIVE INVESTORS TO WHOM IT IS BEING PROVIDED. THE APPLICABLE PARTY WILL FURNISH ANY ADDITIONAL INFORMATION (TO THE EXTENT SUCH PARTY HAS SUCH INFORMATION OR CAN ACQUIRE SUCH INFORMATION WITHOUT UNREASONABLE EFFORT OR EXPENSE) NECESSARY TO VERIFY THE INFORMATION FURNISHED IN THIS PRIVATE PLACEMENT MEMORANDUM.**

**AN INVESTOR OR POTENTIAL INVESTOR IN THE NOTES (AND EACH EMPLOYEE, REPRESENTATIVE OR OTHER AGENT OF THE INVESTOR OR POTENTIAL INVESTOR) MAY DISCLOSE TO ANY AND ALL PERSONS, WITHOUT LIMITATION OF ANY KIND, THE TAX TREATMENT OR TAX STRUCTURE, AS DEFINED IN UNITED STATES TREASURY REGULATIONS SECTION 1.6011-4, OF THE TRANSACTION AND ALL MATERIALS OF ANY KIND (INCLUDING OPINIONS OR OTHER TAX ANALYSES) THAT ARE PROVIDED TO SUCH INVESTOR OR POTENTIAL INVESTOR (AND EACH EMPLOYEE, REPRESENTATIVE OR OTHER AGENT OF THE INVESTOR OR POTENTIAL INVESTOR) RELATING TO SUCH TAX TREATMENT BUT MAY NOT DISCLOSE ANY INFORMATION RELATING TO THIS TRANSACTION, UNLESS SUCH INFORMATION IS RELATED TO THE TAX TREATMENT OR TAX STRUCTURE OF THE TRANSACTION.**

**THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED, AND SECTION 4975 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED, IMPOSE CERTAIN REQUIREMENTS ON THOSE EMPLOYEE BENEFIT PLANS OR OTHER RETIREMENT ARRANGEMENTS TO WHICH THEY APPLY (EACH A "PLAN") AND ON THOSE PERSONS WHO ARE FIDUCIARIES WITH RESPECT TO THE ASSETS OF SUCH PLANS. THE NOTES MAY GENERALLY BE ACQUIRED BY A TRANSFEREE FOR, ON BEHALF OF OR WITH THE ASSETS OF A PLAN, SUBJECT TO THE CONSIDERATIONS DESCRIBED UNDER "*ERISA CONSIDERATIONS*" IN THIS PRIVATE PLACEMENT MEMORANDUM.**

**THE INFORMATION CONTAINED IN THIS PRIVATE PLACEMENT MEMORANDUM HAS BEEN FURNISHED BY THE ISSUER, THE GUARANTOR AND OTHER SOURCES BELIEVED BY THE ISSUER TO BE RELIABLE. NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, IS MADE BY THE SYNDICATION AGENT AS TO THE ACCURACY OR COMPLETENESS OF THE INFORMATION SET FORTH HEREIN, AND NOTHING CONTAINED HEREIN IS OR SHALL BE RELIED UPON AS A PROMISE OR REPRESENTATION BY THE SYNDICATION AGENT AS TO THE PAST OR THE FUTURE. THE SYNDICATION AGENT HAS NOT INDEPENDENTLY VERIFIED ANY OF SUCH INFORMATION AND ASSUMES NO RESPONSIBILITY FOR THE ACCURACY OR COMPLETENESS OF SUCH INFORMATION.**

**IN MAKING AN INVESTMENT DECISION REGARDING THE NOTES OFFERED HEREBY, PROSPECTIVE INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE ISSUER, ITS BUSINESS, THE GUARANTOR, ITS BUSINESS, AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. PROSPECTIVE INVESTORS ARE NOT TO CONSTRUE THE CONTENTS HEREOF AS INVESTMENT, LEGAL OR TAX ADVICE. EACH INVESTOR SHOULD CONSULT ITS OWN COUNSEL, ACCOUNTANT AND OTHER ADVISORS AS TO LEGAL, TAX, BUSINESS, FINANCIAL AND RELATED ASPECTS OF AN INVESTMENT IN THE NOTES. NEITHER THE ISSUER, THE GUARANTOR NOR THE SYNDICATION AGENT IS MAKING ANY REPRESENTATION TO ANY OFFEREE OR PURCHASER OF THE NOTES REGARDING THE LEGALITY OF AN INVESTMENT IN THE NOTES BY SUCH OFFEREE OR PURCHASER UNDER APPLICABLE LEGAL INVESTMENT OR SIMILAR LAWS. THE OFFERING IS BEING MADE SOLELY ON THE BASIS HEREOF. ANY DECISION TO PURCHASE NOTES MUST BE BASED ON THE INFORMATION CONTAINED HEREIN. EACH PURCHASER OF THE NOTES MUST COMPLY WITH ALL APPLICABLE LAWS AND REGULATIONS IN FORCE IN ANY JURISDICTION IN WHICH IT PURCHASES, OFFERS OR SELLS THE NOTES OR POSSESSES OR DISTRIBUTES THIS PRIVATE PLACEMENT MEMORANDUM AND MUST OBTAIN ANY CONSENT, APPROVAL OR PERMISSION REQUIRED BY IT FOR THE PURCHASE, OFFER OR SALE BY IT OF THE NOTES UNDER THE LAWS AND REGULATIONS IN FORCE IN ANY JURISDICTION TO WHICH IT IS SUBJECT OR IN WHICH IT MAKES SUCH PURCHASES, OFFERS OR SALES, AND NONE OF THE ISSUER, THE GUARANTOR OR THE SYNDICATION AGENT HAVE RESPONSIBILITY THEREFOR.**

**NO PERSON IS AUTHORIZED IN CONNECTION WITH THIS OFFERING TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION NOT CONTAINED HEREIN AND, IF GIVEN OR MADE, SUCH OTHER INFORMATION OR REPRESENTATION MUST NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE ISSUER, THE GUARANTOR OR THE SYNDICATION AGENT. THE INFORMATION CONTAINED OR INCORPORATED HEREIN BY REFERENCE IS AS OF THE DATE HEREOF AND IS SUBJECT TO CHANGE, COMPLETION OR AMENDMENT WITHOUT NOTICE. NEITHER THE DELIVERY HEREOF AT ANY TIME NOR ANY SUBSEQUENT COMMITMENT TO ENTER INTO ANY FINANCING SHALL, UNDER ANY CIRCUMSTANCES, CREATE ANY IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION SET FORTH OR INCORPORATED BY REFERENCE HEREIN OR IN THE AFFAIRS OF THE ISSUER, THE GUARANTOR OR ANY RELEVANT PARTY SINCE THE DATE HEREOF.**

**THE NOTES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. SEE "*NOTICE TO INVESTORS: TRANSFER RESTRICTIONS*" HEREIN.**

**NOTICE TO RESIDENTS OF THE UNITED KINGDOM: THE SYNDICATION AGENT AND THE ISSUER: (A) HAVE ONLY COMMUNICATED OR CAUSED TO BE COMMUNICATED AND WILL ONLY COMMUNICATE OR CAUSE TO BE COMMUNICATED ANY INVITATION OR INDUCEMENT TO ENGAGE IN INVESTMENT ACTIVITY (WITHIN THE MEANING OF SECTION 21 OF THE FINANCIAL SERVICES AND MARKETS ACT 2000 ("FSMA")) RECEIVED BY THEM IN CONNECTION WITH THE ISSUE OR SALE OF ANY NOTES IN CIRCUMSTANCES IN WHICH SECTION 21(1) OF THE FSMA DOES NOT APPLY TO THE TRUST; AND (B) HAVE COMPLIED AND WILL COMPLY WITH ALL APPLICABLE PROVISIONS OF THE FSMA WITH RESPECT TO ANYTHING DONE BY THEM IN RELATING TO THE NOTES IN, FROM OR OTHERWISE INVOLVING THE UNITED KINGDOM.**

**THE NOTES MAY NOT BE OFFERED OR SOLD TO PERSONS IN THE UNITED KINGDOM IN A TRANSACTION THAT RESULTS IN AN OFFER TO THE PUBLIC WITHIN THE MEANING OF THE SECURITIES LAWS OF THE UNITED KINGDOM.**

**THE NOTES ARE OFFERED PURSUANT TO A CLAIM OF EXEMPTION UNDER SECTION 517.061 OF THE FLORIDA SECURITIES ACT (THE "FLORIDA ACT") AND HAVE NOT BEEN REGISTERED UNDER THE FLORIDA ACT IN THE STATE OF FLORIDA. FLORIDA RESIDENTS WHO ARE NOT INSTITUTIONAL INVESTORS DESCRIBED IN SECTION 517.061(7) OF THE FLORIDA ACT HAVE THE RIGHT TO VOID THEIR PURCHASES OF THE NOTES WITHOUT PENALTY WITHIN THREE DAYS AFTER THE FIRST TENDER OF CONSIDERATION.**

**THE INFORMATION CONTAINED HEREIN SUPERSEDES ANY PREVIOUS SUCH INFORMATION DELIVERED TO YOU, INCLUDING ANY INVESTOR PRESENTATION OR ANY EARLIER DRAFT OR VERSION HEREOF PREVIOUSLY DELIVERED TO PROSPECTIVE INVESTORS, AND ANY OF THE CONTENTS HEREIN MAY BE SUPERSEDED BY OTHER INFORMATION DELIVERED TO YOU PRIOR TO THE TIME OF CONTRACT OF SALE. THE INFORMATION CONTAINED HEREIN IS PRELIMINARY AND IS SUBJECT TO COMPLETION OR CHANGE. THE INFORMATION CONTAINED HEREIN MAY BE BASED ON PRELIMINARY ASSUMPTIONS ABOUT THE STUDENT LOANS OR PARAMETERS AND THE STRUCTURE OF THE TRANSACTION. ANY SUCH ASSUMPTIONS ARE SUBJECT TO CHANGE. IF THERE ARE MATERIAL CHANGES BETWEEN (A) THE INFORMATION CONTAINED HEREIN OR IN ANY SUBSEQUENT COMMUNICATION PRIOR TO THE TIME OF CONTRACT OF SALE AND (B) THE FINAL PRIVATE PLACEMENT MEMORANDUM, YOU SHOULD REVIEW THE CHANGES AND CONSIDER THEM IN CONNECTION WITH YOUR INVESTMENT DECISION.**

---

**TO ENSURE COMPLIANCE WITH INTERNAL REVENUE SERVICE CIRCULAR 230, TAXPAYERS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES IN THIS PRIVATE PLACEMENT**

**MEMORANDUM IS NOT INTENDED OR WRITTEN BY US TO BE RELIED UPON, AND CANNOT BE RELIED UPON, BY TAXPAYERS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON TAXPAYERS UNDER THE CODE; (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) TAXPAYERS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

---

The Notes will be available only to investors that are (a) Qualified Institutional Buyers pursuant to Rule 144A of the Securities Act, or (b) institutional Accredited Investors as defined in Rule 501(a)(1), (2), (3) or (7) of Regulation D of the Securities Act and only in physical form.

## AVAILABLE INFORMATION

To permit compliance with Rule 144A under the Securities Act for resales of notes, the Issuer will make available to holders and prospective purchasers who request such information, the information required to be delivered under Rule 144A(d)(4) of the Securities Act if, at the time of the request, the Issuer is not a reporting company under section 13 or section 15(d) of the Securities Exchange Act of 1934, as amended, also known as the "**Securities Exchange Act**." Copies of all such documents may be obtained free of charge from the office of the Owner Trustee (as defined below). The Issuer does not expect to become a reporting company under the Securities Exchange Act.

Investors should review the CD-ROM that will be attached hereto as Appendix A containing copies of forms of the Transaction Documents (as defined below) that are expected to be entered into on or before the closing date.

## SPECIAL NOTE REGARDING FORWARD LOOKING STATEMENTS

Statements in this private placement memorandum, including those concerning expectations as to the Issuer's ability to pay the Notes, the Guarantor's ability to pay its obligations under the Guarantee, and certain other information presented in this private placement memorandum, constitute "forward looking statements," which represent the Issuer's or the Guarantor's expectations and beliefs about future events. Actual results may vary materially from such expectations. For a discussion of certain of the factors which could cause actual results to differ from expectations, please see the information under the caption entitled "*Risk Factors*" in this private placement memorandum.

**Purchase Funding Mechanics Diagram**



# TABLE OF CONTENTS

**Private Placement Memorandum** **Page**

SUMMARY OF TERMS ....... 1
RISK FACTORS ....... 19
FORMATION OF THE TRUST ....... 32
THE GUARANTOR ....... 36
THE SERVICER AND ADMINISTRATOR ....... 39
THE ORIGINATING LENDER ....... 43
DESCRIPTION OF THE STUDENT LOANS ....... 43
PREPAYMENT AND YIELD CONSIDERATIONS ....... 46
THE TRANSACTION DOCUMENTS ....... 47
DESCRIPTION OF THE NOTES ....... 48
MATERIAL FEDERAL INCOME TAX CONSEQUENCES ....... 63
STATE AND OTHER TAX CONSEQUENCES ....... 68
ERISA CONSIDERATIONS ....... 69
INVESTOR SUITABILITY ....... 71
NOTICE TO INVESTORS: TRANSFER RESTRICTIONS ....... 71
PRIVATE PLACEMENT ....... 73
LEGAL MATTERS ....... 74
RATINGS ....... 74

APPENDIX A FORMS OF TRANSACTION DOCUMENTS A-1
APPENDIX B INFORMATION MEMORANDUM B-1

## SUMMARY OF TERMS

This summary highlights selected information from this private placement memorandum, referred to herein as the "private placement memorandum." It does not contain all of the information that you need to consider in making your investment decision. You should read carefully this entire private placement memorandum in order to understand all of the terms of the offering of the Notes. This summary provides an overview to aid your understanding and is qualified by the full description of the information in this private placement memorandum.

### THE TRUST

PEAKS Trust 2009-1 is a Delaware statutory trust (the "**Trust**" or the "**Issuer**") formed pursuant to a trust agreement dated December 23, 2009. Its principal address is in care of Deutsche Bank Trust Company Delaware, as the owner trustee (in such capacity, the "**Owner Trustee**"), located at 1011 Centre Road, Suite 200, Wilmington, Delaware 19805. The Trust will issue student loan asset-backed senior notes (the "**Notes**") to investors and a subordinated variable funding note to the Guarantor (the "**Subordinated Note**"). The Trust will also be the borrower under a loan (the "**Loan**" and together with the Notes, the "**Senior Credit**"). The Trust will use the proceeds it obtains from the sale of the Notes and the borrowing under the Loan (and, solely with respect to clause (i)(a) below, amounts received from advances on the Subordinated Note), to (i) make a deposit to an account (the "**Acquisition Account**") from which funds on deposit will be used to (a) purchase full beneficial ownership of private education loans (the "**Student Loans**") or a 100% participation interest (a "**Participation Interest**") in all collections on or proceeds of a Student Loan which is only partially disbursed (each, a "**Partially Disbursed Student Loan**") from the Originating Lender, and (b) pay the Syndication Agent Fee (as defined below under "*Principal Parties—Arranging Agent and Syndication Agent*") and (ii) fund a reserve account (the "**Reserve Account**") with amounts expected to be sufficient to pay interest on the Senior Credit and fees of the Trust through the Payment Date in January 2012.

Payments on the Notes will be made on the 27th calendar day of each month or if the 27th is not a business day, the next business day (each, a "**Payment Date**"). The first Payment Date for the Notes is March 1, 2010.

With respect to any Payment Date, the "**Interest Period**" for the Senior Credit will be (i) with respect to the first Payment Date, the period commencing on and including the Closing Date and ending on and including the day immediately preceding such Payment Date and (ii) with respect to each Payment Date thereafter, the period beginning on and including the Payment Date immediately preceding such Payment Date and ending on and including the day immediately preceding such Payment Date.

