# EXHIBIT 7

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

```
JODY ALIFF, MARIE SMITH, HEATHER   )
TURREY, INDIVIDUALLY, AND ON BEHALF)
OF ALL OTHERS SIMILARLY SITUATED,  )
                                   )
          Plaintiffs,              ) 3:20-cv-00697-DMS-AHG
                                   )
vs.                                )
                                   )
VERVENT, INC. FKA FIRST ASSOCIATES )
LOAN SERVICING, LLC; ACTIVATE      )
FINANCIAL, LLC; DAVID JOHNSON;     )
CHRISTOPHER SHULER; LAWRENCE       )
CHIAVARO, et al.                   )
                                   )
          Defendants.              )
_____)
```

VIDEOTAPED DEPOSITION OF STEPHANIE RODRIGUEZ

Thursday, June 24, 2021

San Diego, California

Reported by:

Catherine Ebbert

CSR No. 14122

**Page 2**

```
 1              APPEARANCES:
 2  FOR THE PLAINTIFFS:
 3  LANGER GROGAN & DIVER, PC
 4  BY:  IRV ACKELSBERG, ESQ.
 5  BY:  DAVID NAGDEMAN, ESQ.
 6  1717 Arch Street, Suite 4020
 7  Philadelphia, PA 19103
 8  215.320.5660
 9  iackelsberg@langegrogan.com
10
11  BLOOD HURST & O'REARDON, LLP
12  BY:  JAMES McCORKLE DAVIS, IV, ESQ.
13  501 West Broadway, Suite 1490
14  San Diego, California 92101
15  619.338.1100
16  Jdavis@bholaw.com
17
18  FOR THE DEFENDANTS:
19  ARENT FOX
20  BY:  JOHN SHERMAN PURCELL, ESQ.
21  555 West Fifth Street, Floor 48
22  Los Angeles, California 90013
23  213.629.7400
24  John.purcell@arentfox.com
25
```

**Page 3**

```
 1  FOR THE VERVENT DEFENDANTS IN-HOUSE:
 2  DEREK ROBERT GAMBLE, ESQ.
 3
 4  THE VIDEOGRAPHER:  John Dusenbery
 ...
21          VIDEOTAPED DEPOSITION OF STEPHANIE RODRIGUEZ,
22  taken on behalf of PLAINTIFFS, at 10182 Telesis Court, San
23  Diego, California 92121, commencing on Thursday, June 24,
24  2021, at 9:13 a.m., before Catherine Ebbert, Certified
25  Shorthand Reporter, CSR No. 14122.
```

**Page 4**

```
 1                   I N D E X
 2  EXAMINATION                                PAGE
 3  By: Mr. Ackelsberg                         8, 229
 4  By: Mr. Purcell                            225
 5
 6
 7  EXHIBIT                                    PAGE
 8  Exhibit P-1   Undated Employee Directory   47
 9  Exhibit P-2   E-mail, 5/22/11, Subject:    59
                  Re: More $
10
    Exhibit P-3   Declaration of Stephanie     61
11                Rodriguez
12  Exhibit P-4   Agreement for Servicing      62
                  Private Student Loans By and
13                Among PEAKS TRUST 2009-1
14  Exhibit P-5   E-mail, 6/26/12, Subject     65
                  RE: PEAKS data issues -
15                responses
16  Exhibit P-6   E-mail, 3/6/12, Subject:     65
                  PEAKS - Collections (new
17                folder)
18  Exhibit P-7   E-mail, 11/22/11, Subject:   68
                  PEAKS Program guidelines
19
    Exhibit P-8   Private Education Loan       98
20                Final Disclosure
21  Exhibit P-9   Loan Comment Report:         100
                  Turrey, Heather
22
    Exhibit 10    Loan Comment Report: Turrey, 127
23                Heather
24  Exhibit P-11  Excel Spreadsheet(not provided) 138
25  Exhibit P-12  Excel Spreadsheet similar    146
                  to Exhibit P-11 (not provided)
```

**Page 5**

```
 1
    Exhibit P-13  Excel PEAKS Revenue          149
 2                History (Not provided)
    Exhibit P-14  E-mail, 10/24/12, Subject:   151
 3                RE: Mark Palmerton has added
                  you to a collaborated folder
 4                on Box
 5
    Exhibit P-15  E-mail, 12/6/12, Subject:    161
 6                RE: PEAKS October Reporting
                  questions - response
 7
    Exhibit P-16  Excel Sheet PEAKS ITT        169
 8                Recovery Payments Wires
                  received in 2012
 9
    Exhibit P-17  E-mail Chain, 3/29/13,       170
10                Subject: ITT Wire Received
11  Exhibit P-18  E-mail, 6/15/12, Subject:    172
                  $ Received - PEAKS/ALPS
12                RELATED
13  Exhibit P-19  E-mail, 3/28/13, Subject:    176
                  FW: ITT Repayment - some DPD
14                not changing 0 ITT recovery
                  applied to Late Fees in error
15
    Exhibit P-20  E-mail, 5/14/13, Subject:    179
16                RE: PEAKS fee writeoffs
                  (Access issue re: ITT
17                Repayment)
18  Exhibit P-21  E-mail, 7/25/13, Subject:    183
                  RE: 7-25-13 PEAKS Payment Wire
19                - ITT File
20  Exhibit P-22  E-mail, 9/17/13, Subject:    183
                  RE: PEAKS - Loan Class 2
21                (please review)
22  Exhibit P-23  E-mail, 11/7/13, Subject:    190
                  PEAKS performance data - Oct
23                update
24  Exhibit P-24   E-mail, 12/20/13,           193
                  Subject: RE: ITT Recovery
25
    Exhibit P-26  2/27/14, Transmittal of      195
```

### Page 6

```
 1      Time Sensitive Materials to
        the Senior Creditors of the
 2      PEAKS Trust 2009-1
 3  Exhibit P-27  SEC vs. ITT, et al.,        205
        Complaint, Case No.
 4      15-CV-00758
 5  Exhibit P-28  Photocopied Letters         219
        Regarding Marie Smith
 6
    Exhibit P-29  Photocopied Letter          219
 7      Regarding Heather Turrey
 8
 9         WITNESS INSTRUCTED NOT TO ANSWER:
10                    (None)
11
12            INFORMATION REQUESTED:
13                    (None)
```

### Page 7

```
 1  THURSDAY, JUNE 24, 2021; 9:13 A.M.: SAN DIEGO, CALIFORNIA
 2                     * * *
 3         THE VIDEOGRAPHER:  Good morning.  My name is
 4  John Dusenbery.  I'm your videographer, and I represent
 5  Imagine Reporters of San Diego, California.  I am a
 6  notary.  I am not financially interested in this action,
 7  nor am I a relative or an employee of any of the attorneys
 8  or parties.
 9         Today's date is June 24, 2021.  The time is
10  approximately 9:13 a.m. Pacific Daylight Time.  The case
11  number is 3:20-CV-00697-DMS-AHG.  The case is entitled
12  Jody Aliff versus Vervent, Inc.  The deponent today is
13  Stephanie Rodriguez.
14         This deposition is taking place at the Seaview
15  Corporate Center, located at 10182 Telesis Court, Suite
16  300, San Diego, California.  The court reporter today is
17  Catherine Ebbert with Imagine Reporting.
18         Would all counsel present please state your
19  appearance.
20         MR. ACKELSBERG:  My name is Irv Ackelsberg,
21  spelled A-C-K-E-L-S-B-E-R-G, with the Law Firm of
22  Langer, Grogan & Diver.  And I'm representing the
23  plaintiffs in this action.
24         MR. NAGDEMAN:  My name is David Nagdeman,
25  N-A-G-D-E-M-A-N, for the plaintiffs.
```

