# EXHIBIT 11

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

```
JODY ALIFF, MARIE SMITH, HEATHER   )
TURREY, INDIVIDUALLY, AND ON BEHALF)
OF ALL OTHERS SIMILARLY SITUATED,  )
                                   )
          Plaintiffs,              )3:20-cv-00697-DMS-AHG
                                   )
vs.                                )
                                   )
VERVENT, INC. FKA FIRST ASSOCIATES )
LOAN SERVICING, LLC; ACTIVATE      )
FINANCIAL, LLC; DAVID JOHNSON;     )
CHRISTOPHER SHULER; and LAWRENCE   )
CHIAVARO,                          )
                                   )
          Defendants.              )
_____)
```

VIDEOTAPED DEPOSITION OF STEPHANIE JIMENEZ

Friday, June 25, 2021

San Diego, California

Reported by:

Catherine Ebbert

CSR No. 14122

Stephanie Jimenez

30(b)(6)
June 25, 2021

```
 1                    APPEARANCES:

 2   FOR THE PLAINTIFFS:

 3   LANGER GROGAN & DIVER, PC

 4   BY:  IRV ACKELSBERG, ESQ.

 5   BY:  DAVID NAGDEMAN, ESQ.

 6   1717 Arch Street, Suite 4020

 7   Philadelphia, PA 19103

 8   215.320.5660

 9   iackelsberg@langegrogan.com

10

11   BLOOD HURST & O'REARDON, LLP

12   BY:  JAMES McCORKLE DAVIS, IV, ESQ.

13   501 West Broadway, Suite 1490

14   San Diego, California 92101

15   619.338.1100

16   Jdavis@bholaw.com

17

18   FOR THE DEFENDANTS:

19   ARENT FOX

20   BY:  JOHN SHERMAN PURCELL, ESQ.

21   555 West Fifth Street, Floor 48

22   Los Angeles, California 90013

23   213.629.7400

24   John.purcell@arentfox.com

25
                                            Page 2
```

```
 1                  I N D E X

 2   EXAMINATION                              PAGE
 3   By:  Mr. Ackelsberg                        7

 4

 5

 6   EXHIBIT                                  PAGE
 7   Exhibit P-30  Amended Notice of            9
                   Deposition
 8
     Exhibit P-31  Amended Notice of            9
 9                 Deposition
10   Exhibit P-32  Vervent Responses to First  39
                   Set of Interrogatories
11
     Exhibit P-33  E-mail, 11/20/12, Subject:  51
12                 PEAKS
13   Exhibit P-34  E-mail, 11/30/12, Subject:  53
                   Follow Up
14
     Exhibit P-35  E-mail, 7/17/15, Subject:   60
15                 June Financial Statement for
                   FALS
16
     Exhibit P-36  Master Services Agreement   69
17
     Exhibit P-37  Statement of Work           69
18
     Exhibit P-38  Peaks Collections Document  79
19                 dated September 24, 2019
20   Exhibit P-39  Peaks Historical Revenue -  88
                   FALS/Vervent - Does NOT
21                 include Activate Revenue
22   Exhibit P-40  CFFB versus ITT             93
                   Educational Services, Inc.
23
     Exhibit P-41  In Re: ITT Education       113
24                 Services, Inc., et al.
25   Exhibit P-42  Certified Mail Letter,     126
                   6/16/14, CFPB Complaint, Case
                                            Page 4
```

```
 1   FOR THE VERVENT DEFENDANTS IN-HOUSE:

 2   DEREK ROBERT GAMBLE, ESQ.

 3

 4   THE VIDEOGRAPHER:  John Dusenbery

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21        VIDEOTAPED DEPOSITION OF STEPHANIE JIMENEZ,

22   taken on behalf of PLAINTIFFS, at 10182 Telesis Court, San

23   Diego, California 92121, commencing on Friday, June 25,

24   2021, at 9:10 a.m., before Catherine Ebbert, Certified

25   Shorthand Reporter, CSR No. 14122.
                                            Page 3
```

```
 1   No. 140613-000686

 2

 3        WITNESS INSTRUCTED NOT TO ANSWER:

 4             (None)

 5

 6        INFORMATION REQUESTED:

 7             (None)

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
                                            Page 5
```

**Page 6**

1 FRIDAY, JUNE 2,5 2021; 9:10 A.M.: SAN DIEGO, CALIFORNIA
2                              * * *
3          THE VIDEOGRAPHER:  Good morning.  My name is
4 John Dusenbery.  I'm your videographer.  I represent
5 Imagine Reporters of San Diego, California.  I'm a notary.
6 I am not financially interested in this action, nor am I a
7 relative or an employee of any of the attorneys or
8 parties.
9          Today's date is June 25, 2021.  The time is
10 approximately 9:10 a.m. Pacific Daylight Time.  The case
11 number is 3:20-CV-00697-DMS-AHG.  The case is entitled
12 Jody Aliff versus Vervent, Inc.  The deponent today is
13 Stephanie Jimenez.
14          This deposition is taking place at the Seaview
15 Corporate Center located at 10182 Telesis Court, Suite
16 300, San Diego, California.  The court reporter today is
17 Catherine Ebbert with Imagine Reporting.
18          Would all counsel present please state your
19 appearance.
20          MR. ACKELSBERG:  Irv Ackelsberg,
21 A-C-K-E-L-S-B-E-R-G, with Langer, Grogan & Diver for the
22 plaintiffs.
23          MR. NAGDEMAN:  David Nagdeman, N-A-G-D-E-M-A-N,
24 with Langer, Grogan & Diver for the plaintiffs.
25          MR. DAVIS:  James Davis, D-A-V-I-S, of Blood,

**Page 7**

1 Hurst & O'Reardon for Plaintiffs.
2          MR. PURCELL:  John Purcell, Arent Fox, for the
3 Vervent defendants.
4
5              STEPHANIE JIMENEZ,
6     having been duly sworn, testified as follows:
7
8              EXAMINATION
9 BY MR. ACKELSBERG:
10    Q    Good morning, Ms. Jimenez.
11    A    Good morning.
12    Q    We already met.  And in order to move this
13 along, your counsel has informed me that you've been
14 deposed before.
15         You understand what this process is, correct?
16    A    I do.
17    Q    Okay.  And you -- have you also appeared as a
18 corporate designee witness in cases before?
19    A    I have.
20    Q    Okay.  So what I have agreed to do is dispense
21 with the usual preliminaries where you've got to make sure
22 that the witness knows what they're doing, that there's no
23 reason why -- for example, that the witness will be unable
24 to pay attention to the questions, to listen to the
25 questions, to answer the questions, to understand the

**Page 8**

1 testimony is under penalty of perjury, all that stuff.
2         You know all that?
3    A    I do.
4    Q    Okay.  And you also understand that you're here
5 both to testify as to your personal knowledge and also as
6 a corporate designee on certain topics?
7    A    I am.
8    Q    Okay.  The one thing you did inform me of is
9 that you have a hearing issue on one side.  So what -- I
10 feel like I have spent my -- much of my adult life
11 listening to my wife and friends telling me not to speak
12 so loud.  Well, I'm going to try to reverse all that.  And
13 please tell me if I'm not speaking loud enough.  Okay?
14    A    Thank you.
15    Q    All right.  Why don't we start with you telling
16 us the name of your employer.
17    A    Vervent, Inc.
18    Q    Okay.  And we're -- this deposition is in the
19 offices of Vervent, Inc., correct?
20    A    It is.
21    Q    Okay.  And what position do you hold with
22 Vervent, Inc.?
23    A    I'm currently the president at Vervent, Inc.
24    Q    Okay.  And I want to ask you also for your
25 residential address in case next month you're not working

**Page 9**

1 here and we need to find you.
2    A    It's 11419 Windy Summit Place, San Diego, 92127.
3          MR. ACKELSBERG:  All right.  What I would like
4 to do is to show you -- I'm going to make these exhibits.
5 This will be Exhibits 29 -- 29 and 30.  We marked 29
6 yesterday.  Okay.  So this will be 30 and 31.  These are
7 the -- what we call the 30(b)(6) deposition notices.  So
8 this is B and C.  And here is 30, and here is 31.
9              (Exhibit P-30 was marked.)
10             (Exhibit P-31 was marked.)
11 BY MR. ACKELSBERG:
12    Q    You know, before we get to the -- I'm going to
13 ask you a few questions about the deposition notices.
14 Before we get there, I want to just get a little bit of --
15 a little bit of background.
16         So you're currently the president of Vervent.
17 Do you have any position with Activate Financial?
18    A    I oversee the Activate Financial subsidiary as
19 well.
20    Q    And that's in your capacity as president of
21 Vervent?
22    A    That's right.  I have a VP who reports to me for
23 that.
24    Q    Who is that?
25    A    Mark Palmerton.

