1  BLOOD HURST & O'REARDON, LLP
   TIMOTHY G. BLOOD (149343)
2  LESLIE E. HURST (178432)
   JAMES DAVIS (301636)
3  501 West Broadway, Suite 1490
   San Diego, CA 92101
4  Tel: 619/338-1100
   619/338-1101 (fax)
5  tblood@bholaw.com
   lhurst@bholaw.com
6  jdavis@bholaw.com

7  LANGER GROGAN & DIVER, PC
   IRV ACKELSBERG (*pro hac vice*)
8  JOHN J. GROGAN (*pro hac vice*)
   DAVID NAGDEMAN (*pro hac pending*)
9  1717 Arch Street, Suite 4020
   Philadelphia, PA 19103
10 Tel: 215/320-5660
   215/320-5703 (fax)
11 iackelsberg@langergrogan.com
   jgrogan@langergrogan.com
12 dnagdeman@langergrogan.com

13 Attorneys for Plaintiffs

14 [Additional counsel appear on signature page]

15        **UNITED STATES DISTRICT COURT**

16      **SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| 17 HEATHER TURREY, OLIVER FIETY, JORDAN HERNANDEZ, and | Case No. 3:20-cv-00697-DMS-AHG |
| 18 JEFFREY SAZON, individually, and on behalf of all others similarly | **CLASS ACTION** |
| 19 situated, | |
| 20        Plaintiffs, | **SECOND AMENDED CLASS ACTION COMLAINT** |
| 21        v. | District Judge Dana M. Sabraw Courtroom 13A, 13th Floor (Carter-Keep) |
| 22 VERVENT, INC. fka FIRST ASSOCIATES LOAN SERVICING, | Magistrate Judge Allison H. Goddard Chambers Room 3B, (Schwartz) |
| 23 LLC; ACTIVATE FINANCIAL, LLC; DAVID JOHNSON; and LAWRENCE | |
| 24 CHIAVARO. | Complaint Filed: April 10, 2020 Trial Date: June 5, 2023 |
| 25        Defendants. | **JURY TRIAL DEMANDED** |

26

27

28

00195051

BLOOD HURST & O' REARDON, LLP

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION .................................................................. 1

II.  JURISDICTION AND VENUE .............................................. 5

III. THE PARTIES .................................................................... 5

IV.  OTHER INVOLVED PERSONS AND ENTITIES ..................... 6

V.   THE FACTS ...................................................................... 8

    A.   In Agreeing to Service the PEAKS Enterprise, Defendants Knew that, as Part of a Scheme to Falsely Enhance Its Appearances to Investors and the Department of Education, ITT Had Saddled Its Already Heavily Indebted Students with $300 Million in Predatory PEAKS Loans .................................................................. 8

        1.   Defendants Were Aware of ITT's Fraud When They Joined the Enterprise in December 2011 ................................. 11

        2.   Defendants Knew that the Loan Agreements They Were Provided Were Not Complete and Lacked Federally Guaranteed Provisions and Disclosures ...................................... 14

        3.   As Early as 2012, Defendants Willingly Assisted ITT's Fraudulent Purposes by Concealing Exploding Default Rates ...................................................................................... 16

    B.   By 2016, Defendants Continued to Collect Despite Law Enforcement Actions and the ITT Bankruptcy ..................................... 19

    C.   At the End of the PEAKS Enterprise, Defendants Extracted Funds from PEAKS Borrowers Through Their Wholly-Owned Debt Collection Company ............................................................... 23

    D.   The Facts Pertaining to the Named Plaintiffs ..................... 25

VI.  CLASS ACTION ALLEGATIONS ........................................ 31

VII. CLAIMS FOR RELIEF ...................................................... 33

VIII. PRAYER FOR RELIEF ..................................................... 42

BLOOD HURST & O' REARDON, LLP

00195051

## I.    INTRODUCTION

1.    This is a consumer class action brought by the victims of a racketeering student loan scheme against the companies and persons that collected millions of dollars in loan payments from them.

2.    ITT Education Services, Inc. (ITT), now bankrupt, was one the nation's largest and most notorious for-profit school chains. Its business model was built on systematic, widespread deceit. ITT churned students through its high cost programs, pitching itself as a sound investment with a healthy return in the form of near-guaranteed entry-level employment in a lifelong career. In reality, ITT deliberately and severely underinvested in resources needed to deliver on these promises, leaving students with an expensive but inferior credential. This case involves one aspect of ITT's fraud: its creation and exploitation of a sham private student loan program called "PEAKS" (an acronym for "Program for Education Access and Knowledge").

3.    ITT represented PEAKS to shareholders and the U.S. Department of Education as a source of non-federal, outside funding for student tuition payments. In fact, however, ITT controlled who got loans, it controlled the servicing of the loans, and it was itself the primary funder of the loan program.  Through this subterfuge, the company was able to maintain its principal source of revenue—federal financial aid—for several more years until it finally collapsed into bankruptcy, largely as a result of financial hemorrhaging caused by this fraud.

4.    Plaintiffs are the former students who were victimized by this sham private student loan program. As described by the Consumer Financial Protection Bureau, which, in collaboration with the ITT bankruptcy trustee, produced a legal settlement that canceled all remaining loans balances from the fraudulent PEAKS program: "Simply to enhance its financial statements and appearances to investors,

ITT sacrificed its students' futures by saddling them with debt on which it knew they would likely default."[1] Similarly, in the words of the bankruptcy trustee, PEAKS was:

> a for-profit education version of the sub-prime mortgage lending catastrophe, in which students rather than new homeowners were the victim. For the benefit of ITT insiders and Defendants, the PEAKS program allowed ITT to defraud students and evade regulators, while shielding the fruits of ITT's fraud from claims of students through a complicated structure involving multiple trusts and a circuitous flow of funds.[2]

5.     The Defendants, for their part, conspired with ITT to earn tens of millions of dollars by handling the billing and collecting for the PEAKS racketeering enterprise. Defendants performed this role of loan servicer for PEAKS with knowledge that ITT had saddled PEAKS borrowers with predatory and deceptive loan obligations in order to falsely enhance the company's financial disclosures to shareholders and to hide its evasions of federal regulatory requirements. Defendants helped facilitate the scheme and actively assisted ITT in its misrepresentations to borrowers and investors. Defendants continued to extract money from the victimized student borrowers even in the face of federal and state law enforcement actions against ITT regarding the PEAKS fraud and even after ITT had collapsed in bankruptcy.

6.     Defendant Vervent, Inc. (formerly known as First Associates Loan Servicing, or "FALS"), is the loan servicing company that collected around $80 million, or more, in PEAKS loan payments from borrowers from January 2012 until all the PEAKS loan balances were cancelled in 2020. At the time FALS assumed the role of servicer, it was a small, start-up loan servicer that landed ITT as its principal customer, hoping to build its business from that lucrative contract. Over time, FALS earned more than $14 million in servicing and collection fees from the PEAKS

---

[1]     *See Consumer Financial Protection Bureau v. ITT Educational Services, Inc.*, Case No. 1:14:cv-292 (S.D. Ind.) (Complaint, ¶ 12).

[2]     *See In Re: ITT Educational Services, Inc., et al.*, Case No. 16-07207-JMC-7A, ECF No. 1863 (Complaint, "Nature of Action").

portfolio. At all times relevant herein, Vervent has been located in, and operated from, San Diego, California.

7. Also sued are: Defendant Activate Financial, LLC, Vervent's wholly-owned debt collection company that specifically targeted PEAKS borrowers; Defendant David Johnson, the owner/CEO of both Vervent and Activate Financial; and Defendant Lawrence Chiavaro, the former Vervent owner/executive who was primarily responsible for the ITT account. At all times relevant herein, Activate Financial has been located in, and operated from, San Diego, California.

8. Plaintiffs allege on information and belief that each Defendant herein is acting in concert with, and is the agent and/or employee of, each other Defendant. Plaintiffs also allege that at all times relevant herein, Defendant Activate Financial LLC was so dominated and controlled by Vervent and Johnson that it had no separate personality or existence and that the corporate veil should be pierced because if the acts of Activate Financial LLC are treated as those of the Activate Financial LLC alone, an inequitable result will follow.

9. From the start, Defendants knew that PEAKS was not a bona fide private student loan program. They knew that no lender had ever evaluated whether borrowers had the ability to repay the loans and that, on the contrary, ITT controlled who got the loans without any underwriting restrictions. They knew that the interest and fee terms they were provided for each loan were highly disadvantageous to the borrowers, and also knew that they had been provided with no evidence that any borrowers had ever agreed to the specific interest and fees they were being charged. Moreover, they knew that ITT had inserted an illegal contract provision into the form loan agreements, designed to obstruct borrowers' federally guaranteed right to hold PEAKS responsible for any claims or defenses they could assert against ITT, requiring further deception on their part as to the true nature of the supposed loan obligations.

10.     Defendants also knew from the start that ITT's publicly filed financial statements falsely characterized PEAKS as an outside, independent source of tuition funding when, in fact, (i) ITT determined who got the loans and in what amount; (ii) ITT carried 100% of the risk of loan defaults through guarantees it provided the PEAKS investors, and (iii) it was ITT, not any third-party lender or assignee, that had the power to fire Defendants once loan defaults reached certain fully anticipated levels.

11.     By the fall of 2012, less than a year into this business relationship with ITT, Defendants began to assist ITT in concealing that ITT itself was making millions of dollars of payments on behalf of borrowers who were nearing default. ITT did this solely to avoid or delay guarantee obligations that ITT would have otherwise owed—and eventually had to pay—to the senior investors in the PEAKS Trust.

12.     During 2013 and 2014, Defendants were served with investigative subpoenas focused specifically on the PEAKS program from the federal Consumer Financial Protection Bureau (CFPB) and the Securities Exchange Commission (SEC) and by the Maryland Attorney General on behalf of numerous state attorneys general. These investigations resulted in the CFPB and SEC filing civil enforcement actions, which described the fraudulent nature of the PEAKS. Yet Defendants ignored these enforcement actions and continued to collect from the victimized borrowers.

13.     In the end, the vast majority of PEAKS loans defaulted, requiring ITT to make good on guaranteed payments to the senior PEAKS creditors, in excess of $200 million. As a result of the escalating default rate and massive guarantee obligations coming due, as well as losses of accreditation and financial aid eligibility for its schools, ITT collapsed into chapter 7 bankruptcy in September 2016.

14.     Yet Defendants continued their collection activity against the victimized PEAKS borrowers. In late 2018, they began using a previously inactive, in-house debt collection company, Activate Financial, to intensify collection efforts targeting the PEAKS borrowers who had defaulted. Between 2016 and the cancellation of the

remaining PEAKS portfolio in 2020 (as the result of settlements of actions brought by the CFPB, state attorneys general and the ITT bankruptcy trustee), Defendants collected more than $43 million in loan payments from PEAKS loan borrowers.

15. Plaintiffs bring this action on behalf of themselves and a putative class of PEAKS loan borrowers to recover all payments made on PEAKS loans during the four years preceding the commencement of this action. Plaintiffs are also suing on behalf of a subclass which made payments to Activate Financial; and on behalf of a California subclass who received deceptive collection notices from Activate Financial. Plaintiffs seek actual and/or treble damages, statutory damages, and reasonable attorney's fees and costs, under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968, the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1691, *et seq.*, and under California state law.

## II. JURISDICTION AND VENUE

16. Plaintiffs bring this action pursuant to 18 U.S.C. § 1964, which confers jurisdiction upon this Court over Plaintiffs' claims brought under RICO; and pursuant to 15 U.S.C. § 1692k(d) which confers jurisdiction over Plaintiffs' claims under the FDCPA. The jurisdiction of this Court also arises under 28 U.S.C. § 1331. Supplemental jurisdiction over the state law claims exists pursuant to 28 U.S.C. § 1367.

17. Venue is proper in this district pursuant to 18 U.S.C. § 1965(a)—which provides for venue in any district in which a RICO defendant transacts his affairs—and 28 U.S.C. § 1391(b), in that a substantial part of the events giving rise to Plaintiffs' claims occurred in this district and the defendants are subject to personal jurisdiction in this district.

## III. THE PARTIES

18. Plaintiff Heather Turrey is an adult person residing in Lancaster, California. She was an ITT student and PEAKS borrower.

BLOOD HURST & O' REARDON, LLP

BLOOD HURST & O' REARDON, LLP

19.     Plaintiff Oliver Fiety is an adult person residing in La Mesa, California. He was an ITT student and PEAKS borrower.

20.     Plaintiff Jordan Hernandez is an adult person residing in San Pedro, California. He was an ITT student and PEAKS borrower.

21.     Plaintiff Jeffrey Sazon is an adult person residing in Eastvale, California. He was an ITT student and PEAKS borrower.

22.     Defendant Vervent, Inc., a Delaware corporation, is the product of a merger between First Associate Loan Servicing, LLC and Portfolio Financial Servicing Co., Inc. in October 2019. Vervent is headquartered and conducts its business in San Diego, California. Since most of the conduct relevant to the action occurred prior to the recent merger, "Vervent" and "First Associates" (or "FALS") are used interchangeably unless otherwise specified. From 2011 until 2020, FALS functioned as the servicer of the PEAKS loan portfolio.

23.     Defendant Activate Financial, LLC ("AFL") is a Utah limited liability company. FALS formed AFL in 2011 to function as an in-house debt-collection agency, but it was not until 2018 that FALS put AFL into active use. AFL's principal place of business was in the Vervent headquarters in San Diego.

24.     Defendant David Johnson is Vervent's CEO, the position he held with FALS at all relevant times. Mr. Johnson is also the CEO of AFL. At all times relevant herein, Johnson was a resident of the State of California and resided in this district.

25.     Defendant Lawrence Chiavaro was, until recently, Vervent's Executive Vice President, the position he held with FALS at all relevant times.

