1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

HEATHER TURREY, OLIVER FIATY, JORDAN HERNANDEZ, and JEFFREY SAZON, individually, and on behalf of all others similarly situated,

Plaintiffs,

v.

VERVENT, INC. fka FIRST ASSOCIATES LOAN SERVICING, LLC; ACTIVATE FINANCIAL, LLC; DAVID JOHNSON; and LAWRENCE CHIAVARO,

Defendants.

Case No.:  20-CV-0697 DMS (AHG)

**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

This case comes before the Court on Plaintiffs' motion to certify a consumer class action.  (ECF No. 143.)  The matter is fully briefed and submitted.  For the following reasons, the motion is granted in part and denied in part.

## I.

## BACKGROUND AND FACTS

The full background of this case is summarized in prior orders.  (*See* ECF Nos. 128, 140).  To address the instant motion, a summary suffices along with additional material facts as discussed below.

1

Plaintiffs Heather Turrey, Jeffrey Sazon, Jordan Hernandez, and Oliver Fiaty bring this consumer class action as alleged victims of a racketeering student loan scheme against companies and persons that collected millions of dollars in loan payments from them. (ECF No. 141 at ¶ 1; Second Amended Complaint ("SAC").)   Plaintiffs allege ITT Education Services, Inc. ("ITT"), now bankrupt, and one the nation's largest and most notorious for-profit school chains, offered high-cost programs that left students with large debt and inferior credentials. (*Id.* at ¶ 2.)   The present case involves one aspect of ITT's alleged fraud: it's creation and exploitation of a sham private student loan program called "PEAKS," an acronym for "Program for Education Access and Knowledge." (*Id.*)

Plaintiffs allege Deutsche Bank Trust Company Americas ("DBTCA") designed the PEAKS loan program and was complicit with ITT. (*Id.* at ¶ 29.)   The original complaint, filed on April 10, 2020, named DBTCA and Defendants Vervent, Inc., the loan servicer for the PEAKS loan program (formerly known as First Associates Loan Servicing or "FALS"); Activate Financial, LLC ("Activate Financial" or "AFL"), an "in-house" collection agency owned by Vervent; and David Johnson (owner and CEO of Vervent and Activate Financial) and Lawrence Chiavaro (former owner and executive of Vervent) (collectively "Defendants"). (ECF No. 1.)   Thereafter, DBTCA was dismissed by Plaintiffs, for reasons discussed below. (ECF No. 51.)   Plaintiffs now seek class certification of five claims against Defendants under (1) the Racketeer Influenced and Corrupt Organizations Act ("RICO"); (2) the Fair Debt Collection Practices Act ("FDCPA"); (3) California's Rosenthal Fair Debt Collection Practice Act ("RFDCPA"); (4) California's Unfair Competition Law ("UCL"); and (5) common law negligent misrepresentation. (ECF No. 141.)

The original complaint included three PEAKS borrowers as proposed class representatives: Jody Aliff, Marie Smith, and Heather Turrey. (ECF No. 1.)   Defendants settled with Plaintiffs Aliff and Smith, and both were voluntarily dismissed from the case. (ECF Nos. 89, 90.)   The Court granted leave to amend new named plaintiffs. (ECF No. 97.)   Plaintiffs filed a first amended complaint ("FAC") adding Tara Chambers and Philip

2

Fernandez.  (ECF No. 84-4.)  Defendants filed a motion to dismiss the FAC on December 3, 2021 (ECF No. 100), but then withdrew the motion on January 7, 2022 (ECF No. 104), and instead filed a motion for summary judgment.  (ECF No. 105.)  Defendants settled with Plaintiffs Chambers and Fernandez, and both were voluntarily dismissed.  (ECF Nos. 113, 114.)  This left Heather Turrey as the sole Plaintiff to defend the summary judgment motion.  The Court ultimately denied in part and deferred in part Defendants' motion for summary judgment, (ECF No. 128, "Summary Judgment Order"), and permitted Plaintiff Turrey to file a SAC, in which she added three new Plaintiffs: Jeffrey Sazon, Jordan Hernandez, and Oliver Fiaty.

As with the original complaint, Plaintiffs' SAC alleges Defendants joined and facilitated the fraudulent loan scheme initiated by ITT and DBTCA.  (*See* ECF No. 141.)  Plaintiffs allege Defendant Vervent collected approximately $80 million in PEAKS loan payments from borrowers from January 2012, when it took over from loan originator Access Group, Inc. ("Access Group") until all PEAKS loan balances were cancelled in 2020, following investigations by the Securities and Exchange Commission ("SEC") and Consumer Financial Protection Bureau ("CFPB").  (*Id.* at ¶¶ 6, 77-94 (SEC characterizing the PEAKS program as a "fraudulent scheme[;]" CFPB describing ITT as "sacrific[ing] its students' futures by saddling them with debt on which it knew they would likely default.").)  Defendant Vervent earned approximately $14 million in servicing and collection fees from the PEAKS portfolio during that time.  (*Id.*)  PEAKS loans were available only to ITT students, and owing an existing tuition debt to ITT was enough for students to qualify.  (*Id.* at ¶¶ 49-50.)  All loan applications were processed electronically on the website of Access Group, the origination agent, and thus could be completed from ITT's financial aid offices with little to no underwriting.  (*Id.*)  ITT students were already likely to be heavily indebted and the loan terms were unfavorable, including high interest rates and daily accrued interest.  (*Id.* at ¶¶ 49-50; 83 (ITT itself projected "likely default rates of more than 60%.").)  By the time all PEAKS loan balances were canceled in 2020, more than 41,000 student loans (or 79% of the PEAKS loans) "had defaulted."  (ECF No. 143-1 at 12, n.11.)

ITT falsely represented PEAKS to shareholders and the U.S. Department of Education as a source of non-federal, outside funding for student tuition payments, (ECF No. 141 at ¶ 3), when in fact, ITT controlled who got loans and serviced the loans, and ITT itself was the primary funder of the loan program. (*Id.*) Through this "subterfuge," ITT was able to maintain its principal source of revenue—federal financial aid—for several years until it collapsed into bankruptcy. (*Id.*) ITT was the ultimate guarantor to the PEAKS Trust, which was created by DBTCA and used to purchase the PEAKS loans; PEAKS Trust was the creditor to whom the loans were owed. (*Id.*) Representing PEAKS as "unaffiliated" private loans helped ITT comply with its 90/10 obligations, the Department of Education's requirement that at least 10% of an educational institution's revenue come from outside the Department of Education. (*Id.* at ¶¶ 36-43.) The PEAKS Trust sold senior notes to institutional investors, who became the Senior Creditors in the Trust with the right to be paid first. (*Id.* at ¶ 48.) ITT guaranteed the PEAKS Trust that it would maintain a 105% "Parity Ratio" between the non-defaulted loans in repayment and the outstanding amount due to the Senior Creditors. (*Id.* at ¶ 54.) If it could not, ITT would be required to make payments directly to the Senior Creditors. (*Id.*) Defaulted loans would be removed from the Trust portfolio, thus impacting the Parity Ratio and eventually triggering ITT to make the mandatory guarantor payments. (*Id.* at ¶ 55.)

By October 2012, ITT was required to make its first such guarantor payment. (*Id.* at ¶¶ 61-66.) ITT also, for the first time, wired nearly $1 million directly to Defendant Vervent to make payments on loans which were nearing default. (*Id.*) This would forestall these loans from being removed from the Trust portfolio and avoid corresponding changes to the Parity Ratio that would require ITT to make more guarantor payments. (*Id.*) Payments by ITT on loans nearing default, which were processed by Vervent, continued through January 2014 and totaled approximately $16 million. (*Id.* at ¶ 69.) According to Plaintiffs, Defendants knowingly facilitated the loan scheme and profited enormously.