The Loan will be made by a lender (the "**Lender**") with an initial principal balance of $75,000,000. All payment terms of the Loan, including but not limited to, payment dates, interest rate, calculations of interest, entitlement to principal and call premium and maturity date, are identical to the corresponding payment terms on the Notes. All payments by the Trust from available funds, payments under the Guarantee (as defined below) or from amounts on deposit in the Reserve Account to the holders of the Notes in respect of principal, interest or call premium will be made pari passu with payments to the Lender in respect of

principal, interest and call premium on the Loan.

The person in whose name a Note is registered in the note register is referred to in this private placement memorandum as a "**Noteholder**" and the Noteholders, together with the Lender, are referred to herein as the "**Senior Creditors**".

**THE GUARANTOR AND THE GUARANTEE**

ITT Educational Services, Inc. (the "**Guarantor**") is a leading for-profit provider of postsecondary degree programs in the United States, based on revenue and student enrollment. All of the Guarantor's locations are authorized by the applicable education authorities of the states in which they operate and are accredited by an accrediting commission recognized by the United States Department of Education (the "**Department of Education**"). The Guarantor's corporate headquarters is located in Carmel, Indiana. See "*The Guarantor*" in this private placement memorandum for more information concerning the Guarantor.

Pursuant to a guarantee agreement (the "**Guarantee**") to be entered into by the Guarantor and the Secured Party (as defined below under "*Principal Parties—Secured Party*") on behalf of the Senior Creditors, the Guarantor will unconditionally and irrevocably guarantee payment of (i) all Program Fees (as defined below under "*Description of the Notes—Program Fees*"), (ii) all interest payable on the Senior Credit on any Payment Date or at the maturity of the Senior Credit (including as a result of the acceleration of the maturity of the Senior Credit following an event of default under the Indenture and Credit Agreement (as defined below under "*The Transaction Documents*")), (iii) principal due and payable on the Senior Credit at the maturity of the Senior Credit (including as a result of the acceleration of the maturity of the Senior Credit following an event of default under the Indenture and Credit Agreement), (iv) any Call Premium (as defined below under "*Description of the Notes—Principal Payments*") due upon a prepayment in full of the Senior Credit, (v) on any Payment Date after the Payment Date in February 2012, the Arranging Agent Fee (as defined below under "*Principal Parties—Arranging Agent and Syndication Agent*") for such Payment Date, (vi) on any Payment Date related to a Monthly Measurement Date on which the Asset/Liability Test (as defined below) is not satisfied, (a) an amount sufficient to reduce the Senior Credit Balance (as defined below) to an amount that would satisfy the Asset/Liability Test if the Asset/Liability Test were calculated giving effect to such reduction, and (b) any Call Premium that would be payable upon a payment of principal on the Senior Credit of the amount set forth in clause (a), and (vii) to the extent not otherwise covered pursuant to clauses (i) - (vi) above, any principal and interest payable on the Senior Credit when due and any Call Premium due upon a prepayment in full of the Senior Credit (the payments referred to in clauses (i) through (vii) together, the "**Guaranteed Payments**").

The "**Asset/Liability Test**" will be satisfied (i) on each Monthly Measurement Date on which no Trigger (as defined below) is in effect, if the Asset/Liability Ratio (as defined below) is greater than or equal to 105% and (ii) on each Monthly Measurement Date on which a Trigger is in effect, if the Asset/Liability Ratio is greater than or equal to 140%.

The "**Asset/Liability Ratio**" means a fraction expressed as a percentage, determined on each Monthly Measurement Date, equal to (i) the sum of (a) the aggregate Student Loan Balance (as defined below under "*Description of the Student Loans—Program Guidelines*")

of and accrued interest on all Student Loans (including Partially Disbursed Student Loans with respect to which the Trust holds a Participation Interest) less than 180 days delinquent and (b) amounts on deposit in the Reserve Account and the collection account of the Trust (the "**Collection Account**") over (ii) the aggregate outstanding Senior Credit Balance and accrued interest on the Senior Credit less any amounts on deposit in the Acquisition Account, all as of the end of the related Collection Period (as defined below under "*—Description of the Student Loans—Collection Period*").

A "**Trigger**" will be in effect on any Payment Date upon the occurrence of any of the following as of any prior quarterly measurement date (and which is not cured as of a subsequent quarterly measurement date), in each case calculated for the Guarantor and its majority owned subsidiaries on a consolidated basis (except, with respect to the third and fourth bulleted clauses below, to the extent any such majority owned subsidiary is subject to any restriction that limits such subsidiary's ability to dividend or distribute to the Guarantor any (i) funds contained in the entries "cash," "cash equivalents," "restricted cash" and "short-term investments" (or any such substantially similar category that is a successor to any such category as noted on the financial statements of the Guarantor) on the balance sheet of the Guarantor or (ii) Short Term Investments (as defined herein under "*Description of the Notes—Glossary*") of the Guarantor):

- the ratio of the Guarantor's debt on such date (exclusive of the amount of guarantees that under generally accepted accounting principles ("**GAAP**") are not required to be recorded as a liability on the Guarantor's financial statements) to its earnings before interest, taxes, depreciation and amortization ("**EBITDA**") for the period of the four consecutive fiscal quarters ended on such date is greater than 2.50:1.00;

- the ratio of the Guarantor's debt on such date (inclusive of the amount of guarantees that under GAAP are not required to be recorded as a liability on the Guarantor's financial statements) to its EBITDA for the period of the four consecutive fiscal quarters ended on such date is greater than 3.50:1.00;

- the sum of the entries "cash," "cash equivalents" and "restricted cash" (or any such substantially similar category that is a successor to any such category as noted on the financial statements of the Guarantor) on the balance sheet of the Guarantor, determined in accordance with GAAP, plus Short Term Investments of the Guarantor, is less than $100,000,000;

- the sum of the entries "cash," "cash equivalents," "restricted cash" and "short-term investments" (or any such substantially similar category that is a successor to any such category as noted on the financial statements of the Guarantor) on the balance sheet of the Guarantor, determined in accordance with GAAP, plus the amount available to be drawn under a revolving credit facility available to the Guarantor is less than $200,000,000; or

- schools owned and operated by the Guarantor representing more than 25% of the Guarantor's revenues for the four consecutive fiscal quarters ended on such quarterly measurement date are ineligible to receive funds provided pursuant to Title IV of the Higher Education Act of 1965, as

amended (the "**Higher Education Act**").

The "**Initial Note Balance**" of the Notes is $225,000,000. The "**Note Balance**" of the Notes with respect to any Payment Date will be equal to the excess of (i) the Initial Note Balance over (ii) the aggregate of amounts actually paid as principal to the holders of the Notes. The "**Senior Credit Balance**" with respect to any date of determination will be the sum of the Note Balance with respect to such date and the outstanding principal balance of the Loan with respect to such date. On the closing date, the Senior Credit Balance will be $300,000,000.

The Guarantor will be required to make a payment under the Guarantee to the extent that Available Funds (as defined below under "*Description of the Notes—General*") and, solely with respect to the amounts described in clauses (i) and (ii) in the definition of "Guaranteed Payments" above, funds on deposit in the Reserve Account, are insufficient to make any payments of the type described in the definition of "Guaranteed Payments." The Guarantee will be entered into by the Guarantor and the Secured Party and will be an asset of the Trust.

The Secured Party will enforce the Guarantee and make claims thereon on behalf of Senior Creditors. If the Guarantor is timely notified by the Secured Party that it must make a payment under the Guarantee, it will be required to deposit the required amount of such payment into the Collection Account by the related Payment Date.

The Guarantor is entering into the Guarantee to provide credit support to the Trust and will not receive any monetary consideration for providing the Guarantee. When all of the Senior Credit has been paid in full, the Guarantor will be entitled to a reimbursement by the Trust of all amounts paid by the Guarantor under the Guarantee and repayment by the Trust of amounts borrowed by the Trust from the Guarantor under the Subordinated Note to the extent of Available Funds.

Pursuant to the purchase obligation agreement to be entered into (the "**Purchase Obligation Agreement**") among the Guarantor, the Secured Party and the initial Senior Creditors, in the event that, subsequent to the Closing Date, there is any legislative change enacted into law to reduce the maximum allowable percentage of the Guarantor's cash revenues derived from funding under Title IV of the Higher Education Act from 90% to 75% or less, each Senior Creditor will have the right to require the Guarantor to purchase the Senior Credit owned by such Senior Creditor at a purchase price equal to the unpaid principal amount of such Senior Credit, together with interest accrued thereon to the purchase date. Additionally, in the event the Guarantor enters into a transaction similar to the transaction described in this private placement memorandum in which Deutsche Bank Securities Inc. (or an affiliate thereof) acts as arranging agent, collateral agent, placement agent, syndication agent, indenture trustee, lender trustee or owner trustee and which contains a right for investors to require the Guarantor to purchase their investment in such transaction, in whole or in part, in the event that the maximum allowable percentage of the Guarantor's cash revenues derived from funding under Title IV of the Higher Education Act is reduced from 90% to a percentage above 75% but below 90%, then the Guarantor will be required to agree to an amendment to the Purchase Obligation Agreement incorporating such terms.

## PRINCIPAL PARTIES

### Servicer, Administrator and Origination Agent

Access Group, Inc. ("**Access Group**"), in its capacity as servicer (the "**Servicer**"), will

service the Student Loans owned by the Trust pursuant to a servicing agreement (the "**Servicing Agreement**") between Access Group, the Trust, the Guarantor and the Secured Party. Access Group will service the Partially Disbursed Student Loans pursuant to a servicing agreement (the "**Originating Lender Servicing Agreement**") between Access Group and the Originating Lender (as defined below under "*—Originating Lender*"), which servicing agreement will be on substantially the same terms as the Servicing Agreement. The Trust will be a third party beneficiary of the Originating Lender Servicing Agreement. As Servicer, Access Group will be required to perform the services and duties customary to the servicing of private education loans in compliance with applicable standards and procedures. Subject to certain limitations described in this private placement memorandum, the Servicer will be entitled to a monthly fee (the "**Servicing Fee**") for its services payable by the Trust on each Payment Date before any payments are made on the Senior Credit in an amount equal to the product of (i) 1/12, (ii) 1.025% and (iii) the aggregate outstanding Student Loan Balance as of the last day of the related Collection Period. Upon the occurrence of certain conditions described in the Servicing Agreement which materially increase the costs or obligations of the Servicer in providing the services under the Servicing Agreement, the Servicer may propose an increase to the Servicing Fee and, if the other parties do not agree to such increase, the Servicer may terminate the Servicing Agreement.

Access Group, in its capacity as administrator (the "**Administrator**"), will undertake specific administrative duties for the Trust. The administrator will be entitled to a monthly fee (the "**Administration Fee**") for its services payable by the Trust on each Payment Date before any payments are made on the Senior Credit in an amount equal to the product of (i) 1/12, (ii) 0.20% and (iii) the Senior Credit Balance prior to the application of any payments on such Payment Date.

Access Group will also serve as the origination agent (the "**Origination Agent**") and will be entitled to a fee (the "**Origination Agent Fee**") for its services payable by the Originating Lender.

**Secured Party**

Deutsche Bank Trust Company Americas ("**DBTCA**"), a New York banking corporation, will act as indenture trustee (in such capacity, the "**Indenture Trustee**") and as collateral agent (in such capacity, the "**Collateral Agent**" and in its capacities as Indenture Trustee and as Collateral Agent, the "**Secured Party**") under the indenture and credit agreement (the "**Indenture and Credit Agreement**"). Its principal trust offices are located at 100 Plaza One, Jersey City, NJ 07311-3901. As Secured Party, DBTCA will act for the benefit of and to protect the interests of the Senior Creditors and as paying agent and registrar for the Senior Credit.

The Secured Party will be entitled to a fee (the "**Secured Party Fee**") for its services payable by the Trust on each Payment Date before any payments are made on the Senior Credit in an amount equal to the product of (i) 1/12, (ii) 0.04% and (iii) the Senior Credit Balance prior to the application of payments on such Payment Date.

**Lender Trustee**

Deutsche Bank National Trust Company ("**DBNTC**"), a national banking association, will act as lender trustee (the "**Lender Trustee**") and will hold legal and record title to the Student Loans on behalf and for the benefit of the Trust. DBNTC's principal trust offices are located at 100 Plaza One, Jersey City, NJ 07311-3901. Where the context involves the holding, transferring or

perfection of title to or an interest in Student Loans, references in this private placement memorandum to the Trust's interest in the Student Loans include both the Trust's beneficial interest and the Lender Trustee's legal title to the Student Loans.

**Owner Trustee**

Deutsche Bank Trust Company Delaware ("**DBTCD**"), a Delaware banking corporation, will act as Owner Trustee for the Trust. As Owner Trustee for the Trust, it will act in the capacities required under the Delaware Statutory Trust Act. Its principal trust offices are located at 1011 Centre Road, Suite 200, Wilmington, Delaware 19805.

The Owner Trustee will be entitled to a fee (the "**Owner Trustee Fee**") for its services payable by the Trust on each Payment Date before any payments are made on the Senior Credit in an amount equal to the product of (i) 1/12, (ii) 0.01% and (iii) the Senior Credit Balance prior to the application of any payments on such Payment Date.

**Originating Lender**

Liberty Bank, N.A. (the "**Originating Lender**") will act as the Originating Lender of the Student Loans. The Originating Lender is a national banking association insured by the Federal Deposit Insurance Corporation with headquarters in Beachwood, Ohio, governed by the rules and regulations of the Office of the Comptroller of the Currency and authorized to originate and make loans throughout the United States. The Student Loans will all be made by the Originating Lender and sold (or with respect to Partially Disbursed Student Loans, Participation Interests in such Partially Disbursed Student Loans will be sold) to the Trust for an amount (the "**Purchase Price**") equal to 101.05% of the amount of the proceeds of each Student Loan disbursed by the Originating Lender to or for the account of the Guarantor in payment of a portion of the related student's cost of education, less any payments, refunds, credits or cancellations in respect thereof (the "**Base Student Loan Balance**") plus accrued and unpaid interest thereon since its origination.

The Originating Lender will receive a sale premium in connection with each sale of Student Loans or Participation Interests to the Trust (the "**Originating Lender Premium**") equal to 1.05% of the Base Student Loan Balance payable as part of the Purchase Price for the related Student Loans or Participation Interests, as applicable. The Originating Lender will be responsible for payment of the Origination Agent Fee.

**Arranging Agent and Syndication Agent**

Deutsche Bank Securities Inc. ("**DBSI**") will act as syndication agent (in such capacity, the "**Syndication Agent**") and Deutsche Bank AG, London Branch will act as arranging agent (in such capacity, the "**Arranging Agent**") for the transaction. In compensation for its services as Syndication Agent, DBSI will be entitled to a Syndication Agent Fee equal to 4.00% of the Base Student Loan Balance of each Student Loan purchased by the Trust (the "**Syndication Agent Fee**"). The Syndication Agent Fee is payable to the Syndication Agent by the Trust from amounts on deposit in the Acquisition Account on each day Student Loans are purchased by the Trust.

Deutsche Bank AG, London Branch, in its capacity as Arranging Agent, will also be entitled to an arranging agent fee on each Payment Date in an amount equal to the product of (i) 1/12, (ii) 1.00% (the "**Arranging Agent Fee Rate**") and (iii) 95.43% of the Senior Credit Balance with respect to such Payment Date (the "**Arranging Agent Fee**"). The Arranging Agent Fee is payable by the Trust pari passu

with payments of interest on the Senior Credit. See "*Description of the Notes—Fees and Expenses of the Trust*" in this private placement memorandum for more information.