### Page 8

```
 1         MR. DAVIS:  James Davis of Blood, Hurst &
 2  O'Reardon for plaintiffs.
 3         MR. PURCELL:  John Purcell of Arent Fox for the
 4  Vervent defendants.
 5
 6              STEPHANIE RODRIGUEZ,
 7     having been duly sworn, testified as follows:
 8
 9                  EXAMINATION
10  BY MR. ACKELSBERG:
11     Q    Good morning, Ms. Rodriguez.
12     A    Good morning.
13     Q    We already had a chance to introduce each other.
14  And I just want to go through a little preliminaries.
15  It's pretty standard when you start a deposition.
16         The first thing that we always ask is, have you
17  have ever been deposed before?
18     A    Yes, I have.
19     Q    Okay.  And how many times have you been deposed
20  before?
21     A    Once.
22     Q    Was that a case related to your job, or was it a
23  personal matter?
24     A    Personal matter.
25     Q    So have you ever -- you haven't been deposed
```

### Page 9

```
 1  with regard to your duties at Vervent or First Associates?
 2     A    That's correct.
 3     Q    And was that a -- deposed, was it a civil matter
 4  in which you were a party?
 5     A    It was for a lemon law for a boat.
 6     Q    Now, I obviously don't know how that deposition
 7  went, and I don't want to depend on your memory of how it
 8  works, so I'm just going to go through what we are doing
 9  today, the procedure that we are going to follow here.
10         First of all, as I assume you remember and as
11  I'm sure your lawyer has told you, this is a -- sort of a
12  question-and-answer procedure where I ask a question, I
13  wait -- and hopefully, we -- I will say it right off.  I
14  know the reporter is going to want me to remind you of
15  this.  We can't talk over each other because she can only
16  hear one of us at a time.
17         So I'm going to ask a question.  Hopefully,
18  there will be a pause, and then you will answer the
19  question.  That's how we are going to operate today.
20         You got that?
21     A    Understood.
22     Q    Okay.  And there -- your lawyer may object to a
23  question that -- maybe I ask a question before you answer.
24  And I'm sure he's already told you that might happen.
25  He's going to object to some question.
```

**Page 62**

ask you some questions about the loan agreements in a minute, but I just want to just establish that the loan agreements are attached to your declaration, P-3. Okay?

A   Okay.

MR. ACKELSBERG: And then I will show you another document, a very big one. This we will call P-4. This is the servicing agreement. And just, again, for clarity of the record -- actually, I didn't -- this is not the -- I didn't use the -- I didn't use the --

MR. PURCELL: The Bates-numbered one?

MR. ACKELSBERG: -- the Bates-numbered version, so we can avoid the confidentiality issue. I forgot. It came from one of the documents in the case.

(Exhibit P-4 was marked.)

BY MR. ACKELSBERG:

Q   All right. And we referred before to the servicing agreement. That's what you're looking at, right?

A   That is correct.

Q   And you've seen this before?

A   Yes, I have.

Q   And if you turn to the end to -- let's see -- Addendum E. And then I believe this is Addendum F, although I think the F, we got lost in the copying.

But the program guidelines are at the -- are

**Page 63**

attached to the servicing agreement; am I right?

A   That is correct.

Q   Okay. And that's what you were referring to about the program guidelines?

A   Yes.

Q   And those two were -- and those two -- that document as well would have been a document that you would have become familiar with in order to establish the rules in the servicing platform as you were setting it up?

A   Correct.

Q   Now, the -- if you look at the servicing agreement, you will see that the parties -- the parties besides First Associates were ITT, the PEAKS trust, and Deutsche Bank, correct?

MR. PURCELL: Objection. What part are you referring to?

MR. ACKELSBERG: I'm sorry. Just the parties to the agreement.

BY MR. ACKELSBERG:

Q   You see that, right?

A   I do see that.

Q   And when you referred to the investors as separate from ITT, were you referring to the PEAKS trust?

A   PEAKS trust and Deutsche Bank. I'm not sure how they worked together.

**Page 64**

Q   Okay. Now, in -- besides ITT Deutsche Bank and the trust, there were other -- there were other parties that ITT -- outside parties that ITT communicated with, reported to with regard to the performance of the PEAKS portfolio.

Am I right?

MR. PURCELL: Objection. Calls for speculation. Lack of foundation.

BY MR. ACKELSBERG:

Q   So, for example -- I will give you some examples. Access Group retained some role after they transferred servicing, did they not?

MR. PURCELL: Same objections.

THE WITNESS: I believe so.

BY MR. ACKELSBERG:

Q   Do you remember what role Access Group had after they transferred servicing?

A   I do not recall.

Q   Okay. What about a company called Boston Portfolio advisers?

A   Yes. I have heard of them.

Q   Do you know what their role is?

A   No, I don't.

Q   E and F.

A   Your microphone fell off.

**Page 65**

Q   I think we can make this -- well, I guess for ease, we will make it two exhibits.

MR. ACKELSBERG: Here is -- we will call this P-5.

And we will call this one P-6.

(Exhibit P-5 was marked.)
(Exhibit P-6 was marked.)

BY MR. ACKELSBERG:

Q   And, again, these are marked "Confidential," but we dispute the confidentiality and would ask for a clean copy to be provided to us.

Let's start with P-5, which is an e-mail from June 26, 2012 from Mark Palmerton to someone named Mark Mousseau at Boston Portfolio. And you see that you're included in the cc's.

Do you see that?

A   I do see that.

Q   Okay. So based on looking at this document, does it refresh your recollection about what the role of Boston Portfolio was?

A   No. I'm familiar with Mark Mousseau, the name, but I don't know what he did for ITT.

Q   But it was -- but your understanding was that he had some role on behalf of ITT?

A   Correct.