Stephanie Jimenez

**Page 30**

1  prepared?  I mean, do you know the queries that produced
2  this data?
3      A    This was pulled from the historical invoices.
4      Q    So this is not the servicing platform?  This is
5  not NLS?
6      A    No.  It is a spreadsheet from reporting --
7  reports.
8      Q    And where does that reside?  What's that data?
9      A    That's in our reporting.  So we have a share
10  file location where the reports are uploaded to a share
11  file location.  They're point-in-time created reports.
12      Q    That are reports about revenue?
13      A    Right.  It would be the client invoice.  So the
14  invoice that we sent to Deutsche for payment on the PEAKS
15  accounts.
16      Q    Now, the servicing fee would be the column under
17  "PEAKS," correct?
18      A    That would be the full invoice fee,
19  predominantly would be the servicing fee.  But to your
20  earlier question, if there's ancillary fees that come in,
21  past-due expenses, et cetera, could potentially be in that
22  number.
23      Q    But let's look at the second column, "PEAKS
24  Default."  And we actually have the servicing agreement.
25  It's a document -- in fact, I was planning on showing it

**Page 31**

1  to you later.  I can show it to you now, if it will help.
2          Are you aware that after 180 days of
3  delinquency, an account comes out of the PEAKS portfolio?
4  Did you know that?
5      A    That's the distinction of the PEAKS collections.
6  That PEAKS collection portfolio is what's listed as PEAKS
7  default on the spreadsheet.
8      Q    Before you made a reference to 120 days.  And
9  that's why I wasn't sure if we were talking about the same
10  thing.
11      A    Yeah.  My understanding was most of our accounts
12  are 120.  I would need to look at PEAKS if it has a
13  specific later than date.  Typically it's 120.
14      Q    But if PEAKS is 180, it would have been 180,
15  right?
16      A    Exact same scenario.
17      Q    So you weren't -- in saying 120 days in the
18  previous question, it wasn't like you were -- you weren't
19  referring to the specific applicable number for PEAKS.  It
20  was just what usually is the case?
21      A    Right.
22      Q    Okay.  So -- and actually, I will let you --
23  maybe at a break, we will take a look so you can see the
24  servicing agreement and have confidence that you know what
25  we are talking about.

**Page 32**

1          At the point that a loan becomes defaulted, gets
2  a default status and goes into that next category that I
3  think was -- in the previous spreadsheet was called "PEAKS
4  collections," correct?
5      A    Right.
6      Q    We are talking about the same thing?
7      A    Right.
8      Q    At that point, the compensation for -- the
9  compensation received by First Associates is from a
10  different source, correct?  It's not the servicing fee.
11      A    Do you have that in the agreement?
12      Q    Yes.
13          MR. ACKELSBERG:  Why don't we go off the record
14  for a second.
15          THE VIDEOGRAPHER:  Going off the record at
16  approximately 9:55 a.m.
17          (Discussion off the record.)
18          THE VIDEOGRAPHER:  We are back on the record at
19  approximately 10:05 a.m.
20  BY MR. ACKELSBERG:
21      Q    Ms. Jimenez, while we were off the record, you
22  had an opportunity to review the servicing agreement,
23  Exhibit P-4; am I correct?
24      A    You are.
25      Q    Okay.  And that included -- you had the chance

**Page 33**

1  to review the fee schedule and Schedule A, which is at
2  page 27 of 94 of the exhibit.
3      A    That's correct.
4      Q    Okay.  And after reviewing this, can we agree
5  that the revenue that we see in the spreadsheet in the
6  first column under "PEAKS" would have been from the basic
7  servicing fee as described in schedule A of the servicing
8  agreement?
9          MR. PURCELL:  Objection.  Vague and ambiguous.
10  You can answer, if you understand.
11          THE WITNESS:  With the addition of the
12  additional fees that may have been applicable.
13  BY MR. ACKELSBERG:
14      Q    Right.  Now, that means deconversion fees or
15  additional activities that would be billed at 125 an hour,
16  right?
17      A    Right.
18      Q    There's no late fee revenue mentioned in here,
19  is there?
20      A    No.
21      Q    So that would mean that late fees -- I want to
22  make sure that I have this right.  That in this particular
23  portfolio, the late fees would be owned by the investor,
24  not by First Associates?
25      A    That's correct.

Stephanie Jimenez                                                      June 25, 2021

1    Q    And often in other portfolios that you service,
2  late fees are actually a revenue source for the servicer?
3    A    It varies by client, yes.
4    Q    But in this case, it's clear that late fees were
5  not an asset of First Associates.  They were an asset of
6  the trust?
7    A    That's right.
8    Q    And then when we look at the next column, "PEAKS
9  Default," I want to refer you to another section of the
10  servicing agreement.  It's at page 15 of 94.  And I'm
11  specifically referring to Section 5.03 of the servicing
12  agreement.
13         Now, you have confirmed, have you not, that 180
14  days is the point when, in this portfolio, loans would go
15  into default and be removed from the portfolio and
16  instead -- and then be moved into the collections
17  portfolio, correct?
18    A    That's right.
19    Q    Okay.  And this language that we are looking at
20  in Section 5.03(a) of the servicing agreement defines how
21  First Associates would be compensated with regard to
22  recoveries it makes from the PEAKS collection portfolio?
23    A    Yes.
24    Q    Okay.  And am I right that it is under -- that
25  this revenue -- that this revenue source would be

Page 34

1  essentially 26.5 percent of what's recovered, with the
2  remaining 73.5 percent being remitted to the trust?
3    A    Of the gross amount, yes.
4    Q    Gross amount, meaning after --
5    A    I'm sorry?
6    Q    So what -- in terms of the 26.5 percent, if
7  First Associates had to hire a collection agency and pay
8  that collection agency, it would come out of First
9  Associates' share, correct?
10    A    When we did, yes, it did.
11    Q    But now that you have Activate, you don't have
12  to do that, right?
13    A    There still would be because they're two
14  separate companies.
15    Q    Right.  But -- okay.  But -- okay.  I understand
16  that.  But if we look at the PEAKS default revenue in the
17  second column, that represents the revenue that -- the net
18  revenue that PEAKS -- that First Associates earned from
19  that 26.5 percent share referenced in this section?
20    A    That should be reflected in Colum C.
21    Q    And as to the revenue -- as to the money that
22  was paid -- any money that was paid to Activate, that
23  would be in a different -- that would be reflected in a
24  different report, right?  Because we see up there it does
25  not include Activate revenue.

Page 35

1    A    Right.
2    Q    So if we wanted to know what all Vervent
3  companies were earning off of the defaulted PEAKS loans,
4  we would have to add the PEAKS default column to whatever
5  Activate earned as revenue?
6    A    For revenue.  That's correct.
7    Q    Okay.  And that could be determined, right?
8  Just the revenue that Activate -- I mean, if we were to
9  give a query -- there's a query that you could do that
10  would give us the number for what Activate earned off of
11  the PEAKS portfolio, and we could add that to the PEAKS
12  default column if we wanted to get the aggregate number
13  for what all Vervent companies earned off the PEAKS
14  defaulted loans?
15    A    Yes, we could get that.
16    Q    Do you know if it's been done yet?
17    A    I believe it has.
18    Q    I think it -- yeah.
19         MR. PURCELL:  It's not a question for --
20         MR. ACKELSBERG:  Yeah.  Okay.  I think that's
21  right.  I think we have it.  We will identify that later.
22  BY MR. ACKELSBERG:
23    Q    Now, one of those other topics -- strike that.
24         One of the other topics --
25         MR. PURCELL:  Irv, do I need to keep this up?