## IV.     OTHER INVOLVED PERSONS AND ENTITIES

26.     ITT Educational Services, Inc. was a public corporation that owned a chain of for-profit postsecondary schools and that served as guarantor of the PEAKS program. ITT conducted the racketeering enterprise at issue in this case. It no longer exists, having filed a chapter 7 bankruptcy in the Southern District of Indiana in

00195051

September 2016, Case No. 16-7207-JMC-7A. The chapter 7 trustee of that liquidating estate is Deborah J. Caruso. ITT is not named as a defendant in this action.

27. Kevin M. Modany and Daniel M. Fitzpatrick were, respectively, the CEO and CFO of ITT. Their wrongful conduct regarding the PEAKS loan program ultimately resulted in their being disbarred by the SEC from serving as executives of public corporations.

28. The PEAKS Trust 2009-1 was a statutory trust organized and existing under the laws of Delaware and was the nominal creditor to whom PEAKS loans were owed. ITT and its conspirators designed the PEAKS Trust to be only a pass-through entity with no assets, among other reasons, in order to insulate it from liability. The Trust was effectively dissolved as a result of a multi-party settlement agreement with the ITT bankruptcy trustee.

29. Deutsche Bank Trust Company Americas ("DBTCA") is a New York banking corporation with its offices at 60 Wall Street, New York, New York. DBTCA and other Deutsche Bank entities were involved in building the structure of the PEAKS program for ITT, selling investments in the PEAKS Trust, holding the PEAKS loan assets, and in various other fee-generating roles.

30. Liberty Bank, N.A. is a national banking association. Under the structure devised by ITT and Deutsche Bank, Liberty Bank functioned as the nominal lender of the PEAKS loans, which were all immediately sold, for a fee, to the PEAKS Trust.

31. Access Group, Inc., is a Pennsylvania non-profit corporation, currently operating under the name AccessLex Institute. Access Group played multiple roles in the PEAKS program, first as the origination agent for the nominal lender, Liberty Bank, NA; then as the initial loan servicer; and later as the "Trust Administrator."

///

///

///

///

## V.  THE FACTS

**A.  In Agreeing to Service the PEAKS Enterprise, Defendants Knew that, as Part of a Scheme to Falsely Enhance Its Appearances to Investors and the Department of Education, ITT Had Saddled Its Already Heavily Indebted Students with $300 Million in Predatory PEAKS Loans**

32.  ITT was a public company that owned one of the nation's largest chains of for-profit post-secondary schools. ITT's schools operated in most states and the District of Columbia. It offered associates and bachelor's degree programs in such areas as Business, Drafting and Design, Information Technology and Criminal Justice.

33.  ITT's revenue came almost entirely from tuition, and, given the low-income profile of its students, the vast majority of that tuition was paid through the federal financial aid programs administered by the U.S. Department of Education. According to its filed Form 10-K report for the year ending December 31, 2010, ITT earned revenue of $1.6 billion in that year alone from the tuition paid by 84,000 students, 75% of which came from the Education Department's financial aid programs.

34.  ITT's tuition prices were among the highest in the for-profit industry. For example, its tuition for an associate's degree in Business was $48,000, more than eight times the comparable price charged by community colleges for that same degree. *See* Staff of S. Comm. on Health, Educ., Labor and Pensions, No. 112-37: For Profit Higher Education: The Failure to Safeguard the Federal Investment and Ensure Student Success (Comm. Print Jul. 30, 2012) ("Senate Report"), at 26, 46-48.

35.  ITT allocated an unusually high percentage of its revenue towards its own profit (37.1%) and to its marketing expenditures (19.1%), the latter going to fund an aggressive recruiting operation. *Id*. at 561-565. In 2009, this spending on recruiters instead of teachers translated into a per-student ITT expenditure for instruction of $2,839, while spending $3,156 for marketing and $6,127 for profit. *Id*. at 583.

36.    ITT's continued access to its principal source of revenue—the federal financial aid system—depended on its ability to appear compliant with a host of regulatory requirements, including the so-called "90/10" rule, under which no more than 90% of its revenue could come from the Department of Education. *See* 34 C.F.R. § 668.14(b)(16). In its 2010 10-K filing, ITT reported that 12% of its revenue derived from supposedly "unaffiliated" private student loan programs.

37.    Under the Education Department's 90/10 rule, an institution's receipts of disbursements from a genuinely "unaffiliated" loan program counted towards its required, nonfederal portion of revenues. However, during the relevant period, with regard to loan programs not truly independent of the institution, only the "present value" of such loans could be counted, *see* 34 C.F.R. § 668.28, meaning that the timing and likelihood of repayment would have to be considered.

38.    Historically, ITT had relied on its students obtaining private loans from traditional private lenders to comply with its 90/10 obligations. These third-party lenders would establish their own underwriting criteria, interact with student borrowers at arms-length without any involvement from ITT, and independently make decisions about whether or not to extend loans in each instance. In 2008, however, traditional private lenders ceased extending loans to students attending for-profit colleges.

39.    When private lenders stopped making student loans, this created a crisis for ITT. As a stop-gap measure, ITT extended "temporary credit" to students who were unable to pay the full cost of tuition from other sources. Temporary Credit was a short-term loan payable in one payment at the end of the academic year for which it was offered, *i.e.*, a payment it knew its students would not have the ability to pay, and therefore, under the 90/10 rule, would have had no true present value. Unknown to the students induced to accept Temporary Credit obligations, these were intended by ITT as entry points to private student loans that ITT would push its students to accept in order to repay those obligations and pay for any subsequent tuition gaps.

BLOOD HURST & O' REARDON, LLP

40. In 2009 and 2010, ITT formed two student loan programs to replace the millions of dollars in Temporary Credit it was carrying on its books and to make new loans to students. These programs were the supposedly "unaffiliated" loan programs referred to in the 2010 10-K Report.

41. The first of these, called "CUSO," was launched in 2009, and provided ITT with roughly $141 million in loan proceeds. As ITT exhausted the CUSO loan pool, Deutsche Bank stepped in to help ITT organize the even larger PEAKS program. Both of these programs were funded by investors who were promised substantial returns on their investment, funded, in theory, by student borrower repayments over ten years. But those investors demanded that ITT provide backing in the form of contractual guarantees, which in the case of PEAKS was all-encompassing: should borrower defaults reach specified levels, ITT would be obligated to make the outside investors whole.

42. The funds generated by CUSO and PEAKS enabled ITT to convert Temporary Credit receivables into what appeared to be simple cash. The company also applied this cash towards the "10" portion of its 90/10 obligation in its representations to the Department of Education, made to ensure the continued flow of the federal financial aid dollars.

43. However, this representation of revenue coming from an outside, independent private student loan lender was intentionally misleading to both shareholders and the Department of Education. ITT itself provided more than a quarter of the initial investment in PEAKS, and because of its guarantee obligation, ITT was the party bearing the risk of loss on the entire remaining investment. In other words, the revenue being reported from PEAKS was actually concealing a corresponding liability so big it could—and ultimately did—bring down the company. ITT was also misleading the Department of Education since the reality of ITT's own investment and liability in the PEAKS program would have threatened ITT's compliance with the 90/10 rule.

44.    The representation of PEAKS being an outside, "unaffiliated" source of private student loan funding also concealed the extent to which ITT controlled who got PEAKS loans and how the loans were collected. ITT students could only apply for PEAKS loans on ITT computers, enabling financial aid personnel to control the application process, and any student with a Temporary Credit debt owed to ITT was automatically eligible for a loan. Moreover, under the Servicing Agreement that governed Defendants' collection activity, ITT, not PEAKS, controlled the loan servicing, because it was ITT, not the PEAKS Trust or Deutsche Bank, that, in its capacity as the designated "Voting Party" could fire the servicer in the event the rate of defaults by borrowers reached specified levels.

45.    In the original PEAKS transaction, Access Group was assigned the role of loan servicer to bill and collect the loan payments. However, pursuant to an "Agreement for Servicing Private Student Loans," dated December 11, 2011, between the PEAKS Trust, DBTCA, ITT and Defendant FALS (hereafter "Servicing Agreement), Defendant FALS agreed to take over as the PEAKS loan servicer. At the time, FALS was already servicing the CUSO portfolio, as well. Defendant Chiavaro signed the Servicing Agreement on behalf of Defendant FALS.

46.    At the time FALS assumed the role of PEAKS loan servicer, there were approximately 50,000 PEAKS loans in the PEAKS portfolio, attributable to approximately 40,000 individual student-borrowers.

**1.    Defendants Were Aware of ITT's Fraud When They Joined the Enterprise in December 2011**

47.    From the time FALS assumed the role as loan servicer, Defendants were aware of the sham nature of the PEAKS program from the Servicing Agreement and the other transaction documents underlying the program.

48.    While the loans were designed to appear to have been made by Liberty Bank, the bank was a mere straw party. According to the Program Guidelines attached to the Servicing Agreement, Liberty Bank performed no underwriting and assumed

BLOOD HURST & O' REARDON, LLP

1  none of the risk of nonpayment for the $300 million in loans to ITT students that were

2  all immediately purchased by the PEAKS Trust, with funds raised from the sale of

3  PEAKS Senior Notes to various institutional investors ("the Senior Creditors") and

4  from a $75 million loan from Wells Fargo Bank. Liberty was paid a 1.05% fee for the

5  service of performing this limited role.

6  49.  There were no genuine underwriting guidelines for the loans. This meant

7  that no one was required to evaluate the repayment capacity of borrowers. Given the

8  low-income profile of ITT students and their already substantial federal student loan

9  indebtedness, any such ability would have been minimal, at best. Yet under the so-

10  called loan qualifications outlined in the Program Guidelines, any student identified

11  by ITT could become an eligible borrower, with the existence of a Temporary Credit

12  obligation automatically qualifying the student for a PEAKS loan. All loan

13  applications were processed electronically on the website of the Access Group, in its

14  capacity as the origination agent for the straw bank. This enabled ITT to control the

15  loan application process from computers in ITT financial aid offices without any

16  involvement of the bank that was supposedly taking the application.

17  50.  The terms of the loans were unusually disadvantageous to the student

18  borrowers, and, as will be explained below, Defendants knew these terms were

19  actually hidden from the borrowers. Borrowers were charged large origination fees

20  and high, variable interest rates, both of which were pegged to their credit rating. For

21  example, according to the Program Guidelines, a borrower with a FICO score of 600-

22  649 would be charged a variable rate of 8% above Prime, and an origination fee of

23  7% of the amount of the loan; a lower score would produce an even higher interest

24  rate and fee. Further, increasing the cost of credit, interest accrued on a daily basis;

25  until repayment began after graduation or withdrawal, accrued interest and the

26  origination fee would be capitalized into the principal; and any payments made would

27  be first allocated to late fees and accrued interest, increasing the likelihood that

28

00195051

delinquent borrowers could find themselves making payments that would not reduce

the principal.

51.     ITT itself was also a principal investor in PEAKS loans. Although the student loans were used to pay for Temporary Credit and tuition obligations, ITT actually received only 72% of the investments raised by the PEAKS Trust (*i.e.*, around $216 million of the $300 million raised), with the remaining 28% (approximately $84 million) being "loaned" by ITT to the PEAKS Trust in return for a non-interest bearing subordinated note that would become payable from future collections, but only after the Senior Creditors and Wells Fargo were paid in full.

52.     The Servicing Agreement provided that FALS would earn a servicing fee of 1.025% per year, paid monthly, multiplied by the amount of the outstanding portfolio (including accrued interest and fees), including all loans that were less than 180 days delinquent. This fee was earned automatically, regardless of the performance of the loans, as long as the 180-day delinquency was not reached.

53.     Any loan reaching the 180-day trigger would acquire the status of a "defaulted" loan, and, by virtue of that fact alone, would be permanently removed from the PEAKS portfolio. For those defaulted loans, the role of FALS would shift from servicer to debt collector, with FALS retaining as compensation 23.5% of recoveries it was able to achieve, less expenses it incurred in the collection.

54.     ITT guaranteed the Trust that it would maintain a 105% "Parity Ratio" between the value of the non-defaulted PEAKS loans in repayment and the outstanding amount due to the Senior Creditors. If the value of PEAKS' loans dipped below 105% of the value of the liability to the Senior Creditors, ITT was required to pay down the debt owed to the Senior Creditors. Any increase in defaults would therefore have the effect of reducing the numerator in the Parity Ratio, which, if dipping below the 105% mark, would trigger mandatory payments by ITT to the Senior Creditors sufficient to rebalance the ratio.

BLOOD HURST & O' REARDON, LLP

55. It was not only ITT that faced potentially catastrophic financial risk as a result of high levels of loan defaults in the PEAKS portfolio. The Servicing Agreement contained default measures that, if breached, would also trigger the right of ITT (defined in the Servicing Agreement as "Guarantor" and "Voting Party") to terminate FALS's servicing rights. As a result, it was understood by Defendants from the outset that they were accountable principally to ITT—not the PEAKS Trust that owned the loans—and that it was ITT that controlled their continued PEAKS revenues. ITT's leverage over Defendants was so strong that, during the first year of the Serving Agreement, revenues earned from servicing the PEAKS portfolio represented more than half of all of FALS's earnings.

**2.      Defendants Knew that the Loan Agreements They Were Provided Were Not Complete and Lacked Federally Guaranteed Provisions and Disclosures**

56. Once the actual loan data and records for the thousands of PEAKS loans were onboarded to their system, Defendants also knew that loan documentation was so lacking that none of the loan agreements appeared be fully formed. The loan documents they were provided were, by their terms, *applications* for loans. As illustrated by Plaintiff Turrey's Application and Loan Agreement for PEAKS Private Student Loan, attached hereto as Exhibit 1, there was only a stated loan amount "requested." According to the language in this standard, form agreement, the actual amount of the loan, and the actual interest rate and fees (to be pegged to a yet-undetermined credit score), would be disclosed to the borrower later, at the time of any disbursement to ITT.