Plaintiff Heather Turrey attended an ITT school in California between 2008 and 2011. (*Id.* at ¶ 105.) Turrey alleges she does not recall ever applying for or agreeing to a

PEAKS loan, and that if a PEAKS loan was obtained on her behalf, it was procured by fraud.  (*Id.* at ¶ 107.)  Turrey began receiving payment demands on a PEAKS loan after leaving ITT, (*id.* at ¶ 108), in response to which she made payments from approximately 2012 to April 2017.  (*Id.* at ¶ 109.)  Turrey continued to receive notices regarding her PEAKS loan, including notices from Defendant Activate Financial in 2019 and 2020.  (*Id.* at ¶¶ 111-14.)

Plaintiff Oliver Fiaty attended an ITT school in California between 2008 and 2012. (*Id.* at ¶ 117.)  Fiaty recalls being required to sign up for something called "Temporary Credit" and one or two PEAKS loans, as a condition of continuing his studies at ITT.  (*Id.* at ¶ 118.)  Fiaty made sporadic payments from 2012 to 2016, and then resumed payments from approximately February 2019 to January 2020.  (*Id.* at ¶¶ 121, 123.)  He began receiving communications regarding repayment obligations prior to graduating from ITT. (*Id.* at ¶ 121.)  Fiaty defaulted in 2016, and thereafter, received collection notices from FALS and Activate Financial until at least April 10, 2019.  (*Id.* at ¶ 122.)

Plaintiff Jordan Hernandez attended an ITT school in California between 2009 and 2013.  (*Id.* at ¶ 125.)  Hernandez paid for his entire education at ITT with financial aid arranged through ITT, including a PEAKS loan.  (*Id.* at ¶ 126.)  Similar to Fiaty, he began receiving communications regarding repayment obligations prior to graduating from ITT. (*Id.* at ¶ 129.)  Hernandez made sporadic payments until he defaulted in 2016, and thereafter, received collection notices from FALS and Activate Financial until at least April 10, 2019.  (*Id.* at ¶ 130.)

Plaintiff Jeffrey Sazon attended several ITT schools in California over a period of years, eventually graduating in 2012.  (*Id.* at ¶ 133.)  Sazon paid for his entire education at ITT with financial aid arranged through ITT, including a PEAKS loan.  (*Id.* at ¶ 134.) Sazon made payments periodically, but eventually defaulted in 2018.  (*Id.* at ¶ 137.)  Sazon recalls receiving collection demands from either FALS or Activate Financial, or both, until at least April 10, 2019.  (*Id.* at ¶ 138.)  Based on these allegations, Plaintiffs move for class certification on all five claims.  (*See* ECF No. 143-1.)

Plaintiffs seek to certify a nationwide class ("the Class") consisting of:

All individuals who, based on Defendants' records: (i) were PEAKS loan borrowers, and (ii) made a payment during the period April 10, 2016 until the present.

(ECF No.143-1 at 10.)

Plaintiffs also seek certification of two subclasses, a nationwide subclass under the FDCPA ("FDCPA subclass") and a California subclass under the RFDCPA ("RFDCPA subclass"), respectively, as follows:

All individuals to whom, on or after April 10, 2019, Activate Financial directed a written communication in an attempt to collect on a PEAKS loan, and who thereafter made a payment to Activate Financial (FDCPA subclass).

All individuals to whom Defendants, on or after April 10, 2019, sent a written communication to an address in California, attempting to collect a PEAKS loan payment, and who thereafter made a payment to Defendants (RFDCPA subclass).

(ECF No. 146 at 1.)[1]

## II.

## LEGAL STANDARD

"The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979)). To qualify

---

[1] Plaintiffs used two different subclass definitions for the RFDCPA class in its Motion for Class Certification (ECF No. 143 at 1) and Memorandum (ECF No. 143-1 at 10), and both of those definitions differed from the subclass definition in the SAC. (ECF No. 141 at 31.) Plaintiffs filed an errata clarifying which definition was correct, (ECF No. 146 at 1), and thereafter in their Reply Brief proposed modifying the subclass definitions to address arguments raised in Defendants' Opposition Brief. (ECF No. 148 at 7 n. 5.) District courts have inherent authority to modify class definitions. *Victorino v. FCA US LLC*, 326 F.R.D. 282, 301-02 (S.D. Cal. 2018). In its analysis, the Court uses the definitions for the subclasses proposed by Plaintiffs in their Reply Brief.

for the exception to individual litigation, the party seeking class certification must provide facts sufficient to satisfy the requirements of Federal Rule of Civil Procedure 23(a) and (b). *Doninger v. Pac. Nw. Bell, Inc.*, 564 F.2d 1304, 1308–09 (9th Cir. 1977). "The Rule 'does not set forth a mere pleading standard.'" *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (quoting *Dukes*, 564 U.S. at 350). "Rather, a party must not only 'be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact,' typicality of claims or defenses, and adequacy of representation, as required by Rule 23(a). The party must also satisfy through evidentiary proof at least one of the provisions of Rule 23(b)[.]" *Comcast*, 569 U.S. at 33 (quoting *Dukes*, 564 U.S. at 350) (internal citation omitted).

Federal Rule of Civil Procedure 23(a) sets out four requirements for class certification—numerosity, commonality, typicality, and adequacy of representation. A showing that these requirements are met, however, does not warrant class certification. The plaintiff also must show that one of the requirements of Rule 23(b) is met.

Here, Plaintiffs assert they meet the requirements of Rule 23(b)(3). Rule 23(b)(3) "allows class certification in a much wider set of circumstances but with greater procedural protections," *Dukes*, 564 U.S. at 362, including that: (a) "'questions of fact or law common to class members predominate over questions affecting only individual members,'" *id.* (quoting Fed. R. Civ. P. 23(b)(3)), (b) class treatment is determined to be superior to other methods of adjudicating the controversy, and (c) class members receive "'the best notice that is practicable under the circumstances[,]'" *id.* (quoting Fed. R. Civ. P. 23(c)(2)(B)), and are allowed to "withdraw from the class at their option." *Id*. Plaintiffs must prove, by a preponderance of the evidence, the elements of Rule 23(a) and Rule 23(b)(3) are satisfied. *Olean Wholesale Grocery Cooperative, Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 665 (9th Cir. 2022), *cert. denied*, 143 S.Ct. 424 (2022).

The district court must conduct a rigorous analysis to determine whether the prerequisites of Rule 23 have been met. *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 161 (1982). It is a well-recognized precept that "the class determination generally involves

7

considerations that are 'enmeshed in the factual and legal issues comprising the plaintiff's cause of action.'"  *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 469 (1978) (quoting *Mercantile Nat'l Bank v. Langdeau*, 371 U.S. 555, 558 (1963)).  "Although some inquiry into the substance of a case may be necessary to ascertain satisfaction of the commonality and typicality requirements of Rule 23(a), it is improper to advance a decision on the merits at the class certification stage."  *Moore v. Hughes Helicopters, Inc.*, 708 F.2d 475, 480 (9th Cir. 1983) (citation omitted).  Rather, a court's review of the merits should be limited to those aspects relevant to making the certification decision on an informed basis.  *See* Fed. R. Civ. P. 23 advisory committee's notes.  If a court is not fully satisfied that the requirements of Rule 23(a) and (b) have been met, certification should be denied.  *Falcon*, 457 U.S. at 161.

### III.

### DISCUSSION

**A. Federal Rule of Civil Procedure 23(a)**

Rule 23(a) and its prerequisites for class certification—numerosity, commonality, typicality, and adequacy of representation—are addressed in turn.