## DESCRIPTION OF THE STUDENT LOANS

### General

The Student Loans are private education loans made to certain students currently attending, and certain graduates of, schools owned and operated by the Guarantor.

No student is eligible to borrow under the program until he or she has completed 20 quarter credit hours (or the equivalent) at any postsecondary educational institution. The purposes of the Student Loans are two-fold: (1) to provide financing for amounts that remain due and owing to the Guarantor for such student's or graduate's prior academic periods, and (2) to provide a portion of the tuition and related costs for such student's current or subsequent academic periods not otherwise funded through loans made under the Higher Education Act, if applicable, or other sources.

Each Student Loan will be originated by the Originating Lender pursuant to the program guidelines, which are described under "—*Program Guidelines*" below. The beneficial interest in each such Student Loan (or with respect to Partially Disbursed Student Loans, Participation Interests in such Student Loans) will be sold to the Trust and legal and record title to the Student Loans sold to the Trust will be held by the Lender Trustee. The Trust will obtain the funds required to purchase Student Loans and Participation Interests from the proceeds of the sale of the Notes, the borrowing under the Loan and advances on the Subordinated Note.

A Student Loan will only be sold to the Trust when such Student Loan has been fully disbursed. Private education loans made to students who reside in certain states, must, under applicable laws or regulations, be disbursed over the course of the related academic period and not entirely at origination (such student loans, "**Partially Disbursed Student Loans**"). A Partially Disbursed Student Loan will only be sold to the Trust after it has been fully disbursed. Once a Partially Disbursed Student Loan is approved, the Originating Lender will be obligated to fund all partial disbursements of such Partially Disbursed Student Loans until funded in full and will sell Participation Interests in such Partially Disbursed Student Loan to the Trust (which will, in turn, pay such required sums from amounts on deposit in the Acquisition Account, including advances on the Subordinated Note). The Originating Lender will continue to be the record and legal owner of all Partially Disbursed Student Loans until such time as they are fully disbursed, at which point ownership of such Partially Disbursed Student Loans will be transferred to the Lender Trustee, on behalf and for the benefit of the Trust. The Purchase Price for each Participation Interest will be the same as the Purchase Price would be for the related Student Loan; provided, that only the amount then disbursed on such Partially Disbursed Student Loan will be included as its Base Student Loan Balance. For all purposes herein, ownership of a Participation Interest in a Partially Disbursed Student Loan is equivalent to the beneficial ownership of a Student Loan, and at all times calculations regarding Student Loans and Participation Interests will be made collectively as if the related Partially Disbursed Student Loan is then a Student Loan owned by the Trust (utilizing the amount then disbursed on such Partially Disbursed Student Loan as its Base Student Loan Balance).

With respect to collections on each Partially Disbursed Student Loan, the Originating Lender (or the Servicer on its behalf) will be obligated to forward to the Trust (for deposit into the Collection Account) all collections received on such Partially Disbursed Student Loan.

None of the Student Loans are guaranteed by the Department of Education, any other federal or state government agency, or any other person.

*If not specifically noted otherwise herein, the use of the term "Student Loans" also refers to "Partially Disbursed Student Loans" or "Participation Interests" in such Partially Disbursed Student Loans, as the context requires.*

**Program Guidelines**

The program guidelines pursuant to which the Student Loans will be originated will be included as an exhibit to the Student Loan Origination and Sale Agreement (as defined below under "*The Transaction Documents*"), which will be included in the CD-ROM attached to this private placement memorandum as Appendix A. The description of the program guidelines contained herein is qualified in its entirety by reference to the program guidelines included as an exhibit to the Student Loan Origination and Sale Agreement.

In general, the principal balance of each Student Loan will equal the sum of (i) the related Base Student Loan Balance, (ii) an origination fee (the "**Capitalized Fee**") that is dependent upon the FICO score of the related student or, if applicable, the related co-signer and (iii) any interest capitalized to the principal balance of such Student Loan, *minus* all payments received in reduction of the principal balance thereof (the "**Student Loan Balance**"). Each Student Loan initially will have a Base Student Loan Balance of at least $1,000. All amounts provided by the Originating Lender with respect to the Student Loans will be disbursed by the Originating Lender to the Guarantor for the accounts of the related borrowers; no amounts will be paid by the Originating Lender directly to the applicable borrower.

All Student Loans will be made by the Originating Lender in accordance with applicable federal and state lending and consumer protection laws and related regulations.

The interest rate on each Student Loan will be equal to the prime rate (rounded up to the nearest 0.125%) plus the applicable Student Loan Margin set forth in the table below, but may not exceed 25% per annum (such interest rate, the "**Student Loan Rate**"). The Student Loan Margin for a Student Loan as set forth in the table below is based on the higher of the related student's or, if applicable, the related co-signer's FICO score as set forth in the table below. Initially, there will be no co-signers for Student Loans. "Prime rate" is determined on the 17th day of each month by reference to the prime rate as published in *The Wall Street Journal*, "Credit Markets" section, "Money Rates" table (the "**Prime Rate**") (provided, that if *The Wall Street Journal* is not published on the 17th day of a month, the Prime Rate shall be the Prime Rate as set forth in *The Wall Street Journal* on the next day on which it is published) and is reset monthly.

| **FICO Score** | **Student Loan Margin** |
|---|---|
| 790 and above | 1.50% |
| 720 to 789 | 2.50% |
| 680 to 719 | 5.00% |
| 650 to 679 | 7.00% |
| 600 to 649 | 8.00% |
| No score available | 9.00% |
| 599 and below | 11.50% |

The only payment incentive in the form of a rate reduction associated with the Student Loans is a 0.25% interest rate reduction for students who make monthly ACH payments.

There are no scheduled repayments of principal or interest on any Student Loan prior to the earliest of (1) six months from the applicable student's date of graduation from the related school, (2) three months from the applicable student's withdrawal or termination from the related school prior to graduation, or (3) 48 months from the date of the first disbursement of the applicable student's first Student Loan made under this program; *provided, however* that the period during which there are no scheduled repayments of principal or interest on any Student Loan may be extended if the applicable student returns to a school owned or operated by the Guarantor. Such period during which no repayments of interest or principal are scheduled is referred to herein as a "**Deferment Period**." During this Deferment Period, interest on each such Student Loan is capitalized monthly at the applicable Student Loan Rate. A student may, however, elect to make payments of interest on or principal of his or her Student Loan at any time without penalty.

Under certain circumstances, students may be allowed forbearance of the payment of principal and interest on a Student Loan. Any single period of forbearance in the payment of a Student Loan may not exceed three months, and all periods of forbearance granted with respect to a Student Loan may not, in aggregate, exceed twelve months over the life of the Student Loan. Notwithstanding the foregoing, additional forbearance of payments of principal and interest on a Student Loan may be granted in connection with the military service of a borrower, a borrower's return to school, or for another reason that is reasonable and customary for student loans of this type. Such periods are referred to as "**Forbearance Periods.**" Forbearance Periods may be allowed by the Servicer to the extent permitted under the program guidelines. All monthly interest will be capitalized during any Forbearance Period at the applicable Student Loan Rate.

The Capitalized Fee charged in connection with each Student Loan's origination will be included in the Student Loan Balance of such Student Loan and is determined based on the higher of the related student's or, if applicable, the related co-signer's FICO score as set forth in the table below.

| FICO Score | Capitalized Fee |
|---|---|
| 790 and above | 0.00% |
| 720 to 789 | 2.00% |
| 680 to 719 | 3.00% |
| 650 to 679 | 5.00% |
| 600 to 649 | 7.00% |
| No score available | 8.00% |
| 599 and below | 10.00% |

Each Student Loan will have a term to maturity of 10 years following the applicable Deferment Period; provided, that Forbearance Periods may extend the repayment period.

A Student Loan will become a defaulted Student Loan (and subject to charge-off) if it becomes more than 180 days delinquent or if the borrower dies.

**Purchases of Student Loans**

The Trust will not own any Student Loans (or Participation Interests) on the Closing Date. The Originating Lender will commit to sell, and the Trust will be obligated to purchase, Student Loans (and Participation Interests) on one or more transfer dates. Such transfer dates may occur any time during the period beginning on the Closing Date and ending on the date on which all Student Loans originated or approved by the Originating Lender in accordance with the program guidelines prior to its receipt of notice of an

event of default under the Indenture and Credit Agreement have been purchased by the Trust (such period, the "**Transfer Period**").

The Trust will pay the Purchase Price for each Student Loan (or Participation Interest, as applicable). The portion of the Purchase Price for each Student Loan (or Participation Interest, as applicable) equal to the sum of (i) 72.00% of the Base Student Loan Balance, (ii) the related Originating Lender Premium and (iii) all accrued and unpaid interest on such Student Loan (or Participation Interest) since origination is referred to herein as the "**Senior Purchase Price.**" The Trust will obtain the portion of the Purchase Price for each Student Loan (or Participation Interest, as applicable) equal to the Senior Purchase Price for such Student Loan (or Participation Interest, as applicable) from amounts on deposit in the Acquisition Account. The Trust will obtain the portion of the Purchase Price for each Student Loan (or Participation Interest, as applicable) equal to the excess of the Purchase Price for such Student Loan (or Participation Interest, as applicable) over the Senior Purchase Price for such Student Loan (or Participation Interest, as applicable) from the proceeds of advances under the Subordinated Note.

All or a portion of the Base Student Loan Balance of certain Student Loans (each a "**Refunded Student Loan**") may be credited to the borrower's account after such Student Loan has been sold to the Trust. In such case, the product of (i) 72% and (ii) the portion of the Base Student Loan Balance of such Refunded Student Loan that is being refunded or credited to the borrower's account (the "**Net Refunded Amount**"), plus all associated Syndication Agent Fees and Originating Lender Premiums, will be returned to the Trust and deposited into the Acquisition Account.

**Collection Period**

With respect to the Student Loans, a "**Collection Period**" means (i) with respect to any Payment Date other than the first Payment Date, the calendar month preceding the month in which such Payment Date occurs (unless any Payment Date falls in the calendar month after the month in which such Payment Date would have occurred if the 27th day of the month in which the Payment Date was scheduled to occur was a Business Day, in which case the Collection Period with respect to such Payment Date will be the second calendar month preceding the month of such Payment Date) and (ii) with respect to the first Payment Date, the period beginning on the Closing Date and ending on the last day of the second calendar month preceding the month in which such Payment Date occurs.

## DESCRIPTION OF THE NOTES

### General

Investors in the Notes will purchase their Notes pursuant to a note purchase agreement. The proceeds of the sale of the Notes and the proceeds of the borrowing under the Loan will be used for the purpose of financing a portion of the cost of the acquisition of Student Loans and Participation Interests by the Trust, paying the related Syndication Agent Fees and making the required deposits into the Reserve Account. The proceeds of the sale of the Notes and the borrowing under the Loan will be deposited in the required amounts into the Acquisition Account and the Reserve Account, as applicable. Amounts on deposit in the Acquisition Account will be withdrawn by the Secured Party to fund the Purchase Price with respect to Student Loans purchased by the Trust and to pay the associated Syndication Agent Fees. On each Payment Date on and after the earlier of (i) the Payment Date in January 2011 and (ii) the first Payment Date immediately following the

end of the Transfer Period, any amounts remaining on deposit in the Acquisition Account in excess of the sum of (i) the amount required to purchase additional Participation Interests in Partially Disbursed Student Loans and (ii) amounts required for the purchase of Student Loans that are scheduled to be disbursed, or Participation Interests for which the first scheduled disbursement is, prior to February 28, 2011 (including, in each case, the amount required to pay the associated Syndication Agent Fees), will be transferred to the Collection Account and will become part of available funds on such Payment Date.

Amounts on deposit in the Acquisition Account will be used to purchase Student Loans even if an event of default has occurred under the Indenture and Credit Agreement to the extent that such Student Loans have been originated or approved by the Originating Lender in accordance with the program guidelines but such Student Loans (or Participation Interests) have not yet been purchased by the Trust. The Originating Lender will not be permitted to approve any additional Student Loans following notification of the occurrence of an event of default.

Each Note will be issued in physical, fully-registered form. Definitive Notes will be transferable and exchangeable at the corporate trust office of the Secured Party, which will initially act as registrar on behalf of the Trust, subject to limitations on transfer described herein.

All cash payments on the Senior Credit will be made on each Payment Date to the extent of "**Available Funds**" which will be equal to (i) all collections received on the Student Loans (and Participation Interests) during the related Collection Period, other than Net Refunded Amounts, (ii) investment earnings on amounts on deposit in the Collection Account, the Reserve Account and the Acquisition Account during such Collection Period, (iii) on each Payment Date on and after the earlier of (a) the Payment Date in January 2011 or (b) the first Payment Date immediately following the end of the Transfer Period, any amounts remaining on deposit in the Acquisition Account in excess of the sum of (x) those amounts required for the purchase of additional Participation Interests with respect to Partially Disbursed Student Loans and (y) amounts required for the purchase of Student Loans that are scheduled to be disbursed, or Participation Interests for which the first scheduled disbursement is, prior to February 28, 2011 (including, in each case, the amount required to pay the associated Syndication Agent Fees), (iv) all amounts received from the Originating Lender pursuant to a repurchase of Student Loans pursuant to the Student Loan Origination and Sale Agreement and (v) on the January 2013 Payment Date, all funds remaining on deposit in Reserve Account.

All payments by the Trust from Available Funds to Noteholders in respect of principal, interest or call premium will be made pari passu with payments to the Lender in respect of principal, interest and call premium on the Loan.

**Interest Payments on the Notes**

The rate of interest on the Senior Credit (the "**Interest Rate**") for each Interest Period will be an annual rate equal to the sum of one-month LIBOR plus 5.50%. LIBOR is determined as set forth in this private placement memorandum under "*Description of the Notes—Determination of LIBOR.*"

Interest calculations for the Senior Credit are based on the actual number of days in the interest period and a 360-day year. Interest on the Senior Credit will accrue on the Senior Credit Balance as of the first day of the

related Interest Period (after giving effect to payments on such date).

Interest on the Senior Credit must be paid monthly on each Payment Date. A failure to pay interest on the Senior Credit on any Payment Date will be an event of default under the Indenture and Credit Agreement.

After issuance of the Notes, investors may obtain the current interest rate for their Notes from the Secured Party by telephone at (201) 593-8421.

**Principal Payments**

On each Payment Date and until the Senior Credit is paid in full, solely to the extent of Available Funds, principal will be payable on the Senior Credit in an amount equal to the Principal Payment Amount for such Payment Date. In addition, under the Guarantee, (i) on any Payment Date with respect to which the Asset/Liability Test is not satisfied, the Guarantor will be required to make payments in an amount sufficient to reduce the Senior Credit Balance to an amount that would satisfy the Asset/Liability Test if the Asset/Liability Test were calculated giving effect to such reduction, which amounts will be used to pay principal on the Senior Credit, and (ii) on the maturity date for the Senior Credit, the Guarantor will be required to pay the entire unpaid Senior Credit Balance of the Senior Credit.

With respect to any Payment Date, the "**Principal Payment Amount**" will equal (i) on any Payment Date on or prior to the Payment Date in January 2011, the product of (a) approximately 97.09% and (b) all Available Funds remaining after payment of amounts in clauses (1) through (4) under "—*Payments from Available Funds*" below, (ii) on any Payment Date on and after the Payment Date in February 2011 and on or prior to the Payment Date in January 2012, the product of (a) approximately 98.04% and (b) all Available Funds remaining after payment of amounts in clauses (1) through (4) under "—*Payments from Available Funds*" below, (iii) on any Payment Date on and after the Payment Date in February 2012 and on or prior to the Payment Date in January 2013, the product of (a) approximately 99.01% and (b) all Available Funds remaining after payment of amounts in clauses (1) through (4) under "—*Payments from Available Funds*" below, and (iv) on any Payment Date on and after the Payment Date in February 2013, all Available Funds remaining after payment of amounts in clauses (1) through (4) under "—*Payments from Available Funds*" below, in each case, until the Senior Credit Balance of the Senior Credit has been reduced to zero.