Stephanie Rodriguez | 30(b)(6)
June 24, 2021

Page 74

```
 1  it says "The servicer agrees to provide a data dump at the
 2  end of each month."
 3         Do you know what that is?
 4   A     I do.
 5   Q     What's that?
 6   A     It's all the information in one file.
 7   Q     Is that the EOM report, the end of month report?
 8   A     It's usually a loan report that has all the data
 9  for the loans, the demographics all in one file.
10   Q     What do you call that file?
11   A     The loan report.
12   Q     The loan report?
13   A     Uh-huh.
14   Q     And is it a loan --
15   A     Or it could be a daily data file.  It depends on
16  how it's named.
17   Q     Okay.  And if -- you're familiar with the
18  documents that -- some of the documents that have been
19  produced to us in this case.  You were involved a little
20  bit in that project?
21         MR. PURCELL:  Objection.  Vague and ambiguous.
22  Seeks attorney-client privileged communications.
23         Don't tell him anything about any communications
24  you had with any lawyers.
25  ///
```

Page 75

```
 1  BY MR. ACKELSBERG:
 2   Q     I'm just talking about what you did, like
 3  gathering documents.
 4   A     Yes.
 5   Q     And some of those document were electronic
 6  files, correct?
 7   A     Yes.
 8   Q     Okay.  Were -- this data dump that's referred to
 9  here that you just described to us, is that among the
10  files that were produced to us?
11         MR. PURCELL:  Objection.  Calls for speculation.
12  BY MR. ACKELSBERG:
13   Q     Do you know?
14   A     I didn't provide that, so I don't know.
15   Q     Okay.  Do you know if anybody provided it?
16   A     I don't know.
17   Q     Okay.
18         MR. ACKELSBERG:  John, we don't necessarily need
19  them for every month, but I just want to -- and it may be
20  that you have produced it to us, but since it's hard to
21  know exactly -- they weren't all labeled.  So if you can
22  just let us know if we have some of these.  And if not,
23  then we can talk, and we would request to get access to
24  probably particular months.  We are not going to waste --
25         MR. PURCELL:  The most efficient thing to do
```

Page 76

```
 1  would be to send me an e-mail about it because my
 2  associate, Doug Hewlett, is the one who knows about all
 3  the documents.
 4         MR. ACKELSBERG:  Okay.  We will do that.
 5  BY MR. ACKELSBERG:
 6   Q     Now, turn to Section -- Schedule A.  And that's
 7  at page 27 of 94.
 8         And before I ask you the question I was about to
 9  ask you, let me just ask you more generally.  You
10  understand what a servicing fee is, right?
11   A     I do.
12   Q     And why don't you explain to me the way
13  generally loan servicing gets compensated.  How does that
14  happen in -- just from within your experience of servicing
15  various loan portfolios?
16         MR. PURCELL:  Objection.  Vague and ambiguous.
17  Overly broad.
18         THE WITNESS:  A fee per loan per account.
19  BY MR. ACKELSBERG:
20   Q     So it is basically -- it's a percentage of the
21  portfolio that you're managing, correct?
22         MR. PURCELL:  Objection.  Vague and ambiguous.
23         THE WITNESS:  Not necessarily.  It can be a
24  per-month, per-loan charge.
25  ///
```

Page 77

```
 1  BY MR. ACKELSBERG:
 2   Q     Okay.
 3   A     So not anything to do with balances.
 4   Q     Okay.  And with regard -- you understand that
 5  what we are looking at, the fee schedule, is how the
 6  servicing fee was calculated within the PEAKS program,
 7  correct?
 8   A     Yes.
 9   Q     Okay.  And when it says the 1.025 percent per
10  year based on the aggregate principal balance as of the
11  last day of the month -- and it looks like not including
12  defaulted loans, right?
13         Do you see that?
14   A     I see that.
15   Q     Okay.  So can you put it into your own words
16  what that means?  How does First Associates -- how did
17  First Associates earn a servicing fee from the PEAKS
18  loans?  How was that calculated?
19         MR. PURCELL:  Objection.  This document speaks
20  for itself.
21         THE WITNESS:  This wasn't my role, but if you're
22  asking me to interpret it, I would say the principal
23  balance of any active loans on the last day of the month
24  would be multiplied times 1.25.
25  ///
```

Page 86

1  modified graduate repayment schedule.
2        Is that a term that you're familiar with?
3   A   Yes.
4   Q   What does that mean?
5   A   It was a type of repayment plan.
6   Q   So, as I recall, there was a standard repayment,
7  which was basically just coming up with a payment for the
8  life of the loan, right?
9   A   Correct.
10  Q   And then there was an alternative that was
11 allowed one time for a borrower, a different kind of
12 payment schedule, correct?
13  A   Correct.
14  Q   And there were certain rules that applied to
15 whether you could get an MGRS, correct?
16  A   I don't recall the qualifications, but, yes,
17 there was a varying payment schedule for the MGRS.
18  Q   And if we wanted to see the rules, again, we
19 would be looking at the document that we are looking at?
20  A   That is correct.
21  Q   Now, there also was -- there was in this
22 program, I understand, a late charge. I'm not sure if it
23 was $10 or $15.
24      Do you remember what the late charge was for
25 PEAKS?

Page 87

1   A   No. I do not recall.
2   Q   Now -- and do you know, who owns the late
3  charge? Does that depend on the loan program? Is it
4  different for every loan program?
5   A   I believe it depends on the servicing agreement.
6   Q   So, again, as to who owns that -- so there were
7  late fees that were charged in the PEAKS program, correct?
8   A   That is correct.
9   Q   And where that goes depends on what the -- the
10 document, again, that we are looking at. Whatever that
11 says, that's where it goes?
12  A   That is correct.
13  Q   So maybe it went to the investor. Maybe it was
14 retained by First Associates. But that would be
15 whatever -- it would be whatever it says in the servicing
16 agreement?
17      MR. PURCELL: Objection. Calls for speculation.
18 Calls for a legal conclusion.
19      THE WITNESS: That is correct.
20 BY MR. ACKELSBERG:
21  Q   Now, go back to the primary agreement, the
22 servicing agreement. Let's leave the schedules. And I
23 want to look at Section 5.03.
24      MR. PURCELL: What page is that on?
25 ///

Page 88

1  BY MR. ACKELSBERG:
2   Q   It's 15 of 94.
3       And 5.03, Section A. "This agreement shall
4  cease to apply with respect to a serviced loan when such
5  serviced loan is paid in full or becomes a defaulted loan,
6  provided that the servicer shall assign to one or more
7  collection agencies any such defaulted loan, shall
8  continue to account for such defaulted loan, and shall
9  transfer to the secured party an amount equal to
10 73.5 percent of the gross amount received prior to
11 reduction for a collection agency."
12      Do you see that?
13  A   I do.
14  Q   And you understand what that's referring to,
15 right?
16  A   Yes.
17  Q   Okay. So let me describe what I think it's
18 saying, and you tell me whether that's consistent with
19 your understanding.
20      So you told us before that when a loan hits 180
21 days, it comes out of the portfolio, right?
22  A   Correct.
23  Q   And then it goes into something called a
24 collection portfolio, correct?
25  A   That is correct.