Page 36

1         MR. ACKELSBERG:  No.  You can take that off.
2  Sorry.
3         MR. PURCELL:  No problem.
4  BY MR. ACKELSBERG:
5    Q    Going back to the -- I think we identified it as
6  P-30, the list of topics that you're testifying to.
7         Do you have that in front of you?
8    A    I do.
9    Q    Can you look at Topic 23.  This asks about the
10  percentage of -- basically what percentage did PEAKS
11  represent of the business.  And the same question was
12  asked for Activate.  So you can explain it if you want to
13  one company, two companies divided up, but -- however you
14  want, but just as long as you explain it.
15         We are looking for the percentage of revenue
16  from PEAKS that was the percentage of the total business.
17  And this would have been -- and we are looking at both
18  numbers of loans being serviced, total dollars, I mean,
19  however it's looked at.
20         The answer to this question would be vastly
21  different between 2012 and 2018, wouldn't it?
22    A    Likely.
23    Q    So if we -- I want to look at it from the
24  beginning, early on.  And I know you weren't here.
25         But would it be accurate to say that in the

Page 37

Stephanie Jimenez

**Page 86**

1   A   That role is the most changing because it is a
2   relationship-based role.
3   Q   Has it changed a lot even since the bankruptcy
4   was filed in 2016, or are we talking really
5   pre-bankruptcy, post-bankruptcy?
6   A   No.  That's not a demarcator for us.  That
7   didn't have much impact internally for us.
8   Q   Uh-huh.  Okay.
9       And I just want to ask you just to -- and I
10  apologize if -- you know, to you, John, if we covered this
11  yesterday, but I am not remembering at the moment.
12      If we wanted to know the number of people with
13  PEAKS accounts from whom Activate Financial attempted to
14  collect in any fashion, send any letters, make any text
15  messages or anything like that, that could be determined,
16  correct?
17  A   Yes.
18  Q   And if we wanted to drill down and determine
19  the -- identify the specific people who paid anything to
20  Activate on PEAKS obligations, you could determine that
21  too?
22  A   Yes.
23  Q   That's all sitting right in NLS, right?
24  A   It is.
25  Q   Okay.  And if we wanted to drill down even

**Page 87**

1   further and determine how many people with California
2   addresses with PEAKS accounts got collection letters or
3   any kind of communications from Activate Financial, we
4   could get that information right out of your NLS database?
5   A   Yes.
6   Q   And, similarly, if we wanted to know how many
7   dollars were paid to Activate by California residents, we
8   could get that information also?
9   A   You could.
10  MR. ACKELSBERG:  I'm going to switch to another
11  topic.
12      Does anybody need a break at the moment?
13  MR. PURCELL:  I could use a restroom break.
14  THE VIDEOGRAPHER:  Going off the record at
15  approximately 11:49 a.m.
16      (Recess was held.)
17  THE VIDEOGRAPHER:  We are back on the record at
18  approximately 1:00 p.m.
19  BY MR. ACKELSBERG:
20  Q   My understanding, Ms. Jimenez, is that during
21  the break, you were able to get us some of the revenue
22  numbers we were looking for; is that correct?
23  A   That's correct.
24  Q   Okay.  And what have you brought for us?
25  A   We have updated the spreadsheet that we

**Page 88**

1   referenced earlier with the revenue to put in total
2   company so that you could have the percent of revenues for
3   PEAKS.
4   Q   And that's on a document, correct?
5   A   Right.
6   Q   Okay.  Can we call that -- why -- did you make
7   multiple copies?
8   A   I have two.
9   MR. ACKELSBERG:  Great.  So we will call one of
10  them P-39.  Let me just take a minute and look at this.
11      (Exhibit P-39 was marked.)
12  BY MR. ACKELSBERG:
13  Q   And just to be clear, as -- I see.  So the
14  Activate revenue is still not included in this?
15  A   Right.  There's only Activate revenue associated
16  with PEAKS in 2019.  So we've articulated that on the
17  bottom.
18  Q   I see.  Great.  Great.  Great.  Great.  Okay.
19      So in 2019, there is $134,936.94 in Activate
20  Financial revenue attributable to PEAKS, correct?
21  A   PEAKS.
22  Q   And if we look at the same year for PEAKS
23  default, that's the Vervent money earned -- let me ask it
24  another way.
25      Am I right that in 2019 -- if we were to look at

**Page 89**

1   the total amount of money that the Vervent companies
2   collectively earned off PEAKS defaults, am I right it
3   would be the 244,685 plus the 134,936?
4   A   She just handed this to me.  I need to confirm
5   that for you, if it was included or not.
6   Q   Okay.  And, again, just so that I am looking at
7   this in the way -- I am reading it correctly.  In 2012,
8   the revenue generated by First Associates on the PEAKS
9   portfolio represented 51 and a half percent of all of the
10  company revenue?
11  A   That's what this indicates.
12  Q   Okay.
13  MR. ACKELSBERG:  All right.  We are going to
14  switch gears.  And before we began, Counsel -- off the
15  record for a minute.
16  THE VIDEOGRAPHER:  Off the record at 1:04 p.m.
17      (Discussion off the record.)
18  THE VIDEOGRAPHER:  We are back on the record at
19  1:05 p.m.
20  BY MR. ACKELSBERG:
21  Q   Ms. Jimenez, you understand that one of the
22  topics that you've been designated to talk about are civil
23  actions that were filed concerning the PEAKS lawsuit --
24  the PEAKS portfolio?
25  A   Yes.

Stephanie Jimenez                                         30(b)(6)
                                                          June 25, 2021

1    Q    Okay.  And I want to just give you -- name some
2  of the -- and you also understand that, before those --
3  before some of those lawsuits were filed, there were
4  subpoenas served on First Associates for First Associates
5  to produce documents concerning the PEAKS portfolio?
6    A    Yes.
7    Q    Okay.  And I'm going to just give you dates
8  that -- I'm going to give you the specific subpoenas.  I'm
9  going to give you who was behind the subpoena, what agency
10 was serving the subpoena, and the date the subpoena was
11 served on First Associates.  And then I'm going to ask you
12 at the end just to confirm that that's what -- that's what
13 the record is, and then we will be asking you questions
14 about that.
15   A    Okay.
16   Q    Okay.  So first -- and this is in chronological
17 order -- there was a subpoena served on First Associates
18 asking for records concerning the PEAKS portfolio on
19 June the 4th, 2013.  And that is in the production
20 Bates-stamped at Vervent 586.
21        The second subpoena, actually called a civil
22 investigative demand, was from the Federal Consumer
23 Financial Protection Bureau that was served on First
24 Associates concerning the PEAKS portfolio on
25 September 11, 2013.  And that is in the production
                                                Page 90

1  Vervent 613.
2        The third subpoena in the production was an
3  Attorney General multi-state -- an Attorney General
4  subpoena originating from the Office of the Maryland
5  Attorney General November 20, 2015.  That's Vervent 668.
6        And finally, there was a subpoena in private
7  civil litigation initiated by the senior bond holders
8  against ITT.  And that subpoena was served on First
9  Associates April 28, 2016.  And I think that's -- is that
10 Vervent -- and that's Vervent -- starts at Vervent 687.
11       So you understand that those are the subpoenas
12 that we are talking about?
13   A    I don't have reason to believe anything other
14 than that.
15   Q    Okay.  Greatly appreciate it.
16       Now, First Associates gathered documents to
17 comply with those four subpoenas in 2013 and 2015 and
18 2016, correct?
19   A    Yes.  We produce documents when we are
20 subpoenaed.
21   Q    Do you know if any of those agencies -- the SEC,
22 the CFPB or the State Attorneys General -- conducted any
23 interviews of First Associates' staff?
24   A    I understand that the CFPB had two members of
25 our staff interviewed.
                                                Page 91