57. Yet even though, by the express terms of the "Application and Loan Agreement," the borrower was not agreeing to a specific interest rate or origination fee, which would be disclosed later, FALS was not provided with copies of any such disclosures and had no evidence that they had ever been provided to the student borrowers. Defendants therefore had no evidence in their possession that any PEAKS loan agreements had ever been completely formed with the student borrowers.

BLOOD HURST & O' REARDON, LLP

58. Moreover, a provision in the Truth in Lending Act specifically governing private student loans, *see* 15 U.S.C. § 1638(e) (as amended, Aug. 14, 2008), mandates specific disclosures that were not present in the loan documentation provided to Defendants. That provision requires that, at the time of an application for a private student loan, the range of potential interest rates and fees be disclosed, *see* 15 U.S.C. § 1638(e)(1); that at the time the loan is approved and, before it is consummated, the actual rates and fees must by disclosed, *see* 15 U.S.C. § 1638(e)(2); and that the borrower must be provided a 3-day right of cancelation prior to consummation, *see* 15 U.S.C. § 1638(e)(7).

59. Thus, Defendants were not only aware that PEAKS borrowers had not actually agreed to loans in a particular amount, nor to any particular interest rate or origination fee, they also knew or should have known that this information had to be provided to borrowers, as a matter of federal law, *before* the borrower could be legally obligated, and that PEAKS borrowers even had a 3-day right to cancel their loans, which would not start to run until *after* the mandated disclosure were provided.

60. Moreover, Defendants knew that the standard Application and Loan Agreement contained language ("if I am . . . dissatisfied with the education program paid for with my Loan, I am not relieved of any obligation on my Loan") which directly contradicted the FTC Holder Rule language also mandated by federal law, 16 C.F.R. pt. 433, and that appeared later in the form agreement. This federally mandated language expressly granted each PEAKS borrower a defense against repayment to the extent of any claims or defenses the borrowers had against ITT. *See* bold faced "Notice" on the last page of the Turrey loan agreement (Exhibit 1). In other words, the standard form agreement essentially misrepresented borrower rights to all PEAKS borrowers.

**3. As Early as 2012, Defendants Willingly Assisted ITT's Fraudulent Purposes by Concealing Exploding Default Rates**

61. As mentioned above, loan defaults were the key factor that would threaten a breach of the Parity Ratio by ITT. Each defaulted loan would come out of the portfolio, thereby reducing the numerator in the Parity Ratio by that amount. If, as a result, the ratio approached the 105% level, ITT had to make sufficient payments to the Senior Creditors in order to rebalance the ratio above the required 105% level.

62. Defaults at high levels were inevitable. PEAKS borrowers, who were also carrying massive federal student loan indebtedness, could only pay their loans if, following their time at ITT schools, they were gainfully employed and earning salaries that could support all that debt, something that FALS would have known was unlikely. Indeed, FALS took on the PEAKS account with knowledge that it was a "high touch" portfolio, meaning that borrowers were unlikely to pay without substantial, and continuing collection contacts, starting even before the accounts went into repayment status.

63. Moreover, after reviewing the early delinquency trends that were already emerging in the PEAKS portfolio and seeing that defaults were already headed to levels that would give ITT, in its capacity as Voting Party, the right to terminate FALS as servicer, Defendants demanded and obtained an oral side agreement from ITT, before the December 2011 servicing transfer, that ITT would not enforce those Voting Party rights against Defendants.

64. As anticipated, from the very first months of Defendants' servicing of the PEAKS portfolio, there were immediate, dramatic increases in defaults. By the end of July 2012, the portfolio had already shrunk precipitously as a result of these rising defaults, leaving the Parity Ratio, at 107%, *i.e.*, near the trigger point for ITT's guaranty, and with the looming threat of ever greater defaults in the future.

65. In October 2012, ITT notified FALS's CEO, Defendant Johnson, that it would be wiring nearly a million dollars to FALS for FALS to book as borrower

payments made on specified accounts nearing default. ITT wired the money as it said it would. FALS proceeded to credit the designated accounts as ITT had directed, and FALS reported the $1 million as borrower payments in its report to the Trust.

66. A few weeks later, still in October 2012 and then again, in November 2012, ITT did the same thing, providing Defendants a list of PEAKS accounts nearing the 180-day delinquency trigger point and wiring money sufficient to bring those accounts current. As it did in October, FALS booked these as borrower payments. In their communications with each other, ITT and FALS referred to these fraudulent payments as "Payments on Behalf of Borrowers" or "POBOB", or sometimes, "ITT Recovery payments."

67. During the same period it began sending these "payments on behalf of borrowers," ITT also flexed its muscle with Defendants, reminding them that "FA is servicing and collecting *on our behalf*" (emphasis added) and that the defaults on the first pool of PEAKS loans to enter repayment status were already so high that "technically" ITT could give FALS a 30-day notice of termination, and that the second pool was showing a similar trajectory.

68. The Payments on Behalf of Borrowers continued through January 2014. Each month, ITT would provide a list of delinquent accounts and would wire money in the amount of those delinquencies to FALS. Defendants, following ITT's directions, would book the money allocated to each account as a borrower payment and would falsely characterize these payments by ITT in its report to the Trust as borrower payments. For these months, Defendants reported defaults as being at zero.

69. During the period October 2012 to January 2014, ITT made $16 million in these payments to FALS, which Defendants falsely reported as payments made by borrowers. On information and belief, this classification was never reversed in Defendants' records, meaning that Defendants' end-of-program numbers for payments made by borrowers remain inflated by $16 million.

70.     Defendants obtained a direct financial benefit from the help they rendered ITT in this illicit scheme in that, by avoiding tens of millions of dollars of portfolio defaults, they were artificially inflating FALS's servicing fee revenue, which, as stated above, was calculated as a percent of loans *not* in default.

71.     One additional way that Defendants assisted ITT's fraud was in the treatment of late fees that were owing on the accounts being made current through the ITT payments. Under the PEAKS program, late fees were assets of the Trust, not the Servicer. Despite this, ITT asked, and Defendants agreed, to assist it in reducing the amount needed to bring the designated accounts current, by waiving late fees owed on the accounts. Effectively, by waiving late fees in this manner, Defendants were giving away the Trust's property without the Trust's consent.

72.     As early as November 2012, Access Group, the company that had previously assisted ITT in the loan origination process and was now playing the role of "Trust Administrator," discovered both the fraudulent POBOB payments and the fraudulent late charge waivers but neither countermanded ITT's instructions to FALS, nor notified the Senior Creditors.

73.     FALS, for its part, being the only party with any continuing, direct relationship with the borrowers, decided not to notify those borrowers whose accounts were brought current by ITT. In fact, this caused conflict with FALS servicing staff, who on occasion were placed in the awkward position of trying to work with a delinquent borrower, only to learn that the account had been mysteriously brought current. When this conflict was brought to the attention of FALS executives, the response was clear: following ITT instructions takes precedence over any issues regarding relations with borrowers.

74.     When the Payments on Behalf of Borrowers came to light, the Senior Creditors threated ITT with a demand for payment of the Guaranty in full. In settlement of that claim, in February 2014, ITT agreed to make $40 million in guaranty payments.

18     Case No. 3:20-cv-00697-DMS-AHG

SECOND AMENDED CLASS ACTION COMPLAINT

BLOOD HURST & O' REARDON, LLP

75.    During the sixteen months of the concealed POBOB payments, FALS was reporting roughly $2 million in borrower payments coming in monthly and was reporting zero defaults. By February 2014, after the illicit ITT payments had stopped, the reported defaults began to escalate rapidly. In March 2014 alone, FALS reported $15 million in new defaults.

76.    Eventually, under pressure from its auditors, ITT was forced to restate its financial statements going back to 2012, now showing the PEAKS program as an on-balance-sheet asset and liability of ITT, because of (a) ITT's control and (b) the guaranty obligation that made ITT the party bearing the ultimate risk of loss.

**B.    By 2016, Defendants Continued to Collect Despite Law Enforcement Actions and the ITT Bankruptcy**

77.    During the period that FALS was helping ITT to conceal the Payments on Behalf of Borrowers, it was served with subpoenas from two federal agencies investigating the PEAKS program: a June 4, 2013 subpoena by the Securities and Exchange Commission (SEC) and a September 11, 2013 Civil Investigative Demand by the Consumer Financial Protection Bureau (CFPB). Besides gathering and producing thousands of documents in response, FALS executives, including Defendant Johnson, were interviewed by CFPB investigators.

78.    As a result of these two investigations, both agencies filed civil actions against ITT, alleging fraud in the PEAKS program. The CFPB filed its action in February 2014. *Consumer Financial Protection Bureau v. ITT Educational Services, Inc.*, Case No. 1:14:cv-292 (S.D. Ind.).

79.    The CFPB allegations explained how ITT had managed to get students into PEAKS obligations in the first place. Defendants already knew that the loan origination process was facially irregular, with applications for a loan from Liberty Bank being submitted electronically on the website of Access Group and with no evidence that the borrowers had ever agreed to the actual interest rate and fees they were being charged. Now, however, the CFPB Complaint gave them detailed facts

BLOOD HURST & O' REARDON, LLP

SECOND AMENDED CLASS ACTION COMPLAINT

about the shocking circumstances surrounding the loan execution process, based on extensive interviews of students, ITT personnel, and even "mystery shoppers" that had been hired by ITT.

80. The CFPB Complaint described how ITT got students to sign up for PEAKS loans by instructing and incentivizing Financial Aid staff to use high-pressure tactics—including "emailing students, calling them at home, finding them in the bookstore or the library or student lounge, pulling them from class, barring them from class, . . . and withholding course materials, diplomas, and transcripts," *see* CFPB Complaint, ¶ 87, to get them into the Financial Aid Offices. Once there, the Financial Aid staff were trained how to control the application process through orchestrated "hand holding" and special software that enabled them to automatically populate loan forms, "requiring only e-signatures from students." *Id.*, ¶ 91.

81. According to the CFPB, some students objected but "were told that if they refused to [take out this additional loan], they either had to pay any outstanding Temporary Credit and the next year's tuition gap—which most could not do—or leave the school in the middle of their program and forfeit the investment they had made so far." Others accepted the loans "because they believed ITT Financial Aid staff was acting in their interests," while others "did not even realize they took out the ITT Private Loans because of the rushed and automated manner in which ITT Financial Aid staff pushed through ITT students' paperwork." *Id.*, ¶¶ 140-142. Regardless of any differences in the particular sign-up experiences of borrowers, all ended up with "high-fee, high-interest rate, ten-year loans" that "they could not afford, did not want, did not understand, or did not even know they had," *id.*, ¶ 162, for the purpose of enabling ITT to deceive its shareholders and the Department of Education.

82. Defendants would have also learned about ITT's systematic recruiting fraud from the CFPB complaint, for example, the "Projected Future Earnings" representations that recruiters were required to recite from memory, telling potential students, among other things, that with just an ITT associate's degree, a graduate's

Case No. 3:20-cv-00697-DMS-AHG

00195051

earnings would increase over time into the six figures. *Id*., ¶ 39. The reality of ITT graduates' success was far different, as the CFPB explained. ITT's Form 10-K for 2012 reported annualized graduate salaries averaging $32,061, *id*., ¶ 46, and its CFO, Mr. Fitzpatrick, acknowledged an even lower actual average of $18,000 per year. *Id*., ¶ 24.

83.    Default rates on PEAKS loans were, according to the CFPB, high, but the agency revealed that that ITT had itself projected, as far back as May 2011, likely default rates of more than 60%. *Id*., ¶ 12. In the words of the CFPB, "Simply to enhance its financial statements and appearances to investors, ITT sacrificed its students' futures by saddling them with debt on which it knew they would likely default." *Id*.

84.    The SEC filed its action in May 2015. *United States Securities and Exchange Commission v. ITT Educational Services, Inc.*, Case No. 15-cv-00758 (S.D. Ind.). The SEC characterized the PEAKS program as a "fraudulent scheme" and sought, among other things, to disbar CEO Medany and CFO Fitzpatrick from holding an executive position in any public company.

85.    In November 2015, Defendants were served with yet another subpoena, this time from a multi-state investigation by attorneys general. As with the earlier subpoenas from the CFPB and the SEC, Defendants again gathered and produced thousands of documents to yet more law enforcement authorities.

86.    Despite all of this, Defendants continued to collect the PEAKS portfolio, billing borrowers and collecting from the PEAKS loans that remained in the portfolio and from the defaulted loans against which they directed their debt-collection activity.

87.    Not only did Defendants ignore the PEAKS contract provision—mandated by federal law—giving every PEAKS borrower the right to withhold payments based on any frauds by ITT, Defendants went further, actually instructing their staff to deflect any complaints about ITT received from borrowers with the false

BLOOD HURST & O' REARDON, LLP

1   and misleading response that PEAKS loans had to be paid, regardless of borrowers'

2   claims against ITT.

3       88.    On April 20, 2016, ITT's accrediting body issued a show-cause letter

4   why ITT's accreditation should not be withdrawn, noting the existence of substantial

5   unresolved litigation and investigations of a variety of issues related to ITT's student

6   lending practices and misrepresentations.

7       89.    On September 6, 2016, ITT announced that it was shutting down its

8   academic operations.

9       90.    On September 16, 2016, the company filed for Chapter 7 bankruptcy.

10  Case No. 16-07207-JMC-7A (S.D. Ind.).

11      91.    The school closings and bankruptcy produced a flurry of high-profile

12  news stories about the years of ITT fraud that caused so much harm to its students

13  and to federal taxpayers. *See*, *e.g.*, Gretchen Morgenson, "A whistle was blown on

14  ITT; 17 years later it collapsed," NY Times, October 23, 2016; Patricia Cohen, "The

15  downfall of ITT Technical Institute was a long time in the making," NY Times, Sept.