1. Numerosity

Rule 23(a)(1) requires the class to be "so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1); *Staton v. Boeing Co.*, 327 F.3d 938, 953 (9th Cir. 2003).  Plaintiffs need not state the exact number of potential class members; nor is a specific minimum number required.  *Arnold v. United Artists Theatre Circuit, Inc.*, 158 F.R.D. 439, 448 (N.D. Cal. 1994).  Rather, whether joinder is impracticable depends on the facts and circumstances of each case.  *Id.*

Here, Plaintiff alleges there are thousands of putative class members in both the Class and subclasses.  (ECF No. 143-1 at 11, n.11.)  Defendants argue Plaintiffs' lack of concrete numbers shows Plaintiffs' failure to "make any numerosity showing."  (ECF No. 147 at 13).  While "bare assertions of numerosity without any clear factual grounding . . . leave[] the court with little concrete basis for assessing numerosity[,]"  *Mays v. Wal-Mart Stores,*

8

*Inc.*, 804 F. App'x. 641, 643 (9th Cir. 2020), a rough estimate is sufficient. *A.B. v. Haw. State Dep't of Educ.*, 30 F.4th 828, 839 (9th Cir. 2022).   Due to unresolved discovery disputes, Defendants are the only party in possession of the records that could provide precise class estimates.   (ECF No. 148 at 2 n.1, Ackelsberg Reply Decl. ¶¶2-4) (stating "Defendants' objection to a numerosity finding is particularly disingenuous given their refusal to provide the class data that would have established the precise class numbers they now accuse Plaintiffs of not proving.").   The evidence presently before the Court indicates that the proposed Class and subclasses will include thousands of individuals.   Defendants themselves have noted that "there are indeed thousands of PEAKS borrowers who made payments on their PEAKS loans between April 2016 and the present."   (ECF No. 147 at 9.)   Given Plaintiffs' RICO claim that the entire ITT PEAKS program was a fraudulent enterprise, and that Defendants were aware of the fraud and helped facilitate it (through deception and unlawful collection efforts), thereby victimizing all PEAKS borrowers during the Class and subclass periods, it is apparent the numerosity requirement is satisfied.

## 2. Commonality

The second element of Rule 23(a) requires the existence of "questions of law or fact common to the class[.]"   Fed. R. Civ. P. 23(a)(2).   This requirement is met through the existence of a "common contention" that is of "such a nature that it is capable of classwide resolution[.]"   *Dukes*, 564 U.S. at 350.   As summarized by the Supreme Court:

> What matters to class certification ... is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of commons answers.

*Id.* (quoting Richard A. Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U. L. Rev. 97, 132 (2009)).   Because "Rule 23(a)(2)'s 'commonality' requirement is subsumed under, or superseded by, the more stringent Rule 23(b)(3) requirement that questions common to the class 'predominate over' other questions[,]" *Amchen Prods. v.*

*Windsor*, 521 U.S. 591, 609 (1997), the Court addresses commonality in its discussion of Rule 23(b)(3) below.

   3. <u>Typicality</u>

   The next requirement of Rule 23(a) is typicality, which focuses on the relationship of facts and issues between the class and its representatives.  "[R]epresentative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical."  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998) (overruled on other grounds by *Dukes*, 564 U.S. at 338).  "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct."  *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (citation and internal quotation marks omitted).

   Plaintiffs contend the typicality requirement is met because the claims "rise or fall on an assessment of Defendants' conduct and state of knowledge." (ECF No. 143-1 at 14). Defendants dispute this, and argue that each of the proposed class representatives is gainfully employed and making more money than they did before attending ITT, which is inconsistent with Plaintiffs' description of the class in the SAC.  (ECF No. 147 at 18-19). This argument, however, does not controvert typicality.  Instead, what matters given the claims at issue is that each proposed representative had a PEAKS loan, based on the same PEAKS form application and loan agreement, and made payments on the loan within the timeframes identified in the Class and subclasses.  Plaintiffs argue that for the RICO Class claim they have shown that the named Plaintiffs paid money to Defendants on loans that "were the instrument of a fraudulent scheme[,]" (ECF No. 143-1 at 14), and thus, their claims are co-extensive with absent class members.  The Court agrees.

   With respect to the debt collection subclasses, Defendants argue that Plaintiffs "lack standing for the [FDCPA and RFDCPA] Debt Collection claims … for different idiosyncratic reasons." (ECF No. 147 at 19.)  Initially, Defendants argue Plaintiffs Turrey and Sazon never made payments within the applicable one-year statute of limitations, and

10

thus suffered no damages within the limitations period.  (*Id.*)  Plaintiffs do not dispute that Turrey's Debt Collection claims are time-barred, and this Court has already so found. (Summary Judgment Order, ECF No. 128 at 16-18.)  Turrey, therefore, fails to meet the typicality requirement and may not represent the FDCPA and RFDCPA subclasses.  *See Blackwell v. SkyWest Airlines, Inc.*, 245 F.R.D. 453, 462-63 (S.D. Cal. 2007) (plaintiff whose damages fall outside the relevant statute of limitations lacks typicality).  Plaintiff Sazon, however, received email reminders regarding paying his loans, (ECF No. 147-2, Ex. 11 at PageID.3492), and made five payments to FALS between April 23 and August 23, 2019, within the applicable limitations period.  (*Id.* at Ex. 10 at PageID.3490.) Nevertheless, Plaintiffs concede that FALS never referred Sazon's account to its "in-house" collection agency Activate Financial.  Plaintiffs have therefore withdrawn Sazon's FDCPA claim.  (ECF No. 148 at 9-10.)  Under the RFDCPA, however, a loan servicer such as Vervent (formerly FALS) is treated as a "debt collector."  *Davidson v. Seterus, Inc.*, 21 Cal.App.4th 283, 289-90 (2018) (holding mortgage servicer is debt collector under RFDCPA).  Plaintiffs argue Sazon paid money "he did not owe to an entity covered by the RFDCPA [Vervent], in violation of Civ. Code § 1788.17[,]" (ECF No. 148 at 10), therefore his claims are typical of the RFDCPA subclass members.  The Court agrees.

Defendants also argue that Plaintiff Fiaty did not make any payments "in response to" Defendants' collection attempts, and thus, his claims are not typical of putative subclass members.  (ECF No. 147 at 14, 19).  However, reliance on specific misrepresentations is not necessary under the FDCPA and RFDCPA.  Falsely stating the nature or amount of a debt, or attempting to collect money that is not owed, is a violation of the Debt Collection statutes.  *Kaiser v. Cascade Capital*, 989 F.3d 1127, 1135 (9th Cir. 2021) ("FDCPA makes debt collectors strictly liable for misleading and unfair debt collection practices.").  Here, Fiaty made consistent payments to FALS, and then subsequently to Activate Financial, over the years.  (ECF No. 147-1, Exs. 2, 3.)  After each payment to Activate Financial, he received a "Payment Letter," which stated in bold: "This letter is an attempt to collect a

debt by a debt collector." (ECF 148-1, Ackelsberg Reply Decl., Ex. A at PageID.3749.) Plaintiff Fiaty's claims are therefore typical of the FDCPA and RFDCPA subclasses.