On each Payment Date on or prior to the Payment Date in January 2013 on which any principal payments are made on the Senior Credit, the Senior Creditors will also be entitled to payment of Call Premium.

The "**Call Premium**" will equal (i) on any Payment Date on or prior to the Payment Date in January 2011, 3.00% of the Principal Payment Amount for such Payment Date, (ii) on any Payment Date on and after the Payment Date in February 2011 and on or prior to the Payment Date in January 2012, 2.00% of the Principal Payment Amount for such Payment Date, and (iii) on any Payment Date on and after the Payment Date in February 2012 and on or prior to the Payment Date in January 2013, 1.00% of the Principal Payment Amount for such Payment Date.

**Program Fees**

The Trust will be responsible for the payment of certain fees owed to the Secured Party, the Owner Trustee, the Servicer and the Administrator (collectively, the "**Program Fees**").

Payments in respect of Program Fees will be made on each Payment Date by the Trust to the extent of Available Funds and, if Available Funds are insufficient, from amounts on deposit in the Reserve Account or payments made under the Guarantee.

**Payments from Available Funds**

On each Payment Date, the following payments will be made from Available Funds in the order indicated below and as set forth on the chart on page 15.

(1) pro rata based on amounts due, accrued and unpaid Program Fees, payable to the Secured Party, the Owner Trustee, the Servicer and the Administrator;

(2) (a) on any Payment Date prior to the occurrence of an event of default under the Indenture and Credit Agreement, to pay to the Secured Party, the Owner Trustee, the Lender Trustee, the Administrator, the Servicer and the Originating Lender, pro rata, based on amounts owed to each such party, without preference or priority of any kind, extraordinary fees and expenses or indemnification amounts owed to such party by the Trust pursuant to the Transaction Documents or any costs and expenses of replacing the Secured Party, the Owner Trustee, the Lender Trustee, the Servicer or the Administrator (but only to the extent required under the terms of the Transaction Documents), up to an annual cap equal to $200,000, due on such Payment Date; and

(b) on any Payment Date on or after the occurrence of an event of default under the Indenture and Credit Agreement, sequentially, as follows:

(i) first, to pay to the Secured Party, extraordinary fees and expenses or indemnification amounts owed to the Secured Party by the Trust pursuant to the Transaction Documents or any costs and expenses of replacing the Secured Party (but only to the extent required under the terms of the Transaction Documents) due on such Payment Date, up to an aggregate maximum amount (including all such payments on prior Payment Dates) of $350,000; and

(ii) to pay to the Owner Trustee, the Lender Trustee, the Administrator, the Servicer and the Originating Lender, pro rata, based on amounts owed to each such party, without preference or priority of any kind, extraordinary fees and expenses or indemnification amounts owed to such party by the Trust pursuant to the Transaction Documents or any costs and expenses of replacing the Owner Trustee, the Lender Trustee, the Servicer or the Administrator (but only to the extent required under the terms of the Transaction Documents), up to an annual cap equal to $200,000, due on such Payment Date;;

(3) *pro rata*, based on amounts due (i) to the Senior Creditors, accrued and unpaid interest on the Senior Credit and (ii) to the Arranging Agent, the Arranging Agent Fee for such Payment Date;

(4) to the Arranging Agent, the accrued and unpaid Arranging Agent Fees for all prior Payment Dates (the "**Arranging Agent Carryover Fee Amount**"); and

(5) concurrently, to the Senior Creditors (i) the Principal Payment Amount for such Payment Date, in repayment of principal until the outstanding Senior Credit Balance of the Senior Credit is reduced to zero and (ii) on or prior to the Payment Date in January 2013, the Call Premium for such Payment Date.

After the Senior Credit Balance of the Senior Credit has been paid in full, the following payments will be made from remaining Available Funds in the order indicated below and as set forth on the chart on page 15:

(6) to reimburse the Senior Creditors for certain expenses incurred by the Senior Creditors in accordance with the Note Purchase Agreement or the Loan Agreement, as applicable;

(7) to the Secured Party, the Owner Trustee, the Lender Trustee, the Servicer, the Administrator and the Originating Lender, pro rata, based on amounts due, any extraordinary fees and expenses or indemnification amounts due and owing to such party by the Trust pursuant to the Transaction Documents, including any amounts remaining unpaid under priority (2) above;

(8) to the Guarantor, in repayment of any Guaranteed Payments made by the Guarantor under the Guarantee;

(9) to the owner of the Subordinated Note, in repayment of the Subordinated Note, until the principal balance of the Subordinated Note has been reduced to zero; and

(10) to the holder of the owner trust certificate, all remaining amounts.


PAYMENT DATE CASHFLOWS
Collection Account
1st
SECURED PARTY, OWNER TRUSTEE, SERVICER AND ADMINISTRATOR, pro rata based on amounts due (Program Fees)
2nd
SECURED PARTY, OWNER TRUSTEE, LENDER TRUSTEE, SERVICER, ADMINISTRATOR AND ORIGINATING LENDER, pro rata based on amounts due (Any extraordinary expenses up to annual cap)
3rd
SENIOR CREDITORS AND ARRANGING AGENT, pro rata based on amounts due (Monthly Interest Amount and Arranging Agent Fee, as applicable)
4th
ARRANGING AGENT (Arranging Agent Carryover Fee Amount)
5th
SENIOR CREDITORS (Principal Payment Amount and Call Premium, if any)
Items 6 through 10 will be paid from Available Funds remaining after the Note Balance has been paid in full
6th
SENIOR CREDITORS (Certain amounts due under Note Purchase Agreement and Loan Agreement)
7th
SECURED PARTY, OWNER TRUSTEE, LENDER TRUSTEE, SERVICER, ADMINISTRATOR AND ORIGINATING LENDER, pro rata based on amounts due (Any extraordinary expenses remaining unpaid under 2nd above)
8th
GUARANTOR (Repayment of any Guaranteed Payments)
9th
GUARANTOR (Repayment of Subordinated Note)
10th
EXCESS DISTRIBUTION CERTIFICATEHOLDER (Any remaining amounts)

**Credit Enhancement**

*Overcollateralization*: After the initial purchase of Student Loans, the aggregate Student Loan Balance of the Student Loans and amounts on deposit in the Acquisition Account and the Reserve Account should always exceed the Senior Credit Balance of the Senior Credit; however, the amount of overcollateralization in the Trust will vary from time to time depending on the rate and timing of principal payments on the Student Loans, the actual amount of Capitalized Fees on the Student Loans, capitalization of interest, payments made under the Guarantee following a failure of the Asset/Liability Test and losses on the Student Loans. Following repayment of the Senior Credit, a portion of the additional collections on the Student Loans will be distributed to the Guarantor in repayment of payments made under the Guarantee and to the owner of the Subordinated Note in repayment of the principal amount thereof. See "*Description of the Notes—Credit Enhancement—Overcollateralization*" in this private placement memorandum.

*Excess Spread*: Because the weighted average Student Loan Rate is expected to be greater than the Interest Rate, it is expected that the interest that will accrue on the Student Loans will be greater than the interest that will be payable on the Senior Credit. In addition, during the period when interest on the Student Loans is likely to be capitalized, the aggregate Student Loan Balance is likely to grow, resulting in increased overcollateralization. After the period when interest on the Student Loans is likely to be capitalized (assuming payments on the Student Loans are made without greater-than-expected rates of default), interest payments on the Student Loans included as part of Available Funds will be greater than the sum of amounts the Trust owes as Program Fees and interest payments on the Senior Credit.

*Reserve Account*: The Trust will have the benefit of the Reserve Account. The Reserve Account will be funded with a portion of the proceeds of the sale of the Notes and the borrowing under the Loan. On the Closing Date following the sale of the Notes and the making of the Loan, $36,000,000 will be on deposit in the Reserve Account. On each Payment Date, withdrawals will be made from amounts on deposit in the Reserve Account to pay Program Fees on such Payment Date and interest due and payable on the Senior Credit on such Payment Date, in each case, to the extent Available Funds for such Payment Date are insufficient to make such payments. Amounts withdrawn from the Reserve Account will not be replenished from collections on the Student Loans or payments made under the Guarantee. To the extent amounts are on deposit in the Reserve Account on the Monthly Measurement Date in January 2013, all amounts remaining on deposit therein will be withdrawn and will become part of Available Funds on the related Payment Date.

All payments by the Trust from amounts on deposit in the Reserve Account to Noteholders in respect of interest on the Notes will be made pari passu with payments to the Lender in respect of interest on the Loan.

*Guarantee*: Under the terms of the Guarantee, the Guarantor is required to make all Guaranteed Payments. Failure of the Guarantor to make any Guaranteed Payment would result in an event of default under the Indenture and Credit Agreement. On each Payment Date, to the extent that Available Funds and, solely with respect to amounts described in clauses (i) and (ii) of the definition of "Guaranteed Payments," amounts on deposit in the Reserve Account, are insufficient to make a payment of the type described in the definition of "Guaranteed Payments," the Guarantor will be required to pay the amount of such Guaranteed Payment

to the Secured Party, for distribution to recipients of Program Fees, the Arranging Agent or the Senior Creditors, as applicable.

All payments by the Trust from payments under the Guarantee to Noteholders in respect of principal, interest or call premium will be made pari passu with payments to the Lender in respect of principal, interest and call premium on the Loan.

**Closing Date**

The closing date for this offering is expected to occur on or about January 20, 2010 (the "**Closing Date**").

**Final Maturity Date**

The Notes will be due and payable in full on the Payment Date in January 2020.

**ACTIVITIES AND ASSETS OF THE TRUST**

The principal activities of the Trust will be (i) acquiring the beneficial interest in the Student Loans (and Participation Interests in partially Disbursed Student Loans), (ii) issuing the Notes and the Subordinated Note, (iii) making the borrowing under the Loan on the Closing Date, (iv) requesting advances under the Subordinated Note and (v) making monthly payments on the Senior Credit and other required monthly payments.

The assets of the Trust will include:

- the Student Loans purchased by the Trust, legal title to which is held by the Lender Trustee on behalf of the Trust;
- the Participation Interests purchased by the Trust relating to Partially Disbursed Student Loans, which Partially Disbursed Student Loans will be owned by the Originating Lender prior to complete disbursement;
- all funds collected on the Student Loans and in respect of the Participation Interests after the date such Student Loan or Participation Interest, as applicable, was purchased by the Trust;
- the rights of the Trust under the transaction documents;
- all moneys and investments then held in any of the Trust's accounts (including the Collection Account, the Reserve Account and the Acquisition Account) and all other property pledged as security for the Senior Credit; and
- the proceeds of the foregoing.

**TRANSFER RESTRICTIONS**

See "*Notice to Investors: Transfer Restrictions*" in this private placement memorandum.

**TRANSACTION DOCUMENTS**

A CD-ROM is attached to this private placement memorandum as Appendix A containing copies of forms of each of the following transaction documents that will be entered into on or before the Closing Date: the Trust Agreement, the Indenture and Credit Agreement, the Note Purchase Agreement, the Loan Agreement, the Subordinated Note Purchase Agreement, the Servicing Agreement, the Administration Agreement, the Guarantee, the Lender Trust Agreement, the Purchase Obligation Agreement and the Student Loan Origination and Sale Agreement (each as defined herein under "*The Transaction Documents*" and collectively, the "**Transaction Documents**"). Potential investors are strongly urged to review each of

these agreements for a more complete understanding of the transaction.

## U.S. FEDERAL INCOME TAX CONSEQUENCES

Although there is no authority directly on point governing the classification of transactions like that described in this private placement memorandum, under current law and assuming execution of, and compliance with, the Indenture and Credit Agreement and the Trust Agreement, in the opinion of Bingham McCutchen LLP, the Trust will not be characterized as an association (or a publicly traded partnership) taxable as a corporation for federal income tax purposes. Access Group, as owner of the owner trust certificate, and the Guarantor will agree, so long as there is a single owner of the Trust, to treat the Trust as disregarded as an entity separate from Access Group for the purpose of federal and state income tax, franchise tax and any other tax measured in whole or in part by income. If at any time Access Group or any successor certificateholder is not the sole equity owner, Access Group and the Guarantor agree to treat the Trust as a partnership for the purpose of federal and state income tax, franchise tax and any other tax measured in whole or in part by income. For more information see "*Material Federal Income Tax Consequences.*"

## ERISA CONSIDERATIONS

Subject to the considerations set forth in "*ERISA Considerations*" herein, the Notes may generally be purchased by employee benefit plans or other retirement arrangements subject to Section 406 of the Employee Retirement Income Security Act of 1974, as amended, or Section 4975 of the Internal Revenue Code of 1986, as amended.

See "*ERISA Considerations*" in this private placement memorandum.

## RATINGS

The Notes will not be rated by any nationally recognized statistical rating agency.

## IDENTIFICATION NUMBERS

| **Notes** | **CUSIP Number** |
|---|---|
| Notes | 70469H AA 7 |

## RISK FACTORS

You should consider the following risk factors together with all the information contained in this private placement memorandum in deciding whether to purchase any of the Notes.

**The Notes are not suitable investments for all investors.**

The Notes are not a suitable investment if you require a regular or predictable schedule of payments or payment on any specific date. The Notes are complex investments that should be considered only by investors who, either alone or with their financial, tax and legal advisors, have the expertise to analyze the prepayment, reinvestment, default and market risk, the tax consequences of an investment, and the interaction of these factors.

**You may have difficulty selling your Notes**

This offering of the Notes will not be registered under the Securities Act, any other United States state securities laws or "Blue Sky" laws, or any securities laws of any other jurisdiction. Neither the Syndication Agent, the Trust, the Guarantor nor any other party will have any obligation to undertake such registration under any circumstance. Consequently, the Notes are not transferable other than in accordance with an exemption from the registration provisions of the Securities Act and applicable state securities laws and upon satisfaction of certain other provisions of the Indenture and Credit Agreement pursuant to which the Notes are issued.

Resales of the Notes may be made only pursuant to a valid registration statement, pursuant to Rule 144A, pursuant to Regulation D, or pursuant to another exemption available under the Securities Act.

There is currently a very limited market for asset-backed securities. There may be a similar lack of liquidity at times in the future. As a result, you may not be able to sell your Notes when you want to do so, or you may not be able to sell your Notes at prices that will enable you to realize your desired yield or full return of principal. The market values of the Notes are likely to fluctuate. Any of these fluctuations may be significant and could result in significant losses to you.

Recent and continuing events in the global financial markets, including the failure, acquisition or government seizure of several major financial institutions, the establishment of government initiatives such as the government bailout programs for financial institutions and assistance programs designed to increase credit availability, support economic activity and facilitate renewed consumer

lending, problems related to subprime mortgages and other securities as a result of the de-leveraging of structured investment vehicles, hedge funds and financial institutions, and the lowering of ratings on certain asset-backed securities, have caused or may cause a significant reduction in liquidity in the secondary market for asset-backed securities, which could adversely affect the market value of your Notes and/or limit your ability to resell your Notes.

The Notes will not be rated and the lack of a rating may limit the market liquidity of the Notes.

**Recent and current economic events have negatively impacted the finances of U.S. consumers, adversely affecting performance of private education loans**

Since mid-2007, credit markets have encountered difficulties that have adversely affected the performance of consumer credit instruments including private education loans. Student loans originated in recent years, particularly since 2005, have generally borne higher interest rates and experienced earlier and higher than expected delinquencies. Economic trends in the United States continue to be primary indicators of future defaults and delinquencies and a continuing economic recession could increase the likelihood of future delinquencies and defaults. A general unavailability of credit and an increase in job losses may also adversely affect the overall economy in ways that result in increased delinquencies and defaults on student loans.