Page 89

1   Q   And what that means is, when the servicing fee
2  is calculated, which you explained was this one point
3  something percent of the portfolio -- of all the loans,
4  when a loan gets default -- becomes defaulted and is
5  removed and put in the collection portfolio, it's no
6  longer part of the calculation of -- for the servicing
7  fee, correct?
8   A   That is the way I understand it.
9   Q   And once, though, the loan becomes -- is put in
10 the collection portfolio, that First Associates, then,
11 essentially owns 26.5 percent of whatever it can recover?
12      MR. PURCELL: Objection. Calls for a legal
13 conclusion. Calls for speculation.
14 BY MR. ACKELSBERG:
15  Q   It has to pay for a collection agency, but
16 whatever the excess is, is the servicer's compensation,
17 correct?
18      MR. PURCELL: Same objection. The document
19 speaks for itself.
20      THE WITNESS: That is correct.
21 BY MR. ACKELSBERG:
22  Q   And so in those periods when -- during the years
23 when First Associates was using outside collection
24 companies, the amount that First Associates would receive
25 as compensation for any recoveries it got from loans in

**Page 90**

1  the collection portfolio, it would be that 26.5 percent of
2  what was recovered, less whatever First Associates had to
3  pay to the collection agency that brought in the money?
4          MR. PURCELL:  Same objections.
5          THE WITNESS:  That's my understanding.
6  BY MR. ACKELSBERG:
7      Q   But when -- and then at some point when First
8  Associates began using Activate, it no longer had to pay
9  anybody, right?
10         MR. PURCELL:  Objection.  Misstates -- well --
11 BY MR. ACKELSBERG:
12     Q   What's your understanding -- I will withdraw the
13 question.
14         What's your understanding of the -- how the
15 compensation worked once it was an Activate Financial
16 file?
17     A   There is an arrangement between Activate and
18 Vervent.
19     Q   And we will ask Ms. Jimenez about that tomorrow.
20 Okay.
21         All right.  Now I want to look at the loan
22 agreements, which you told us -- and we looked at -- was
23 attached to your declaration.  That was P-3.
24         And actually, before we get to the loan
25 agreements, let's look at your declaration.  I believe you

**Page 91**

1  stated in the declaration that based on the information
2  that you got from Access Group these -- the agreements
3  were all signed electronically.
4      A   That's correct.
5      Q   And these -- and you got some information
6  about -- about the signing of the loan agreements from
7  Access Group?
8      A   Correct.
9      Q   And can you look at page 5 of your declaration?
10     A   Okay.
11     Q   And it said -- in paragraph 13, it said that you
12 have -- or basically you're saying that you got records
13 from Access Group that provides forensic identifying
14 details concerning the actual signing of the loan
15 agreements for the named plaintiffs here.
16     A   Correct.
17     Q   Okay.  And I was wondering if you could
18 interpret what this means.  Let's take Turrey, the last
19 one.  It says -- there's an ID.  I'm not sure what that
20 means.  But it says, "Consent time, accept time."  And
21 then it says "e-sign time."
22         Now, are these minutes, as far as you understand
23 it?
24     A   I would think -- I don't actually know.  I
25 believe so.

**Page 92**

1      Q   So there was, like -- there's probably some kind
2  of counter, time counter.
3      A   It is a time stamp.
4      Q   Okay.  And so when -- and the time stamp was at
5  5:07 when -- on whatever date it was that Turrey
6  consented, and then 8:44 when she accepted.
7          Now, does this look like it was, like, roughly
8  three and a half minutes later?  Is that what -- your
9  understanding of that?
10     A   Yes.
11     Q   And then the e-sign happened another minute
12 later, right?
13     A   Yes.
14     Q   So at least -- and I realize you weren't there.
15 This is data that you got from Access Group.  At least as
16 far as you can tell, the time between roughly -- it was
17 roughly five minutes between the time that Ms. Turrey
18 consented to something and then e-signed the loan
19 agreement?
20     A   That's what it looks like, yes.
21     Q   And same thing with Aliff -- roughly five
22 minutes for that process?
23     A   Correct.
24     Q   And with Ms. Smith, it looks like it was more
25 like a minute, a minute and a half.

**Page 93**

1          Would that be correct?
2      A   Correct.
3      Q   And have you ever asked anyone at Access Group
4  for any information beyond what's here in the information
5  that's -- that you state -- that you list here in
6  paragraph 13?
7          MR. PURCELL:  Vague and ambiguous as to -- for
8  any information about anything or just what you're
9  referring to here?
10 BY MR. ACKELSBERG:
11     Q   About the origination.  You understand this is
12 about the signing of the loan agreements, correct?
13     A   Correct.
14     Q   Have you asked -- or do you know, has the
15 company -- anyone that you're aware of -- has asked Access
16 Group for any more information about the actual signing of
17 the loan agreements?
18     A   I don't have knowledge of that.
19     Q   Okay.  Now, if we turn to the loan agreements.
20 Can we agree that every -- that the way the loan
21 agreements is set up is that on the first half of page 1,
22 there's information personal to that particular borrower,
23 but everything else is just a form.  It's all the same,
24 correct?
25     A   Correct.

**Page 94**

1  Q   So every -- you mentioned there are roughly
2  55,000 PEAKS borrowers. Every one of those 55,000 PEAKS
3  borrowers would have signed a loan agreement that looks
4  like this and that is sitting somewhere in NLS, in the
5  servicing platform?
6  A   It's not in NLS, but yes.
7  Q   Where is it?
8  A   It is stored on our servers.
9  Q   Does NLS have the power to get it, or is that
10 something that has to be retrieved manually?
11 A   It has to be retrieved manually.
12 Q   But these -- okay. So it's not NLS, but it
13 is -- but First Associates has a loan agreement that looks
14 like the three loan agreements of the named plaintiffs for
15 every one of the 55,000 PEAKS borrowers?
16 A   Correct.
17 Q   And other than the first page, every other
18 provision would be as it appears here in the loan
19 agreements attached?
20 A   Correct.
21 Q   Now, is there an identifier that links
22 particular loan agreements that are stored to the files in
23 NLS?
24 A   So there's a spreadsheet that you look up the
25 customer to get their information that gives you this PDF,

**Page 95**

1  but then you can find -- they're all named by this long
2  PDF number.
3  Q   And when you say -- you're referring to your
4  declaration?
5  A   Correct. On page 5 of 48. So the long PDF file
6  name, you have to find the borrower. I believe their
7  Social is in that sheet. You find the customer, and then
8  there's another folder that has all these PDFs in it.
9  Then you would search for that PDF using that extremely
10 long file name.
11 Q   Okay. And that would pull up both the PDF --
12 A   That agreement, correct.
13 Q   And that's how you produced -- that's how you --
14 what you described is exactly what you did in order to
15 find the loan agreements for these three borrowers?
16 A   Correct.
17 Q   And you could do that for any other PEAKS
18 borrower if you were asked to?
19 A   Correct.
20 Q   Now, as I look at this document, the only number
21 in terms of amount of a loan or the terms of a loan, the
22 only thing that's specific to any one of these individual
23 borrowers is the -- it says "loan amount requested."
24     Do you see that?
25 A   I do.