1    Q    And which staff members were interviewed?
2    A    David Johnson and Mark Palmerton.
3    Q    Now, as a result of receiving the subpoenas and
4  being interviewed, at least those two executives being
5  interviewed, did First Associates do anything new or take
6  any steps with -- that were different than the past with
7  regard to the PEAKS -- the handling of the PEAKS
8  portfolio?
9    A    We wouldn't take specific steps just because
10 we're responding to a subpoena.
11   Q    Were there any efforts made to determine what
12 those federal agencies might be concerned about?
13        MR. PURCELL:  Objection.  Vague and ambiguous.
14        THE WITNESS:  I don't believe so.
15 BY MR. ACKELSBERG:
16   Q    Okay.  Now, after those subpoenas were served,
17 at least with regard to the SEC and the CFPB, civil
18 actions were, in fact, filed in the United States District
19 Court; am I right?
20   A    I didn't follow them.
21   Q    Okay.  But, again, you're here as the
22 representative of the corporation, so my question is, did
23 anyone follow them?
24   A    I don't believe so.
25        MR. ACKELSBERG:  If -- so if I were to -- maybe
                                                Page 92

1  we can -- well, let me just make -- let's confirm.  Let me
2  just show -- let's -- give me -- 40.
3             (Exhibit P-40 was marked.)
4        MR. ACKELSBERG:  And it looks like this one was
5  already identified as P-27.  Do you have the ones from
6  yesterday?
7        MR. PURCELL:  I do.
8        MR. ACKELSBERG:  Well, actually, we don't need
9  to -- we can just use his.
10       MR. PURCELL:  This is 27.
11       MR. ACKELSBERG:  Uh-huh.
12       MR. PURCELL:  Oh, no, it's not.  27 is the SEC
13 one.
14       MR. ACKELSBERG:  The SEC, right.  That's what I
15 want.
16       MR. PURCELL:  You want to use this one?
17       MR. ACKELSBERG:  Yeah.  I want her to have both
18 the CFPB and the SEC.
19       MR. PURCELL:  So you want me to do this?
20       MR. ACKELSBERG:  Yeah, that's fine.
21 BY MR. ACKELSBERG:
22   Q    So the SEC complaint is Exhibit 27.  It was
23 identified yesterday.  And that's Exhibit 40.
24   A    Yes.
25   Q    Okay.  So this -- I'm showing you a copy of the
                                                Page 93

Stephanie Jimenez                                                   June 25, 2021

1  complaint filed by the Consumer Financial Protection
2  Bureau on February 26, 2014.  And I realize that was
3  before you were at the company.
4       And I just want to make sure that, you know,
5  talking on behalf of the company, you are not aware of
6  anyone at the company having made this complaint.
7       A    I don't have specific knowledge of that.  We
8  tend to be informed by our outside counsel when it
9  involves our work or something is mandated to change in
10 our work.
11      MR. PURCELL:  Be care not to share any
12 communications with your outside counsel.
13 BY MR. ACKELSBERG:
14      Q    Yeah.  And I'm not asking about that.  So to the
15 extent there was any, yeah, monitoring by your counsel or
16 discussions with your counsel, that's not within the scope
17 of my question.
18      Did the company conduct any meetings, as far as
19 you know, concerning the allegations that were being made
20 by the Consumer Financial Protection Bureau concerning the
21 PEAKS loan program that you were servicing?
22      MR. PURCELL:  When you answer, exclude anything
23 where you had meetings with counsel.
24 BY MR. ACKELSBERG:
25      Q    Yes.

                                                   Page 94

1       A    No, none that I'm aware of.
2       Q    Now turn to Exhibit P-27, the SEC complaint.
3  And I want you to look at paragraph one of the SEC
4  complaint that states that, "Beginning no later than the
5  second quarter of 2012, ITT education services, an
6  operator for profit schools, its chief executive officer
7  Kevin M. Modany and its chief financial officer
8  Daniel M. Fitzpatrick engaged in a fraudulent scheme and
9  course of business and made various false and misleading
10 statements and omissions to defraud ITT's investors by
11 concealing the extraordinary failure of two off-balance
12 sheet student loan programs and the looming effect of that
13 failure on ITT's financial condition."
14      And I realize, again, this looks like it's two
15 months before you arrived, right?
16      A    Right.
17      Q    Is this something -- you have never seen this
18 before?
19      A    I haven't looked at this, no.
20      Q    Do you find it a little shocking?
21      A    No.
22      Q    No?  That a loan program that you were servicing
23 might be considered by the Securities & Exchange
24 Commission as a fraudulent scheme?
25      A    Nothing that you read to me is about the loans

                                                   Page 95

1  themselves and the servicing of the loans themselves.  I
2  would be interested in anything about the servicing of the
3  loans themselves.
4       Q    Okay.  We can look at some other -- turn to some
5  other parts of the complaint, then.
6       All right.  Let's start with paragraph 30.  And
7  remember, I was asking you earlier if you knew anything
8  about parity ratios.
9       Remember that?
10      A    I do remember.
11      Q    Okay.  So this is, I will represent to you, the
12 SEC's -- what the SEC had to say in their complaint about
13 parity ratios.  So let's start looking at paragraph 30.
14 And you see this is all about PEAKS, right?  You see from
15 the heading this is the SEC talking about PEAKS.
16      Do you see that?
17      A    Yes.  I haven't read it to see if it's
18 specifically about the loan servicing, though.
19      Q    Okay.  And paragraph 30 states, "ITT guaranteed
20 all the principal and interest payments on the PEAKS
21 senior debt, as well as other financial obligations of the
22 PEAKS trust.  The PEAKS trust was required to pay off all
23 of the senior debt by the beginning of 2020, either
24 through student loan cash flows or ITT's guarantee
25 payments."

                                                   Page 96

1       And the student loan cash flow, that is about
2  servicing, right?  That's about the --
3       MR. PURCELL:  Objection.  Assumes facts not in
4  evidence.
5  BY MR. ACKELSBERG:
6       Q    I will -- strike that.  Strike that.  Withdraw
7  that question.
8       The cash flows are the cash flows that would be
9  collected by First Associates and then remitted to the
10 PEAKS trust.  That's what we are talking about here.
11      You understand that, correct?
12      A    That certainly could be part of the cash flows.
13 It may not be the only cash flows.
14      Q    Right.
15      And then paragraph 31, "ITT guaranteed that it
16 would maintain a parity ratio between the PEAKS trust's
17 assets, which essentially consisted of the value of the
18 loans made to ITT students and liabilities, which
19 essentially consisted of the senior debt owed to the PEAKS
20 noteholders."
21      You got that?
22      A    I do.
23      Q    "ITT guaranteed that the value of the assets
24 would at all times equal or exceed 105 percent of the
25 liabilities.  In practice, this meant that if the value of

                                                   Page 97

Stephanie Jimenez

1  the trust's assets declined below the required parity
2  ratio, ITT was required to pay down the liabilities, that
3  is, the senior debt, until the ratio was back in balance."
4      You got that?
5  A   I do.
6  Q   And you understand what they're talking about
7  there?
8  A   That's outside of the scope of servicing the
9  loans.
10  Q   Well, it's actually within the scope of the
11  reporting that Mark Palmerton was doing, though, with
12  regard to -- for example, in terms of putting a number on
13  the value of the loans made to the ITT students, that's
14  the asset itself, and the senior debt owed to the PEAKS
15  noteholders, these are things that Mr. Palmerton was
16  reporting on a monthly basis to ITT, was it not?
17      MR. PURCELL:  Objection.  Assumes facts not in
18  evidence.  Misstates the record.
19      THE WITNESS:  We were reporting on the loan
20  demographics based on our system of record tied to the
21  loans.
22  BY MR. ACKELSBERG:
23  Q   Right.  But Mr. -- but aren't you aware that in
24  the monthly servicing reports, Mr. Palmerton was actually
25  giving reports on where the parity ratio stood?