16  8, 2016; Rowan Moore-Gerety, "What former employees say ITT Tech did to scam

17  its students," National Public Radio, Dec. 7, 2016.

18      92.    In settlement of a class action filed by ITT's students in the bankruptcy

19  proceedings, *Villalba, et al. v. ITT Educational Services, Inc., et al.*, Adv. No. 17-

20  50003, Case No. 16-07207 (S.D. Ind.), all remaining tuition debt owed by students to

21  ITT was dissolved and the students were granted an allowed class bankruptcy claim

22  in an amount more than $1 billion. In addition, in a settlement of an adversary

23  proceeding filed by the Chapter 7 Trustee, *Caruso v. Student CU Connect CUSO, et*

24  *al.*, Adv. No. 17-50101, all CUSO loan balances were also dissolved, resulting in the

25  end of any servicing fees and collection commissions flowing to Defendants as a

26  result of CUSO collections. On September 7, 2018, the Chapter 7 Trustee filed a

27  similar, separate adversary proceeding again the PEAKS Trust, Deutsche Bank, the

28  Access Group and others. *Caruso v. PEAKS Trust-2009-1 et al.*, Adv. No. 18-50272.

00195051

93.     On July 6, 2018, the SEC announced a final settlement of its fraud action concerning the CUSO and PEAKS programs against the former ITT executives, CEO Medany and CFO Fitzpatrick. https://www.sec.gov/news/press-release/2018-129. Both of them agreed to pay monetary penalties and to a five-year disbarment.

94.     None of these events had an impact on Defendants, as they continued collecting from PEAKS borrowers. In the words of Defendant FASL's designee, testifying under Federal Rule of Civil Procedure 30(b)(6), in the years following the ITT bankruptcy, it was "business as usual" for Defendants regarding PEAKS.

## C.     At the End of the PEAKS Enterprise, Defendants Extracted Funds from PEAKS Borrowers Through Their Wholly-Owned Debt Collection Company

95.     With their CUSO-derived revenue shut down, and the bankruptcy trustee pressing to shut down PEAKS, as well, Defendants initiated a new strategy to continue to extract dollars from PEAKS borrowers in default.

96.     In the same month that the bankruptcy trustee filed her action against the PEAKS Trust, Defendants activated their debt collection business, Defendant Activate Financial LLC ("AFL"). Having formed AFL years earlier but not having put it into operation, Defendants decided to use the portfolio of defaulted PEAKS loans as the initial collection portfolio of AFL.

97.     Through form letters directed towards these PEAKS borrowers, on the letterhead of a debt collector they knew no borrower would recognize, Defendants deliberately set out to mislead borrowers that their defaulted PEAKS obligations were now in the hands of an outside independent collector, and offered cash compromises to induce them to make some amount of payments to this new entity. The idea was to collect as much as they could from confused or frightened borrowers—even from those whose obligations were no longer enforceable due to the expiration of statutes of limitation—before the PEAKS cash spigot was turned off.

23     Case No. 3:20-cv-00697-DMS-AHG
SECOND AMENDED CLASS ACTION COMPLAINT

98.  For two more years, until September 2020, Defendants continued collecting from PEAKS borrowers, through FALS for the small percentage remaining in the servicing portfolio, and through AFL for those who had defaulted.

99.  This collection activity did not end until September 2020, when settlements were announced in (a) the CFPB action against ITT, (b) the multi-state attorney general investigation of ITT, and (c) the bankruptcy trustee's action against the PEAKS Trust, Deutsche Bank and the Access Group, resulting, among other things, in the cancelation of all the remaining loan balances under the PEAKS program. All PEAKS borrowers were informed by mail that they no longer had to pay.

100.  As of the loan cancelation in September 2020, nearly 80% of PEAKS loans had already defaulted.

101.  Over the course of their participation in the scheme, spanning nine years, Defendants collected, in total, approximately $77 million from PEAKS borrowers and earned approximately $13 million in fees for themselves.  During the period starting four years prior to the filing of this action on April 10, 2020, and ending with the termination of the PEAKS program, they collected approximately $43 million from PEAKS borrowers.

102.  In comparison to the $77 million paid by PEAKS borrowers, ITT paid nearly three times that to the PEAKS Trust, in guarantee payments and the so-called Payments on Behalf of Borrowers. While the magnitude of these payments by ITT were ultimately catastrophic for the company, this expenditure enabled it to prolong for years the façade of PEAKS being a bona fide private student loan program and thereby continue the flow of billions of dollars in federal financial aid.

103.  Following the nullification of the remaining PEAKS loans, the aftermath of the ITT racketeering scheme has continued to unfold. On June 16, 2021, the Department of Education began discharging federal student balances for ITT students based on findings that ITT had systematically misrepresented the employment prospects of graduates and the transferability of credits to other institutions of higher

learning. https://www.ed.gov/news/press-releases/department-education-announces-approval-new-categories-borrower-defense-claims-totaling-500-million-loan-relief-18000-borrowers.

104. More recently, the Department expanded these cancelations, announcing on August 16, 2022, a $3.9 billion group discharge for every federal student loan obligation attributable to attendance at an ITT school. In the words of the Secretary of Education, "The evidence shows that for years, ITT's leaders intentionally misled students about the quality of their programs in order to profit off federal student loan programs, with no regard for the hardship this would cause."

### D. The Facts Pertaining to the Named Plaintiffs

#### *Heather Turrey*[3]

105. Plaintiff Heather Turrey attended an ITT school in Sylmar, California between 2008 and 2011. Because she transferred some credits from another school, Ms. Turrey was able to obtain both associate's and bachelor's degrees in Criminal Justice during this time period.

106. Ms. Turrey worked hard throughout her time at ITT, with the goal of obtaining credentials that would enhance her work and career prospects in her chosen field of criminal justice. She stayed at ITT for her bachelor's degree on the promise and understanding that her degree would be appropriately accredited. Only after graduating did she learn ITT was not accredited by the Western Association of Schools and Colleges (WASC) and as a result she faced significantly limited job prospects. She has been unable to obtain a job in the field of criminal justice because she lacks an accredited degree.

---

[3] Plaintiff Turrey is able to provide specific dates and figures as a result of discovery she has obtained from Defendants. Because no discovery has yet been obtained by the other Plaintiffs, their statement of facts will not be able to be similarly precise.

BLOOD HURST & O' REARDON, LLP

107. Ms. Turrey has no recollection of ever applying for or agreeing to a PEAKS loan. The signature on the PEAKS loan application and agreement is an electronic signature which Ms. Turrey did not knowingly authorize. The personal references listed on the loan application she was able to obtain further indicate to her that she did not complete or approve the loan application. If she in fact obtained a PEAKS loan, the loan was procured by fraud.

108. After leaving ITT, Ms. Turrey learned about the PEAKS loan when she began receiving payment demands from Defendants for a PEAKS loan of approximately $3,000. Ms. Turrey sought but was unable to obtain further information about the loan or whether the loan had in fact been applied towards her tuition at ITT.

109. Starting in 2012, Ms. Turrey made sporadic payments to Defendants, mainly to protect her credit rating. These payments totaled approximately $2,800. Of these payments, she paid $427 during the years 2016 and 2017. At the time she ceased paying on the loan in 2017, her account with Defendants was listed as having a balance of $3,718.96, plus late charges.

110. Both Defendants' communications with Ms. Turrey and her payments to Defendants utilized the interstate wire system. Defendants mainly used email messages, text messages and telephone calls to contact her and she often used the ACH system to make payments to Defendant electronically.

111. On November 24, 2017, by letter sent through the U.S. mail, Defendants notified Ms. Turrey that her PEAKS account had defaulted. Defendants also used the mail to send her standardized debt validation notices in March and April 2019.

112. On December 29, 2018, Defendants informed Ms. Turrey that her account had been "placed" with a different company, namely, Defendant Activate Financial ("AFL").

113. Beginning in January 2019, Ms. Turrey began receiving letters in the mail from AFL, advising her that her student loan obligation to PEAKS Loan Trust 2009-1 had been placed with them for collection. The notice claimed a balance due of

$3,913.76. The letter listed a San Diego postal box as AFL's address, different than the one that appeared on bills she had received from FALS. She received similar collection letters for the remainder of 2019 and into 2020.

114.    In February 2020 she received an AFL letter stating that AFL "is willing to accept a $1,956.88 payment" if made in a lump sum within 30 days. The next one, in March 2020 lowered the offer to $978.44.

115.    At no point, during the years that Defendants were calling her, sending her emails, text messages and letters, hounding her for payments, did they ever inform her that she had a right not to pay the PEAKS loan based on any of the claims she and most ITT graduates had against ITT.

116.    In discovery, Defendants produced a Payment History for Ms. Turrey which stated an interest rate of 0%. However, from another document produced in discovery, a summary of all PEAKS loans as of 2018, she learned that she was being charged an interest rate of 15.75%, a rate that had not been disclosed to her.

### *Oliver Fiaty*

117.    Plaintiff Oliver Fiaty is a first-generation immigrant who, believing that ITT was a legitimate post-secondary institution, attended a campus in San Diego, California between 2008 and 2012. He graduated with an associate's degree in Computer Networking Systems and a bachelor's degree in Information Security Systems, neither of which ever provided him any value in his post-graduation job searches.

118.    Mr. Fiaty paid for his tuition at ITT entirely with financial aid arranged by ITT. He recalls being called from class on several occasions and having to report to the financial aid office to sign up for more assistance as a condition of continuing in his studies. Besides federal financial aid, he was required to sign up for something called "Temporary Credit" and for one (or possibly two) PEAKS loan.

119.    As best as he can recall, the loan origination process for the PEAKS loan consisted of him being told on more than one occasion to use a keyboard in the

BLOOD HURST & O' REARDON, LLP

00195051

B L O O D   H U R S T   &   O '   R E A R D O N ,   L L P

1  financial aid office to "click" his agreement to whatever the financial aid staff person

2  presented to him. He did not receive any copies of loan documentation and was not

3  informed about the terms of the loan that he was asked to accept.

4      120.   Although the terms of the loan he purportedly agreed to had not been

5  disclosed to him, he has learned from discovery produced in this case that the original

6  amount of his PEAKS obligation was booked as $11,770, which amount included an

7  undisclosed origination fee of 7% paid to ITT, and an undisclosed interest rate of

8  11.5%.

9      121.   Mr. Fiaty began receiving communications from Defendants about his

10  PEAKS repayment obligation even before graduating and continuing during his post-

11  graduation grace period. Upon graduation he made some sporadic payments but

12  eventually defaulted around April 2016.

13      122.   After defaulting, he continued to receive collection notices from

14  Defendants and continued to make sporadic payments. These notices started out

15  coming from FALS, but then around December 2018, the notices came from a

16  collection company he had never heard of, "Activate Financial." On information and

17  belief, he alleges that on or after April 10, 2019, he received collection notices from

18  either FALS or Activate Financial, or both.

19      123.   Starting in February 2019 and continuing until at least January 2020,

20  Mr. Fiaty made $75/month payments to Defendant Activate Financial.

21      124.    In late 2020 Mr. Fiaty received notification from Defendants that his

22  PEAKS obligation had been canceled because of a lawsuit settlement.

23                        *Jordan Hernandez*

24      125.   Plaintiff Jordan Hernandez attended classes at the ITT campus in

25  Torrence, California during the period 2009-2013, graduating with an associate's

26  degree in Computer Networking.

27      126.   He paid for his tuition at ITT entirely with financial aid arranged by ITT,

28  including a PEAKS private student loan.

BLOOD HURST & O' REARDON, LLP

127.  With regard to the PEAKS loan, Mr. Hernandez recalls being called into the ITT financial aid office during his enrollment, being told to "click" his agreement to a loan application on a keyboard provided to him. He did not receive any copies of loan documentation and was not informed about the terms of the loan that he was asked to accept.

128.  Although the terms of the loan he purportedly agreed had not been disclosed to him, Mr. Hernandez has learned from discovery produced in this case that the original amount of his PEAKS obligation was booked as $9,920, which amount included an undisclosed origination fee of 10% paid to ITT, and an undisclosed interest rate of 15%.

129.  Mr. Hernandez began receiving communications from Defendants about his PEAKS repayment obligation even before graduating and continuing during his post-graduation grace period. Upon graduation he made some sporadic payments but eventually defaulted around April 2016.

130.  After defaulting, he continued to receive collection notices from Defendants and continued to make sporadic payments. These notices started out coming from FALS, but then around December 2018, the notices came from a collection company he had never heard of, namely Defendant Activate Financial. On information and belief, he alleges that on or after April 10, 2019, he received collection notices from either FALS or Activate Financial, or both.

131.  Mr. Hernandez made substantial payments to Activate Financial, including more than $5,000 in September 2019.

132.  In late 2020 Mr. Hernandez received notification from Defendants that his PEAKS obligation had been canceled because of a lawsuit settlement.

### *Jeffrey Sazon*

133.  Plaintiff Jeffrey Sazon attended classes at several ITT campuses in Southern California over a period of years, graduating in June 2012 with a bachelor's

00195051

degree in Electrical Engineering Technology and an associate's degree in Computer Drafting.

134.   He paid for his tuition at ITT entirely with financial aid arranged by ITT, including a PEAKS private student loan.

135.   Mr. Sazon has little recollection about the PEAKS loan origination process that occurred in an ITT financial office. He did not receive any copies of loan documentation and was not informed about the terms of the loan that he was asked to accept.

136.   Although the terms of the loan he purportedly agreed to had not been disclosed to him, Mr. Sazon has learned from discovery produced in this case that the original amount of his PEAKS obligation was booked as $13,635, which amount included an undisclosed origination fee of 10% paid to ITT, and an undisclosed interest rate of 16%.