Plaintiff Hernandez made sporadic payments to FALS from 2014 to 2018. (ECF No. 147-2, Ex. 6.) His account was thereafter placed with Activate Financial on December 19, 2018. (*Id.*, Ex. 7 at PageID.3458.) On August 29, 2019, pursuant to a one-time settlement offer to resolve his delinquent account for $5,672, Activate Financial confirmed Hernandez's payment of that amount. (ECF No. 148 at 9.) Hernandez, therefore, made a payment as a result of a collection communication within the one-year limitations period. (*See infra* at 28.) Plaintiffs argue that by collecting money Hernandez did not owe, AFL violated both the FDCPA and the RFDCPA and Hernandez's claims are sufficiently typical of subclass members. Defendants dispute this and argue that because Hernandez "actually wishe[d] ITT made payments on his behalf[,]" as ITT did for some subclass members, he lacks typicality. (ECF No. 147 at 20.) However, any payment by ITT on behalf of a class member would be deducted (off-set) from any recovery by that class member—an affirmative defense that Defendants are free to pursue. But that circumstance does not render Hernandez's claims atypical.

Furthermore, given evidence of Hernandez's payments as result of Defendants' alleged conduct, as set forth above, his claims are typical of the UCL and negligent misrepresentation Class members' claims. (*See infra* Sec. B.1.c.) The Court therefore finds that Hernandez's claims are sufficiently co-extensive with and typical of those being pursued by the Debt Collection subclass members (FDCPA and RFDCPA claims) and the Class members (RICO, UCL and negligent misrepresentation claims).

As qualified above, Plaintiffs' have satisfied the typicality requirement for both the Class and Debt Collection subclasses. Therefore, the Court turns to Rule 23(a)(4)'s adequacy of representation requirement.

4. Adequacy of Representation

Rule 23(a)(4) requires a showing that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This requirement

is grounded in constitutional due process concerns: "absent class members must be afforded adequate representation before entry of a judgment which binds them." *Hanlon*, 150 F.3d at 1020 (citing *Hansberry v. Lee*, 311 U.S. 32, 42–43 (1940)).  In reviewing this issue, courts must resolve two questions: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Id.* (citing *Lerwill v. Inflight Motion Pictures, Inc.*, 582 F.2d 507, 512 (9th Cir. 1978)).  The named plaintiffs and their counsel must have sufficient "zeal and competence" to protect the interests of the rest of the class.  *Fendler v. Westgate-Cal. Corp.*, 527 F.2d 1168, 1170 (9th Cir. 1975).

Defendants challenge each Plaintiff's competence by highlighting that Plaintiffs do not know what a subclass is, are unfamiliar with the statutes of limitation, FTC Holder Rule and whether ITT made payments on behalf of some class members, and are unable to distinguish between Defendants.  (ECF No. 147 at 21.)  Class representatives, however, are not required to have comprehensive knowledge about legal technicalities.  *Turocy v. El Pollo Loco Holdings, Inc.*, 2018 WL 3343493, at *19 (C.D. Cal. July 2, 2018).  It is sufficient that Plaintiffs "display some minimal level of interest in the action, familiarity with the practices challenged, and ability to assist in decision making in the conduct of the litigation." *Wolford v. Safeway Stores, Inc.*, 78 F.R.D. 460, 487 (N.D. Cal. 1978).  Here, Plaintiffs are pursuing claims on behalf of others who, like themselves, made payments on an alleged fraudulent loan scheme and were subject to collection efforts by Defendants on debts allegedly not owed.  Accordingly, Plaintiffs are ready and able to pursue the interests of the Class and subclasses, and possess a "rudimentary understanding" of the claims and relief sought.  *Trosper v. Styker Corp.*, 2014 WL 4145448, at *12 (N.D. Cal. Aug. 21, 2014).

Proposed class counsel is comprised of three law firms—Blood Hurst & O'Reardon, LLP, Langer, Grogan & Diver, and the Law Office of Paul Arons.  Defendants dispute the adequacy of counsel and argue "they continually create conflicts with the class" and are motivated by greed rather than the interests of the class.  (ECF No. 147 at 22-23.)

13

1   Defendants point to counsels' decision to (1) cap damages in their original complaint to
2   "$5,000 to avoid the contract provision in the Loan Agreements that barred arbitration of
3   claims over $5,000[,]" (2) drop "massive deep pocket" DBTCA as a named defendant—
4   the "primary moving force behind the PEAKS loans"—to avoid arbitration, (3) add class
5   representatives who have no knowledge about the case, and (4) amend their complaint to
6   focus on a fraud perpetrated not on the class but on the Department of Education and ITT
7   investors by ITT, DBTCA, and other entities.  (*Id.* at 23.)  Accordingly, Defendants argue
8   the present case is lawyer-driven and "manufactured" to "make a quick buck," (quoting *In*
9   *re Cooper Companies Inc. Sec. Litig.*, 254 F.R.D. 628, 637 (C.D. Cal. 2009), and therefore
10  raises adequacy concerns.  (ECF No. 147 at 23.)

11          These are serious allegations that the Court declines to credit on the present record.
12  Counsels' litigation strategy is entitled to deference so long as that strategy appears to be
13  taken in good faith and in the interests of the class.  Plaintiffs commonly attempt to avoid
14  arbitration in order to pursue trial by jury, just as defendants often seek to compel
15  arbitration and avoid a jury trial—as was done in this litigation by Defendants.[2]  The record
16  here does not demonstrate that counsels' strategy to avoid arbitration with previously
17  named defendants is motivated by greed at the expense of the class.  In addition, the need
18  to add class representatives has been precipitated by Defendants settling with class
19  representatives, including prior Plaintiffs Fernandez and Chambers, and before that, Aliff
20  and Smith.  Despite Defendants' protestations, Plaintiffs current class representatives are
21  adequate, as discussed above.  Finally, notwithstanding Defendants' arguments, Plaintiffs'

22

23
_____

24  [2] The Vervent Defendants and DBTCA each filed motions to compel arbitration based on
25  arbitration agreements contained in Plaintiffs' PEAKS loan agreements.  (ECF Nos. 31,
    32.)  The Court denied the Vervent Defendants' motion but granted DBTCA's motion.
26  (ECF No. 43.)  After the Ninth Circuit affirmed this Court's order compelling arbitration
27  as to DBTCA, Plaintiffs dismissed their case against DBTCA.  (ECF No. 51.)  The Vervent
    Defendants also appealed, (ECF No. 45) and the Ninth Circuit ultimately affirmed this
28  Court's denial of the Vervent Defendants' motion to compel arbitration.  (ECF No. 107.)

allegations regarding the fraudulent loan scheme perpetrated by DBTCA, ITT and other entities, and later joined by Defendants, survived summary judgment—given evidence raising triable questions of fact that Defendants knew about the fraudulent scheme and helped facilitate it, as explained in the Summary Judgment Order.  (ECF No. 126 at 10-15.)  The Court therefore finds that proposed class counsel are experienced and capable of handling this complex consumer class action.  (*See, e.g.*, ECF No. 143-2, Decl. of Timothy G. Blood; ECF No. 143-3, Decl. of Irv Ackelsberg; ECF No. 143-4; Decl. of Paul Arons.)

Accordingly, the adequacy requirement is met.  Having addressed the requirements of Rule 23(a), the Court next considers whether Plaintiffs have satisfied the predominance and superiority requirements of Rule 23(b)(3).  *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 614–15 (1997).

**B. Federal Rule of Civil Procedure 23(b)(3)**

Class certification under Rule 23(b)(3) is proper "whenever the actual interests of the parties can be served best by settling their differences in a single action." *Hanlon*, 150 F.3d at 1022 (internal quotations omitted).  Rule 23(b)(3) calls for two separate inquiries: (1) do issues of fact or law common to the class "predominate" over issues unique to individual class members, and (2) is the proposed class action "superior" to other methods available for adjudicating the controversy.  Fed. R. Civ. P. 23(b)(3).  The Advisory Committee added the requirements of predominance and superiority to the qualifications for class certification, "to cover cases 'in which a class action would achieve economies of time, effort, and expense, and promote … uniformity of decisions as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.'" *Amchem*, 521 U.S. at 615 (quoting Fed. R. Civ. P. 23(b)(3) advisory committee notes).