Additionally, the performance of earlier vintages of student loan asset backed securities ("**SLABS**") may have suffered. Many SLABS, in particular those of recent vintages, have been subject to rating agency downgrades. These downgrades have included downgrades of "AAA" securities, and in some cases have occurred within a few months after issuance. There may be further downgrades of SLABS in the future and this may negatively impact the marketability of the Notes.

To the extent that market interest rates increase in the future, increases in monthly payments with respect to student loans may result and borrowers may, consequently, become increasingly likely to default on their payment obligations.

**Current illiquid market conditions may continue in the future**

Despite recent federal market interventions and programs, the current period of general market illiquidity may continue or even worsen and may adversely affect the secondary market for your Notes. Accordingly, you may not be able to sell your Notes when you want to do so or you may be unable to obtain the price that you wish to receive for your Notes and, as a result, you may suffer a

loss on your investment.

**If the Guarantor derives in excess of 90% of its revenue from federal sources, it could be subject to penalties.**

Pursuant to the Higher Education Act, as amended by the Higher Education Opportunity Act, a proprietary institution of higher education that participates in the federal student aid programs, such as the Guarantor, must derive at least ten percent of such institution's revenues from sources other than funds provided pursuant to Title IV of the Higher Education Act. If a proprietary institution of higher education fails to satisfy such criteria for one fiscal year, then such institution's eligibility to participate in the programs authorized by the Higher Education Act becomes provisional for the following two fiscal years. If a proprietary institution of higher education fails to satisfy such criteria for two consecutive fiscal years, then such institution becomes ineligible to participate in the programs authorized by the Higher Education Act for a period of not less than two fiscal years. If schools owned and operated by the Guarantor that share an Office of Postsecondary Education Identifier fail as a group to satisfy the requirement that they derive at least ten percent of their revenues from sources other than funds provided pursuant to Title IV of the Higher Education Act for any fiscal year or years and such institutions' eligibility to participate in programs authorized by the Higher Education Act (including the ability of their students to obtain federally guaranteed student loans) is suspended, the Guarantor may suffer severe financial difficulties which could cause an inability of the Guarantor to meet its obligations under the Guarantee. In addition, any such event may cause increased delinquencies and defaults on the Student Loans as students could be unable to obtain sufficient financing to continue their educations. In such circumstances, holders of Notes may suffer a loss. While the Guarantor believes that there are reasonable grounds to conclude that at least that portion of the Base Student Loan Balance of the Student Loans allocable to the amount funded by the Senior Purchase Price will be considered revenues of the Guarantor from sources other than funds provided pursuant to Title IV of the Higher Education Act, there can be no assurance that the Department of Education will agree with this position. During the three months ended September 30, 2009, net Title IV proceeds to the Guarantor were $263.7 million, or 77.6%, of the period's total revenue of $339.6 million.

**Your Notes will have basis risk, which could compromise the Trust's ability to pay principal**

Basis risk is the risk that shortfalls might occur because, among other things, the interest rates of the Student Loans adjust on the basis of the prime rate and the interest rate on

**and interest on your Notes**

the Notes adjusts on the basis of LIBOR. If these indices diverge, the Trust's ability to pay principal and/or interest on the Notes could be compromised and the holders of Notes may suffer a loss if the Guarantor fails to make the applicable Guaranteed Payments.

You must rely on forms of credit enhancement described below under "*Description of the Notes—Credit Enhancement*," to the extent available, to mitigate the basis risk associated with your Notes. There can be no assurance that the amount of credit enhancement will be sufficient to cover the basis risk associated with the Notes.

**Amounts in the Reserve Account may not be sufficient to pay interest and fees on the Notes**

The Trust will have the benefit of the Reserve Account which will be funded with the proceeds of the sale of the Notes and the borrowing under the Loan. On the Closing Date, $36,000,000 will be deposited to the Reserve Account. Such amount is expected to be sufficient to pay all interest on the Senior Credit and Program Fees on each Payment Date on or prior to the Payment Date in January 2012. Amounts withdrawn from the Reserve Account will not be replenished. Because the interest rate on the Senior Credit adjusts on the basis of LIBOR, an increase in the level of LIBOR may compromise the Trust's ability to pay interest on the Senior Credit from amounts in the Reserve Account on or prior to the Payment Date in January 2012. If amounts on deposit in the Reserve Account are insufficient to make such payments, holders of Notes may suffer a loss if the Guarantor fails to make the applicable Guaranteed Payments.

**The PEAKS Program may impact relationships between the Guarantor and the Originating Lender**

The transactions contemplated by this private placement memorandum will be considered an offer by the Originating Lender of funds to be used for private education loans to the Guarantor's students under the Higher Education Opportunity Act of 2008 (the "**HEOA**") and regulations published by the Department of Education on October 28, 2009. Under the regulations, if the Guarantor participates in a preferred lender arrangement, the Guarantor is required to comply with Code of Conduct provisions, which, among other requirements, prohibit the Guarantor from soliciting or accepting any offer by the Originating Lender to make Student Loans in exchange for the Guarantor promising the Originating Lender: (a) a specified number of Family Federal Education Loan Program (the "**FFEL Program**") loans ("**FFELP Loans**") or private education loans; (b) a specified loan volume of FFELP Loans or private education loans; or (c) a preferred lender relationship for FFELP Loans or private education

loans. The PEAKS Program is not being offered by the Originating Lender or accepted by the Guarantor in exchange for any such promises by the Guarantor to the Originating Lender. The Guarantor has no reason to believe that the Department of Education will interpret or apply its regulations governing this requirement such that the PEAKS Program violates those regulations. However, if the Department of Education determined that the Guarantor violated the Code of Conduct provisions contained in the regulations by participating in the PEAKS Program, the Department of Education could subject the Guarantor to monetary fines or penalties or other sanctions. Any substantial fine or penalty or other sanction could have a material adverse effect on the Guarantor's financial condition, results of operations and cash flows, which could adversely affect the Guarantor's ability to satisfy any obligations that may come due under the Guarantee.

**Risks related to the prohibition of revenue sharing pursuant to the HEOA**

Regulations published by the Board of Governors of the Federal Reserve System prohibit private educational lenders such as the Originating Lender from engaging in revenue sharing with covered educational institutions. The Code of Conduct provisions in the October 28, 2009 regulations published by the Department of Education also prohibit covered educational institutions from accepting revenue sharing from any lender with respect to educational loans. Neither the Guarantor nor the Originating Lender has any reason to believe that the Department of Education or the Board of Governors of the Federal Reserve System will interpret or apply the regulations governing these requirements such that the PEAKS Program violates these requirements. However, if the Department of Education determined that the Guarantor violated the Code of Conduct provisions contained in the regulations by participating in the PEAKS Program, the Department of Education could subject the Guarantor to monetary fines or penalties or other sanctions. Any substantial fine or penalty or other sanction could have a material adverse effect on the Guarantor's financial condition, results of operations and cash flows, which could adversely affect the Guarantor's ability to satisfy any obligations that may come due under the Guarantee.

**The characteristics of the Student Loans are uncertain**

The Trust will not own any Student Loans or Participation Interests as of the Closing Date and thus no statistical information concerning the Student Loans that may be included in the Trust is provided in this private placement memorandum. No representation is made with respect to the distribution of the Student Loans by interest rate, credit

score, Capitalized Fee, or any other characteristic. There are no parameters concerning the Student Loans that the Trust may purchase so long as they are originated pursuant to the program guidelines described herein. Investors should consider the effect that a high concentration of Student Loans with any particular characteristic may have on their investment in the Notes.

**You will rely on a third party servicer for the servicing of the student loans**

Although the Servicer is obligated to cause the Student Loans to be serviced in accordance with the terms of the servicing agreement, the timing of payments from borrowers, and consequently distributions on the Notes, will be directly affected by the ability of the Servicer to adequately service the Student Loans. If the Servicer defaults on its obligations and is terminated, or if the Servicing Agreement is otherwise terminated, you will have to rely on the ability of Moehn Management, Inc. to find an alternative servicer to service the Student Loans and the Trust may experience a delay in the timing of payments until any transfer of servicing is completed or effective. If servicing on the Student Loans is disrupted, as a result of the transfer of servicing to a successor servicer or otherwise, an increase in delinquencies or defaults on the Student Loans could occur.

**Access Group may be negatively impacted if the FFEL Program is eliminated.**

The principal activities of Access Group, which is the Origination Agent, Servicer, and Administrator, include its participation as a lender and loan servicer in the FFEL Program. The administration of President Obama has proposed legislation that would eliminate the FFEL Program, by completely transitioning the Title IV loans under the Higher Education Act to direct loans originated by the schools with funds provided by the Department of Education. The legislation includes provisions that would ensure that non-profit student loan servicing organizations, such as Access Group, receive a portion of the direct loan servicing contracts entered into by the Department of Education. The elimination of the FFEL Program could adversely affect Access Group's future student loan income. If the legislation were to be revised to eliminate set-asides for non-profit servicers, or if Access Group is not selected as one of the servicers, Access Group may be unable to replace this income with servicing income from direct student loans. Although Access Group expects that income from its existing student loan portfolio will be sufficient to sustain its operations for several years, and it also expects to continue to develop other student loan servicing business, significant reductions in Access

Group's future income could adversely affect its ability to service the Student Loans or perform its duties as Administrator.

**The Trust will not have the benefit of any guarantees or insurance on the Student Loans**

The Student Loans are not guaranteed, insured or reinsured by the United States or any state-sponsored guarantee agency or private insurer or by any other insurance or external credit enhancement. The primary forms of credit enhancement for the Senior Credit are overcollateralization, excess interest, amounts on deposit in the Reserve Account and the Guarantee. If the Guarantor is unable to perform its obligations, the amounts of the other credit enhancement are limited and may be depleted over time. In these events, you may suffer a loss on your investment.

**Your yield to maturity may be reduced by prepayments, delinquencies and defaults**

The pre-tax return on your investment is uncertain and will depend on a number of factors including the following:

***The rate of return of principal on the Notes is uncertain.*** The timing and amounts of distributions of principal on the Notes depends on the size and timeliness of borrowers' principal payments on the Student Loans. Those principal payments may be in the form of regularly scheduled payments or unscheduled prepayments on the Student Loans. A borrower may prepay a Student Loan in whole or in part at any time. The rate of prepayments on the Student Loans may be influenced by a variety of economic, social, competitive and other factors, including changes in interest rates, the availability of alternative financing and the general economy. Loan consolidation products offered to borrowers may increase the likelihood of prepayments. No prediction may be made as to the amount and timing of payments that will be made to holders of the Notes in any period. Consequently, the length of time that your Notes are outstanding and accruing interest may be shorter than you expect. On the other hand, payments on Student Loans may be delayed as a result of delinquencies, deferment periods and, under some circumstances, forbearance periods. Delayed payments on the Student Loans may in turn delay principal payments to you. The amount available for distribution to you will be reduced if borrowers fail to pay timely the principal and interest due on the Student Loans. Consequently, the length of time that your Notes are outstanding and accruing interest may be longer than you expect.

***You may not be able to reinvest distributions in comparable investments***. Asset backed securities, such as the Notes offered by this private placement memorandum,

usually produce faster returns of principal to investors when market interest rates fall below the interest rates on the Student Loans and produce slower returns of principal when market interest rates are above the interest rates on the Student Loans. As a result, you are likely to receive more money to reinvest at a time when other investments generally are producing a lower yield than that on the Notes, and are likely to receive less money to reinvest when other investments generally are producing a higher yield than that on the Notes. You will bear the risk that the timing and amount of distributions on your Notes will prevent you from attaining your desired yield.

**Actual cash flow results may be materially different**

The Trust expects that the amounts on deposit in the Reserve Account and the proceeds of the Student Loans will be sufficient to pay principal of and interest on the Senior Credit when due and also to pay the Program Fees and expenses until the final maturity of the Senior Credit. This expectation is based upon analysis of cash flow projections, based upon assumptions which the Trust believes are reasonable, regarding the timing of the financing of the Student Loans, the composition of and yield on the Student Loan portfolio, the rate of return on moneys to be invested in various accounts under the Trust and the occurrence of future events and conditions.

There can be no assurance, however, that interest and principal payments from the Student Loans will be received as anticipated, that the reinvestment rates assumed on the amounts in various accounts will be realized, or that other payments will be received in the amounts and at the times anticipated. Furthermore, future events over which the Trust has no control may adversely affect the Trust's actual receipt of revenues and recoveries of principal on the Student Loans. If actual proceeds of the Student Loans or actual expenditures vary greatly from those projected, the Trust may be unable to pay the principal of and interest on the Notes when due solely from cashflow on the Student Loans. In this case, the Trust will be dependent on payments from the Guarantor under the Guarantee.

**You should consider the variability of revenues**

Amounts received with respect to the Student Loans for a particular period may vary in both timing and amount from the payments actually due on the Student Loans for a variety of economic, social and other factors, including both individual factors, such as additional periods of deferral or forbearance prior to or after a borrower's commencement of repayment, and general factors, such as a general economic downturn, which could increase the

amount of defaulted Student Loans. Failures by borrowers to pay timely principal and interest on the Student Loans will affect the amount of revenues, which may reduce the amount of principal and interest available to be paid to the Senior Creditors.

**Risk of bankruptcy discharge of private education loans**

Private education loans made to students attending Title IV programs for qualified education expenses are generally not dischargeable by a borrower in bankruptcy. Private education loans can be discharged in bankruptcy, however, if keeping the loans non-dischargeable would impose an undue hardship on the debtor and the debtor's dependents or if the school attended by the borrower is not Title IV eligible. If you own any Notes, you will bear any risk of loss resulting from the discharge of any borrower of a Student Loan to the extent the amount of the default is not covered by the Trust's credit enhancement including the Guarantee.

**Consumer protection laws may affect enforceability of the Student Loans**

The risk of noncompliance with regulatory requirements by originators of student loans and their marketing agents has been highlighted by recent state and federal investigations into school channel marketing practices, particularly the payment of marketing fees directly to schools in exchange for loan referrals. None of the contracts between the Originating Lender, the Guarantor, the Servicer or the other parties contain any such arrangements. However, state and federal regulatory authorities, including the Attorney General of the State of New York, have sought information regarding loan programs similar to this loan program, and it is possible that some marketing or underwriting practices associated with this program could be challenged. Further, the Student Loan promissory notes issued under the Program will include the FTC Holder Rule language. Under the FTC Holder Rule, the Trust is subject to all claims and defenses that the borrowers on the Student Loans could assert against the Guarantor for the educational services purchased with the proceeds of the Student Loans, up to the amounts paid by such borrowers to the Guarantor for such educational services.

Beginning with applications for Student Loans received on or after February 14, 2010, the Originating Lender will be required to comply with new rules issued by the Board of Governors of the Federal Reserve System that amend Regulation Z of the federal Truth-in-Lending Act ("**TILA**") with respect to private education loans. These amendments require lenders that make private education loans to provide additional disclosures to student loan

borrowers. The amendments require lenders to provide borrowers who are approved by the lender for a private education loan with a 30 day period in which to accept the loan and a three Business Day cancellation period after the lender provides the borrower with the final TILA disclosure. Further, the statute of limitations for civil claims under TILA has been significantly extended. If the Originating Lender fails to comply with these new requirements under Regulation Z, it and the Trust may be subject to civil claims under TILA including class actions.

The Student Loans have been priced using a so-called "risk based pricing" methodology in which borrowers with lower creditworthiness are charged higher prices. If pricing has an adverse impact on classes of protected persons under the federal Equal Credit Opportunity Act and other similar laws, claims under those acts may be asserted against the Originating Lender and, possibly, the Trust.