**Page 96**

1  Q   Okay. Now, loan amount requested is not the
2  same as the actual loan that was put on the books, right?
3  A   Correct.
4  Q   Because it depends on what's disbursed, right?
5  A   Correct.
6  Q   It depends on -- there's an origination fee
7  that's added to it, correct?
8  A   Correct.
9  Q   And the interest rate. The interest rate isn't
10 on there because all that's here is just the way the index
11 works, the margin and the index. But that depends on the
12 FICO score of the particular individual, right?
13 A   Correct.
14 Q   So even though this is the loan agreement, we
15 can't see actually the amount that was borrowed here, can
16 we?
17 A   Correct.
18 Q   Nor can we see the amount of interest that was
19 charged because we don't know what the FICO was, right?
20     MR. PURCELL: Objection. Vague and ambiguous.
21 Do you mean the amount of interest that's charged or the
22 rate?
23 BY MR. ACKELSBERG:
24 Q   Yes. The index. The margin that's added to
25 prime. We don't know that for the particular person,

**Page 97**

1  right?
2  A   Correct.
3  Q   Now, you would be able to find that out, what
4  the margin is for a particular person. I mean, that's all
5  on NLS, right?
6  A   It is now, yes.
7  Q   And, in fact, the actual amount of the original
8  loan, that would be on NLS?
9  A   Yes.
10 Q   How does that get on NLS?
11 A   The data we received from Access Group.
12 Q   Okay. Now, do you know if the borrowers -- we
13 have three borrowers here, so let's talk about Aliff,
14 Smith, and Turrey.
15     Is there any document residing in the records of
16 First Associates beyond the loan agreement where the
17 borrower is notified or consents to or in any way is
18 involved in the actual amount that they're borrowing and
19 the actual interest rate that they're charged and the
20 actual payment that they're going to have? The specifics
21 that would be pretty critical to anyone borrowing money.
22     How do the borrowers find that out?
23 A   I don't know how the origination process -- what
24 documentation they received.
25 Q   But First Associates doesn't have anything in

**Page 98**

its possession that shows that the borrowers ever were notified of what they're -- how much they're -- how much they're borrowing --

A   I don't know what we have --

Q   -- or what the origination fee is?

A   Other than this -- the promissory note, I don't know what other agreements we received. This is what we would go off of.

MR. ACKELSBERG: Now give me H.

Oh, I have it here. You already gave it to me. I'm not sure why, but I'm really sorry about that. I don't know why I have it. This is P-8.

(Exhibit P-8 was marked.)

BY MR. ACKELSBERG:

Q   Now, as you look at P-8, I'm going to represent to you -- also, this is -- I also note this is confidential. It's the same concern about confidentiality.

This -- I'm going to represent to you that this was produced with metadata. It said it came from your files. And I believe the title is "Sample Loan Disclosure."

And in looking at this, is this a document that's at all familiar to you?

A   PEAKS specifically, no.

**Page 99**

Q   No. Okay.

But this is not a document that you would have in your files -- and I say "you," I'm talking about First -- the company's files. This is not a document like the loan agreement that would be easily accessible to you or someone in the company if they wanted to get a document that looks like this for a particular borrower?

MR. PURCELL: Vague and ambiguous. Calls for speculation. Lack of foundation. Incomplete hypothetical.

THE WITNESS: I don't know. We would have to look to see what we have. I don't -- it's been a long time. I don't know if we have these or not.

BY MR. ACKELSBERG:

Q   But you don't recall ever being involved in trying to get one of these?

A   Not this document, no.

Q   Okay.

MR. PURCELL: Irv, we have been going another hour, and I really could use another restroom break.

MR. ACKELSBERG: Let's do it.

THE VIDEOGRAPHER: Going off the record at approximately 11:35 a.m.

(Recess was held.)

///

**Page 100**

THE VIDEOGRAPHER: We are back on the record at approximately 11:40 a.m.

MR. ACKELSBERG: I show you what's been marked as Exhibit P-9. This is Vervent -- the document Bates-stamped Vervent 515. This is a document too that we are -- to the extent any confidentiality here is due to it being information -- personal information of Ms. Turrey, we will waive it except as to her personal, like, phone number and things like that.

And so if we can just work on that to produce some redactions here that -- and this one will be a little annoying because it just keeps repeating. But if you agree to work with us on that, that would be fine.

(Exhibit P-9 was marked.)

MR. PURCELL: Sure.

BY MR. ACKELSBERG:

Q   So looking at this exhibit, it's a document at least the format of which you're familiar with, correct?

A   Yes.

Q   And tell us what we are looking at.

A   The commentary from her loan file in the NLS system.

Q   And so we are going to go through this, and I'm going to want you to explain how the information gets inputted. And what -- just so that we are clear, NLS

**Page 101**

enables the user to get a printout of everything -- of everything that's there for a particular -- this is a log of -- an activity log, correct?

A   Correct.

Q   And NLS enables the user to generate this document reflecting operations that have been made at some point in the past in this account?

A   Correct.

Q   And there is a document like this for every PEAKS borrower that was actively serviced by First Associates?

A   Correct.

Q   So -- and the way -- as I understand it, the way this works is that it's in reverse chronological order?

A   Correct.

Q   All right. So if we can start from the back, which would be the beginning, correct?

A   Yes.

Q   And it looks like you personally were the person who made certain entries into this account back in 20 -- it says 2010. I don't know what the 2010 means, but -- well, why don't you explain to us what this means. There's disbursements that -- and you're a user name here.

So starting from -- just describe these three entries that are labeled "Disbursements." What are we

**Page 150**

1  BY MR. ACKELSBERG:
2     Q    And am I right that this -- that you were not
3  involved in preparing this spreadsheet either?
4     A    That is correct.
5     Q    And so you don't really -- and you don't know
6  where these -- how these numbers were derived?
7     A    That's correct.
8          MR. ACKELSBERG:  And we will be able to ask
9  Ms. Jimenez that tomorrow?
10         MR. PURCELL:  Uh-huh.
11         MR. ACKELSBERG:  Okay.  Great.
12         All right.  That's it on these documents.
13         MR. PURCELL:  Am I off duty?
14         MR. ACKELSBERG:  Yes.  I really appreciate it.
15         MR. PURCELL:  No problem.
16  BY MR. ACKELSBERG:
17    Q    We are going to switch to another topic.  And
18  this is a topic that I understand you have been designated
19  as the corporate designee for this particular topic, and
20  that is something called ITT payments on behalf of
21  borrowers.  Okay?
22    A    Yes.
23    Q    And that is something that you know about,
24  right?
25    A    Yes.