Page 98

1      MR. PURCELL:  Objection.  Assumes facts not in
2  evidence.  Do you have something to show her that shows
3  that that happened so she doesn't have to take your word
4  for it?
5      MR. ACKELSBERG:  Yeah, we can.  Sure.
6      This is one of the documents I think that I --
7  which one -- that would have it.  So look at your -- one
8  of the documents that I asked her to bring was the MSR, I
9  believe, for August of 2012.  Or not asked her, but --
10      MR. PURCELL:  MSRs, August 2012.  Does it matter
11  if I look at the PDF or the Excel?
12      MR. ACKELSBERG:  The Excel.  It doesn't matter,
13  actually.  You can do the PDF.  Okay.
14      MR. PURCELL:  What do you think will be easier
15  for me?  I will do both.  I mean, I have it up here.  I
16  don't know what I'm supposed to do with it.  Oh, you want
17  me to put it up there?
18      MR. ACKELSBERG:  Yeah.
19      MR. PURCELL:  Okay.
20  BY MR. ACKELSBERG:
21  Q   So have you ever looked at a monthly servicing
22  report?
23  A   I have looked at many monthly servicing reports.
24  They vary by client.  And I have not looked at one since
25  my employment.

Page 99

1  Q   Okay.  So you see the first tab has asset
2  liability summary?  Do you see that?
3      MR. PURCELL:  I'm starting at the top.  What do
4  you want me to do?
5      MR. ACKELSBERG:  Scroll down and look at notes
6  and certificates.  And -- all right.  Where is it?
7      MR. PURCELL:  Row 34.
8      MR. ACKELSBERG:  So you look at Row 34.
9      MR. PURCELL:  So it's the asset/liability ratio
10  178 --
11      MR. ACKELSBERG:  Yes.
12      THE WITNESS:  It's not showing on the screen.
13      MR. PURCELL:  34?
14      MR. ACKELSBERG:  I'll show it.
15      THE WITNESS:  Oh, it's summing the totals from
16  the --
17      MR. PURCELL:  It's mostly blank, but at the end
18  it says "asset/liability ratio."
19  BY MR. ACKELSBERG:
20  Q   Do you see it?
21  A   Yes.
22  Q   The monthly servicing reports were prepared by
23  Mark Palmerton or people working for him?
24  A   I believe so.
25  Q   Yeah.  So --

Page 100

1  A   There is data entry fields and then already set
2  calculation fields.  So I don't know what data on this was
3  specifically provided by Mark's team.
4  Q   Right.  And so -- and I realize that, in terms
5  of payments that would have been made during a particular
6  period, that would come from the servicing platform,
7  right?
8  A   The balance in this -- in Column -- I cannot
9  see.  It's so tiny.  Columns F and H would come from the
10  system of record.
11  Q   Right.  But in terms of the actual amounts owed
12  to the senior bond holders, that would come from some
13  other source, correct?
14  A   Likely.
15  Q   Right.  And do you know what source -- what data
16  Mark Palmerton or his staff would be looking at in
17  preparing this -- where would they get that data from?
18  From what database?
19  A   Typically that's initially started when we start
20  the reports, and then it's just a carryover calculation
21  field, is the typical course.  So they're not
22  data-entering or calculating anything.  It's just rolling
23  forward month to month from the original data provided by
24  the trust owners.
25  Q   But if data provided by the trust -- I see.  So

Page 101

1  what you're saying is, on a monthly basis, Mark would have
2  been getting the information about the senior --
3       A    Month end from last month usually pulls into
4  month beginning for next month.  So that first report when
5  the data was provided at origination of our servicing
6  agreement, they're entered.  And then it's just a
7  carryforward based on the new data that's being entered on
8  the performance of the loans.
9       Q    Well, but if -- but if -- if, for example,
10 ITT -- step back for a minute.
11           Do you understand that the parity ratio is
12 basically the balance of the loans in the portfolio
13 divided by the amount owed the senior creditors?
14      A    I understand that from what we have read.
15      Q    Yes.
16      A    Yes.
17      Q    Okay.  And you see -- and you see that there is,
18 in fact, an asset-over-liability ratio that is on this
19 report, right?
20      A    Yes.
21      Q    All right.  So the balance of loans in the
22 portfolio would just come out of the servicing --
23      A    Record.
24      Q    -- record.  Right.
25           But the amount owed the senior creditor, you

1  on the senior notes.  In other words, there is --
2       A    I don't know that that's a data field we've
3  entered.  We, Vervent.
4       Q    But you don't know where that data came from?
5       A    No.
6       Q    Now, go to the tab that says "Trends."  Do you
7  see that there's a tab?  Go across the bottom of the --
8           MR. PURCELL:  Right here, the last one?
9           MR. ACKELSBERG:  Yeah.  All right.  And we are
10 now in a different tab of the spreadsheet.  And just
11 for --
12          MR. PURCELL:  I'm going to --
13          MR. ACKELSBERG:  -- identification purposes, we
14 are talking about Vervent 48962.  And go down to -- so go
15 down to -- scroll down to F.  We see A, B, C, D.  Let's go
16 down further.  Okay.  Now stop.
17 BY MR. ACKELSBERG:
18      Q    And if you look at the asset/liability ratio, do
19 you see it shrinking over time?
20      A    It does.
21      Q    And do you see the note numbers, the numbers for
22 the senior notes -- the amount owed to the senior
23 noteholders, the amount owed on loan note and subordinated
24 note?  Do you see those numbers are changing too over
25 time?

1  wouldn't have that information, correct?
2       A    No.
3       Q    But that could change month to month, right?
4  If, for example, there was a big payment made to the
5  senior creditors, that would alter that ratio that we're
6  talking about.
7       A    I don't know.  We're not involved in the parity
8  ratio.  I'm simply reporting on the loans.
9       Q    When you say "we're not," I know that you were
10 not involved in that, but apparently Mark Palmerton or his
11 people were involved in that.
12          Do you see that?
13          MR. PURCELL:  Objection.  Assumes facts not in
14 evidence.
15          THE WITNESS:  I don't see that on here.  So
16 where is the parity ratio called out on here?
17 BY MR. ACKELSBERG:
18      Q    You see that the -- there's the student --
19 there's the senior notes that are -- the balance as of
20 June 30th -- July 31, 2012, is roughly $213 million.
21          Do you see that?
22      A    Yes.
23      Q    How would Mark Palmerton know that?
24      A    The balance on the loans?
25      Q    No, not the balance on the loans.  The balance

1       A    They are also decreasing.
2       Q    Okay.  And your testimony is that you don't know
3  where that data comes from that would enable -- that
4  explains those trends in the senior notes, the loan notes,
5  the subordinated notes.  You don't know where that data
6  comes from?
7       A    That's correct.
8       Q    But you understand that we are looking at a
9  Vervent document?
10      A    I do, but I don't know that these are populated
11 fields by Vervent or if they're populated fields by the
12 trust.
13      Q    Or by ITT or somebody.
14      A    Right.
15      Q    Okay.  Understood.
16          So as far as you know, if Mr. Palmerton and his
17 people were preparing these reports, those numbers did not
18 come from any data that you're aware of that exists in any
19 system of Vervent?
20      A    These are not in our system of record.  These
21 numbers would not be coming from our system.
22      Q    They would have to come from outside the system
23 of record?
24      A    Right.
25      Q    And who would know where these numbers came

Stephanie Jimenez

30(b)(6)
June 25, 2021

1    Q    And the fact that one of the two clients
2  underlying a portfolio that at one point was half of
3  the -- represented half of the revenue of the company,
4  that wasn't considered a significant event, that it filed
5  bankruptcy?
6         MR. PURCELL:  Objection.  Vague and ambiguous.
7         THE WITNESS:  At this point, they weren't a
8  significant volume.
9  BY MR. ACKELSBERG:
10   Q    Okay.  But historically, this is -- was a
11 portfolio that had financial significance for this
12 company, correct?
13        MR. PURCELL:  Objection.  Vague and ambiguous.
14        THE WITNESS:  Historically, yes.
15 BY MR. ACKELSBERG:
16   Q    Okay.  And, nonetheless, the bankruptcy was not
17 treated at First Associates as a significant event?
18   A    That's right.
19   Q    But there was a point when the trustee in
20 bankruptcy made certain allegations about the CUSO
21 portfolio, right?
22        MR. PURCELL:  Objection.  Vague and ambiguous.
23 Assumes facts not in evidence.
24 BY MR. ACKELSBERG:
25   Q    Do you remember when the trustee sued the
                                           Page 114