137.   Although never being clear on the terms of his PEAKS loan obligation, Mr. Sazon knows that he received notices and billing statements from the Defendants on account of the loan and believes that he made many payments of roughly $400/month to Defendants when he was able. Despite these payments, he defaulted in October 2018.

138.   On information and belief, around December 2018, Defendants informed Mr. Sazon, by mail or email that his account had been referred to a separate debt collection company, namely, Defendant Activate Financial, and, soon thereafter, began receiving regular collection demands, in the mail, from Activate Financial. On information and belief, he alleges that on or after April 10, 2019, he received collection notices from either FALS or Activate Financial, or both.

139.   During the period 2019-2020 Mr. Sazon made periodic payments of $299/mo. to Defendants, including a final payment of $299 in August 2019. Based on information and belief, these payments were made to Activate Financial.

BLOOD HURST & O' REARDON, LLP

140.   In late 2020 Mr. Sazon received notification from Defendants that his PEAKS obligation had been canceled because of a lawsuit settlement.

## VI.   CLASS ACTION ALLEGATIONS

141.   Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of a class of similarly situated individuals. They seek class certification under Rule 23(b)(3).

142.   The proposed nationwide class (hereafter "the RICO Class") is defined as:

> All individuals who, based on Defendants' records, (i) were PEAKS loan borrowers and (ii) made at least one payment during the period April 10, 2016 until the present ("Class Period").

143.   Plaintiffs also seek certification of two subclasses:

a.   A nationwide subclass of all individuals to whom, on or after April 10, 2019, Activate Financial directed a written communication in an attempt to collect on a PEAKS loan, and who thereafter made a payment to Activate Financial ("the FDCPA subclass");

b.   A subclass of all individuals to whom Defendants, on or after April 10, 2019 sent a written communication attempting to collect a PEAKS loan payment to an address in California ("the RFDCPA subclass").

144.   The RICO Class and the sub-classes are so numerous that joinder of all individuals in the class would be impracticable. According to Defendants' records, there were 55,196 PEAKS loans originated, 5,214 of which were to borrowers with California addresses. As of April 2016, there were 10,386 PEAKS loans in Repayment status, and an additional 37,999 were in default. It can be determined from Defendants' records, exactly which borrowers made a payment during the Class Period and the amount of such payments. For each member of the Class, Defendants have names, addresses, email addresses and telephone numbers.

145.   Plaintiffs are adequate representatives of the Class and the sub-classes and their claims are typical of those of the Class. There are no issues or defenses

31       Case No. 3:20-cv-00697-DMS-AHG

00195051

BLOOD HURST & O' REARDON, LLP

unique to Plaintiffs, and Plaintiffs have no conflicts with members of the class or sub-classes. Counsel for Plaintiffs are experienced in the prosecution of complex, class-action litigation and have appeared as counsel and as lead counsel in class actions across the United States. Counsel are providing and will provide an unusual level of specialized knowledge and skill. Langer, Grogan & Diver PC is a Philadelphia-based class action firm that has successfully handled consumer fraud actions under RICO. The Law Offices of Paul Arons is a Washington firm specializing in class actions under the FDCPA. Blood Hurst & O'Reardon LLP is a California firm located in this District that is a nationally recognized class action law firm specializing in consumer protection under federal and California law.

146. There are issues of fact and law common to the Class that will predominate over any individual issues. Some of these include:

    a.    The characteristics of a bona fide student loan program, and whether the PEAKS program was consistent with those characteristics or whether, as Plaintiffs allege, it was a sham, lacking any genuine underwriting and with loan agreements lacking legally required information, that was designed as a financial subterfuge for ITT to defraud its investors and the Department of Education;

    b.    Whether the PEAKS loan program functioned as an association in fact that included ITT, the PEAKS Loan Trust, Deutsche Bank, the Access Group and the Defendants, with each member of the association in fact having an assigned role;

    c.    The extent of Defendants' knowledge of ITT's fraudulent purposes at various stages of its involvement in the scheme;

    d.    Whether any of the Defendants are "debt collectors" under federal and/or California law;

    e.    Whether the collection activity alleged violated the FDCPA, including but not limited to 15 U.S.C. §§ 1692e, 1692f, and/or California law;

00195051

f.  Whether the AFL letters included notices and disclosures required by California law;

g.  Whether Defendants breached a duty owed to all PEAKS borrowers by failing to conduct at least minimal due diligence sufficient to assure themselves that the borrowers were obligated to pay specific loan amounts, origination fees and interest rates, pursuant to fully formed loan agreements and that they were accurately representing the nature of these obligations to the borrowers; and

h.  How much money the Defendants collected from the Class during the relevant time period.

147.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The individual claims of the class members are too small to warrant their bringing individual actions. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances here. To the best of plaintiffs' knowledge, there is no other action brought on behalf of the class against the Defendants.

## VII.  CLAIMS FOR RELIEF

### COUNT ONE

### RICO, 18 U.S.C. §§ 1964(c), 1962(d)

### Against All Defendants

148.  Plaintiffs incorporate by reference all previous paragraphs as though set forth herein.

149.  ITT, various Deutsche Bank entities, the Access Group and other entities formed an association-in-fact ("the PEAKS Loan Enterprise", or "the Enterprise")

BLOOD HURST & O' REARDON, LLP

sometime during the period 2009-2010, having as its ostensible purpose the creation of a private student loan product that would enable ITT (a) to convert its Temporary Credit liability into cash and (b) to create a source of nonfederal funds that would bolster its appearances to shareholders and in its 90/10 representations to the Education Department.

150.   ITT and its top executives directed the Enterprise, operating the affairs of the PEAKS Loan Enterprise through a pattern of racketeering, namely wire and mail fraud. They did so to further the following fraudulent purposes:

(a) to conceal from its shareholders and the Department of Education the extent of ITT's funding and its control over this supposedly independent loan program, including its control over who got loans and how the loans were serviced;

(b) to conceal from its shareholders the massive, and potentially catastrophic, off-balance sheet, financial risk that ITT was assuming in order to persuade outside investors to participate; and, most importantly,

(c) to saddle ITT students with onerous private student loan burdens being added to their massive, already existing federal loan indebtedness, while concealing from them as much as possible about the loan terms, their legal rights, and, in many cases, even the very existence of the loans.

151.   This association in fact, the PEAKS Loan Enterprise, was an "enterprise" within the meaning of 18 U.S.C. § 1961(4).

152.   The pattern of racketeering engaged in by the Enterprise persisted from 2010 until September 2020, when all PEAKS loan balances were canceled as part of a legal settlement of multiple fraud claims brought by law enforcement authorities and the ITT bankruptcy trustee.

153.   Defendant FALS (now Vervent), which was already servicing an earlier, similarly corrupt ITT private loan program named CUSO, joined the Enterprise on or about December 10, 2011, when it assumed the role of Servicer for the PEAKS loans.

00195051

As of that date, the PEAKS Loan Enterprise was described in various written agreements, including an Amended and Restated Trust Agreement, an Agreement for Servicing Private Student Loans and a Preliminary Placement Memorandum.

154. In its role as servicer, it was Defendant FALS that collected all the payments from the defrauded borrowers and was in charge of all communications with the borrowers. In these communications, FALS furthered the fraud by engaging in a systematic practice of concealing from borrowers the fact that their loan agreements had never been fully consummated and that they had the right not to pay PEAKS loans based on their claims against ITT.

155. FALS's decision to join the Enterprise was made by its CEO, Defendant Johnson, and by Defendant Chiavaro, the FALS executive who was in charge of the ITT relationship. Thereafter, Johnson and Chiavaro directed the above-described actions of FALS with regard to its participation in the Enterprise.

156. As further described above, while the fraudulent purposes underlying the Enterprise were apparent to Defendants at the time they agreed to join the Enterprise, those fraudulent purposes became even more explicit in the fall of 2012, when ITT asked Defendants, and Defendants agreed, to help ITT conceal from the investors in PEAKS the extent of borrower defaults by falsely reporting millions of dollars in loan payments that ITT was surreptitiously making on behalf of borrowers. Defendants even concealed these payments from the borrowers themselves to whose accounts these payments were applied.

157. Defendants kept the Enterprise collections flowing for years, and earned millions of dollars in servicing fees and collection commissions by doing so, even after two federal agencies had initiated civil actions against ITT, explicitly alleging in great detail the fraudulent purposes underlying the PEAKS program.

158. In its operation of the collection side of the Enterprise, Defendants relied on the U.S mail and the interstate wire system, sending and receiving thousands of letters, phone calls, text messages, emails and ACH transmissions.

BLOOD HURST & O' REARDON, LLP

BLOOD HURST & O' REARDON, LLP

159.   Even after the ballooning PEAKS guarantee obligations helped to drive ITT into a bankruptcy liquidation, Defendants kept the PEAKS loan collection machinery running.

160.   Defendants then began a new phase in their collection of PEAKS loans by launching AFL, a wholly-owned and controlled debt collection entity that had been dormant until then, and using defaulted PEAKS loans as AFL's first collection portfolio. They did so, in part, to extract as much money as possible from the victimized PEAKS borrowers before pending bankruptcy litigation that they feared might force them to stop all PEAKS collections.

161.   Using the U.S. mail, Defendant AFL sent thousands of collection letters to Class members. In these letters Defendants represented that their PEAKS obligations were now in the hands of an outside collection company, demanding payment of the full balances, but offering "compromises" designed to motivate payments from confused or worried borrowers.

162.   Defendant FALS and Defendant Johnson—who, as CEO of FALS, named himself CEO of AFL, as well—directed the activities of AFL and exercised control over its collection practices.

163.   The Enterprise continued extracting money from the Class until the anticipated end of the PEAKS program finally did occur, as a result of the September 2020 settlement of the litigation and investigations of the CFPB, the SEC, the state attorneys general and the bankruptcy trustee.

164.   In violation of 18 U.S.C. § 1962(d), Defendants conspired to violate 18 U.S.C. § 1962(c), in that, with actual or constructive knowledge of the fraudulent nature of the PEAKS Loan Enterprise, they agreed to facilitate and service the scheme for approximately nine years, earning substantial revenues from this support role.

165.   The ultimate victims of the racketeering enterprise described above were the PEAKS borrowers from whom Defendants collected tens of millions of dollars.

166. Pursuant to 18 U.S.C. § 1964(c), Plaintiffs Turrey, Fiety, Hernandez, and Sazon and the RICO Class they seek to represent suffered injuries to their property by reason of a violation of 18 U.S.C. § 1962, to wit, their loan payments, and are therefore entitled to treble damages in an amount approximating $129 million, plus reasonable attorney's fees and costs.

## COUNT TWO
### FDCPA, 15 U.S.C. §§ 1692k, 1692e, 1692f
### Against Defendants Vervent, Activate Financial and Johnson

167. Plaintiffs incorporate by reference all previous paragraphs as though set forth herein.

168. Defendant Activate Financial, LLC ("AFL") was a "debt collector" within the meaning of 15 U.S.C. § 1692a(6) in that it regularly used the mails in a business the principal purpose of which was the collection of debt, and it regularly collected and attempted to collect, directly or indirectly, debts alleged to be due another.

169. Defendant Vervent was a "debt collector" within the meaning of 15 U.S.C. § 1692a(6) in that, through AFL, it regularly used the mails in a business the principal purpose of which was the collection of debt, and it regularly collected and attempted to collect, directly or indirectly, debts alleged to be due another. Vervent employees managed the AFL collection business, which was located within Vervent's San Diego headquarters, and determined AFL's collection policies and practices.

170. Defendant Johnson is a "debt collector," within the meaning of 15 U.S.C. § 1692a(6) in that he directed a business the principal purpose of which was the collection of debt and which regularly collected and attempted to collect, directly or indirectly, debts alleged to be due another. In his position as CEO of both Vervent (the managing member of AFL) and as the CEO of AFL itself, Johnson controlled and directed AFL's collection activities relating to PEAKS loans, was personally

1   responsible for the decision that AFL would collect PEAKS loans, and implemented

2   and ratified the manner and means by which collection would be attempted.

3      171.   Defendants AFL, FALS and Johnson used the PEAKS default portfolio

4   to collect high-rate, adjustable, PEAKS loans they knew, or should have known were

5   invalid, for the reasons explained above, including, but not limited to, the improper

6   loan terms and incomplete loan documentation, the fraudulent nature of the loan

7   program itself, and the likelihood that the loans would soon be voided as a result of

8   the multiple litigations involving ITT and its associated entities.

9      172.   As a result of collection activities conducted in the AFL name, Plaintiffs

10  and members of the FDCPA subclass suffered concrete harm by paying Defendants

11  money on invalid loans that were ultimately cancelled.

12     173.   By collecting or attempting to collect on invalid loans, Defendants

13  violated 15 U.S.C. § 1692e(2), (10) and § 1692f(1).

14     174.   As a consequence, pursuant to 15 U.S.C. § 1692k, Plaintiffs Fiety,

15  Hernandez and Sazon, and all members of the FDCPA subclass, are entitled to the

16  following relief: (a) actual damages, in the amount of all payments made to AFL;

17  (b) statutory damages of $500,000 or 1% of each Defendant's net worth, whichever

18  is less; (c) an award of reasonable attorney fees and costs.

19                          **COUNT THREE**

20  **Rosenthal Fair Debt Collection Practice Act, Cal. Civ. Code §§ 1788-1788.33**

21          **Against Defendants Vervent, Activate Financial and Johnson**

22     175.   Plaintiffs incorporate by reference all previous paragraphs as though set

23  forth herein.

24     176.   In enacting the Rosenthal Fair Debt Collection Practices Act, Cal. Civ.

25  Code §§ 1788-1788.33 ("RFDCPA"), the California legislature found that "[u]nfair

26  or deceptive collection practices undermine the public confidence which is essential

27  to the continued functioning of the banking and credit system and sound extensions

28  of credit to consumers, [that[ [t]here is need to ensure that debt collectors and debtors

BLOOD HURST & O' REARDON, LLP

exercise their responsibilities to one another with fairness, honesty and due regard for the rights of the other" and that it was necessary to ". . . prohibit debt collectors from engaging in unfair or deceptive acts or practices in the collection of consumer debts." Cal. Civ. Code § 1788.1.