1. Predominance

A "central concern of the Rule 23(b)(3) predominance test is whether 'adjudication of common issues will help achieve judicial economy.'" *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 944 (9th Cir. 2009) (citation omitted).  Thus, courts must

15

determine whether common issues constitute such a significant aspect of the action that "there is a clear justification for handling the dispute on a representative rather than on an individual basis." 7A Charles Alan Wright, *et al.*, *Federal Practice and Procedure* § 1778 (3d ed. 2005).   Under Rule 23(b)(3), "[t]he predominance inquiry focuses on the relationship between the common and individual issues and tests whether the proposed class [is] sufficiently cohesive to warrant adjudication by representation." *Vinole*, 571 F.3d at 944 (internal quotation marks, footnote and citation omitted).   The predominance inquiry under Rule 23(b) is therefore "far more demanding" than the commonality requirement of Rule 23(a)(2), *Amchem*, 521 U.S. at 623-24, as it tests whether the claims advanced by the proposed class can be adjudicated on a class-wide basis.   It does not require exclusively common questions, but merely predominance of common questions. *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 459 (2013).   Plaintiffs must prove by a preponderance of evidence that common questions predominate over any questions affecting only individual members, and that the common questions relate to "a central issue in the plaintiffs' claim." *Olean*, 31 F.4th at 665 (stating "class-wide proof is not required on all issues[.]").   Thus, the predominance inquiry begins "with the elements of the underlying cause of action." *Id.*

> a. *The RICO Claim*.

Plaintiffs allege that Defendants engaged in a RICO conspiracy in violation of 18 U.S.C. § 1962(d).   To succeed on a § 1962(d) claim, Plaintiffs must first demonstrate that a substantive RICO violation took place.   Section 1962(c) is a substantive violation, which makes it unlawful for a person employed by, or associated with, an "enterprise engaged in, or the activities which affect, interstate or foreign commerce, to conduct or participate … in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."   18 U.S.C. § 1962(c).   In other words, a § 1962(c) violation requires the (1) conduct (2) of an enterprise (3) through a pattern of (4) racketeering activity. *See Sanford v. MemberWorks, Inc.*, 625 F.3d 550, 557 (9th Cir. 2010).

16

To establish a violation under § 1962(c), a plaintiff must prove conduct by at least "two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001). "Enterprise" is defined as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). A "'pattern' … requires at least two acts of racketeering activity[,]" 18 U.S.C. § 1961(5), and "racketeering activity" includes, among other acts, mail fraud and wire fraud. *Turner v. Cook*, 362 F.3d 1219, 1229 (9th Cir. 2004).

Plaintiffs contend there are numerous common questions regarding the RICO claim, all of which are susceptible to determination on a class-wide basis, including, among others, whether: (1) Defendants knew that PEAKS was a fraudulent scheme, designed as a financial subterfuge for ITT to defraud its investors and Department of Education; (2) the PEAKS loans lacked consummated loan agreements containing legally required information, such as the high interest rates and fees charged; (3) the PEAKS loan program functioned as an association in fact enterprise that included ITT, the PEAKS Loan Trust, DBTCA, the Access Group and Defendants, with each member of the association in fact having an assigned role; (4) that association in fact was engaged in making fraudulent representations to the Department of Education and to ITT shareholders and the PEAKS Trust investors; and (5) the association in fact used the mails and interstate wire system. (*See* ECF No. 143-1 at 12-13 (addressing the commonality requirement under Rule 23(a)).)

Plaintiffs argue all elements of a substantive violation under § 1962(c)—the structure of the PEAKS Loan "enterprise," identity of "persons" engaged in the enterprise, nature of the "predicate acts," and "existence of a pattern of racketeering activity"—can be determined on a class-wide basis through evidence that will not vary from class member to class member. (ECF No. 143-1 at 18.)

To address the elements of "identity of persons" involved in an "enterprise," Plaintiffs point to: transaction documents forming the association in fact enterprise, the

December 2011 Servicing Agreement executed by Defendant Chiavaro, Program Guidelines detailing how loans were processed and priced, standard form loan agreements, monthly investor reports showing money flow, delinquency and default trends, and end-of-month payment snapshots prepared by Defendants showing payments, allocations, classifications on each PEAKS loan, and Defendant Johnson's capital infusions which kept FALS afloat. (ECF No. 143-1 at 4-8.) In addition to this evidence, Plaintiffs retained two experts: Sandy Baum, Ph.D., an expert in student loans, to address the structure of private student loans generally and the Department of Education's 90/10 rule, (ECF No. 143-6, Declaration of Sandy Baum, Ph.D.); and Thomas Cooper, CPA, to address the significance of the 2011 and 2015 ITT 10-K disclosures of student loan disbursements received from the purportedly "unaffiliated" PEAKS programs. (ECF No. 143-5, Declaration of Thomas Cooper, CPA.) This evidence, according to Plaintiffs, "will prove the existence of a highly organized student loan enterprise, the principal purpose of which was to further ITT's fraudulent goals." (ECF No. 143-1 at 6.)

With respect to predicate acts of racketeering activity, Plaintiffs allege multiple uses of the mail and wire system as steps in the overall process to defraud, such as the loan applications conducted over the internet and the wiring of funds by ITT to Defendants to make payments on PEAKS loans nearing default. Plaintiffs further argue that Defendants' communications with the student borrowers in furtherance of the scheme were largely automated and "executed through mass-generated, standardized emails, texts and letters[,]" (ECF No. 143-1 at 17, Ex. 1, Rodriguez Dep. at 104:1-106:2 (explaining "campaigns" of standardized communications sent to groups of borrowers)), thus obviating the need for individualized review of communications to each borrower. *See United States v. Garlick*, 240 F.3d 789, 795 (9th Cir. 2001) (stating fraudulent statements in mail and wire transmissions are themselves not necessary, so long as the mail and wire transmissions were a "step in the plot.").

To prove the conspiracy claim under § 1962(d), Plaintiffs must demonstrate Defendants "knew about and agreed to facilitate the scheme." *Salinas v. U.S.*, 522 U.S.

52, 66 (1997).  Plaintiffs maintain that by knowingly acting as a debt collector and loan servicer to further a fraudulent loan scheme that victimized all PEAKS borrowers, Defendants are subject to RICO conspiracy liability.  (ECF No. 148 at 4-5.)  Defendants contend that if class members were harmed by any misrepresentations, as alleged in the SAC, these misrepresentations were made by ITT, DBTCA and other entities, not Defendants.  However, a defendant need not "have actually conspired to operate or manage the enterprise," but may be part of a conspiracy to violate § 1962(c) if it "knowingly agree[d] to facilitate a scheme which includes the operation or management of a RICO enterprise."  *U.S. v. Fernandez*, 388 F.3d 1199, 1230 (9th Cir. 2004), *modified*, 425 F.3d 1248 (9th Cir. 2005) (internal quotation omitted).  Thus, the key to RICO conspiracy liability in the present case is whether Defendants knowingly participated in an enterprise's illicit scheme.  Either Defendants knew of the scheme to defraud and agreed to facilitate it, or they did not.