**There is a possibility that the purchases of the Student Loans and Participation Interests by the Trust may be recharacterized**

It is intended that the transfers of the Student Loans and Participation Interests from the Originating Lender to the Trust constitute sales of the Student Loans and Participation Interests. If the transfers constitute true sales, the Student Loans and Participation Interests and the proceeds thereof would not be the property of the Originating Lender should it become the subject of any proceeding under any receivership after the transfer of the Student Loans and Participation Interests to the Trust. In case the sales of the Student Loans and Participation Interests from the Originating Lender to the Trust are determined by a court not to be true sales, the Originating Lender will grant to the Trust a first priority perfected security interest in the Student Loans and Participation Interests. In such case, the Trust would merely possess a security interest in the Student Loans and Participation Interests, subject to the Federal Deposit Insurance Corporation's rights and powers in any receivership involving the Originating Lender, which could involve significant payment delays or reductions in payments to be made on the Notes.

**Repurchase of Student Loans by Originating Lender**

Upon the occurrence of a breach of representations and warranties with respect to a Student Loan or Participation Interest, as applicable, the Originating Lender may be obligated to repurchase the related Student Loan or Participation Interest, as applicable, from the Trust and, regardless of the repurchase, must indemnify the Trust with respect to losses caused by the breach. If the Originating Lender were to become insolvent or otherwise be unable to

repurchase the Student Loan or Participation Interest, as applicable, or to make required indemnity payments, it is unlikely that a repurchase of the Student Loan or Participation Interest, as applicable, from the Trust or payments to the Trust would occur.

**Effect of the Servicemembers Civil Relief Act of 2003; deferment for armed forces personnel**

Under the Servicemembers Civil Relief Act of 2003, loans entered into by persons on active duty in military service prior to their period of active duty may bear interest at no more than 6% per year during the period of active service and for a grace period thereafter. Installment payments must be reduced correspondingly. The Servicemembers Civil Relief Act of 2003 also limits the ability of a loan servicer to take legal action against the borrower during the borrower's period of active military duty and for a grace period thereafter. Certain fees and penalties are also suspended.

New or escalated military operations by the United States may increase the number of citizens who are in active military service, including persons in reserve status who are called or may be called to active duty.

We do not know how many Student Loans may be affected by the application of these laws. As a result, there may be unanticipated delays in payment and losses on the Student Loans.

**Noteholders are only entitled to exercise rights and remedies under the Indenture and Credit Agreement in conjunction with the Lender**

The rights of Noteholders to exercise remedies under the Indenture and Credit Agreement and the other Transaction Documents may only be exercised in conjunction with the Lender. Noteholders will only have such rights in proportion to their share of the Senior Credit. There can be no guaranty that controlling Senior Creditors will vote the same way as you on any issue.

**Certain actions can be taken with limited or no Senior Creditor approval and until the occurrence of a Trigger, the Guarantor will have certain protective voting rights**

The Transaction Documents will provide that various actions may be undertaken without Senior Creditor consent, subject to certain preconditions, or based upon the receipt by the Secured Party of consent of Senior Creditors holding a majority of the aggregate outstanding Senior Credit Balance.

In addition, prior to the occurrence of a Trigger, the Guarantor will be the voting party under the Indenture and Credit Agreement and may exercise certain protective rights as voting party without the consent of Senior Creditors. So long as the Guarantor is the voting party, the Guarantor will be entitled to exercise certain protective rights that otherwise would be exercisable by the Senior

Creditors. Notwithstanding the foregoing, in no event may any rights be exercised by the Guarantor as voting party that would be materially adverse to Senior Creditors without the consent of each Senior Creditor affected thereby. There can be no guaranty that controlling Senior Creditors or the Guarantor will vote the same way as you on any issue.

**Limited history of the Guarantor's student loan program**

The Student Loans to be purchased by the Trust will be originated pursuant to a new student loan program. There is no performance data available concerning student loans originated under the program guidelines described herein. There can be no assurance that the Student Loans will perform similarly to comparable student loans made to borrowers attending the Guarantor's schools or other similar institutions, and the Student Loans may experience significantly higher rates of delinquency and default than such other student loans. If the rate of delinquencies or defaults on the Student Loans is greater than expected, or if the rate of delinquencies and defaults on the Student Loans is similar to the rate of delinquencies and defaults of comparable student loans made to borrowers attending the Guarantor's schools, proceeds of the Student Loans may be insufficient to pay interest in full on the Senior Credit on any Payment Date and the unpaid Senior Credit Balance of the Notes at maturity. In such case, Senior Creditors would have to rely on payments under the Guarantee for full payment of principal and interest on the Senior Credit.

**Guaranteed Payments may be delayed, reduced or eliminated if the Guarantor becomes insolvent**

This Guarantor will guarantee payment of the Guaranteed Payments. However, in the event of the insolvency or bankruptcy of the Guarantor, Guaranteed Payments could be delayed, reduced or eliminated. Please see "*The Guarantor*" herein for additional information concerning the Guarantor.

**The Notes are not rated**

The Notes have not been rated by any rating agency. The lack of a rating greatly reduces the liquidity of the Notes and thus the market value of the Notes. In addition, the lack of a rating will reduce the potential for, or increase the cost of, financing the purchase and/or holding of the Notes. Investors subject to capital requirements will be required to hold more capital against the Notes than would have been the case had the Notes been rated.

We expect that the Notes will be eligible to receive a designation from the National Association of Insurance Commissioners, through there is no assurance as to what designation they will receive.

For additional risk factors associated with the Guarantor's ability to make Guaranteed Payments, see the Guarantor's filings with the Securities and Exchange Commission (the "**SEC**") that have been incorporated herein by reference, the list of which may be found under "*The Guarantor—Documents Incorporated By Reference*" below, and which are available to the public on the SEC's Internet site at **http://www.sec.gov**.

## FORMATION OF THE TRUST

*PEAKS Trust 2009-1*

PEAKS Trust 2009-1 (the "**Trust**") is a statutory trust newly formed under Delaware law and under a short-form trust agreement between Access Group, Inc. ("**Access Group**") and Deutsche Bank Trust Company Delaware, as owner trustee (the "**Owner Trustee**"). The short-form trust agreement will be amended on the Closing Date pursuant to an amended and restated trust agreement between Access Group and the Owner Trustee. We refer to the short-form trust agreement and the amended and restated trust agreement together as the "**Trust Agreement**." The Lender Trustee will hold legal and record title to the Student Loans for the Trust under a lender trust agreement. The Trust's principal offices are in 1011 Centre Road, Suite 200, Wilmington, Delaware 19805, Attention: Corporate Services Division, and its telephone number is (302) 636-3392, in care of the Owner Trustee.

The proceeds from the sale of the Notes and the proceeds of the borrowing under the Loan will be used to make deposits into an acquisition account (the "**Acquisition Account**") and a reserve account (the "**Reserve Account**"). Amounts on deposit in the Acquisition Account (including amounts received from advances on the Subordinated Note, as described herein) will be used to purchase private education loans (the "**Student Loans**") or participation interests therein (the "**Participation Interests**") in partially disbursed Student Loans (the "**Partially Disbursed Student Loans**") from the Originating Lender and to pay Syndication Agent Fees. Amounts on deposit in the Reserve Account will be used as set forth in this private placement memorandum under "*Description of the Notes—Credit Enhancement—Reserve Account*."

After its formation, the Trust will not engage in any activity other than:

- acquiring, holding and managing the beneficial interest in the Student Loans (and Participation Interests in the Partially Disbursed Student Loans) and the other assets of the Trust and related proceeds;
- issuing the Notes, the Subordinated Note and the owner trust certificate;
- making the borrowing under the Loan on the Closing Date;
- making the payments described under "*Description of the Notes—Payments from Available Funds*" below;
- making borrowings pursuant to advances under the Subordinated Note; and
- engaging in other activities that are necessary, suitable or convenient to accomplish, or are incidental to, the foregoing.

The Trust may not issue securities other than the Notes, the Subordinated Note and the owner trust certificate. Other than borrowings under the Notes, the Loan and advances under the Subordinated Note, the Trust will not be permitted to borrow money or make loans to other persons. Any amendment to the Trust Agreement to amend, supplement or modify these permitted activities, or otherwise make any modification that will materially and adversely affect the Senior Creditors, will require the consent of the Senior Creditors.

The Trust has not commenced operations since the date of its establishment and no audited financial statement has been prepared prior to the date of this private placement memorandum. The Trust is not required by the laws of the State of Delaware, and the Trust does not intend, to publish any annual audited financial statements.

The property of the Trust will consist of:

- the Student Loans, legal title to which will be held by the Lender Trustee on behalf of the Trust;
- Participation Interests purchased by the Trust relating to Partially Disbursed Student Loans, which Partially Disbursed Student Loans will be owned by the Originating Lender prior to complete disbursement;
- all funds collected on the Student Loans and in respect of the Participation Interests after the date such Student Loan or Participation Interest, as applicable, was purchased by the Trust;
- all moneys and investments then held in any of the Trust accounts, including the Collection Account, the Acquisition Account and the Reserve Account, and all other property pledged as security for the Senior Credit;
- its rights under the Transaction Documents; and
- the proceeds of the foregoing.

The Trust will have only nominal initial capital. The Trust will not own any other assets. The fiscal year of the Trust will be a calendar year.

The Trust and its assets will be administered by the Administrator pursuant to the administration agreement. The Servicer will be responsible for the servicing of the student loans pursuant to the servicing agreement.

The Notes will represent indebtedness of the Trust secured by its assets. The Acquisition Account, the Collection Account and the Reserve Account will be maintained in the name of the Secured Party for the benefit of the Senior Creditors. To facilitate servicing and to minimize administrative burden and expense, the Servicer, or a custodian on its behalf, will retain possession of the electronic promissory notes and other documents related to the Student Loans as custodian for the Trust and the Lender Trustee. The owner trust certificate will represent the beneficial ownership interest in the residual assets of the Trust.

*The Lender Trustee*

Deutsche Bank National Trust Company ("**DBNTC**") is the Lender Trustee for the Trust under the lender trust agreement and an affiliate of the Secured Party, the Owner Trustee, the Syndication Agent and the Arranging Agent. DBNTC is a national banking association, whose offices are located 100 Plaza One, Jersey City, NJ 07311-3901, Attention: Susan Barstock, Phone: (201) 593-8421, Facsimile: (212) 553-2458. The Lender Trustee will acquire on behalf of the Trust legal title to all the Student Loans acquired by the Trust. The Lender Trustee's liability in connection with the issuance and sale of the Notes is limited solely to the express obligations of the Lender Trustee in the lender trust agreement.

The Lender Trustee will not be personally liable for any actions or omissions that were not the result of its own bad faith, fraud, willful misconduct or gross negligence. The Lender Trustee will be entitled to be indemnified by the Trust for any loss, liability or expense (including reasonable attorneys' fees) incurred by it in connection with the performance of its duties under the Indenture and Credit Agreement and the other Transaction Documents other than as a result of the Lender Trustee's bad faith, fraud, willful misconduct or gross negligence. The Lender Trustee shall not have any responsibility for any action or inaction of the Trust or any other party in connection with the Student Loans and the documents, agreements, understandings and arrangements relating to the Student Loans.

The Lender Trustee may resign at any time. If it does, the Administrator must appoint a qualified successor. The Administrator may also remove the Lender Trustee if the Lender Trustee becomes insolvent or ceases to be eligible to continue as Lender Trustee. In that event, the Administrator must appoint a successor. The resignation or removal of the Lender Trustee and the appointment of a successor will become effective only when a successor accepts its appointment. To the extent expenses incurred in connection with the replacement of the Lender Trustee are not paid by the Lender Trustee that is being replaced or by the applicable successor lender trustee, such amounts may be payable from Available Funds prior to payments on the Notes.

*The Owner Trustee*

Deutsche Bank Trust Company Delaware is a Delaware banking corporation and an affiliate of the Secured Party, the Lender Trustee, the Syndication Agent and the Arranging Agent. Its principal place of business is located at 1011 Centre Road, Suite 200, Wilmington, Delaware 19805. The Owner Trustee has acted as owner trustee on numerous asset-backed transactions. While the structure of each transaction may differ, the Owner Trustee is experienced in administering transactions of this kind. You may contact the Owner Trustee by calling (302) 636-3392.

The Owner Trustee is subject to various legal proceedings that arise from time to time in the ordinary course of business. The Owner Trustee does not believe that the ultimate resolution of any of these proceedings will have a materially adverse effect on its services as owner trustee.

The Owner Trustee has provided the above information for inclusion in this private placement memorandum. Other than the above paragraphs, the Owner Trustee has not participated in the preparation of, and is not responsible for, any other information contained in this private placement memorandum.

The Owner Trustee will act on behalf of the owner trust certificateholder and represent and exercise the rights and interests of the owner trust certificateholder under the Trust Agreement. Except as specifically delegated to the Administrator in the administration agreement, the Owner Trustee will also execute and deliver all agreements required to be entered into on behalf of the Trust.

The liability of the Owner Trustee will consist solely of the express obligations specified in the Trust Agreement. The Owner Trustee will not be personally liable for any actions or omissions that were not the result of its own bad faith, fraud, willful misconduct or gross negligence. The Owner Trustee will be entitled to be indemnified by the Trust for any loss,

liability or expense (including reasonable attorneys' fees) incurred by it in connection with the performance of its duties under the Trust Agreement and the other Transaction Documents, other than any loss, liability or expense incurred by it as a result of its bad faith, fraud, willful misconduct or gross negligence.

The Owner Trustee may resign at any time. The Administrator may also remove the Owner Trustee if it becomes insolvent or ceases to be eligible to continue as Owner Trustee. In the event of such a resignation or removal, the Administrator will appoint a successor with the consent of the voting party under the Indenture and Credit Agreement. The resignation or removal of the Owner Trustee and the appointment of a successor will become effective only when a successor accepts its appointment. To the extent expenses incurred in connection with the replacement of the Owner Trustee are not paid by the Owner Trustee that is being replaced or by the successor owner trustee, such amounts may be payable from Available Funds prior to payments on the Notes.

*The Secured Party*

The Trust will issue the Notes and set forth the terms of the Loan under the Indenture and Credit Agreement pursuant to which Deutsche Bank Trust Company Americas ("**DBTCA**"), a banking association organized under the laws of the State of New York, will act as indenture trustee (in such capacity, the "**Indenture Trustee**") and as collateral agent (in such capacity, the "**Collateral Agent**" and in its capacities as Indenture Trustee and as Collateral Agent, the "**Secured Party**") for the benefit of and to protect the interests of the Senior Creditors and will act as paying agent for the Senior Credit. DBTCA is an affiliate of the Lender Trustee, the Owner Trustee, the Syndication Agent and the Arranging Agent. DBTCA's address is 100 Plaza One, Jersey City, NJ 07311-3901. DBTCA has acted as trustee on numerous asset-backed securities transactions involving pools of student loans.

The Secured Party will act on behalf of the Senior Creditors and represent their interests in the exercise of their rights under the Indenture and Credit Agreement.

The Secured Party will not be personally liable for any actions or omissions that were not the result of its own bad faith, willful misconduct or negligence. The Secured Party will be entitled to be indemnified by the Trust for any loss, liability or expense (including reasonable attorneys' fees) incurred by it in connection with the performance of its duties under the Indenture and Credit Agreement and the other Transaction Documents. Upon the occurrence of an event of default under the Indenture and Credit Agreement, the Secured Party will be entitled to receive all such amounts owed from Available Funds on the Student Loans prior to any amounts being distributed to the Senior Creditors.

In the event of a resignation or removal of the Secured Party in accordance with the terms of the Indenture and Credit Agreement, the controlling Senior Creditors will appoint a successor. The resignation or removal of the Secured Party and the appointment of a successor will become effective only when a successor accepts its appointment. To the extent expenses incurred in connection with the replacement of the Secured Party are not paid by the Secured Party that is being replaced or by the successor secured party, such amounts may be payable from Available Funds prior to payments on the Notes.