**Page 151**

1     Q    Okay.  Good.
2          And you understand, just to be clear, that
3  you're here speaking not simply from what you,
4  Stephanie Rodriguez, recall from your own personal
5  knowledge, but what you have been able to assemble as the
6  collective knowledge of Vervent and Activate?
7     A    Yes.
8     Q    Okay.  Great.
9          So my understanding is that starting in
10 October 2012, there was transactions that were called
11 either payments on behalf of borrowers, POBOB, or the ITT
12 economic recovery program.
13         You remember that, right?
14    A    Yes.
15    Q    So that's a subject that you are able to testify
16 about?
17    A    Yes.
18    Q    Okay.  So what I'm going to do is, there's a
19 bunch of e-mails that we are going to look at, and then
20 I'm going to ask you about them.  And we will start with
21 R.  This will it be P-14.
22              (Exhibit P-14 was marked.)
23 BY MR. ACKELSBERG:
24    Q    So you can see -- we are looking at P-14.  You
25 can see this is a series of e-mails, an e-mail chain that

**Page 152**

1  starts October 23, 2012, and continues until the following
2  day, October 24th, right?
3     A    Yes.
4     Q    Okay.  So it starts, it looks like, with -- it
5  says a NoReply@Box to MarkHuber@headquarters, "Subject,
6  Mark Palmerton has added you to a collaborated folder."
7          This just indicates that Mark Palmerton of First
8  Associates just notified Mark Huber at -- and he's at ITT,
9  right?
10    A    Correct.
11    Q    HQ refers to the headquarters of ITT in Indiana,
12 right?
13    A    Correct.
14    Q    So Mark Palmerton is just alerting Mark Huber
15 that there is something for him to look at, right?
16         MR. PURCELL:  Objection.  Calls for speculation.
17         THE WITNESS:  Well, he invited him to the
18 folder.
19 BY MR. ACKELSBERG:
20    Q    He invited him to a folder.  The folder name is
21 "ITT Files," and the owner is David Johnson, right?
22    A    Correct.
23    Q    And then the next thing that happens is the
24 following day, there's an e-mail from Mark Huber at ITT to
25 David Johnson that says, "David, the file has been

**Page 153**

1  uploaded.  Here is the name of the file.  Please let the
2  group know," blah, blah, blah, "thanks for your help.  I
3  will send the net amount to wire and confirm wiring
4  instructions this afternoon."
5          Do you see that?
6     A    Yes.
7     Q    Okay.  And then there is another e-mail from
8  Mr. Huber at ITT to David Johnson, cc to someone else at
9  ITT named Michael Holtman.
10         And, by the way, are these people that you know,
11 Mark Huber and Michael Holtman?
12    A    Huber, yes.  Holtman, no.
13    Q    What do you know about Huber?
14    A    He was on a lot of the calls that we would have
15 regarding ITT PEAKS.
16    Q    And so this is Mark Huber, and it says "Dan" --
17 do you know who he's referring to there -- Dan?
18    A    I don't.
19    Q    Okay.  And it says "The new anticipated roster
20 file has been uploaded to Box, file name 'PEAKS.'"  And it
21 gives the name of the file.
22         "The only difference from the original file is
23 the net payment amount subtracts out the late fees that
24 were on the accounts that will be waived.  We will be
25 sending the wire tomorrow for a total $940,970.44 to cover

**Page 154**

1  the past-dues for 1,579 borrowers as of October 22nd."
2      Do you see that?
3    A  I do.
4    Q  Okay. And then that same day you're involved,
5  you get an e-mail from David Johnson, as does Mark
6  Palmerton and Jeanne Ray. And it's, I guess, forwarding
7  that whole exchange, right?
8    A  Yes.
9    Q  And Jeanne Ray replies, "Wow, that's a lot,"
10 correct?
11   A  Correct.
12   Q  Okay. What do you -- am I right that this
13 represents the first of the payments that ITT made for
14 borrowers over the course of, let's say, a little over a
15 year?
16     MR. PURCELL: Calls for speculation. Lack of
17 foundation.
18     THE WITNESS: One of the dates I wrote down was
19 October 2012. I didn't write down the 24th, but I do
20 believe that this is one of the first.
21 BY MR. ACKELSBERG:
22   Q  And when you say you wrote down, what do you
23 mean?
24   A  The -- one of the dates I was asked to research
25 was when did the recovery payments start. And so

**Page 155**

1  October 2012 is a date that I did write down.
2    Q  So very likely we are looking now at the e-mail
3  notification for the first of the payments made to ITT --
4  made by ITT on behalf of PEAKS borrowers?
5    A  That is correct.
6    Q  Now I'm going to ask you from your own memory,
7  what do you remember about this whole event when you
8  started getting payments from ITT for borrowers in default
9  or nearing default?
10   A  What information are you looking for?
11   Q  What you remember about this whole incident or
12 this whole event.
13     MR. PURCELL: Objection. Calls for a narrative.
14 BY MR. ACKELSBERG:
15   Q  Wasn't -- this was unusual, right?
16   A  Yes. It was the first of its kind. We received
17 these files, and then we had to process them and post them
18 on the borrowers' account.
19   Q  Now, when you say "first of its kind," it was
20 the first time this happened for PEAKS, right?
21   A  Correct.
22   Q  And PEAKS isn't the only -- you service other
23 loans, right? And you serviced loans before you came
24 to --
25   A  Correct.

**Page 156**

1    Q  Have you ever had a situation where the owner of
2  the loan, the investor loan, is making payments for the
3  borrowers?
4    A  No.
5    Q  Okay. So this was an unusual event for a
6  servicer to be getting close to a million dollars to be
7  making payments for roughly 1,500 borrowers?
8      MR. PURCELL: Objection. Vague and ambiguous.
9      THE WITNESS: Yes.
10 BY MR. ACKELSBERG:
11   Q  And so because it was so unusual, was there
12 discussions in-house like, "What is this? What's going
13 on?"
14   A  The discussions were around the process of how
15 to apply the payments, coding on the accounts, that sort
16 of thing.
17   Q  Did anyone ever say, "Is that proper?"
18     MR. PURCELL: Objection. Vague and ambiguous.
19 Incomplete hypothetical.
20 BY MR. ACKELSBERG:
21   Q  Do you remember anyone questioning whether this
22 should happen?
23     MR. PURCELL: Mr. Ackelsberg, please don't
24 interrupt when I'm objecting. Thanks. I think I got the
25 objection in, but it's just been going on. Thanks.

**Page 157**

1      THE WITNESS: Not at my level.
2  BY MR. ACKELSBERG:
3    Q  Meaning, you didn't hear anything yourself?
4    A  Correct.
5    Q  Do you remember raising any questions with
6  anybody about this?
7    A  No.
8    Q  Okay. So -- but you were involved in the
9  discussion of how to code these payments on the system?
10   A  Correct.
11   Q  And how did you code them?
12   A  We put an identifier on them that they had
13 received an ITT recovery payment.
14   Q  But was it also -- besides the fact you put an
15 identifier on it, were they entered as borrower payments?
16   A  They were entered in as ITT recovery payments.
17   Q  Okay. And so on the system, if we were going to
18 look back and see borrower payments made on the PEAKS --
19 you know, on the PEAKS obligation, we would be able to
20 separate out payments that borrowers made themselves as
21 opposed to payments that ITT made in their name?
22     MR. PURCELL: Objection. Assumes facts not in
23 evidence. And lack of foundation.
24     THE WITNESS: Yes.
25 ///

### Page 190

1  would still be better to get it from the payment history
2  or the cash report or the transaction.
3           You could get a list of accounts that got an ITT
4  recovery payment, but the actual transactions would still
5  come from the cash report or the transaction report.
6           MR. ACKELSBERG:  Let's turn to the next
7  document, 23.
8                (Exhibit P-23 was marked.)
9  BY MR. ACKELSBERG:
10      Q    So this is -- Mark Palmerton apparently is
11  keeping track of the -- he's the one who was keeping track
12  of the ITT payments for borrowers, right?
13      A    Define "keeping track."
14      Q    Strike the question.
15           So Mark Palmerton is writing to you and to
16  Kristen Dunn and to Jeanne Ray and to David Johnson
17  basically giving you some -- basically giving you PEAKS
18  performance data, right?
19      A    Correct.
20      Q    Okay.  And what he tells you is that, as of
21  now -- and the "now" is November 2013, so this is
22  basically a year into the payments on behalf of borrowers'
23  program, right?
24      A    That's correct.
25      Q    And at that point, 42 percent of all loans in