1  participants in the CUSO program?
2    A    I'm not specifically remembering.  It was quite
3  a while ago.
4    Q    Do you remember that, as a result of litigation
5  filed by the bankruptcy trustee in settlement -- and in
6  settle of that litigation, the CUSO loans, whatever was
7  left of them, were forgiven?
8    A    Yes.
9    Q    And do you remember that the trustee also went
10 after the participants in the PEAKS portfolio?
11   A    I know the PEAKS accounts were also addressed.
12   Q    Well, they were addressed to settle litigation
13 that the bankruptcy trustee filed against Deutsche Bank,
14 against the Access Group, against Moehn Management, and
15 all of these participants in the PEAKS trust.
16        You know that, right?
17   A    Yes.
18   Q    Okay.  And when that suit was filed -- and that
19 was -- as you see here, that suit was filed
20 September 7, 2018.  That's like right around the time you
21 were setting up Activate Financial and starting with the
22 PEAKS portfolio, right?  Wasn't that the same period --
23        MR. PURCELL:  Objection.  Misstates the facts.
24 BY MR. ACKELSBERG:
25   Q    It's about the same period of time, right?
                                           Page 115

1         MR. PURCELL:  Objection.  Vague and ambiguous.
2  Misstates the facts.
3  BY MR. ACKELSBERG:
4    Q    Okay.  You can answer.
5    A    It's around a similar time.
6    Q    Yeah.  Okay.
7         Do you -- does -- was the company -- well, let's
8  first -- you --
9         Were you aware of this action being filed
10 against -- it looks First Associates might have been the
11 only ones left out of here.  It's all the other
12 participants, right?
13   A    We were aware through our support of the CUSO.
14   Q    Well, you were aware that the CUSO program was
15 being challenged by the -- the bankruptcy trustee, right?
16 I'm asking now about -- this is the PEAKS portfolio.
17        Were you aware that the trustee then also went
18 after the PEAKS --
19   A    We were aware --
20   Q    -- participants?
21   A    -- in support of our client, yes.
22   Q    And now let's look at this action.  And we don't
23 need to look at the whole thing.  I'm not going to take
24 you through the whole thing.
25        But is your answer the same, that you have never
                                           Page 116

1  seen this before?
2    A    I can't recall if I have seen this one or not.
3  I probably have.
4    Q    Okay.  Could you turn to page 50 of the
5  complaint.  It's a very big complaint.  And if you look at
6  page 184.
7         MR. PURCELL:  Paragraph?
8  BY MR. ACKELSBERG:
9    Q    I'm sorry.  Paragraph 184.  There is a list of
10 all sorts of payments that ITT -- that ITT's former
11 management caused ITT to make.
12        And I want you to look at subparagraph B, that
13 "ITT paid approximately $174 million, which amount
14 excludes the $40 million paid under the payment on behalf
15 of borrowers' settlement, to PEAKS or to Deutsche Bank for
16 the benefit of PEAKS pursuant to its guarantee obligations
17 under the guarantee agreement from 2010 through the
18 petition date."
19        Do you see that?
20   A    I do.
21   Q    Is that kind of eye-popping, that number?
22        MR. PURCELL:  Objection.  Vague and ambiguous.
23 Argumentative.
24 BY MR. ACKELSBERG:
25   Q    You don't have to answer that question.
                                           Page 117

1   Is that a number -- not the precise number, but
2   the magnitude of the number, is that one of the things
3   that might have caught the attention of First Associates
4   when it was looking at this complaint?
5       MR. PURCELL:  Objection.  Vague and ambiguous.
6   Calls for speculation.
7       THE WITNESS:  I'm not sure I understand the
8   question.
9   BY MR. ACKELSBERG:
10      Q   Yeah.  That's okay.  I will ask a different
11  question.
12          You said that you may have looked at this
13  complaint before.
14      A   That's right.
15      Q   Okay.  And do you recall seeing or learning that
16  over the course of the PEAKS program that ITT made
17  guarantee payments of $174.4 million plus an additional
18  $40 million from their settlement concerning payment on
19  behalf of borrowers, that that's the magnitude of dollars
20  that ITT paid on its guarantee obligation under the PEAKS
21  program?
22          Do you remember that at all?
23      A   It's not anything that stands out in my
24  recollection.
25      Q   Okay.  Going back to the document that you

1   prepared -- the spreadsheet that you prepared for us,
2   P-39, where you said that in 2012 PEAKS represented
3   51.5 percent of the revenue coming into First Associates.
4           So CUSO is not included in that right, right?
5       A   Right.
6       Q   So then if we were to ask the question how
7   much -- what percentage did ITT loan -- what percentage
8   did revenue generated by ITT loan programs represent, it
9   would have been a lot bigger than 51.5 percent, right?
10      A   It likely would have been higher.  I don't have
11  those numbers.
12      Q   Okay.  All right.  There's -- I want to turn to
13  a different topic.  And this is Topic 11 on the 30(b)(6)
14  subpoena, the topics where you're testifying on behalf of
15  the corporation.  This concerns the FTC holder rule.
16      A   Okay.
17      Q   You know what the FTC holder rule is, correct?
18      A   I'm familiar with it.
19      Q   Okay.  So let me make sure that we are talking
20  about the same thing and that we are on the same page.
21          Am I right that the FTC holder rule protects
22  consumers who purchase services obtained -- I'm sorry --
23  protects consumers who purchase services with credit
24  obtained through the merchant that's providing the
25  services.

1           You understand that, right?
2       MR. PURCELL:  Objection.  The holder rule speaks
3   for itself.  You're asking for a legal conclusion.
4   Assumes facts not in evidence.
5       THE WITNESS:  I'm not an expert on the holder
6   rule.
7   BY MR. ACKELSBERG:
8       Q   I'm not asking you to be an expert.  I'm just
9   saying that you're familiar with what its purpose is.
10      A   I'm familiar with it broadly.
11      Q   And I'm asking whether you understand that what
12  it's intended to do is to give consumers who owe money for
13  loans that they obtained to purchase services from a
14  merchant that helped them obtain that loan -- it gives
15  them certain rights with -- regarding repayment of the
16  loan?
17      MR. PURCELL:  Same objections.  And I don't
18  think you're stating it accurately anyway.
19  BY MR. ACKELSBERG:
20      Q   You understand what I'm talking about, right?
21      MR. PURCELL:  Same objections.
22      THE WITNESS:  I understand the broad premise of
23  the holder rule.
24  BY MR. ACKELSBERG:
25      Q   And you understand that the rules require such

1   loans -- and I'm talking -- when I say "such loans," loans
2   that are obtained through the merchant providing the
3   services to the consumer.
4           In that circumstance, the rule requires that
5   such loans include a contract provision that preserves the
6   consumer's ability to raise the merchant's misconduct as a
7   reason for not repaying the loan, even if the loan is
8   being collected by a third party.
9           You understand that, correct?
10      MR. PURCELL:  Same objections.  Again, I just
11  don't know why you're doing this.
12      MR. ACKELSBERG:  Okay.
13  BY MR. ACKELSBERG:
14      Q   You understand that, right?
15      A   I'm aware of the provisions broadly, yes.
16      Q   And you understand that the FTC holder provision
17  was, in fact, included in all PEAKS loan agreements?
18      MR. PURCELL:  Same objections.
19      THE WITNESS:  I believe that's true.
20  BY MR. ACKELSBERG:
21      Q   And you understand that it was there because
22  federal law requires it to be there?
23      MR. PURCELL:  Same objection.  Repetitive.
24          Go ahead.  I don't want to get in the way,
25  but...