177. Defendant AFL is a debt collector within the meaning of Cal. Civ. Code § 1788.2(c) because in the ordinary course of business it regularly collected on consumer debts, including, but not limited to, PEAKS loans.

178. Management decisions regarding the accounts that AFL would handle and the content of the form letters it sent, as well as other AFL policies and procedures, were made by Vervent's San Diego personnel. Likewise, the form collection letters sent in the name of AFL were generated in San Diego and the money that class members paid to AFL was received and accepted in San Diego.

179. Defendant Vervent is a debt collector within the meaning of Cal. Civ. Code § 1788.2(c), because in the ordinary course of business it regularly collected on consumer debts, including, but not limited to, PEAKS loans. The RFDCPA covers both the collection activities carried out in the name of AFL, and Vervent's own actions in directly collecting PEAKS loans in the name of FALS or in any other name. The policies and procedures at issue in this case were developed, designed and implemented from Vervent's San Diego headquarters.

180. Defendants Johnson is a debt collector within the meaning of Cal. Civ. Code § 1788.2(c) because in the ordinary course of business he regularly collected on consumer debts, including, but not limited to, PEAKS loans. Johnson controlled and directed Vervent's and AFL's collection activities relating to PEAKS loans, was personally responsible for the decision to collect PEAKS loans, and implemented and ratified the manner and means by which collection would be attempted.

181. In his capacity as CEO of both FALS and AFL, Johnson personally made the decision to have those entities collect PEAKS loans, directed their collection activities and set and approved their collection policies practices, procedures.

00195051

BLOOD HURST & O' REARDON, LLP

182. The RFDCPA prohibits unfair and deceptive conduct. *Cavalry SPV I, LLC v. Watkins*, 36 Cal. App. 5th 1070, 1084 (2019). Defendants violated the RFDCPA by (1) initiating contact with class members to collect on loans Defendants knew or should have known had likely been procured through fraud, and that, even if valid, would be subject to a vast array of potential defenses, and were likely to be canceled in the near future; and, (2) by accepting and retaining payments made on these invalid loans.

183. The conduct of Defendants, as alleged above, was knowing and willful.

184. Plaintiffs Fiety, Hernandez and Sazon and all members of the California subclass have incurred actual damages as a result of these violations, namely, the payments they made to Defendants.

185. Additionally, the RFDCPA provides that a debt collector who willfully and knowingly violates the RFDCPA is liable for a penalty of not less than one hundred dollars ($100) nor greater than one thousand dollars ($1,000), for each debtor, as well as costs and reasonable attorneys' fees. Cal. Civ. Code §§ 1788.30(b)-(c).

## COUNT FOUR

### California Unfair Competition law, Cal. Bus. & Prof. Code § 17200, *et seq.*
### Against Defendants Vervent and Activate Financial

186. Plaintiffs incorporate by reference all previous allegations as though set forth herein.

187. The Unfair Competition Law ("UCL"), California Business & Professions Code § 17200, *et seq.*, provides that a court may order equitable relief, including restitution, to members of the general public, to remedy "unlawful" or "unfair" business acts or practices.

188. Cal. Bus. & Prof. Code § 17200 prohibits any "unlawful ... business act or practice." Defendants Vervent and Activate Financial have violated § 17200's

00195051

BLOOD HURST & O' REARDON, LLP

prohibition against engaging in unlawful acts and practices by, including but not limited to, the following conduct:

    a. Collecting invalid student loan debt, in violation of the RFDCPA and the FDCPA, as alleged above, and

    b. Collecting student loans that were originated in violation of the special provisions governing private student loans in 15 U.S.C. § 1638(e) (as amended, Aug. 14, 2008).

189. Cal. Bus. & Prof. Code § 17200 also prohibits any "unfair ... business act or practice." Defendants Vervent and Activate Financial have violated § 17200's prohibition against engaging in unfair acts or practices, by, including but not limited to, the following conduct:

    a. Collecting based on loan contracts that were, on their face, incomplete, in that there was no evidence that the borrowers had ever agreed to the interest and the origination fees Defendants were charging and accruing, and

    b. Collecting based on loan contracts that misrepresented the existence of borrower defenses that had a high likelihood of being applicable, namely, defenses related to the educational services provided by ITT.

190. This conduct by Defendants Vervent and Activate Financial was substantially injurious to consumers, offended public policy, and was immoral, unethical, oppressive, and unscrupulous as the gravity of the conduct outweighed any alleged benefits attributable to such conduct.

191. There were reasonably available alternatives to further Defendants' legitimate business interests, other than the conduct described herein.

192. Plaintiffs have suffered injury in fact and have lost money as a result of Defendants' unlawful and unfair conduct, entitling them to judgment against Defendants, including restitution.

193. As a consequence, but only in the event RICO damages are not granted under Count One, the California members of the RICO Class are entitled to restitution in the amount of their portion of the $43 million in loan payments made by the RICO Class, pursuant to the UCL.

## COUNT FIVE

### Negligent Misrepresentation

### Against Defendants Vervent and Activate Financial

194. Plaintiffs incorporate by reference all previous paragraphs as though set forth herein.

195. In communicating with consumers in connection with collecting and attempting to collect PEAKS loans, Vervent and Activate Financial assumed a duty to conduct at least a minimal due diligence sufficient to assure themselves that PEAKS was a bona fide student loan program, and that the consumers were at least facially obligated on student loan agreements that were fully formed and were originated in accordance with the procedural mandates of 15 U.S.C. § 1638(e).

196. Defendants Vervent and Activate Financial breached these duties in numerous ways, by, among other things, representing that the PEAKS loan debts were valid and enforceable and that borrower claims against ITT were irrelevant to their obligation to make payments, and by making the other false representations described above.

197. Relying on these representations, Plaintiffs and the Class have paid money that they were not obligated to pay.

198. The Class alleged herein paid a combined total of approximately $43 million.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs seek the following relief:

A. Certification of the alleged RICO Class and the two subclasses, pursuant to Fed. R. Civ. P. 23(b)(3);

BLOOD HURST & O' REARDON, LLP

B.     Actual damages for all members of the class, trebled under 18 U.S.C. § 1964(c), and reasonable attorney's fees and costs;

C.     Actual damages, statutory damages, and reasonable attorney's fees and costs, pursuant to 15 U.S.C. § 1692k, for members of the FDCPA subclass;

D.     Actual damages, statutory damages, and reasonable attorney's fees and costs, pursuant to Cal. Civ. Code § 1788.30, for members of the RFDCPA subclass;

E.     Restitution for all California residents who are members of the RICO Class under the UCL, in the event that damages are not provided to the Class under 18 U.S.C. § 1964(c);

F.     Actual damages for all members of the Class under the common law tort of negligent misrepresentation; and

G.     Such other relief as the Court deems fair and reasonable.

Respectfully submitted,

Dated: September 6, 2022

BLOOD HURST & O'REARDON, LLP
TIMOTHY G. BLOOD (149343)
LESLIE E. HURST (178432)
JAMES DAVIS (301636)

By:     *s/ Timothy G. Blood*
        TIMOTHY G. BLOOD

501 West Broadway, Suite 1490
San Diego, CA 92101
Tel: 619/338-1100
619/338-1101 (fax)
tblood@bholaw.com
lhurst@bholaw.com

LANGER GROGAN & DIVER, PC
IRV ACKELSBERG(*pro hac vice*)
JOHN J. GROGAN (*pro hac vice*)
DAVID NAGDEMAN (*proc hac pending*)
1717 Arch Street, Suite 4020
Philadelphia, PA 19103
Tel: 215/320-5660
215/320-5703 (fax)
iackelsberg@langergrogan.com

43     Case No. 3:20-cv-00697-DMS-AHG

jgrogan@langergrogan.com
dnagdeman@langergrogan.com

LAW OFFICE OF PAUL ARONS
PAUL ARONS (CA #84970)
685 Spring Street, Suite 104
Friday Harbor, WA 98250
Tel: 360/378-6496
360/378-6498 (fax)
lopa@rockisland.com

*Attorneys for Plaintiffs*

SECOND AMENDED CLASS ACTION COMPLAINT

BLOOD HURST & O' REARDON, LLP

00195051

# EXHIBIT 1

11502665 05/24/2010-Esign Authoritative-Web Application

# Application and Loan Agreement for PEAKS Private Student Loan

**T**
T.09.A

Access Group Loan Servicing • P.O. Box 7430 • Wilmington, DE 19803

**WARNING:** Any person who knowingly makes a false statement or misrepresentation on this form is subject to penalties that may include fines or imprisonment under the United States Criminal Code.

| 1. Last Name TURREY | First Name HEATHER | Middle Initial | 2. U.S. Social Security Number or ID number 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 |
|---|---|---|---|

3. Date of Birth (MM/DD/YYYY) 03/17/1973

4. U.S. Driver's License Number State: CA Number: A9998328

5. Current Address
Address 16707 NEWMONT AVE
LANCASTER, CA 93535
*Telephone Number (661)264-3118
E-mail address HEATHERTURREY@AOL.COM

Mailing Address
Address 16707 NEWMONT AVE
LANCASTER, CA 93535
*Telephone Number (661)264-3118
*By providing your phone number, you consent to receive autodialed, pre-recorded or any other type of calls or text messages from the lender, any holder of the loan or any third-party debt collector at that number.

6. Prior U.S. Address
Street **N/A**   City **N/A**   State **N/A**   Zip Code **N/A**

7. Personal References
A. Name LISA MCCAULEY
Address 40648 168TH STREET EAST
LANCASTER, CA 93535
Telephone Number (661)916-7490
E-mail address

B. Name JULIE SCHNELL-COMPO
Address 25021 MOSSIER CIRCLE
CONIFER, CO 80433
Telephone Number (303)838-7799
E-mail address

8. Loan Amount Requested $ 2694 .00

9. School Name ITT TECHNICAL INSTITUTE - SYLMAR, CA

10. Enrollment period for which loan is requested (MM/DD/YYYY)
From: 06/01/2010   To: 03/01/2011

## Borrower Request for Loan and Promise to Pay

STUDENT BORROWERS MUST READ ALL PAGES OF THIS APPLICATION AND LOAN AGREEMENT AND SIGN BELOW.

This loan may not be your lowest cost loan option. You should maximize use of any federal loans and grants for which you may be eligible prior to taking this loan.

I request a loan from Liberty Bank, N.A., (the "Lender") in the amount set forth as the "Loan Amount Requested" in field 8 above, under the PEAKS Private Student Loan Program. The actual loan amount made to me may be greater than the "Loan Amount Requested" in field 8 above due to fee(s) being added to the principal amount as described in this Application and Loan Agreement.

I understand and acknowledge that Liberty Bank, N.A., its employees and agents, do not in any way endorse, promote or make any representations concerning the quality or financial strength of any educational institution. It is the responsibility of the borrower to determine the quality and financial strength of the educational institution. Any listing of educational institutions by Liberty Bank, N.A., its employees or agents, is solely for application submission and does not represent an endorsement of any educational institutions. This disclaimer may not be waived or modified by any employee or agent of Liberty Bank, N.A., its affiliates or subsidiaries.

By my signature, I acknowledge that I have read and understand the information contained in this Application and Loan Agreement, and I agree to be bound by those terms, including, but not limited to, the Promise to Pay in Section A of this Application and Loan Agreement. I certify that the information provided by me is true, complete and accurate to the best of my knowledge and belief. I authorize Liberty Bank, N.A., any assignee of Liberty Bank, N.A., and any guarantor of this loan to investigate my creditworthiness, to obtain consumer reports from consumer reporting agencies, from time to time, and to furnish information concerning my loan to the School, its affiliates and agents, and other persons who may legally receive such information. You may report information about my account to consumer reporting agencies. Late payments, missed payments or other defaults on my account may be reflected in such information. My authorization to obtain consumer reports from consumer reporting agencies is valid as long as any amounts are owed under this Application and Loan Agreement. I agree that you may investigate any information that I supply in order to confirm my eligibility for this Loan Program. I agree that this Application and Loan Agreement provides for the compounding of interest. The originating lender to which this Application and Loan Agreement is directed is Liberty Bank, N.A., in Ohio.

NOTICE TO CONSUMER: DO NOT SIGN THIS BEFORE YOU READ THE WRITING ON THE FOLLOWING PAGES, EVEN IF OTHERWISE ADVISED. DO NOT SIGN THIS IF IT CONTAINS ANY BLANK SPACES. YOU ARE ENTITLED TO AN EXACT COPY OF ANY AGREEMENT YOU SIGN. YOU HAVE THE RIGHT AT ANY TIME TO PAY IN ADVANCE THE UNPAID BALANCE UNDER THIS APPLICATION AND LOAN AGREEMENT WITHOUT PENALTY AND YOU MAY BE ENTITLED TO A PARTIAL REFUND OF THE FINANCE CHARGE IN ACCORDANCE WITH LAW.

CAUTION - IT IS IMPORTANT THAT YOU THOROUGHLY READ THE CONTRACT BEFORE YOU SIGN IT.

**I UNDERSTAND THAT THIS IS A LOAN THAT I MUST REPAY.**

11. Signature of Borrower E-Signed By: HEATHER TURREY

12. Date 05/26/2010

© 2009 Access Group, Inc. All rights reserved. Revised 12/09   APP976(11/09)

**Loan Agreement for PEAKS Private Student Loan Program**

This Loan Agreement applies to, and is a part of, my Application. My signature on the Application certifies that I have read, understand, and agree to this Loan Agreement. In this Loan Agreement the words "I", "me", "my", and "mine" mean the Borrower. The words "you", "your", "yours", and "Lender" mean Liberty Bank, N.A., Beachwood, Ohio, its successors and assigns, and any other holder of my Loan. "School" means the school named in field 9 of my Application and its parent organization.