Plaintiffs argue the documents structuring the PEAKS program to which Defendants had access and ITT's public statements about the "unaffiliated" loan program, among other evidence, establish Defendants' knowledge about the loan scheme and facilitation of it.  That evidence, according to Plaintiffs, shows Defendants knew ITT "determined who got loans and in what amount; that ITT, not the third-party PEAKS investors, bore all the financial risk of nonpayment by the borrowers; and that ITT, not the PEAKS Trust, was the party with the power to fire Defendants."  (ECF No. 143-1 at 20.)  In addition, the application and loan agreement provided to each borrower referenced a future "Final Disclosure" that would identify the interest rate and origination fee, but "no such disclosures in the loan documentation" were ever provided.  (*Id.* at 21.)  Thus, Defendants had no evidence that borrowers ever agreed to the actual interest rates and fees Defendants were collecting.  Plaintiffs further argue that Defendants "helped ITT disguise from investors millions of dollars of payments ITT made on behalf of seriously delinquent borrowers."  (*Id.*)  According to Plaintiffs, ITT used Defendants' "false characterization of these payments to avoid even larger guaranty payments to said investors[,]" (*id.*), all while

19

Defendants were responding to subpoenas from federal authorities who were investigating the PEAKS loan program and ultimately canceled all PEAKS loan balances. (*Id.*)

It its Summary Judgment Order, (ECF No. 128), this Court surveyed much of the evidence above and, construing the evidence in Plaintiffs' favor as required at that stage of the proceedings, found triable questions of fact regarding whether: (1) the PEAKS loan program was a fraudulent association in fact enterprise (noting the program was created for ITT with DBTCA, Access Group, and other entities; ITT misrepresented PEAKS loans as being "unaffiliated" for its own benefit; borrowers were not informed of all terms or given required disclosure statements); (2) Defendants had knowledge of the scheme (noting Defendants knew they never received disclosure statements for the PEAKS loans; they knew ITT was the ultimate guarantor to the PEAKS Trust; they knew ITT was making payments on students' loans nearing default); and (3) Defendants intended their work to further the scheme (noting Defendants continued to collect on the loans for ITT and later the PEAKS Trust; Defendants applied the money sent to them by ITT to loans nearing default, which helped keep those loans in the PEAKS portfolio, to the financial benefit of Defendants and ITT). This same evidence is capable of driving resolution of Plaintiffs' RICO claim on a class-wide basis. *See Olean*, 31 F.4th at 666-67 (stating when "determining whether the 'common question' prerequisite is met," the court is "limited to resolving whether the evidence establishes that a common question is *capable* of class-wide resolution, not whether the evidence in fact establishes that plaintiffs would win at trial") (emphasis in original); s*ee also Negrete v. Allianz Life Ins. Co. of N. Am.*, 287 F.R.D. 590, 610 (C.D. Cal. 2012) (stating "many liability questions" regarding the plaintiffs' RICO claims "can be resolved on a class-wide basis, including whether defendant was part of an association-in-fact enterprise operating an alleged scheme to defraud the class member."). So it is here.

Plaintiffs also must prove that Defendants' conduct was the actual and proximate cause of Plaintiff's injuries. *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 654 (2008). This inquiry focuses on whether the purported harm was "a foreseeable and natural

consequence" of the alleged RICO scheme. *Id.* at 658.  Plaintiffs argue the student borrowers were foreseeable victims of the loan fraud even though the fraud was perpetrated on the investors and federal regulators.  In support, Plaintiffs cite *Bridge*, where the Supreme Court found that competing bidders in a rigged county property auction were the foreseeable victims of the fraud that had been directed at the county.  *Id.* at 657-58. Similarly, in *Painters Allied Trades District Council 82 Health Care Fund v. Takeda Pharmaceuticals Co. Ltd.*, 943 F.3d 1243, 1250-51 (9th Cir. 2019), the Ninth Circuit applied *Bridge* to find RICO causation for consumers injured by a pharmaceutical company's fraudulent statements to the FDA and physicians.  That reasoning applies with equal force here.  If Plaintiffs' evidence is credited by the trier of fact and liability under § 1962(d) is found, the trier of fact could also find based on the same evidence that the student borrowers were foreseeable victims of the fraud, *i.e.*, had the unlawful loans not been made, and had Defendants not agreed to facilitate the scheme through deception and servicing the loans, Plaintiffs would not have made payments on the loans.  Causation and injury can therefore be addressed on a class-wide basis.

The extent of damages caused by Defendants' alleged RICO violation, and whether that determination can be made on a class-wide basis, was not briefed by the parties. However, the Ninth Circuit has held that a district court "is not precluded from certifying a class even if plaintiffs may have to prove individualized damages at trial[.]" *Olean*, 31 F.4th at 668-69 (citation omitted); *see also In re Urethane*, 768 F.3d 1245, 1255 (10th Cir. 2014) ("The presence of individualized damages issues" does not preclude a court from certifying a class because "[c]lass-wide proof is not required for all issues[.]").  In addition, as Plaintiffs point out, during the period from April 2016 to the program-wide loan cancellation in 2020, class members made $43 million in loan payments and Defendants "have acknowledged that they have the capability of running a report that will state precisely the amount of these payments that are attributable to individual Class members." (ECF No. 143-1 at 8; Ex. 3, Palmerton Dep. at 85:1-8.)

Defendants argue that numerous individual questions will arise regarding whether a class member made a payment within the 4-year limitations period of the RICO claim; and if payments were made within the limitations period, determining the amount of those payments will involve inquiry into potentially thousands of individual borrowers. (ECF No. 147 at 25.) Defendants also argue that to determine whether ITT is entitled to an off-set for payments it made on behalf of class members, many individual inquiries will be necessary to identify those class members and the amounts they received. (*Id.* at 26.) However, given acknowledgment of databases available to Defendants and ITT, it appears any such inquiry can be made from those sources. Regardless, the Court finds that common questions predominate over any individual questions, including individualized questions about entitlement to damages and any affirmative defenses. *See Owino v. CoreCivic, Inc.*, 36 F.4th 839, 846 (9th Cir. 2022) (stating where one or more central issues are common to the class and predominate, a class may be certified "'even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members'") (quoting *Tyson Foods, Inc. v. Bouaphakev*, 577 U.S. 442, 453 (2016)). Plaintiffs have shown that the RICO claim is supported by evidence "sufficient to sustain a jury verdict" on the questions of liability, causation and injury for the entire class as to all Defendants, while "preserving the [D]efendants' ability to challenge the persuasiveness of such evidence at trial." *Olean*, 31 F.4th at 685. Questions common to the class predominate over any individual inquiries for the RICO claim and can be answered on a class-wide basis.

b. *The Debt Collection Claims under the FDCPA and RFDCPA.*

The FDCPA is analyzed from the perspective of the "least sophisticated debtor," an objective standard which ensures that all consumers, "the gullible as well as the shrewd[,]" are protected against unfair, deceptive and unconscionable debt collection practices. *Clark v. Capital Credit & Collection Servs.*, 460 F.3d 1162, 1171 (9th Cir. 2006). Thus, the "FDCPA imposes strict liability on creditors, including liability for violations that are not knowing or intentional." *McCollough v. Johnson, Rodenburg & Lauinger, LLC*, 637 F.3d

939, 952 (9th Cir. 2011).   Both the FDCPA and RFDCPA have a one-year statute of limitations from the date of the violation.   15 U.S.C. § 1692k(d); Cal. Civ. Code § 1788.30(f); *see also Rotkiske v. Klemm*, 140 S.Ct. 355, 360 (2019) (interpreting § 1692k(d) and finding a one-year limitation from the date of violation, not discovery).

Plaintiffs allege Defendants violated 15 U.S.C. §§ 1692e(2), (10), and § 1692f(1) by collecting, or attempting to collect, on invalid loans and using false, deceptive, or misleading representations in its collection efforts.   (ECF No. 143-1 at 9.)   Likewise, Plaintiffs allege Defendants violated the RFDCPA (California's Rosenthal Act), which mirrors the FDCPA.   *See* Cal. Civ. Code §§1788-1788.33.