**THE GUARANTOR**

The Guarantor is a leading for-profit provider of postsecondary degree programs in the United States based on revenue and student enrollment. As of September 30, 2009, the Guarantor offered masters, bachelor and associate degree programs to more than 79,000 students at ITT Technical Institute and Daniel Webster College ("**DWC**") locations. As of September 30, 2009, the Guarantor had 122 locations (including 112 ITT Technical Institute campuses, one DWC campus and nine ITT Technical Institute learning sites) in 38 states. All of the Guarantor's locations are authorized by the applicable education authorities of the states in which they operate and are accredited by an accrediting commission recognized by the Department of Education. The Guarantor has provided career-oriented education programs since 1969 under the "ITT Technical Institute" name and since June 2009 under the "Daniel Webster College" name. The Guarantor's corporate headquarters are located in Carmel, Indiana.

The Guarantor is subject to extensive regulation by the Department of Education, state education and professional licensing authorities and the accrediting commissions that accredit its campuses.

The Guarantor's strategy is to pursue multiple opportunities for growth. It is implementing a growth strategy designed to increase revenue and operating efficiencies by increasing the number and types of program offerings and student enrollment at existing campuses, operating new campuses across the United States and adding learning sites to existing campuses. The principal elements of this strategy include the following:

- increase enrollments at existing campuses;
- increase the number of programs offered at existing campuses;
- geographically expand campuses;
- develop additional programs;
- extend total program duration; and
- improve student outcomes.

The Guarantor's common stock is listed on the New York Stock Exchange under the trading symbol "ESI."

*Documents Incorporated By Reference*

The following documents related to the Guarantor are incorporated in, and form part of, this private placement memorandum:

(1) the Guarantor's Annual Report on Form 10-K for the year ended December 31, 2008;

(2) the Guarantor's Quarterly Report on Form 10-Q for the quarter ended March 31, 2009;

(3) the Guarantor's Quarterly Report on Form 10-Q for the quarter ended June 30, 2009;

(4) the Guarantor's Quarterly Report on Form 10-Q for the quarter ended September 30, 2009; and

(5) the Guarantor's Current Report on Form 8-K filed with the SEC on January 12, 2010.

The financial information in the reports referred to above were presented prior to a change in accounting method that the Guarantor effected in the fourth quarter of 2009, and therefore such information is pre-adjustment, as described further below. The reports referred to above, as well as other reports, have been filed by the Guarantor with the SEC, and are available to the public on the SEC's Internet site at **www.sec.gov**.

In the fourth quarter of 2009, the Guarantor changed its accounting method for direct costs that relate to the enrollment of new students. Through the third quarter of 2009, the Guarantor capitalized and amortized those costs over the period during which the revenue streams from the associated contracts were recognized. Beginning in the fourth quarter of 2009, the Guarantor expensed those costs in the period incurred. Both methods are acceptable under, and in accordance with, generally accepted accounting principles in the United States ("**GAAP**"), but the Guarantor has determined that expensing direct marketing costs in the period incurred is preferable, primarily because it will improve the comparability of the Guarantor's financial statements to those of other publicly traded companies in its industry. The presentations of the Guarantor's financial statements for prior periods that it includes in future press releases and SEC filings will be adjusted to reflect the accounting for direct marketing costs under the new accounting method.

The following table sets forth the effect that this change in accounting method would have had on the Guarantor's condensed consolidated financial statements for the periods indicated. The "As adjusted" amounts shown in the following financial information are preliminary and could differ from amounts that will be reported in the Guarantor's Annual Report on Form 10-K for the year ended December 31, 2009. Total cash flows from operating activities, investing activities or financing activities would not have changed in any period as a result of this change in accounting method.

The Condensed Consolidated Balance Sheets as of December 31, 2008 and 2007, and the Condensed Consolidated Statements of Income for the years ended December 31, 2008 and 2007 shown below were derived from audited financial statements but, as presented in this private placement memorandum, may not include all disclosures required by GAAP. In the opinion of the Guarantor's management, the interim financial statements contain all adjustments necessary to fairly state the Guarantor's financial condition and results of operations. The interim financial information should be read in conjunction with the audited consolidated financial statements and notes thereto contained in the Guarantor's Annual Report on Form 10-K as filed with the SEC for the year ended December 31, 2008.

**Condensed Consolidated Statements of Income**
**(Dollars in thousands, except per share data)**

| | Nine Months Ended September 30, 2009 | | | Nine Months Ended September 30, 2008 | | | Year Ended December 31, 2008 | | | Year Ended December 31, 2007 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | (unaudited) | | | (unaudited) | | | | (unaudited) | | | (unaudited) | |
| | As Originally Reported | As Adjusted | Effect of Change | As Originally Reported | As Adjusted | Effect of Change | As Originally Reported | As Adjusted | Effect of Change | As Originally Reported | As Adjusted | Effect of Change |
| Revenue | $ 944,816 | $ 944,816 | $ - | $ 735,533 | $ 735,533 | $ - | $ 1,015,333 | $ 1,015,333 | $ - | $ 869,508 | $ 869,508 | $ - |
| Cost of educational services | 328,609 | 328,609 | - | 282,219 | 282,219 | - | 383,769 | 383,769 | - | 358,601 | 358,601 | - |
| Student services and administrative expenses | 276,044 | 280,293 | 4,249 | 227,535 | 229,662 | 2,127 | 303,693 | 306,099 | 2,406 | 268,876 | 267,815 | (1,061) |
| Total costs and expenses | 604,653 | 608,902 | 4,249 | 509,754 | 511,881 | 2,127 | 687,462 | 689,868 | 2,406 | 627,477 | 626,416 | (1,061) |
| Operating income | 340,163 | 335,914 | (4,249) | 225,779 | 223,652 | (2,127) | 327,871 | 325,465 | (2,406) | 242,031 | 243,092 | 1,061 |
| Interest income, net | 2,234 | 2,234 | - | 1,186 | 1,186 | - | 1,894 | 1,894 | - | 2,455 | 2,455 | - |
| Income before income taxes | 342,397 | 338,148 | (4,249) | 226,965 | 224,838 | (2,127) | 329,765 | 327,359 | (2,406) | 244,486 | 245,547 | 1,061 |
| Income taxes | 133,185 | 131,526 | (1,659) | 87,017 | 86,188 | (829) | 126,793 | 125,854 | (939) | 92,894 | 93,308 | 414 |
| Net income | $ 209,212 | $ 206,622 | $ (2,590) | $ 139,948 | $ 138,650 | $ (1,298) | $ 202,972 | $ 201,505 | $ (1,467) | $ 151,592 | $ 152,239 | $ 647 |
| Earnings per share: | | | | | | | | | | | | |
| Basic | $ 5.51 | $ 5.44 | $ (0.07) | $ 3.59 | $ 3.56 | $ (0.03) | $ 5.22 | $ 5.18 | $ (0.04) | $ 3.76 | $ 3.78 | $ 0.02 |
| Diluted | $ 5.45 | $ 5.38 | $ (0.07) | $ 3.56 | $ 3.53 | $ (0.03) | $ 5.17 | $ 5.13 | $ (0.04) | $ 3.71 | $ 3.73 | $ 0.02 |

**Condensed Consolidated Balance Sheets**
**(Dollars in thousands)**

| | At September 30, 2009 | | | At September 30, 2008 | | | At December 31, 2008 | | | At December 31, 2007 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | (unaudited) | | | (unaudited) | | | | (unaudited) | | | (unaudited) | |
| | As Originally Reported | As Adjusted | Effect of Change | As Originally Reported | As Adjusted | Effect of Change | As Originally Reported | As Adjusted | Effect of Change | As Originally Reported | As Adjusted | Effect of Change |
| Cash and cash equivalents, restricted cash and investments | $ 280,840 | $ 280,840 | $ - | $ 286,698 | $ 286,698 | $ - | $ 375,369 | $ 375,369 | $ - | $ 316,649 | $ 316,649 | $ - |
| Accounts receivable, net | 93,819 | 93,819 | - | 33,309 | 33,309 | - | 29,779 | 29,779 | - | 15,132 | 15,132 | - |
| Other current assets | 35,434 | 35,434 | - | 26,009 | 26,009 | - | 25,897 | 25,897 | - | 18,042 | 18,042 | - |
| Total current assets | 410,093 | 410,093 | - | 346,016 | 346,016 | - | 431,045 | 431,045 | - | 349,823 | 349,823 | - |
| Property and equipment, net | 192,341 | 192,341 | - | 166,140 | 166,140 | - | 166,671 | 166,671 | - | 153,265 | 153,265 | - |
| Direct marketing costs, net | 27,222 | - | (27,222) | 22,694 | - | (22,694) | 22,973 | - | (22,973) | 20,567 | - | (20,567) |
| Deferred income taxes | - | 6,533 | 6,533 | - | - | - | - | 7,462 | 7,462 | - | - | - |
| Other assets | 20,705 | 20,705 | - | 19,481 | 19,481 | - | 3,170 | 3,170 | - | 17,298 | 17,298 | - |
| Total assets | $ 650,361 | $ 629,672 | $ (20,689) | $ 554,331 | $ 531,637 | $ (22,694) | $ 623,859 | $ 608,348 | $ (15,511) | $ 540,953 | $ 520,386 | $ (20,567) |
| Current portion of long-term debt | $ 150,000 | $ 150,000 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Accounts payable | 67,183 | 67,183 | - | 58,781 | 58,781 | - | 54,815 | 54,815 | - | 45,120 | 45,120 | - |
| Other current liabilities | 47,141 | 47,141 | - | 42,601 | 42,601 | - | 47,532 | 47,532 | - | 33,677 | 33,677 | - |
| Deferred revenue | 146,203 | 146,203 | - | 142,044 | 142,044 | - | 162,206 | 162,206 | - | 213,127 | 213,127 | - |
| Total current liabilites | 410,527 | 410,527 | - | 243,426 | 243,426 | - | 264,553 | 264,553 | - | 291,924 | 291,924 | - |
| Long-term debt | - | - | - | 150,000 | 150,000 | | 150,000 | 150,000 | | 150,000 | 150,000 | |
| Deferred income taxes | 4,092 | - | (4,092) | 10,108 | 1,250 | (8,858) | 1,504 | - | (1,504) | 11,754 | 3,727 | (8,027) |
| Other liabilities | 22,262 | 22,262 | - | 19,207 | 19,207 | - | 19,951 | 19,951 | - | 16,717 | 16,717 | - |
| Total liabilities | 436,881 | 432,789 | (4,092) | 422,741 | 413,883 | (8,858) | 436,008 | 434,504 | (1,504) | 470,395 | 462,368 | (8,027) |
| Total shareholders' equity | 213,480 | 196,883 | (16,597) | 131,590 | 117,754 | (13,836) | 187,851 | 173,844 | (14,007) | 70,558 | 58,018 | (12,540) |
| Total liabilities and shareholders' equity | $ 650,361 | $ 629,672 | $ (20,689) | $ 554,331 | $ 531,637 | $ (22,694) | $ 623,859 | $ 608,348 | $ (15,511) | $ 540,953 | $ 520,386 | $ (20,567) |

For more information on the Guarantor, see the information memorandum attached hereto as Appendix B, the contents of which are incorporated into this private placement memorandum in their entirety.

## THE SERVICER AND ADMINISTRATOR

*Organization*

Access Group, Inc. ("**Access Group**") is a Delaware nonstock corporation organized to promote access to legal and other higher education through affordable financing and related services. Access Group is a membership organization, whose members include state-operated and nonprofit American Bar Association-approved law schools located in the United States and Puerto Rico. Access Group has received an Internal Revenue Service determination that it is a tax-exempt organization under Section 501(c)(3) of the Internal Revenue Code of 1986, as amended (the "**Code**"), and that it is not a private foundation within the meaning of Section 509(a) of the Code because it is an organization described in Section 509(a)(2) of the Code.

*Operations*

*General.* Access Group's primary activity is the administration of the Access Group Loan Program, a program that currently provides student loans under the Federal Family Education Loan Program ("**FFELP Loans**"). In addition, Access Group offers a variety of debt management materials and software, a financial aid need analysis service, and assistance and training for financial aid professionals. Access Group also performs third-party origination, servicing, and administration functions with respect to student loans unrelated to the Access Group Loan Program.

As of September 30, 2009, Access Group had 354 full time equivalent employees. Its offices are located at 5500 Brandywine Parkway, Wilmington, Delaware 19803, and its phone number is (302) 477-4100.

As of September 30, 2009, Access Group had total assets of $10.1 billion (including a student loan portfolio of $9.6 billion) and total liabilities of $9.9 billion (including debt of $9.8 billion incurred to finance its student loan portfolio), on an unaudited basis. Access Group's audited financial statements are available on its website at **http://www.accessgroup.org/investors/AuditedFinancialStatements/. None of Access Group's assets are available to pay principal of or interest on the Notes.**

*Access Group Loan Program.* The Access Group Loan Program was originally developed in 1983 by Law School Admission Council, Inc. to provide loans to law students under the federal Guaranteed Student Loan Program (now known as the Federal Family Education Loan Program, or the "**FFEL Program**"). The Access Group Loan Program was expanded over the years to include supplemental, or "private", education loans, and to offer loans to students in other graduate and professional courses of study, as well as to undergraduate students. In 1993, Access Group (then known as "**Law Access, Inc.**") was organized as an independent, membership corporation to operate the program. The organization later changed its name to Access Group, Inc. to reflect the broader scope of its program.

Access Group and its predecessor have provided for the Access Group Loan Program by entering into contracts with a series of lenders, guarantee agencies, and other service providers. Beginning with loans for the academic year 1998-1999, Access Group has, either directly or through limited liability company affiliates, originated or purchased the loans made under the Access Group Loan Program with funds borrowed through limited recourse financings.

Due to changes in the Higher Education Act that expanded the availability of loans under the FFEL Program to include the entire cost of attendance for graduate and professional students (resulting in decreasing annual volumes of private education loans), and due to difficulty in obtaining financing for its private education loans, Access Group ceased offering private education loans under the Access Group Loan Program after 2008.

The following table sets forth the approximate aggregate principal amounts of FFELP Loans (excluding consolidation loans) and private education loans made under the Access Group Loan Program for each of Access Group's fiscal years 2005 through 2009:

| Fiscal Year Ending March 31 | FFELP Loans (millions) | Private Education Loans (millions) | Total Loans (millions) |
|---|---|---|---|
| 2005 | $ 995.1 | $735.3 | $1,730.4 |
| 2006 | 1,020.0 | 796.7 | 1,816.6 |
| 2007 | 1,174.1 | 432.2 | 1,606.3 |
| 2008 | 1,059.5 | 246.4 | 1,305.9 |
| 2009 | 1,024.4 | 81.8 | 1,106.2 |

*Origination Agent Activities*

As Origination Agent, Access Group will be responsible for receiving applications through its web-based process, performing credit checks based upon the credit criteria for the PEAKS Program, obtaining certifications from the Guarantor's schools attended by the prospective borrowers, providing applicants with the required approval or adverse action notices as required by the Equal Credit Opportunity Act, providing approved applicants with disclosures as required under the Truth-in-Lending Act, capturing and retaining electronic signatures on the borrower applications and loan agreements, scheduling disbursements in accordance with school instructions, administering loan cancellations and refunds, providing reconciliation services to the Originating Lender, and transferring information to Access Group's servicing system to establish accounts for post-origination servicing. As Origination Agent, Access Group will be entitled to receive the Origination Agent Fee from the Originating Lender as described under "*Description of the Notes—Glossary—Origination Agent Fee*."