### Page 191

1  repayment have received a prior ITT recovery payment,
2  right?
3       A    That's what it says.
4       Q    And recovery payment, that's the same as
5  payments on behalf of borrowers, right?
6       A    Correct.
7       Q    And that 72 percent of all repayment loans that
8  are more than 30 days due have received a prior recovery
9  payment.  And then he says "Difficult to campaign after
10  they received the initial benefit.  Borrower is still
11  unable or unwilling to pay."
12           What does that mean?
13      A    He's asking questions.  He's saying, is it
14  difficult to campaign after they receive the initial
15  benefit?  Are the borrowers still unable to pay and
16  unwilling to pay?  He's asking two questions.
17      Q    Well, let's ask the first question.  What do you
18  mean difficult to campaign after --
19           MR. PURCELL:  Objection.  Calls for speculation.
20  She didn't review --
21           MR. ACKELSBERG:  We already, I think,
22  established that the borrowers aren't told affirmatively
23  that they got this benefit, right?
24           THE WITNESS:  Correct.
25  ///

### Page 192

1  BY MR. ACKELSBERG:
2       Q    So what does it mean it's difficult to campaign
3  after they got the benefit that they don't know about?
4       A    Their account went current for a period of time,
5  so they may have not heard from us during that period, to
6  then -- us then start campaigning again.  And he's
7  wondering, is that causing some sort of challenge for
8  these customers.
9       Q    I see.  Challenge for the customers or challenge
10  for First Associates?
11      A    Both.
12      Q    In other words, the borrowers are now no
13  longer -- they're not paying, but they're also not showing
14  on the account as behind, so how can we get them to pay if
15  they're -- they haven't been paying before and they're no
16  longer facing default?
17      A    Correct.
18      Q    And then he also says, the total delinquency
19  rate of 59.4 percent.  And he said it is in line with the
20  two prior months.  Well -- so he's saying that, even after
21  all these millions of dollars of payments by ITT have been
22  made, the delinquency rate of the portfolio is almost
23  60 percent?
24      A    Correct.
25      Q    And then the default PEAKS portfolio, these are

### Page 193

1  the people that are already in default where First
2  Associates is trying to get recoveries.  Base payments of
3  85,000.  So the total payments include -- not including
4  one-time settlements that came in in one month was
5  $85,000.  That's the total amount of money paid on
6  delinquent -- by borrowers on delinquent -- on defaulted
7  PEAKS loans?
8       A    Correct.
9       Q    Okay.
10           MR. ACKELSBERG:  Twenty-five.
11           THE REPORTER:  Twenty-four.
12           MR. ACKELSBERG:  Twenty-four.  Sorry.
13              (Exhibit P-24  was marked.)
14  BY MR. ACKELSBERG:
15      Q    And this just is more on the topic that we
16  looked at before about how to classify on the NLS system
17  these payments made by ITT, right?
18      A    Correct.
19      Q    And he -- he's instructing you that he, being
20  Mark Palmerton, make sure that the flag is called ITT
21  recovery and not PEAKS recovery?
22      A    Correct.
23      Q    Because PEAKS recovery might sound like it was,
24  like, defaulted loans or something else, right?
25           MR. PURCELL:  Objection.  Calls for speculation.

**Page 206**

or ITT's guaranteed payments."
 That's consistent with your understanding of how this worked, right?
 A  Yes.
 Q  Now let's go to paragraph 31.
 "ITT also guaranteed that it would maintain a parity ratio between the PEAKS trust's assets, essentially consisting of the value of the loans made to ITT students and liabilities, which essentially consisted of the senior debt owed."
 Now, you're familiar with that concept of parity ratio, are you not?
 A  I am not.
 Q  You know nothing about the parity ratio?
 A  No.
 Q  So I guess we will ask Ms. Jimenez about the parity ratio.
 MR. PURCELL:  Is that -- is that a topic?  Like, these people are supposed to know the intricacies of an investigation that they were never named in?  I mean, you're digging pretty deep into this complaint.  I'm just not sure what you're looking for --
 MR. ACKELSBERG:  Okay.
 MR. PURCELL:  -- or what they're -- how it's going to help your case or why we are doing it.

**Page 207**

BY MR. ACKELSBERG:
 Q  Maybe we will find out more about the parity ratio later.  But let me move to paragraph 50.
 "In October 2012, before ITT filed its Form 10Q for the third quarter of 2012, ITT received a demand for a PEAKS guarantee payment of more than $8 million as a result of the breach of parity ratio.  ITT made a payment to the PEAKS trust in that amount."
 Now, you already told us that you don't know what the parity ratio means.  But if ITT made an $8 million payment in October of 2012 -- and this sounds like it's something different than the payment on behalf of the borrowers that we know about.  If ITT made a separate $8 million payment, you would be able to find that in the records that you're familiar with, right?
 MR. PURCELL:  Objection.  Assumes facts not in evidence.
 THE WITNESS:  Find it where?
 MR. ACKELSBERG:  Well, in --
 MR. PURCELL:  Is this part of the servicing?  That's why I'm --
BY MR. ACKELSBERG:
 Q  If a payment is made by ITT to the investors, not to the borrowers, wouldn't that -- wouldn't you know that that happened or you wouldn't?

**Page 208**

 A  No.  If it doesn't hit the accounts in NLS, then I would have no knowledge of the activity.
 Q  Very well.  We will ask someone else about that.
 Look at paragraph 72.  Now we're, I think, into -- you know, this is something that you do know about and that you testified to a little bit earlier.  This is from the SEC.
 "In addition to concealing information from investors, the defendants furthered their scheme by initially concealing ITT's practice of making payments on behalf of borrowers from other participants in the PEAKS program.  The defendants did not inform the PEAKS Noteholders, the trust administrator, or the trustee that ITT had started to make POBOB payments.
 Instead, they caused the PEAKS trust to issue monthly PEAKS Noteholder reports that misrepresented the true performance of the PEAKS collateral because loans that received payments on behalf of borrower payments were treated as though the borrowers had actually made the payments."
 I mean, that's what you told us already, right?
 MR. PURCELL:  Objection.
BY MR. ACKELSBERG:
 Q  That's a true statement, correct?
 A  I'm not sure what you're referring to.