Stephanie Jimenez

June 25, 2021

1    THE WITNESS:  I believe that's true.
2  BY MR. ACKELSBERG:
3    Q    So tell me how the loan agents were trained
4  about the FTC holder rule that was in every loan agreement
5  that PEAKS borrowers were obligated under.
6    MR. PURCELL:  Objection.  Assumes facts not in
7  evidence.
8  BY MR. ACKELSBERG:
9    Q    Okay.  You're right.  I will withdraw that
10 question and ask, were the loan agents trained about the
11 FTC holder rule?
12   A    No.
13   Q    So what would happen -- have you had a chance to
14 look at the complaint log that was produced in this case?
15   A    I haven't looked at it in detail.
16   Q    But you have had a chance to look at some
17 complaints coming from PEAKS borrowers over the years?
18   A    I have.
19   Q    And --
20   THE VIDEOGRAPHER:  It's okay.  You don't have to
21 have it.
22 BY MR. ACKELSBERG:
23   Q    So what were loan agents told to do when the
24 PEAKS borrower was saying "But I didn't get anything for
25 my education" or "I was ripped off" or "I don't even

Page 122

1  know" -- "I think I was fooled into this PEAKS program."
2    What were the loan agents supposed to do with
3  that?
4    MR. PURCELL:  Objection.  It's an incomplete
5  hypothetical.  Assumes facts not in evidence.
6  Argumentative.  Possibly seeks a legal conclusion.
7  BY MR. ACKELSBERG:
8    Q    Just to be clear, I'm just asking, as the
9  president of the company who's in charge of how borrowers
10 are being communicated with, what should a loan agent have
11 done in that circumstance -- if a borrower in the PEAKS
12 program was complaining about something that could be
13 characterized as misconduct by ITT?
14   MR. PURCELL:  Same objections.
15   THE WITNESS:  Answer?
16   MR. PURCELL:  If you can.
17   THE WITNESS:  They would be trained to handle,
18 like, a typical complaint.  We have specific agents that
19 handle complaints and would look into -- if the customer
20 is claiming that they didn't originate or authorize the
21 loan, they were making sure that it was validated that the
22 loan had been originated.
23   MR. PURCELL:  Go a little slower.  Sorry.
24 You're going fast.
25   THE WITNESS:  Sorry.

Page 123

1    MR. PURCELL:  Thanks.  Were you done?  I didn't
2  mean to interrupt.
3    THE WITNESS:  I don't know where I was.
4  BY MR. ACKELSBERG:
5    Q    Well, rather than try to remember what you said
6  before he interrupted you, let me ask you this question.
7    So you mentioned before that the loan agents,
8  the people talking with the borrowers or collecting --
9  whose job it was to collect this obligation, they weren't
10 trained about the FTC holder rule, right?
11   A    No.  That's done at origination, so it's not
12 what we train in servicing.
13   Q    Well, I'm not -- I don't understand that answer.
14 I understand that the FTC provision comes into the loan
15 agreement as a result of the origination, but there's a
16 lot of things -- I mean, the interest rate, the payment
17 amount, all of that comes in from origination, right?
18   A    Well, the FTC holder rule is part of
19 originating.  You must have this in place to originate the
20 loan.  So it's all done prior to our servicing.  We handle
21 servicing after loans have been originated.  So they don't
22 tend to interact with customers related to that.
23   Q    I guess I don't understand that question.
24   Because if, for example, a borrower is saying "I
25 don't think I signed up for that loan," what you would do,

Page 124

1  as I understand it, is you'd pull the loan agreement and
2  show their electronic signature at the bottom of the loan
3  agreement, correct?
4    A    Right.
5    Q    So if the borrower said, "Do I have to pay this
6  if I was ripped off by ITT?"
7    A    We would refer that back to Deutsche Bank and
8  ITT.
9    Q    Well, but even though the loan agreement says
10 they might have a right not to pay the loan?
11   A    Right.  We would be referring that back to them.
12 As I indicated, this may not have been a validly
13 originated loan.
14   Q    Well, doesn't that usually mean that you're --
15 wouldn't that usually mean that you're characterizing the
16 compliant as the borrower is saying they didn't sign the
17 loan?
18   A    Not necessarily.
19   MR. PURCELL:  Objection.  Vague and ambiguous.
20 BY MR. ACKELSBERG:
21   Q    Were borrowers making complaints about ITT sent
22 to Deutsche Bank?
23   A    If a borrower claims that the loan is originated
24 fraudulently, either -- for whatever reason, those are
25 referred back to the originator.

Page 125

1    Q   Now, you understand that the FTC holder rule is
2    about any claims that the borrower might have against ITT,
3    right?
4        MR. PURCELL:  Objection.  Argumentative.  Seeks
5    a legal conclusion.  Misstates the holder rule.
6    BY MR. ACKELSBERG:
7        Q   If a borrower has a claim against ITT under the
8    holder rule, they might have a right to not pay their loan
9    that ITT arranged to get them this so-called education.
10       MR. PURCELL:  Same --
11   BY MR. ACKELSBERG:
12       Q   That's what you understand the holder rule to
13   mean, right?
14       MR. PURCELL:  Same objections.  And incomplete
15   hypothetical.
16       Don't let him put words in your mouth.  Is that
17   your understanding?
18       THE WITNESS:  I don't even remember what he
19   said.
20       MR. ACKELSBERG:  Let's take a look at a
21   document.  This is Vervent 72641.
22               (Exhibit P-42 was marked.)
23   BY MR. ACKELSBERG:
24       Q   Am I right that Exhibit 42 is a -- we're looking
25   at a mail merge kind of document?

Page 126

1    A   We are looking at a letter to a consumer.
2    Q   And is this the kind of -- is this the -- we
3    have been looking at over the last couple days a lot of
4    mail merge forms that are used in the course of servicing.
5        Is that what -- does it look like
6    Ryan O'Flaherty, that the name was filed into a form
7    letter of some sort?
8    A   I can't tell if this is a form letter from
9    looking at this document.
10       Q   But it might be, right?
11   A   I don't know.
12       Q   Okay.  Well, let's just look at what the letter
13   says.  You can see that it's about a complaint registered
14   with the CFPB.  You can see that's what this concerns,
15   right?
16   A   Yes.
17       Q   And you can see this is First Associates writing
18   to Ryan O'Flaherty with regard to the complaint that he or
19   she submitted to the CFPB.
20       Do you see that?
21   A   Uh-huh.  I do.
22       Q   And let's read the paragraph.  "We are in
23   receipt of your complaint filed with the agency referenced
24   above.  First foremost, we would like to explain our
25   involvement with respect to your private student loans

Page 127

1    from PEAKS.  We, First Associates, are the current
2    third-party loan servicer.  We are not the owner, nor do
3    we own your loans.  We had no involvement in the
4    origination of your loans or the education you received at
5    ITT Tech Institute.  We cannot address complaints against
6    the ITT Tech Institute campus that you attended.  We
7    recommend you contact the school directly regarding any
8    complaints about your education or loan origination."
9        Do you see that?
10   A   I do.
11       Q   And this letter isn't signed by any particular
12   individual, right?
13   A   Right.
14       Q   Which would indicate that this kind of came
15   out -- this was more like a kind of push the button
16   template mail merged kind of document, right?
17       MR. PURCELL:  Objection.  Asked and answered.
18   Assumes facts not in evidence.
19       MR. ACKELSBERG:  It would not indicate -- okay.
20       MR. PURCELL:  Everybody's got to let me object.
21       THE WITNESS:  Sorry.  I can't hear you.  I
22   warned you not to be on that side.
23   BY MR. ACKELSBERG:
24       Q   Is there anything in this -- in that language
25   that we just read that is inconsistent with the

Page 128

1    instructions that were given to the loan agents, to the
2    people handling complaints, to anyone in the loan
3    servicing operation of First Associates?
4        MR. PURCELL:  Objection.  Compound.
5        THE WITNESS:  I don't believe so.
6    BY MR. ACKELSBERG:
7        Q   Okay.  In fact, this is reflective of the policy
8    of First Associates that complaints about ITT should be
9    handled in this sort of way, correct?
10   A   Complaints about ITT's quality of education
11   should be handled by ITT.
12       Q   When, in fact, Ryan O'Flaherty might have had a
13   right not to pay his loan because of what happened to him
14   at ITT.  You understand that, right, under the FTC holder
15   rule?
16       MR. PURCELL:  Objection.  Assumes facts not in
17   evidence.  Seeks a legal conclusion.  Incomplete
18   hypothetical.  Vague and ambiguous.
19       THE WITNESS:  Ask your question again.
20   BY MR. ACKELSBERG:
21       Q   We had a discussion about the FTC holder rule,
22   right?
23   A   We did.
24       Q   And under that rule, there might be
25   circumstances where borrowers whose PEAKS loans were