**A. PROMISE TO PAY**
I promise to pay to you the total principal sum of the Loan, which includes amounts disbursed to my School under the terms of my Application, the loan origination fee described in Paragraph F, and interest and other amounts added to the principal balance as described in this Loan Agreement and the Final Disclosure Statement, which is incorporated into this Loan Agreement by reference. I also promise to pay interest on such principal sum, late charges and other fees, charges and costs as provided in this Loan Agreement. I understand and agree that you may make multiple disbursements to me, and that you may disburse a lesser amount than that which I originally agreed to accept based on information that you receive from the School or otherwise. This Loan Agreement sets forth the terms and conditions applicable to all disbursements of this Loan made to me on or after the date of my Application.

**B. IMPORTANT – READ THIS CAREFULLY**
1. By completing and signing the Application, and submitting it to you, either directly or through some other person, I am requesting that you make a Loan to me on the terms described in this Loan Agreement and in an amount equal to all or part of the Loan Amount Requested (as increased by the amount of the loan origination fee described in this Loan Agreement). When you receive my Application, you are not agreeing to lend me money. You have the right not to make a Loan, to lend an amount less than the Loan Amount Requested, based on my eligibility at the time I make my request and to cancel any disbursement at any time if I am in default of this Agreement or if I am no longer eligible for the Loan. If you decide to make a Loan to me, you will electronically transfer the Loan funds. I authorize the School to credit funds to my student account. I agree to accept an amount less than the Loan Amount Requested.
2. HOW I AGREE TO THE TERMS OF MY LOAN. If you agree to make a Loan to me, you will send me an Approval Disclosure Statement. The Approval Disclosure Statement will tell me the total amount of my Loan, my initial interest rate, the amount of the loan origination fee and the date by which I must accept the Loan offer that you have made. If I decide to accept the Loan that you offer me, I must give you notice of my acceptance as provided in the Approval Disclosure Statement. After I have accepted this Loan you will send me a Final Disclosure Statement. In addition to other information, the Final Disclosure Statement will tell me my final Loan amount (unless that amount is reduced as described in Paragraphs A and B.1 above) and how to cancel the Loan. If I exercise my right to cancel my Loan as described in the Final Disclosure Statement, you will not disburse any Loan proceeds and you will cancel this Loan.
3. I authorize you to suspend or terminate any disbursements in the event my School or its parent organization becomes the

subject of a petition filed under the U.S. Bankruptcy Code.

**C. DEFINITIONS**
1. "Application" means the Application, which incorporates this Loan Agreement, by which I request that you make a Loan to me, and agree to repay any Loan that you make on the terms set forth in this Loan Agreement.
2. "Approval Disclosure Statement" means the closed-end consumer credit disclosure statement as required by the federal Truth-in-Lending Act that is provided to me at the time that my Loan is approved.
3. "Change Date" means the day in March, June, September and December when my monthly installment payment amount is due.
4. "Disbursement Date" means each date on which you lend money to me in consideration for my Application and will be the date of the electronic funds transfer of my Loan proceeds.
5. "Final Disclosure Statement" means the closed-end consumer credit disclosure statement as required by the federal Truth-in-Lending Act provided to me after I have accepted my Loan offer.
6. "Interim Period" means the period beginning on the first Disbursement Date and ending on the earliest of:
a) the date that is six months (grace period) after I graduate from my School, unless I enroll in another program at an ITT Technical Institute or Daniel Webster College on at least a half time basis; or
b) the date that is three months (grace period) after I cease to be enrolled at my School on at least a half time basis for any reason other than graduation, unless I enroll in a program at an ITT Technical Institute or Daniel Webster College on at least a half time basis; or
c) the date that is 48 months after the first disbursement of my **first** PEAKS Private Student Loan.
7. "Loan" means all principal sums disbursed to me pursuant to my Application, and all amounts added to the principal balance and all interest and other amounts due as provided in this Loan Agreement.
8. "Loan Amount Requested" means the dollar amount of the Loan requested by me in my Application.
9. "Repayment Period" means the period beginning on the day after the Interim Period ends, and continuing for up to 120 months (ten years) as set forth in my Final Disclosure Statement, unless I am granted a forbearance, in which case my Repayment Period may be extended, at your discretion, by the number of months my Loan is in forbearance, as described in Paragraph H.

**D. INTEREST**
1. Accrual – Beginning on the first Disbursement Date, interest will accrue at the Variable Rate (as defined below) on the principal amount of my Loan outstanding from time to time. Interest will be calculated on a daily simple interest basis, according to the outstanding principal balance each day during the term of the Loan. The daily interest rate will be equal to the annual interest rate in effect on that day, divided by 365.25 days and will not vary in leap years.
2. Variable Rate – I will pay interest at the Variable Rate, equal to the "Index," rounded up to the nearest one-eighth of one percent (0.125%), plus a margin as disclosed to me on my Final Disclosure Statement (the "Margin"). The Variable Rate may change, effective on the first day of any month, if the Index changes, but will never exceed 25% per annum. The "Index" for any month is the U.S. Prime Rate, as published by *The Wall Street Journal* on the seventeenth day of the immediately preceding month, or if *The Wall Street Journal* is not published

Loan Agreement for PEAKS Private Student Loan

on the seventeenth day of a month, then the next day on which it is published. If *The Wall Street Journal* no longer publishes, you will find an alternate source for the Index. If the Index is no longer available you will choose a comparable index.

3. Capitalization – I agree that you will add the loan origination fee described in Paragraph F to the principal balance of my Loan. I also agree that you may, at your option, add all accrued and unpaid interest to the principal balance of my Loan on a monthly basis during the Interim Period and during any forbearance period, and that you may add any remaining accrued unpaid interest to the principal balance of my Loan at the end of any forbearance period. In addition, if I am in default on my Loan, you may, at your option, add all accrued and unpaid interest and any unpaid late charges to the principal balance of my Loan upon such default. Thereafter interest will accrue on the new principal balance.

### E. TERMS OF REPAYMENT

1. Interim Period – During the Interim Period, you will send me monthly notification of how I can access my Loan information and quarterly statements (showing the total Loan amount and the interest that has accrued on my Loan). I may make, but am not required to make, payments during the Interim Period. You will add my interest that I do not pay during the Interim Period to the principal balance of my Loan, as described in Paragraph D.3.

2. Repayment Period – During the Repayment Period, you will send me monthly statements (showing total Loan amount and the amount of my monthly payment that is due). I will make monthly payments in the amounts and no later than the payment due dates shown on my billing statements until I have paid all of the principal and interest and any other charges I may owe on my Loan.

3. Repayment Terms -- Except as described below, my monthly payment will be established when my Repayment Period begins, based on the terms of this Loan Agreement and my Final Disclosure Statement. My monthly payments will be consecutive monthly installments of principal and interest, effective each Change Date, to equal the amount necessary to amortize the unpaid principal balance of my Loan (including any interest and other amounts added to the principal balance as described in Paragraph D.3) in approximately equal monthly installments of principal and interest at the Variable Rate then in effect over the number of months remaining in the Repayment Period. On any Change Date when the recalculated monthly payment amount would differ by less than 2.0% from the monthly installment payment last in effect, you may determine not to change the monthly installment payment amount on such Change Date.

4. Minimum Repayment – I understand and agree that, during the Repayment Period and notwithstanding Paragraph E.3., the combined monthly payment on all of my Loans made under the PEAKS Private Student Loan Program will be at least $50 each month or the unpaid balance, whichever is less. I understand that this may result in my Loan(s) being paid off in less than 120 months.

5. Amounts Owing at the End of the Repayment Period – Since interest accrues daily upon the unpaid principal balance of my Loan, if I make payments after my payment due dates, I may owe additional interest. If I have not paid my late charges or other fees and charges, I will also owe additional amounts for those fees and charges. In such cases you will increase the amount of my last monthly payment to the amount necessary to repay my Loan in full. If you have not changed my monthly payments on one or more Change Dates because the recalculated amount would differ

by less than 2.0% from the monthly payment previously in effect, my unpaid balance may be more than if you changed my monthly payment on every Change Date.

6. Application of Payments – Payments will be applied first to late charges, then to accrued interest to the date payment is received, and then any remainder to the principal balance of my Loan.

7. Late Charge – If any part of a monthly payment, other than late charges assessed on a prior monthly payment, remains unpaid for a period of more than 15 days after the payment due date, I will pay a late charge of $10.00.

### F. LOAN ORIGINATION FEE

A loan origination fee will be added to the principal balance of my Loan each time you disburse Loan proceeds. The amount of the loan origination fee is calculated as a percentage of the amount disbursed by you as disclosed to me on my Final Disclosure Statement. I understand that this may result in the amount of my Loan exceeding the Loan Amount Requested. If I prepay my Loan in full or in part, I will not be entitled to any refund of any part of the loan origination fee, unless otherwise required by applicable law.

### G. RIGHT TO PREPAY

I have the right to prepay all or any part of any Loan at any time without penalty. During the Interim Period, any partial prepayment will be credited first to accrued interest to the date the payment is received and then to the principal balance of my Loan. During the Repayment Period, any partial prepayment will be credited against my next scheduled payment(s) unless I direct you to apply the partial prepayment to the principal balance of my Loan.

### H. FORBEARANCE

1. If I am unable to repay my Loan in accordance with this Loan Agreement after the beginning of the Repayment Period, I may request and you may, at your sole discretion, grant me a forbearance.

2. During any period of forbearance, regularly scheduled payments on my Loan will be deferred. I understand that I will remain responsible for all interest accruing during any period of forbearance and that you may add any interest that I do not pay during any forbearance period to the principal balance as described in Paragraph D.3.

### I. COLLECTION COSTS

Unless prohibited by applicable law, I agree to pay you all amounts, including reasonable attorneys' fees, and collection agency, court and other collection costs that you incur in collecting or enforcing the terms of my Loan (collectively, "Collection Costs"). The Collection Costs that I agree to pay may also include fees and costs incurred in connection with any appellate or bankruptcy proceedings.

### J. DEFAULT

To the extent permitted by applicable law, I will be in default and you have the right to cancel any scheduled Loan disbursement not yet made and to give me notice that the whole outstanding principal balance, accrued interest, and all other amounts payable to you under this Loan Agreement, are due and payable at once (subject to any applicable law which may give me a right to cure my default) if: (1) I fail to make any monthly payment to you when due, (2) I become the subject of proceedings under the


Loan Agreement for PEAKS Private Student Loan

United States Bankruptcy Code, (3) I die, (4) I break any of my promises in my Application or this Loan Agreement, or (5) I make any false written statement in my Application or at any time during the Repayment Period. The interest rate after default will be subject to adjustment in the same manner as before default. If I default, you may add all accrued and unpaid interest and other amounts to the principal balance of my Loan as described in Paragraph D.3.

### K. NOTICES
1. I will send written notice to you within ten days after any change in my name, address, e-mail address, telephone number or enrollment status.
2. Any notice required to be given to me by you will be effective when mailed by first class mail to the latest address you have for me, or when transmitted by electronic communication to the latest e-mail address you have for me.
3. **To the extent permitted by applicable law, and without limiting any other rights you may have, I consent to your communicating with me, in connection with my Application or my Loan, using any phone number or e-mail address that I provided in the Application, or using any phone number or e-mail address that I provide in the future or using any phone number or e-mail address that my School or the persons listed in my Application as references provided to you or provide you in the future. You may communicate with me using any current or future means of communication, including, but not limited to, automated telephone dialing equipment, artificial or pre-recorded voice messages, SMS text messages, e-mail directed to me at a mobile telephone service, or e-mail otherwise directed to me. YOU MAY USE SUCH MEANS OF COMMUNICATION EVEN IF I WILL INCUR COSTS TO RECEIVE SUCH PHONE MESSAGES, TEXT MESSAGES, E-MAILS OR OTHER MEANS.**

### L. ADDITIONAL AGREEMENTS
1. I understand that you are located in Ohio and that my Application will be entered into in the same state. CONSEQUENTLY, THE PROVISIONS OF MY LOAN, INCLUDING THIS LOAN AGREEMENT, WILL BE GOVERNED BY FEDERAL LAW AND OHIO LAW, WITHOUT REGARD TO CONFLICT OF LAW RULES.
2. I agree to update the information on my Application whenever you ask me to do so.
3. The proceeds of my Loan will be used only for eligible education expenses at the School named in my Application.
4. Except as otherwise provided herein, my responsibility for paying my Loan is unaffected by the liability of any other person to me or by your failure to notify me that a required payment has not been made. You may delay, fail to exercise, or waive any of your rights on any occasion without losing your entitlement to exercise the right at any future time, or on any future occasion. You will not be obligated to make any demand upon me, send me any notice, present my Application to me for payment or make protest of non-payment to me before suing to collect my Loan if I am in default, and to the extent permitted by applicable law, I hereby waive any right I might otherwise have to require such actions. Without losing any of your rights under this Loan Agreement, you may accept late payments or partial payments. **I will not send you partial payments marked "paid in full," "without recourse" or with other similar language unless those payments are marked for special handling and sent to Access Group Loan Servicing, P.O. Box 7480, Wilmington,**

**DE 19803-0480, or to such other address as I may be given in the future.**
5. I may not assign my Application or any of its benefits or obligations. You may assign my Loan (including my Application) at any time.
6. The terms and conditions set forth in my Application, this Loan Agreement and my Final Disclosure Statement constitute the entire agreement between you and me. In the event of any conflict between this Loan Agreement and the Final Disclosure Statement, the Final Disclosure Statement shall prevail.
7. If any provision of this Loan Agreement is held invalid or unenforceable, that provision shall be considered omitted from this Loan Agreement without affecting the validity or enforceability of the remainder of this Loan Agreement.
8. A provision of this Loan Agreement may only be modified if jointly agreed upon in writing by you and me.
9. Dischargeability – I acknowledge that my Loan is subject to the limitations on dischargeability in bankruptcy established by Section 523(a)(8) of the U.S. Bankruptcy Code.
10. **Failure to Attend or Dissatisfaction with Education Program – Except as otherwise provided herein, if I do not attend or am dissatisfied with the education program paid for with my Loan, I am not relieved of any obligation on my Loan.**
11. All payments on my Loan will be made in United States dollars, and if paid by check or draft, drawn upon a financial institution located in the United States.
12. I agree that if I authorize you to withdraw the monthly payments due on my Loan as automatic debits from my checking or savings account, you will reduce my Margin by 0.25 percentage points. I also agree that, if I have qualified for this Margin reduction, and any payment that I make or authorize is returned for any reason, you will increase my Margin by 0.25 percentage points and I am no longer eligible for any Margin reduction. If I have cancelled the automatic debit authorization, or if you have granted me a forbearance, you will increase my Margin by 0.25 percentage points.