To successfully prove such violations, Plaintiffs must first show that Defendants Vervent, AFL and Johnson are debt collectors within the meaning of the FDCPA and Rosenthal Act.[3]   The term "debt collector" encompasses "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another."   15 U.S.C. § 1692a; *see also* Cal. Civ. Code § 1788.2 (similar).   Whether Defendant AFL's debt collection practices violated the FDCPA and RFDCPA, and whether Defendants Vervent, AFL, and Johnson are "debt collectors" under the RFDCPA are common questions that can be determined class-wide.

Defendants argue class members must each show, under 15 U.S.C. § 1692e(2), that they received a written communication from Defendants, necessitating thousands of individual inquiries that will predominate over common questions.   (ECF No. 147 at 26-27.)   However, a "debt collector violates the FDCPA by sending a notice containing unlawful provisions."   *Irwin v. Mascott*, 96 F.Supp.2d 968, 976 (N.D. Cal. 1999).   The "simple act of mailing letters with allegedly misleading information constitutes a 'use' of

---

[3]  Defendant Chiavaro is not named as a Defendant in either of the Debt Collection claims.

such prohibited language," *Sadler v. Midland Credit Mgmt., Inc.*, No. 06 C 5045, 2009 WL 901479, at *2 (N.D. Ill. Mar. 31, 2009), and actual receipt of the letter is irrelevant to liability under the FDCPA. *Mahon v. Credit Bureau of Placer County, Inc.*, 171 F.3d 1197, 1202 (9th Cir. 1999). Thus, whether class members received the written communication is irrelevant. Rather, what is relevant is whether the collection letters, emails and texts sent by Defendants contained misleading information. Plaintiffs argue the written communications were sent to class members through mass-generated, standardized templates. (*See, e.g.*, ECF No. 143-1, Ex. 1, Rodriguez Dep. at 104:1-106:2 (describing "campaigns" where form communications were sent to borrowers)). As such, determining if these communications contained misleading information can be done through common evidence on a class-wide basis. Defendant Johnson's involvement in the alleged "campaign," however, is unclear on the present record. Thus, the Court declines to certify the Debt Collection subclasses as to Defendant Johnson specifically.

Defendants argue that under 15 U.S.C. § 1692f(a), class members must show collection of some fee or charge not set forth in their loan agreement, and that showing will involve some "50,000 inquiries[.]" (ECF No. 147 at 25.) Despite the potential need for that inquiry, it can be done by looking to the standard loan agreements provided to all class members and the PEAKS database, which Defendants "acknowledge[] kept track of all loan payments an[d] all communications sent to the borrowers." (ECF No. 148 at 10.) Defendants further argue that Plaintiffs are seeking damages for any borrower who was mailed a collection communication, whether they paid or not. (ECF No. 147 at 11-12.) The subclass definitions, however, require a payment to have been made after a written communication was sent. Similarly, Defendants argue individual inquiries will abound in determining whether class members received a collection phone call, whether the phone call violated the FDCPA, and whether payment was made in response to the collection call. Here, again, the subclasses are defined to include only written communications. Defendants also argue that numerous individual inquiries will be required to determine whether the subclass members made a payment within the one-year statute of limitations.

24

Here, too, Plaintiffs have redefined the subclasses to resolve any questions regarding the statute of limitations.  Moreover, "narrowing the class based on statute of limitations is not required at the certification stage[,]" as such matters can be addressed through subsequent discovery and motion practice, if necessary.  *Owino*, 36 F.4th at 846-47; *see also Williams v. Sinclair*, 529 F.2d 1383, 1388 (9th Cir. 1975) ("The existence of a statute of limitations issue does not compel a finding that individual issues predominate over common ones.").

Finally, Defendants argue that many of the inquiries they have identified "cannot be answered with anything but deposition testimony" from individual class members or by review of individual records.  (ECF No. 147 at 25-26.)  As discussed, Defendants acknowledge they have databases that can determine the type and frequency of communications with class members, whether the class member was in default and referred to Activate Financial, and the class member's history of payments.  (*See, e.g.*, ECF No. 143-3, Acklesburg Decl. ¶¶ 5, 21 (Exs. 10, 11.)).  Likewise, Defendants' own employees have testified that the collection communications sent to class members were largely automated and generated by the "push of a button." (*See* ECF No. 143-1, Ex. 3, Palmerton Dep. at 252:21-254:17; Ex. 2, Jimenez Dep. at 68:10-73:18; Ex. 4, Chiavaro Dep. at 150:25-152:8.)

Accordingly, questions common to the Debt Collection subclasses predominate over any individual inquiries and can be answered on a class-wide basis.  The Court therefore finds that Plaintiffs have met their burden on these claims under Rule 23(b)(3), as to Defendants Vervent and AFL.

c. *UCL and Negligent Misrepresentation Claims*.

Plaintiffs provided two conclusory sentences in their motion stating that the UCL and negligent misrepresentation claims are "amenable to class certification[,]" but did not otherwise address the claims.  (*See* ECF No. 143-1 at 23.)  Defendants did not respond. Nevertheless, the Court is able to address these claims based on the present record.

The UCL prohibits "any unlawful, unfair, or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200, *et seq*.  It is a broad remedial statute that permits an

25

individual to challenge wrongful business conduct "in whatever context such activity might occur." *Cel-Tech Communications, Inc. v. Los Angeles Cellular Tele. Co.*, 20 Cal.4th 163, 181 (1999) (citation omitted).  It provides for both injunctive and restitutionary relief, (Cal. Bus. & Prof. Code § 17203), and contains a four-year limitations period. *Id.* § 17208.  To bring a UCL claim, a plaintiff must establish he or she suffered an injury "as a result of" the defendant's conduct. *Id.* at § 17204.  In the context of class actions, the California Supreme Court interpreted the UCL "to mean that named plaintiffs, but not absent ones, must show proof of 'actual reliance' at the certification stage." *Walker v. Life Ins. Co.*, 953 F.3d 624, 630 (9th Cir. 2020) (quoting *In re Tobacco II Cases*, 46 Cal.4th 298, 326 (2009)).  Thus, relief under the UCL may be available to absent class members "without individualized proof of deception, reliance and injury[.]"  *In re Tobacco II Cases*, 46 Cal.4th at 298.

*Walker* noted that there is a "conclusive presumption" of class-wide reliance when deceptive information is disseminated to all members of the class.  953 F.3d at 630 (citation omitted).  The presumption "serves to relieve UCL plaintiffs of their obligation to establish absent class members' reliance[]—an issue that, in other contexts, can raise so many individualized questions as to defeat predominance[.]"  *Id.* (citation omitted).  The California Supreme Court has provided for a presumption of class-wide reliance in such cases because if absent class members were required to "'individually establish standing [that] would effectively eliminate the class action lawsuit as a vehicle for the vindication' of rights under the UCL." *Id.* (quoting *In re Tobacco Cases*, 46 Cal.4th at 298.).

Negligent misrepresentation claims, like UCL claims, may also benefit from a class-wide presumption of reliance. *See Woodard v. Labrada*, No. 16-189, 2021 WL 4499184, at *37 (C.D. Cal. Aug. 31, 2021) (citing *Collins v. Rocha*, 7 Cal.3d 232, 237 (1972); *Vasquez v. Superior Court*, 4 Cal.3d 800, 814 (1971) (stating if "material misrepresentations were made to the class members, at least an inference of reliance would arise as to the entire class.")).  To establish negligent misrepresentation, Plaintiffs must prove "(1) the defendant made a false representation as to a past or existing material fact;

26

(2) the defendant made the representation without reasonable ground for believing it to be true; (3) in making the representation, the defendant intended [plaintiff to rely on the representation]; (4) the plaintiff [reasonably] relied on the representation; and (5) the plaintiff suffered resulting damages." *Majd v. Bank of Am., N.A.*, 243 Cal.App.4th 1293, 1307 (2015); Judicial Council of CA Civil Jury Instructions ("CACI") No. 1903. Because negligent misrepresentation is treated as a form of fraud, the generally applicable statute of limitations is three years from discovery of facts constituting the fraud. Cal. Civ. Proc. § 338(d).