Access Group began performing complete origination agent services for loans made under the Access Group Loan Program beginning in 1995. Since that time, Access Group has provided the origination function (both as origination agent for the bank that was the originating lender for private education loans under the Access Group Loan Program and on its own behalf for FFELP Loans originated through an eligible lender trustee and beneficially owned by Access Group) for all Access Group Loan Program loans other than FFELP consolidation loans. In 2009 Access Group also began providing origination services for private education loans unrelated to the Access Group Loan Program.

In connection with the Access Group Loan Program and other programs, Access Group's origination activities also include providing notices to FFELP Loan borrowers required under the Higher Education Act, making disbursements to schools (on behalf of borrowers) or directly to borrowers by checks, master checks and EFT transactions, and managing and administering disbursement accounts of the lender (if other than Access Group).

*Servicing Activities*

As Servicer, Access Group will be responsible for maintaining borrower accounts on behalf of the Trust, providing borrowers with periodic payment statements, receiving and processing loan payments, establishing repayment schedules, providing additional disclosure statements as required at the time the borrowers enter repayment, processing deferment and forbearance requests, performing collection activities for delinquent borrowers, performing skip-tracing activities for borrowers who move without updating their contact information, providing income tax reporting to borrowers and the Internal Revenue Service, providing required privacy notices to borrowers, transmitting Student Loan receipts to the Secured Party, providing monthly status reports regarding the Student Loan portfolio, and other related activities. The Servicer will remit collections received on the Student Loans to the Collection Account within three Business Days of receipt. As Servicer, Access Group will be entitled to receive the Servicing Fee as described under "*Description of the Notes—Glossary—Servicing Fee*" and "*—Fees and Expenses of the Trust.*"

Access Group began servicing a portion of its student loans in 2004. It began third-party servicing at the same time, initially servicing loans made under the Access Group Loan Program that were originated and held by a bank in anticipation of sale to Access Group. Access Group currently services its entire portfolio of Access Group Loan Program student loans, as well as providing third-party servicing for private education loans held by the originating bank under the Access Group Loan Program and a portfolio of FFELP Loans originated under the Access Group Loan Program and sold to a secondary market purchaser. Access Group's servicing activities for FFELP Loans also include preparing and submitting requests for federal subsidy payments to the Department of Education and claims packages with respect to defaulted loans to the appropriate guarantee agencies.

In 2009, Access Group began providing loan servicing for student loans unrelated to the Access Group Loan Program.

As of the end of each of the last five fiscal years, Access Group was servicing the following approximate aggregate principal amounts of student loans:

| Fiscal Year Ending March 31 | FFELP Loans (millions) | Private Education Loans (millions) | Total Loans (millions) |
|---|---|---|---|
| 2005 | $ 199.5 | $ 134.8 | $ 334.3 |
| 2006 | 746.5 | 527.3 | 1,273.8 |
| 2007 | 1,598.2 | 790.9 | 2,389.1 |
| 2008 | 2,451.9 | 973.8 | 3,425.7 |
| 2009 | 4,442.3 | 1,054.7 | 5,496.9 |

As of September 30, 2009, Access Group was servicing $9.6 billion in aggregate principal amount of student loans, having converted to its servicing system over the prior seven months approximately $5.5 billion of Access Group Loan Program loans that were previously serviced by a third-party servicer.

*Administration Activities*

As Administrator, Access Group will be responsible for coordinating with the Owner Trustee for the performance of the functions of the Trust under the Transaction Documents, including the Indenture and Credit Agreement and the Trust Agreement. Access Group will also be responsible for directing the Secured Party regarding investment of the funds in the Trust accounts (which investments will be in eligible investments as set forth in the Indenture and Credit Agreement), coordinating with the Secured Party with respect to the monthly application of funds in the Collection Account and Reserve Account as described under "*Description of the Notes—Payments from Available Funds*" and "*—Credit Enhancement—Reserve Account*," and providing monthly investor reports regarding the Student Loan portfolio performance and the Trust account balances. As Administrator, Access Group will be entitled to receive the Administration Fee as described under "*Description of the Notes—Glossary—Administration Fee*" and "*—Fees and Expenses of the Trust*."

Since 2000, Access Group has administered its own limited-recourse student loan financings under long-term floating rate and auction rate note issuances, of which nine issues totaling $5.5 billion outstanding principal amount supported by FFELP Loans, six issues totaling $2.1 billion outstanding principal amount supported by private education loans and one issue of $200 million outstanding principal amount supported by both FFELP Loans and private education loans were outstanding as of September 30, 2009. Since 1999, Access Group has also from time to time acted as administrator for warehouse and other financings for its special-purpose subsidiaries organized in connection with the Access Group Loan Program.

In 2009 Access Group began providing third-party administration services for special-purpose trusts (similar to the Trust) organized to finance student loans unrelated to the Access Group Loan Program.

*Removal of the Servicer or the Administrator*

In the event of the removal of the Servicer or the Administrator, in accordance with the terms of the Servicing Agreement or the Administration Agreement, as applicable, a successor servicer or administrator, as applicable, will be appointed with the consent of the voting party under the Indenture and Credit Agreement. The removal of the Servicer or the Administrator, as applicable, and the appointment of a successor servicer or administrator, as applicable, will become effective only when such successor accepts its appointment. To the extent expenses incurred in connection with the replacement of the Servicer or the Administrator, respectively, are not paid by the Servicer or Administrator that is being replaced or by the successor servicer or administrator, as applicable, such amounts may be payable from Available Funds prior to payments on the Notes.

## THE ORIGINATING LENDER

Liberty Bank, N.A. is a full-service national bank with assets of $199.7 million as of September 30, 2009. It is governed by the rules and regulations of the Office of the Comptroller of the Currency, and authorized to originate and make loans throughout the United States. Liberty Bank, N.A. was founded in 1990 and is privately held. It is headquartered in Beachwood, Ohio with additional offices in Solon and Twinsburg, Ohio. Liberty Bank, N.A. files quarterly financial reports with the Federal Deposit Insurance Corporation (the "**FDIC**"). These reports are available to the public on the FDIC's internet site at **www.fdic.gov**.

## DESCRIPTION OF THE STUDENT LOANS

*General*

The Student Loans will be private education loans made to certain students currently attending, and certain graduates of, schools owned and operated by the Guarantor.

No student is eligible to borrow under the program until he or she has completed 20 quarter credit hours (or the equivalent) at any postsecondary educational institution. The purposes of the Student Loans are two-fold: (1) to provide financing for amounts that remain due and owing to the Guarantor for such student's or graduate's prior academic periods, and (2) to provide a portion of the tuition and related costs for such student's current or subsequent academic periods not otherwise funded through loans made under the Higher Education Act, if applicable, or other sources.

Each Student Loan will be originated by the Originating Lender pursuant to the program guidelines, which are described in part under "*—Program Guidelines*" below. The beneficial interest in each such Student Loan will be sold (or with respect to Partially Disbursed Student Loans, Participation Interests in such Student Loans will be sold) to the Trust and legal title to the Student Loans sold to the Trust will be held by the Lender Trustee. The Trust will obtain the funds required to purchase Student Loans and Participation Interests from amounts on deposit in the Acquisition Account (which includes advances on the Subordinated Note).

A Student Loan will only be sold to the Trust when such Student Loan has been fully disbursed. Private education loans made to students who reside in certain states, must, under applicable laws or regulations, be disbursed over the course of the related academic period and not entirely at origination. Such Partially Disbursed Student Loan will only be sold to the Trust after it has been fully disbursed. Once a Partially Disbursed Student Loan is approved, the Originating Lender will be obligated to fund all partial disbursements of such Partially Disbursed Student Loans until funded in full and will sell Participation Interests in such Partially Disbursed Student Loan to the Trust (which will, in turn, pay such required sums from amounts on deposit in the Acquisition Account, including advances on the Subordinated Note). The Originating Lender will continue to be the legal owner of all Partially Disbursed Student Loans until such time as they are fully disbursed, at which point ownership of such Partially Disbursed Student Loans will be transferred to the Lender Trustee, on behalf and for the benefit of the Trust. The Purchase Price for each Participation Interest will be the same as the Purchase Price would be for the related Student Loan; provided, that only the amount then disbursed on such Partially Disbursed Student Loan will be included as its Base Student Loan Balance. For all purposes herein, ownership of a Participation Interest in a Partially Disbursed Student Loan is equivalent

to the beneficial ownership of a Student Loan, and at all times calculations regarding Student Loans and Participation Interests will be made collectively as if the related Partially Disbursed Student Loan is then a Student Loan owned by the Trust (utilizing the amount then disbursed on such Partially Disbursed Student Loan as its Base Student Loan Balance).

With respect to collections on each Partially Disbursed Student Loan, the Originating Lender (or the Servicer on its behalf) will be obligated to forward to the Trust (for deposit into the Collection Account) all collections received on such Partially Disbursed Student Loans.

None of the Student Loans are guaranteed by the Department of Education, any other federal or state government agency or any other person.

*If not specifically noted otherwise herein, the use of the term "Student Loans" also refers to "Partially Disbursed Student Loans" or "Participation Interests" in such Partially Disbursed Student Loans, as the context requires.*

*Program Guidelines*

The Student Loans will be originated in accordance with the program guidelines summarized below. The program guidelines pursuant to which the Student Loans will be originated will be included as an exhibit to the Student Loan Origination and Sale Agreement, which will be included in the CD-ROM attached to this private placement memorandum as Appendix A. The description of the program guidelines contained herein is qualified in its entirety by reference to the program guidelines included as an exhibit to the Student Loan Origination and Sale Agreement.

In general, the principal balance of each Student Loan (the "**Student Loan Balance**") will equal (i) the sum of (a) the Base Student Loan Balance, (b) the Capitalized Fee added to the principal balance of such Student Loan and (c) any interest capitalized to the principal balance of such Student Loan, minus (ii) all payments received in reduction of the principal balance thereof. Each Student Loan initially will have a Base Student Loan Balance of at least $1,000. All amounts provided by the Originating Lender with respect to the Student Loans will be disbursed by the Originating Lender to the Guarantor for the accounts of the related borrowers; no amounts will be paid by the Originating Lender directly to the applicable borrower.

All Student Loans will be made by the Originating Lender in accordance with applicable federal and state lending and consumer protection laws and related regulations.

The interest rate on each Student Loan will be equal to the prime rate (rounded up to the nearest 0.125%) plus the applicable Student Loan Margin set forth in the table below, but may not exceed 25% per annum (such interest rate, the "**Student Loan Rate**"). The Student Loan Margin for a Student Loan as set forth in the table below is based on the higher of the related student's or, if applicable, the related co-signer's FICO score as set forth in the table below. Initially, there will be no co-signers for Student Loans. For this purpose "prime rate" is determined on the 17th day of each month by reference to the prime rate as published in *The Wall Street Journal*, "Credit Markets" section, "Money Rates" table (the "**Prime Rate**") on that day (provided, that if *The Wall Street Journal* is not published on the 17th day of a month, the Prime Rate shall be the Prime Rate as set forth in *The Wall Street Journal* on the next day on which it is published) and is reset monthly.

| **FICO Score** | **Student Loan Margin** |
|---|---|
| 790 and above | 1.50% |
| 720 to 789 | 2.50% |
| 680 to 719 | 5.00% |
| 650 to 679 | 7.00% |
| 600 to 649 | 8.00% |
| No score available | 9.00% |
| 599 and below | 11.50% |

The only payment incentive in the form of a rate reduction associated with the Student Loans is a 0.25% interest rate reduction for students who make monthly ACH payments.

There are no scheduled repayments of principal or interest on any Student Loan prior to the earliest of (1) six months from the applicable student's date of graduation from the related school, (2) three months from the applicable student's withdrawal or termination from the related school prior to graduation, or (3) 48 months from the date of the first disbursement of the applicable student's first Student Loan made under this program; *provided, however* that the period during which there are no scheduled repayments of principal or interest on any Student Loan may be extended if the applicable student returns to a school owned or operated by the Guarantor. Such period during which no repayments of interest or principal are scheduled is referred to herein as a "**Deferment Period**." During this Deferment Period, interest on each such Student Loan is capitalized monthly at the applicable Student Loan Rate. A student may, however, elect to make payments of interest on or principal of his or her Student Loan at any time without penalty.

Under certain circumstances, students may be allowed forbearance of the payment of principal and interest on a Student Loan. Any single period of forbearance in the payment of a Student Loan may not exceed three months, and all periods of forbearance granted with respect to a Student Loan may not, in aggregate, exceed twelve months over the life of the Student Loan. Notwithstanding the foregoing, additional forbearance of payments of principal and interest on a Student Loan may be granted in connection with the military service of a borrower, a borrower's return to school or for another reason that is reasonable and customary for student loans of this type. Such periods are referred to as "**Forbearance Periods**." Forbearance Periods may be allowed by the Servicer to the extent permitted under the program guidelines. All monthly interest will be capitalized during any Forbearance Period at the applicable Student Loan Rate.

The Capitalized Fee charged in connection with each Student Loan's origination will be included in the Student Loan Balance of such Student Loan and is determined based on the higher of the related student's or, if applicable, the related co-signer's FICO score as set forth in the table below.

| **FICO Score** | **Capitalized Fee** |
|---|---|
| 790 and above | 0.00% |
| 720 to 789 | 2.00% |
| 680 to 719 | 3.00% |
| 650 to 679 | 5.00% |
| 600 to 649 | 7.00% |
| No score available | 8.00% |

| 599 and below | 10.00% |
|---|---|

Each Student Loan will have a term to maturity of 10 years following the applicable Deferment Period; provided, that Forbearance Periods may extend the repayment period.

A Student Loan will become a defaulted Student Loan (and subject to charge-off) if it becomes more than 180 days delinquent or if the borrower dies.

## PREPAYMENT AND YIELD CONSIDERATIONS

The rate of principal payments on the Notes and the yield on the Notes will be affected by the rate of prepayments on the Student Loans. Depending on the rate of prepayments assumed by an investor, payments on the Notes could occur significantly earlier or later than expected. Consequently, the actual maturity of the Notes could be significantly earlier or later, the average life of the Notes could be significantly shorter or longer, and periodic balances could be significantly lower or higher, than expected. Each Student Loan is prepayable in whole or in part, without penalty, by the related borrower at any time. The rate of such prepayments cannot be predicted and may be influenced by a variety of economic, social, competitive and other factors, including as described below. In general, the rate of prepayments may tend to increase to the extent that alternative financing becomes available on more favorable terms or at interest rates significantly below the interest rates applicable to the Student Loans. Prepayments could increase as a result of certain borrower benefit programs, among other factors.

On the other hand, the rate of principal payments and the yield on the Notes will be affected by scheduled payments with respect to, and maturities and average lives of, the Student Loans. These may be lengthened as a result of, among other things, Deferment Periods, Forbearance Periods, or repayment term or monthly payment amount modifications agreed to by the Servicer. Therefore, payments on the Notes could occur significantly later than expected. Consequently, actual maturity and weighted average life of the Notes could be significantly longer than expected and periodic balances could be significantly higher than expected. The rate of principal payments on the Notes and the yield on the Notes may also be affected by the rates of delinquencies and defaults, by the severity of losses on defaulted Student Loans, by the timing of those losses and whether any principal is paid on the Notes by the Guarantor due to a failure of the Asset/Liability Test. In addition, the maturity of certain of the Student Loans could extend beyond the final maturity of the Notes.

The rate of prepayments on the Student Loans cannot be predicted due to a variety of factors, some of which are described above, and any reinvestment risks resulting from a faster or slower incidence of prepayment of the Student Loans will be borne entirely by the Noteholders. Such reinvestment risks may include the risk that interest rates and the relevant spreads above particular interest rate indices are lower at the time Noteholders receive payments from the Trust than such interest rates and such spreads would otherwise have been if such prepayments had not been made or had such prepayments been made at a different time.