**Page 209**

 Q  That the payments by -- well, you already told us that --
 A  I said depending on the report that was sent to them would either be a cumulative report, or it would show the delineated payment information.  I don't know what report they received.
 Q  Okay.  Do you know if David Johnson was an investor in either the PEAKS loans or in ITT?
 A  I do not know that.
 Q  What about Larry Chiavaro?
 A  I do not know that.
 MR. ACKELSBERG:  I think that would be encompassed within the relationship with ITT.  So if we could find that out from Ms. Jimenez tomorrow, that would be great.
 We are almost done.  I think we're almost done here, so let's -- let us powwow.  We're getting close.
 THE VIDEOGRAPHER:  Going off the record at approximately 3:20 p.m.
 (Recess was held.)
 THE VIDEOGRAPHER:  We are back on the record at approximately 3:28 p.m.
BY MR. ACKELSBERG:
 Q  One of the topics that your counsel has designated you to testify on behalf of the corporation is

**Page 210**

1  with regards to the events following the bankruptcy of
2  ITT.
3     And you remember -- I think they filed
4  bankruptcy in September 2016, correct?
5     A    Yes.
6     Q    Now, do you remember when that happened?
7     A    Not really.
8     Q    That wasn't big news in the office?
9     A    Not in my circle, no.
10    Q    Okay. When we started off talking about the
11 client here -- and I think we said, you know, Mr. Chiavaro
12 was responsible with the client. The client was kind of
13 ITT, right?
14    A    Correct.
15    Q    Once the bankrupt happened, the client was no
16 longer ITT, right?
17    A    Yeah. At that point in 2016, I wasn't hearing
18 from ITT really much at all.
19    Q    Well, ITT didn't exist any longer.
20    A    Right. But, I mean, even leading up to that, I
21 hadn't really heard from them for a while.
22    Q    Was it understood that they were in deep
23 trouble? Was that general knowledge within the office
24 here?
25         MR. PURCELL: Objection. Vague as to time.

**Page 211**

1  Vague as to what "deep trouble" means.
2         THE WITNESS: I don't know that it was put as
3  deep trouble. We just did business as usual. We were
4  here to collect for the trust.
5  BY MR. ACKELSBERG:
6     Q    And the reports that used to go to ITT, where
7  did they go? Just to the trust, right?
8     A    Correct.
9     Q    And so did anything change in the processes
10 after the bankruptcy as far as you could see from your
11 vantage point?
12    A    No. It was business as usual.
13    Q    Business as usual.
14         So -- and that's -- after -- so after the CFPB
15 complaint, after the SEC complaint, after the Maryland
16 investigation, after the bankruptcy, it was just still
17 business as usual, as far as First Associates was
18 concerned?
19    A    Correct.
20    Q    Were you aware of the point -- now, were you
21 also involved at all in the handling of the CUSO
22 portfolio?
23    A    Yes.
24    Q    Also on NLS?
25    A    Yes.

**Page 212**

1     Q    Okay. Now, there came a point where the --
2  there was a settlement in the Bankruptcy Court, and the
3  CUSO loans were all forgiven, right?
4     A    Correct.
5     Q    And what do you remember about that happening?
6     A    I wasn't involved in the processing of it, but I
7  know that those accounts were all written off and closed.
8     Q    And that happened before Activate started
9  handling the PEAKS loans, right?
10    A    If you say so. I don't know specifically.
11    Q    But you don't remember specifically. That's
12 fine.
13    A    Correct.
14    Q    And after the CUSO loans were forgiven, were you
15 aware that the bankruptcy trustee was trying to do the
16 same thing with the PEAKS loans?
17    A    I had heard that there may be a similar type
18 deal where those PEAKS accounts were going to potentially
19 be written off as well.
20    Q    Did anything change after you heard that news,
21 as far as you could tell?
22    A    No. It was business as usual.
23    Q    And that included referring accounts to Activate
24 in terms of the business as usual?
25    A    Correct.

**Page 213**

1     Q    And then eventually the PEAKS loans were
2  forgiven?
3     A    Correct.
4     Q    And all activity ceased as to any ITT loan
5  program?
6     A    Correct.
7     Q    Did Mr. Chiavaro leave the company before or
8  after that happened?
9     A    I don't specifically know the timeline.
10    Q    We were provided a PDF -- I'm sorry. We were
11 provided an Excel file that's entitled the "PEAKS
12 Complaint" file.
13         Were you at all involved in assembling a
14 document -- an Excel sheet that contained all of the
15 complaints from -- for a period of time, borrower
16 complaints?
17    A    I believe you're referring to a complaint log.
18    Q    Yes.
19    A    I didn't compile it, but I am familiar with the
20 log.
21    Q    If we could -- I want to just identify it. And
22 I know that the substance of the complaints is
23 Ms. Jimenez -- is Stephanie Jimenez, not her. I just want
24 to just establish in terms of the record.
25         So while you are -- let's try to pull up the

**Page 230**

```
 1   Q   And you didn't stop accepting them, did you?
 2   A   Correct.
 3   Q   Okay. And did Vervent also stop campaigning?
 4   A   I cannot confirm that.
 5   Q   So we're basically talking about, for example,
 6  people -- now, as I understand it, on the Vervent side,
 7  that delinquencies at different stages would get different
 8  campaigns, to use your word, right?
 9   A   Correct.
10   Q   And you don't know whether that stopped as a
11  result of this direction you're talking about. It very
12  well may be that Vervent was still doing the same
13  campaigning?
14   A   Correct. Or it could be that they had the same
15  status code on there. Stephanie Jimenez could confirm
16  that.
17       MR. ACKELSBERG: Okay. We will talk to her
18  tomorrow. Okay.
19       That's it. Listen, thank you so much. I know
20  this is an ordeal. I often feel -- going to these
21  things -- I really hate to invade other people's lives,
22  but I really appreciate it. You've been a pleasure to
23  spend the day with, and I wish you all the best.
24       THE WITNESS: Thank you.
25       THE VIDEOGRAPHER: This concludes today's
```

**Page 231**

```
 1  deposition. We are going off the record at approximately
 2  4:03 p.m.
 3       (Proceedings adjourned at 4:03 p.m.)
25  ///
```

**Page 232**

```
                              * * *
    I, STEPHANIE RODRIGUEZ, hereby declare under
penalty of perjury that the foregoing is my deposition
under oath; that these are the questions asked of me and
my answers thereto; that I have read my deposition and
have made corrections, additions, or changes that I deem
necessary.

         DATED this _____day of _____ 2021.

                      _____
                               STEPHANIE RODRIGUEZ
```

**Page 233**

```
                        REPORTER'S CERTIFICATE
    I, Catherine Ebbert, Certified Shorthand
Reporter licensed in the State of California, License No.
14122, hereby certify that the deponent was by me first
duly sworn and the foregoing testimony was reported by me
and was thereafter transcribed with Computer-Aided
Transcription; that the foregoing is a full, complete, and
true record of said proceedings.
    I further certify that I am not of counsel or
attorney for either or any of the parties in the foregoing
proceeding and caption named or in any way interested in
the outcome of the cause in said caption.
    The dismantling, unsealing, or unbinding of the
original transcript will render the reporter's
certificates null and void.
    In witness whereof, I have hereunto set my hand
this day: June 24, 2021.
      ___X___ Reading and Signing was requested.
      _____ Reading and Signing was waived.
      _____ Reading and Signing was not requested.

              [signature: Catherine Ebbert]

              _____
              Catherine Ebbert, CSR No. 14122
```