Page 129

30(b)(6)
June 25, 2021

1 arranged by ITT might have the right to not pay their
2 PEAKS loans because of what happened to them at ITT.
3         You understand that, right?
4         MR. PURCELL:  Same objections.
5         THE WITNESS:  Yes.
6 BY MR. ACKELSBERG:
7     Q    Okay.  But that -- I will withdraw that
8 question.
9         MR. PURCELL:  Have we been going long enough to
10 take a bathroom break?
11        MR. ACKELSBERG:  Yeah.  I think --
12        MR. NAGDEMAN:  We are trying to figure out the
13 break.
14        MR. ACKELSBERG:  We are about ready to shut
15 down.  So...
16        MR. PURCELL:  What can we do to help?  I will
17 tell my bladder to pipe down.
18        THE VIDEOGRAPHER:  Going off the record at
19 approximately 2:10 p.m.
20               (Recess was held.)
21        THE VIDEOGRAPHER:  We are back on the record at
22 approximately 2:25 p.m.
23 BY MR. ACKELSBERG:
24     Q    Ms. Jimenez, you have got some more information
25 for us concerning P-39.

Page 130

1     A    That's correct.
2     Q    What is it?
3     A    The line item we have on the bottom of PEAKS is
4 the call-out.  That figure is included in the PEAKS
5 default for 2019.
6     Q    So the 200 -- so looking at the line under PEAKS
7 default for 2019, $244,685, that includes $134,936 that is
8 treated as Activate Financial income?
9     A    That's right.
10    Q    And then the blue line under -- in the title
11 that says "does not include Activate revenue," that's now
12 been deleted because it does include Activate revenue.
13    A    Right.
14    Q    Got it.
15    A    Just from 2018 forward.
16    Q    Right.  Okay.
17        And were you also able to get us a number of ITT
18 percentage total for 2012?
19    A    I am working on that for 2012 and 2014.  2019
20 would remain unchanged.
21    Q    Right.  Okay.
22    A    It's an old system, so they're having to
23 manually pull that.
24    Q    Okay.  You will just get us that -- can we just
25 know that we will get that information?  I mean, is it

Page 131

1 going to be --
2         MR. PURCELL:  Yeah.  Let's do it that way.  Then
3 we won't have to wait until --
4 BY MR. ACKELSBERG:
5     Q    Because how long is it going to be?
6     A    I don't know.
7         MR. PURCELL:  Yeah.  There's a million ways to
8 deal with it.  We will get you that information.
9         MR. ACKELSBERG:  That's fine.
10        All right.  Then just housekeeping.  I want
11 to -- if you can go through the exhibits and think about
12 the confidentiality issues.  It would be nice if we could
13 kind of deal with that up front and not have to do --
14 because otherwise, we're going to have to do between now
15 and the -- so we're off.
16        MR. PURCELL:  No.  We're on the record.
17        MR. ACKELSBERG:  We can do it on the record.
18 Okay.  Fine.
19        MR. PURCELL:  Yeah, sure.
20        MR. ACKELSBERG:  I just -- I don't want to file
21 a class action motion and having to file it under seal and
22 then unseal it and -- I want us to have, if possible, a
23 clean record that will enable me to file this as it should
24 be as just a regular --
25        MR. PURCELL:  I don't have an objection to that.

Page 132

1 So you're going to have specific -- you're going to have
2 specific documents.  Send all the specific documents you
3 want to use to me or whatever.
4         MR. ACKELSBERG:  You have them.
5         MR. PURCELL:  Okay.  The ones --
6         MR. ACKELSBERG:  I just want to make sure
7 that -- I'm going to take this in steps.  Today we're
8 just -- I'm just talking about the transcript of these two
9 depositions.  And these are the exhibits -- these 42
10 exhibits, I want to make sure that these 42 exhibits are
11 cleared in terms of confidentiality and that we can get
12 clean copies to get to the court reporter soon, in the
13 next couple of weeks so that --
14        MR. PURCELL:  Yeah.  We can resolve it.  There's
15 42 documents.  I'm not going to say all of them are not
16 confidential.  But we'll work it out.
17        MR. ACKELSBERG:  And then there may be other
18 confidential issues, but that's beyond the scope of this
19 deposition.  And we'll talk --
20        MR. PURCELL:  And that's fine.
21        Also, while we are on the record, you've got a
22 class cert motion.  We are probably going to file a
23 summary judgment motion.  There's five deposition
24 transcripts.  Which it's my right to do.
25        MR. ACKELSBERG:  Of course it's your right.

Page 133

1    MR. PURCELL:  There's five deposition
2    transcripts.  I think we should also agree that we can use
3    these transcripts in their -- in the form that we're going
4    to get them from the court reporter before the other side
5    can review them.
6        MR. ACKELSBERG:  Yes.
7        MR. PURCELL:  Because time is of the essence.
8        MR. ACKELSBERG:  That's fine.  That's fine.
9    Agreed.
10       MR. PURCELL:  Cool.  I didn't think that would
11   be an issue.  Anything else, we can talk on the phone.
12   Get back to the sweltering East Coast.
13       MR. ACKELSBERG:  I'm sorry to interfere with
14   your travel plans.  I know you wanted to do this next
15   week, but I really appreciate you doing this.  And sorry
16   to invade your life.  But --
17       THE WITNESS:  No worries.
18       MR. ACKELSBERG:  It was a pleasure.
19       THE WITNESS:  Thank you.
20       THE VIDEOGRAPHER:  This concludes today's
21   deposition.  We are going off record at approximately
22   2:30 p.m.
23          (Proceedings adjourned at 2:30 p.m.)
24
25   ///

Page 134

---

1                    * * *
2        I, STEPHANIE JIMENEZ, hereby declare under
3    penalty of perjury that the foregoing is my deposition
4    under oath; that these are the questions asked of me and
5    my answers thereto; that I have read my deposition and
6    have made corrections, additions, or changes that I deem
7    necessary.
8
9        DATED this _____day of _____ 2021.
10
11       _____
12                STEPHANIE JIMENEZ
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 135

---

1                REPORTER'S CERTIFICATE
2        I, Catherine Ebbert, Certified Shorthand
3    Reporter licensed in the State of California, License No.
4    14122, hereby certify that the deponent was by me first
5    duly sworn and the foregoing testimony was reported by me
6    and was thereafter transcribed with Computer-Aided
7    Transcription; that the foregoing is a full, complete, and
8    true record of said proceedings.
9        I further certify that I am not of counsel or
10   attorney for either or any of the parties in the foregoing
11   proceeding and caption named or in any way interested in
12   the outcome of the cause in said caption.
13       The dismantling, unsealing, or unbinding of the
14   original transcript will render the reporter's
15   certificates null and void.
16       In witness whereof, I have hereunto set my hand
17   this day: June 25, 2021.
18       ___X___Reading and Signing was requested.
19       _____Reading and Signing was waived.
20       _____Reading and Signing was not requested.
21
22       *Catherine Ebbert*
23          Catherine Ebbert, CSR No. 14122
24
25

Page 136

---

1                CORRECTION CERTIFICATE
2    To add testimony, indicate "Add" and print the exact
     words you wish to add.  To delete testimony, indicate
3    "Delete" and print the exact words you wish to delete.
4
5    Deposition of:    Stephanie Jimenez
     Proceedings Date:  June 25, 2021
6
7    I, Stephanie Jimenez,
     have the following changes to my proceedings transcript:
8
9    PAGE   LINE   CHANGE TESTIMONY TO READ AS FOLLOWS:
10   ____   ____   _____
11   ____   ____   _____
12   ____   ____   _____
13   ____   ____   _____
14   ____   ____   _____
15   ____   ____   _____
16   ____   ____   _____
17   ____   ____   _____
18   ____   ____   _____
19   ____   ____   _____
20   ____   ____   _____
21   ____   ____   _____
22   ____   ____   _____
23
24   _____ Date_____
     Stephanie Jimenez
25

Page 137