### M. CERTIFICATIONS AND AUTHORIZATIONS OF BORROWER
1. I declare under penalty of perjury under the laws of the United States of America that the following is true and correct. I certify that the information contained in my Application is true, complete and correct to the best of my knowledge and belief and is made in good faith. I certify that the proceeds of my Loan will be used for educational purposes as stated in my Application at the School named in my Application. I understand that I am responsible for repaying immediately any funds that I receive which are not to be used or which are not used for educational purposes. I hereby authorize the School to pay to you any refund which may be due me up to the amount of my Loan.
2. I authorize you or your agents to: (1) advise my School and its affiliates and agents of the status of my Application and my Loan (including my payment performance), (2) respond to inquiries from prior or subsequent lenders or holders with respect to my Loan and related documents, (3) release information and make inquiries to my School and to the persons I have listed in my Application as references, for the purposes of learning my current address, e-mail address and telephone number, and (4) verify my credit. I authorize my School to release, to you and other persons designated by you, any requested information pertinent to my Application or Loan (including enrollment status, prior loan history, current address and other contact information).

3. I authorize you and your agents to verify my Social Security number with the Social Security Administration (SSA) and, if the number on my loan record is incorrect, then I authorize SSA to disclose my correct social security number to these persons.

4. I acknowledge that if I default on my Loan, my School may withhold my transcript and deny any placement services to me to the extent permitted by applicable law.

## N. ARBITRATION AGREEMENT

Except as expressly provided below, I agree that any claim, dispute or controversy arising out of or that is related to (a) my Loan, my Application, this Loan Agreement (including, without limitation, any dispute over the validity of this arbitration provision), my Approval Disclosure Statement, my acceptance, or my Final Disclosure Statement or (b) any relationship resulting from my Loan, or any activities in connection with my Loan, or (c) the disclosures provided or required to be provided in connection with my Loan (including, without limitation, the Approval Disclosure Statement and the Final Disclosure Statement), or the underwriting, servicing or collection of my Loan, or (d) any insurance or other service related to my Loan, or (e) any other agreement related to my Loan or any such service, or (f) breach of this Loan Agreement or any other such agreement, whether based on statute, contract, tort or any other legal theory (any "Claim") shall be, at my or your election, submitted to and resolved on an individual basis by binding arbitration under the Federal Arbitration Act before the American Arbitration Association (AAA) under its Commercial Arbitration Rules including the Supplementary Procedures for Consumer-Related Disputes, in effect at the time the arbitration is brought. For purposes of this Paragraph N, the terms "you," "your," "yours" and "Lender" include the Lender, its officers, directors, and employees, and its affiliates, subsidiaries and parents, and any officers, directors, and employees of such entities.

**RIGHT TO REJECT: I may reject this Arbitration Agreement by mailing a signed rejection notice to Access Group Loan Servicing, P.O. Box 7400, Wilmington, DE 19803-0400 within 60 days after the first Disbursement Date. Any rejection notice must include my name, address, e-mail address, telephone number and loan or account number.**

You and I agree that neither party will elect to arbitrate any individual claim of less than $5,000.

IF EITHER YOU OR I CHOOSE ARBITRATION, NEITHER PARTY WILL HAVE THE RIGHT TO A JURY TRIAL, TO ENGAGE IN DISCOVERY, EXCEPT AS PROVIDED IN THE APPLICABLE ARBITRATION RULES, OR OTHERWISE TO LITIGATE THE DISPUTE OR CLAIM IN ANY COURT (OTHER THAN IN AN ACTION TO ENFORCE THE ARBITRATOR'S AWARD). FURTHER, I WILL NOT HAVE THE RIGHT TO PARTICIPATE AS A REPRESENTATIVE OR MEMBER OF ANY CLASS OF CLAIMANTS PERTAINING TO ANY CLAIM SUBJECT TO ARBITRATION. THE ARBITRATOR'S DECISION WILL BE FINAL AND BINDING. OTHER RIGHTS THAT YOU OR I WOULD HAVE IN COURT ALSO MAY NOT BE AVAILABLE IN ARBITRATION.

The arbitrator shall have no authority to arbitrate Claims on a class action basis, and claims brought by or against me may not be joined or consolidated with claims brought by or against any other person. If I reside in the U.S., any arbitration hearing shall take place in the federal judicial district in which I reside. Each party will bear the expense of its own attorneys, experts and witnesses, regardless of which party prevails, unless applicable law or this Loan Agreement gives a right to recover any of those fees from the other party. All fees and expenses of the arbitrator and administrative fees and expenses of the arbitration shall be paid by the parties as provided by the Commercial Arbitration Rules of the AAA governing the proceeding, including the Supplementary Procedures for Consumer-Related Disputes, to the extent applicable, or by specific ruling by the arbitrator, or by agreement of the parties. The arbitrator shall have the authority to award monetary damages and may grant any non-monetary remedy or relief available by applicable law and rules of the arbitration forum governing the proceeding and within the scope of this Agreement. If the arbitrator determines that any claim or defense is frivolous or wrongfully intended to oppress the other party, the arbitrator may award sanctions in the form of fees and expenses reasonably incurred by the other party (including arbitration administration fees, arbitrator's fees, and attorney, expert and witness fees), to the extent such fees and expenses could be imposed under Rule 11 of the Federal Rules of Civil Procedure.

The Federal Arbitration Act, 9 U.S.C. §§ 1, *et seq.*, shall govern this arbitration provision. If I have a question about the American Arbitration Association, I can contact them as follows: American Arbitration Association, 1633 Broadway 110th Floor, New York, N.Y. 10019, 212-716-5800, www.adr.org.

If any part or parts of this Arbitration Agreement are found to be invalid or unenforceable by a decision of a tribunal of competent jurisdiction, then such specific part or parts shall be of no force and effect and shall be severed, but the remainder of this Arbitration Agreement shall continue in full force and effect.

## O. DISCLOSURE NOTICES

NOTICE TO CONSUMER. (For purposes of the following notice, the word "you" refers to the Borrower not the Lender) 1. DO NOT SIGN THE APPLICATION BEFORE YOU READ THIS LOAN AGREEMENT. 2. YOU ARE ENTITLED TO A COPY OF THIS DOCUMENT. 3. YOU MAY PREPAY THE UNPAID BALANCE AT ANY TIME WITHOUT PENALTY AND MAY BE ENTITLED TO A REFUND OF UNEARNED CHARGES IN ACCORDANCE WITH LAW.

### Notice to Borrowers Regarding Loan Sales

I understand that my Loan will likely be sold while a balance remains outstanding. Any such sale will not result in any change to my Loan terms.

Federal Notices: I understand that the following notice is required by federal law when a new account is opened:

IMPORTANT INFORMATION ABOUT PROCEDURES FOR OPENING A NEW ACCOUNT

To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an account.

What this means for me: When I open an account, you will ask for my name, address, date of birth, and other information that will allow you to identify me. You or my School may also ask to see my driver's license or other identifying documents.

Loan Agreement for PEAKS Private Student Loan

**NOTICE**
**ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.**

As a participant in the consumer credit reporting system, you furnish information about your experience with me to consumer reporting agencies. These consumer reports allow you to make credit and other opportunities available to me. If I believe that you have furnished information to a consumer reporting agency that is inaccurate, I will notify you at the address specified in Paragraph L.4 and identify the specific information that is inaccurate.

**State Notices** - I understand that the following notices are or may be required by state law and that these notices may not describe all of the rights that I have under state and federal law. Unless otherwise indicated, each notice applies or may apply to borrowers who live in the indicated state on the dates that they signed their Applications and to borrowers who are residents of that state.

FOR ALABAMA RESIDENTS: (For purposes of the following notice, the word "you" refers to the Borrower not the Lender) CAUTION -- IT IS IMPORTANT THAT YOU THOROUGHLY READ THE CONTRACT BEFORE YOU SIGN IT.

CALIFORNIA AND UTAH RESIDENTS: As required by law, I am notified that a negative credit report reflecting on my credit record may be submitted to a credit reporting agency if I fail to fulfill my credit obligation terms.

CALIFORNIA RESIDENTS: I have the right to prohibit the use of information contained in my credit file in connection with transactions not initiated by me. I may exercise this right by notifying the consumer credit reporting agency. A married applicant may apply for a separate account. If you take any adverse action as defined by Section 1785.3 of the California Civil Code and the adverse action is based, in whole or in part, on any information contained in a consumer credit report, I have the right to obtain within 60 days a free copy of my consumer credit report from the consumer reporting agency which furnished you my consumer credit report and from any other consumer credit reporting agency which compiles and maintains files on consumers on a nationwide basis. I have the right as described by Section 1785.16 of the California Civil Code to dispute the accuracy or completeness of any information in a consumer credit report furnished by the consumer credit reporting agency.

IOWA, KANSAS AND NEBRASKA RESIDENTS: NOTICE TO CONSUMER (For purposes of the following notice, the word "you" refers to the Borrower not the Lender) IMPORTANT: READ BEFORE SIGNING. THE TERMS OF THIS AGREEMENT SHOULD BE READ CAREFULLY BECAUSE ONLY THOSE TERMS IN WRITING ARE ENFORCEABLE. NO OTHER TERMS OR ORAL PROMISES NOT CONTAINED IN THIS WRITTEN CONTRACT MAY BE LEGALLY ENFORCED. YOU MAY CHANGE THE TERMS OF THIS AGREEMENT ONLY BY ANOTHER WRITTEN AGREEMENT.

MISSOURI RESIDENTS: Oral agreements or commitments to loan money, extend credit or to forbear from enforcing repayment of a debt including promises to extend or renew such debt are not enforceable. To protect me (borrower(s)) and you (creditor) from misunderstanding or disappointment, any agreements we reach covering such matters are contained in this writing, which is the complete and exclusive statement of the agreement between us, except as we may later agree in writing to modify it.

NEW YORK, RHODE ISLAND AND VERMONT RESIDENTS: A consumer report (credit report) may be obtained from a consumer-reporting agency (credit bureau) in connection with this loan. If I request (1) I will be informed whether or not consumer reports were obtained, and (2) if reports were obtained, I will be informed of the names and addresses of the credit bureaus that furnished the reports. If you agree to make this loan to me, a consumer credit report may be requested or used in connection with renewals or extensions of any credit for which I have applied, reviewing my loan, taking collection action on my loan, or legitimate purposes associated with my loan.

NEVADA RESIDENTS: This is a loan for study.

NEW JERSEY RESIDENTS: The section headings of this Agreement are a table of contents and not contract terms. Portions of this Loan Agreement with references to actions taken to the extent of applicable law apply to acts or practices that New Jersey law permits or requires. In this Loan Agreement, acts or practices (i) by you which are or may be permitted by "applicable law" are permitted by New Jersey law, and (ii) that may or will be taken by you unless prohibited by "applicable law" are permitted by New Jersey law.

OHIO RESIDENTS: The Ohio laws against discrimination require that all creditors make credit equally available to all credit worthy customers, and that credit reporting agencies maintain separate credit histories on each individual upon request. The Ohio civil rights commission administers compliance with this law.

WASHINGTON RESIDENTS: Oral agreements or oral commitments to loan money, extend credit or to forbear from enforcing repayment of a debt are not enforceable under Washington law.

WISCONSIN RESIDENTS: For married Wisconsin residents, my signature on my Application confirms that this loan obligation is being incurred in the interest of my marriage or family. No provision of any marital property agreement (pre-marital agreement), unilateral statement under Section 766.59, Wisconsin Statutes, or court decree under Section 766.70, Wisconsin Statutes, adversely affects the interest of the Lender unless the Lender, prior to the time that the loan is approved, is furnished with a copy of the agreement, statement, or decree or has actual knowledge of the adverse provision when the obligation to the Lender is incurred.

BLOOD HURST & O' REARDON, LLP

1

## CERTIFICATE OF SERVICE

2       I hereby certify that on September 30, 2022, I electronically filed the foregoing

3  with the Clerk of the Court using the CM/ECF system which will send notification of

4  such filing to the e-mail addresses denoted on the Electronic Mail Notice List, and I

5  hereby certify that I have mailed the foregoing document or paper via the United

6  States Postal Service to the non-CM/ECF participants indicated on the Electronic

7  Mail Notice List.

8       I certify under penalty of perjury under the laws of the United States of America

9  that the foregoing is true and correct. Executed on September 30, 2022.

10

11                         *s/ Timothy G. Blood*
                           TIMOTHY G. BLOOD

12                   BLOOD HURST & O'REARDON, LLP
13                   501 West Broadway, Suite 1490
                   San Diego, CA 92101
14                   Tel: 619/338-1100
                   619/338-1101 (fax)
15                   tblood@bholaw.com

16

17

18

19

20

21

22

23

24

25

26

27

28

00195051