Here, Plaintiffs allege Defendants Vervent and Activate Financial engaged in "unlawful" and "unfair" business practices under the UCL. (ECF No. 141 at ¶¶186-193.) Specifically, Plaintiffs allege that Defendants acted unlawfully by "collecting invalid student loan debt, in violation of the RFDCPA and the FDCPA," and unfairly by "[c]ollecting based on loan contracts" that were incomplete regarding interest rates and origination fees. (*Id.*) With respect to the negligent misrepresentation claim, Plaintiffs allege that Defendants Vervent and Activate Financial "assumed a duty to conduct at least minimal due diligence" sufficient to ensure the PEAKS loan program was not fraudulent, (ECF No. 141 at ¶ 195), and that by representing the PEAKS loan debts were valid and enforceable, Defendants violated these duties. (*Id.* at ¶ 196.) By "[r]elying on these representations," Plaintiffs allege the class members paid money they were not obligated to pay. (*Id.* at ¶ 197.)

As discussed, the loan applications, contracts, and communications regarding the PEAKS loans were largely form contracts and communications made with and to class members. The same evidence marshaled by Plaintiffs in their attempt to prove the RICO and Debt Collection claims could be used to prove up the UCL and negligent misrepresentation claims.

The record also adequately demonstrates that Plaintiff Hernandez has standing to bring his UCL and negligent misrepresentation claims, as he made payments in response to Defendants' collection attempts—including to FALS from 2014 to 2018, (ECF No. 147-

27

2, Ex. 6), and to Activate Financial for $5,672 in 2019, to settle his account pursuant to a one-time settlement offer.  (ECF No. 147 at 15-16, Purcell Decl. Ex. A at 102:12-20; ECF No. 148 at 9.)[4]  Because Hernandez has standing, putative class members may benefit from the presumption of class-wide reliance.  In *Walker*, the court held that "[t]o establish a [class-wide] reliance presumption, the operative question has become whether the defendant so pervasively disseminated material misrepresentations that all plaintiffs must have been exposed to them."  953 F.3d at 631 (citation omitted).  As discussed, Plaintiffs have come forward with evidence that Defendants engaged in a "campaign" of sending automated misleading collection letters and emails to class members through a "push of a button."  (ECF No. 143-1 at 9.)  This evidence is sufficient to trigger the reliance presumption under the UCL, such that absent class members need not individually establish "deception, reliance and injury[.]"  *See In re Tobacco II Cases*, 46 Cal.4th at 298.  The same reasoning applies to Plaintiffs' negligent misrepresentation claim, as it is based on the same alleged "campaign" of written communications, as well as the standardized loan applications and contracts.

While Defendants have come forward with evidence that Plaintiff Fiaty did not rely on Defendants' communications (and likely other class members as well), the Court is satisfied that central issues pertaining to the UCL and negligent misrepresentation claims are common to the class and predominate over any individual inquiries.  In addition, any

---

[4]   Plaintiffs Fiaty and Sazon appear to lack standing for the UCL and negligent misrepresentation claims.  Fiaty testified he never made a payment because of any collection communication, (ECF No. 147, Purcell Decl. Ex. C at 173:15-21), and there is no evidence before the Court that Sazon relied on collection communications from Defendants to make any payments on his loan.  As to Plaintiff Turrey, she alleges receiving payment demands from Defendants on her PEAKS loan after leaving ITT, (ECF No. 141 at ¶ 108), in response to which she "paid $427 during the years 2016 and 2017" (arguably within the limitations periods for these claims).  (*Id.* at ¶ 109.)  However, given the absence of evidence to support Turrey's allegations and the lack of briefing on the issue, the Court finds Plaintiffs have not met their burden on the present record to establish Turrey's standing on the UCL and negligent misrepresentation claims.

issues relating to damages or affirmative defenses, as discussed above, do not prevent class treatment.  Plaintiffs have therefore shown that central issues regarding these claims are capable of class-wide resolution and have satisfied Rule 23(b)(3)'s predominance requirements.

2. <u>Superiority of Class Action</u>

In assessing superiority, courts assess the following:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

*Wolin v. Jaguar Land Rover North Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010) (quoting Fed. R. Civ. P. 23(b)(3)(A-D)).

Here, litigation involving the ITT PEAKS loans was initiated in civil court by the SEC and CFPB, and also in bankruptcy court. (ECF No. 141 at ¶¶ 77-94.)  Defendants argue that because the settlements in those cases "did not include any of the Vervent Defendants as defendants," it would be "absurd" to require the Vervent Defendants to face potential liability here.  (ECF No. 147 at 27.)  However, Defendants were neither parties in those prior suits nor exonerated by the SEC or CFPB, and Plaintiffs and putative class members have not had an opportunity to challenge Defendants' conduct.  Considering the cost of pursuing a lawsuit on an individual versus class-wide basis, class members would likely have minimal interest in pursuing individual, separate actions and are better served through representative litigation spearheaded by competent class counsel.  Given the number of issues that can be addressed class-wide through common evidence, the case is well-suited for class adjudication and raises no significant administrative or management issues.  Therefore, the Court finds that a class action is superior to other methods of adjudicating these claims.

/ / /

## IV.

## CONCLUSION AND ORDER

For these reasons, Plaintiffs' motion for class certification is **GRANTED** in part and **DENIED** in part, as follows.  The Court certifies the following Class and subclasses under Federal Rule of Civil Procedure 23(a) and (b)(3):

A nationwide Class consisting of all individuals who, based on Defendants' records: (i) were PEAKS loan borrowers, and (ii) made a payment during the period April 10, 2016 until the present.  The Class includes the RICO claims against all Defendants, and the UCL and negligent misrepresentation claims against Defendants Vervent and Activate Financial.

A nationwide FDCPA subclass consisting of all individuals to whom on or after April 10, 2019, Activate Financial sent a written communication in an attempt to collect on a PEAKS loan, and who thereafter made a payment to Activate Financial.  The FDCPA subclass includes claims against Defendants Vervent and Activate Financial.

A California RFDCPA subclass consisting of all individuals to whom on or after April 10, 2019, Defendants sent a written communication in an attempt to collect on a PEAKS loan to an address in California, and who thereafter made a payment to Defendants.  The RFDCPA subclass includes claims against Defendants Vervent and Activate Financial.

Plaintiff's Turrey, Hernandez, Fiaty, and Sazon are appointed as class representatives for the Class RICO claim.  Plaintiff's Hernandez and Fiaty are appointed as class representatives for the FDCPA subclass.  Plaintiff's Hernandez, Fiaty, and Sazon are appointed as class representatives for the RFDCPA subclass.  Plaintiff Hernandez is appointed as the class representative for the Class UCL and negligent misrepresentation claims.  The law firms of Blood Hurst & O'Reardon, LLP, Langer, Grogan & Diver, and Law Office of Paul Arons are appointed as class counsel, pursuant to Rule 23(g).

/ / /

/ / /

/ / /

1  **IT IS SO ORDERED.**

2  Dated:  January 11, 2023

3

4  _____

5  Hon. Dana M. Sabraw, Chief Judge
   United States District Court
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28