BLOOD HURST & O'REARDON, LLP
TIMOTHY G. BLOOD (149343)
LESLIE E. HURST (178432)
JAMES M. DAVIS (301636)
501 West Broadway, Suite 1490
San Diego, CA 92101
Tel: 619/338-1100
619/338-1101 (fax)
tblood@bholaw.com
lhurst@bholaw.com
jdavis@bholaw.com

LANGER GROGAN & DIVER, PC
IRV ACKELSBERG (*pro hac vice*)
JOHN J. GROGAN (*pro hac vice*)
DAVID A. NAGDEMAN (*pro hac vice*)
1717 Arch Street, Suite 4020
Philadelphia, PA 19103
Tel: 215/320-5660
215/320-5703 (fax)
iackelsberg@langergrogan.com
jgrogan@langergrogan.com
dnagdeman@langergrogan.com

Attorneys for Plaintiffs

[Additional counsel appear on signature page]

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HEATHER TURREY, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>VERVENT, INC., etc., et al.,<br><br>Defendants. | Case No. 3:20-cv-00697-DMS-AHG<br><br>**CLASS ACTION**<br><br>**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR ENTRY OF JUDGMENT ON CLAIM FOR VIOLATION OF UNFAIR COMPETITION LAW, CAL. BUS. & PROF. CODE § 17200,** *et seq.*<br><br>**Date:     August 7, 2023**<br>**Time:     9:00 a.m.**<br><br>District Judge Dana M. Sabraw<br>Courtroom 13A, 13th Fl. (Carter-Keep)<br>Magistrate Judge Allison H. Goddard<br>Chambers Room 3B, (Schwartz)<br><br>Complaint Filed:   April 10, 2020<br><br>**JURY TRIAL DEMANDED** |

BLOOD HURST & O' REARDON, LLP

00204700

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BLOOD HURST & O' REARDON, LLP

# TABLE OF CONTENTS

Page

I.      INTRODUCTION ............................................................. 1

II.     ARGUMENT ................................................................... 3

        A.      The Court Should Enter Judgment in Favor of Plaintiffs and the
                Class on their UCL Claim ........................................... 3

                1.      Plaintiffs' and Class Members' "Unlawful" UCL Claim ............. 5

                2.      Plaintiffs' and Class Members' "Unfair" UCL Claim ............... 6

                        a.      Defendants Serviced Loans They Knew Came from
                                a Sham Private Student Loan Program ........................... 7

                        b.      By the Start of the Class Period, Defendants Knew
                                the PEAKS Loan Program Was Predatory and
                                Targeted Financially Vulnerable Consumers with
                                Coercive Marketing That Concealed the True Nature
                                of the Loan Obligation and Did Not Consider Ability
                                to Repay ................................................................. 16

                        c.      Defendants Had No Documentary Basis to Collect on
                                the Fraudulent PEAKS Program ................................. 19

        B.      Plaintiffs and Class Members Are Entitled to Restitution to Return
                Them to the Status Quo ............................................... 22

III.    CONCLUSION ................................................................ 23

00204700

PLAINTIFFS' MEMO. IN SUPPORT OF MOTION FOR ENTRY OF JUDGMENT ON CLAIM FOR
VIOLATION OF UNFAIR COMPETITION LAW

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bank of the West v. Super. Ct.*,
   2 Cal. 4th 1265 (1992) ........................................................................... 4

*Cel-Tech Comm., Inc. v. Los Angeles Cellular Telephone Co.*,
   20 Cal. 4th 163 (1999) ........................................................................ 3, 6

*City Fin. Servs. v. Smith*,
   97 CVF 00679, 2000 WL 288469 (Ohio Mun. Jan. 4, 2000) ........................... 17

*Commonwealth v. Fremont Inv. & Loan*,
   897 N.E.2d 548 (Mass. 2008) ................................................................. 17

*Cortez v. Purolator Air Filtration Prods. Co.*,
   23 Cal. 4th 163 (2000) ......................................................................... 23

*Davidson v. Seterus, Inc.*,
   21 Cal. App. 5th 283 (2018) .................................................................. 20

*Drakeford v. Capital Ben., Inc.*,
   No. 20-cv-04161-WHO, 2022 WL 2643984
   (N.D. Cal. July 8, 2022) ......................................................................... 5

*Epic Games, Inc. v. Apple, Inc.*,
   67 F.4th 946 (9th Cir. 2023) ................................................................ 3, 6

*Fowler v. Wells Fargo Bank, N.A.*,
   No. 17-cv-02092-HSG, 2017 WL 3977385
   (N.D. Cal. Sep. 11, 2017) ...................................................................... 23

*Hahn v. Massage Envy Franchising, LLC*,
   No. 12cv153 DMS (BGS), 2014 WL 5100220
   (S.D. Cal. Sept. 25, 2014) (Sabraw, J.) .................................................... 22

*People ex rel. Harris v. Sarpas*,
   225 Cal. App. 4th 1539 (2014) ............................................................ 4, 22

*Korea Supply Co. v. Lockheed Martin Corp.*,
   29 Cal. 4th 1134 (2003) ....................................................................... 22

BLOOD HURST & O' REARDON, LLP

00204700

*Lafferty v. Wells Fargo Bank*,
    213 Cal. App. 4th 545 (2013),
    *as modified on denial of reh'g* (Feb. 27, 2013) ................................................. 15

*Moran v. Prime Healthcare Management, Inc.*,
    3 Cal. App. 5th 1131 (2016) ................................................................. 6

*Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*,
    No. 5:16-cv-06370-EJD, 2020 WL 1812257
    (N.D. Cal. Apr. 9, 2020) ..................................................................... 5

*People v. Bestline Prods.*,
    61 Cal. App. 3d 879 (1976) ................................................................. 4

*People v. Dollar Rent-A-Car Sys., Inc.*,
    211 Cal. App. 3d 119 (1989) ............................................................... 3

*People v. First Fed. Credit Corp.*,
    104 Cal. App. 4th 721 (2002) .............................................................. 3

*People v. Toomey*,
    157 Cal. App. 3d 1 (1984) ................................................................... 4

*People v. Witzerman*,
    29 Cal. App. 3d 169 (1972) ................................................................. 4

*Piccarreto v. Presstek, LLC*,
    No. CV 16-1862 DMG, 2017 WL 3671153
    (C.D. Cal. Aug. 24, 2017) ................................................................... 5

*Saunders v. Super. Ct.*,
    27 Cal. App. 4th 832 (1994) ................................................................ 5

*South Bay Chevrolet v. General Motors Acceptance Corp.*,
    72 Cal. App. 4th 861 (1999) ................................................................ 4

*Turrey v. Vervent, Inc.*,
    No. 20-CV-0697 DMS (AHG), 2023 WL 3028079
    (S.D. Cal. Apr. 20, 2023) .................................................................... 22

*In re Wells Fargo Ins. Mktg. & Sales Practices Litig.*,
    No. SAML 17-02797 AG (KESx), 2018 WL 9536803
    (C.D. Cal. Dec. 14, 2018) ................................................................... 5

BLOOD HURST & O' REARDON, LLP

iii                Case No. 3:20-cv-00697-DMS-AHG

00204700

*Williams v. First Gov't Mortg. & Invs. Corp.*,
  225 F.3d 738 (D.C. Cir. 2000)..............................................................................17

*Zhang v. Super. Ct.*,
  57 Cal. 4th 364 (2013)..........................................................................................3

**Statutes**

15 U.S.C. § 1962f(1)...................................................................................................19

18 U.S.C. § 1962(d) .........................................................................................1, 5, 6

Bus. & Prof. Code § 17200...............................................................................*passim*

Bus. & Prof. Code § 17203..................................................................3, 22, 23

Cal. Civ. Code § 1788.17, Rosenthal Fair Debt Collection Practices Act ..........5, 19

Cal. Civ. Code § 1788.101.....................................................................................21

BLOOD HURST & O' REARDON, LLP

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PLAINTIFFS' MEMO. IN SUPPORT OF MOTION FOR ENTRY OF JUDGMENT ON CLAIM FOR
VIOLATION OF UNFAIR COMPETITION LAW

## I.      INTRODUCTION

Plaintiffs move for judgment against Defendants Vervent Inc., Activate Financial LLC, David Johnson, and Laurence Chiavaro for violations of California's Unfair Competition Law, Cal. Bus. & Prof Code § 17200, *et. seq.* ("UCL") for their conduct in servicing and facilitating the PEAKS loan program. As the jury found, the PEAKS loan program was an enterprise conducted through a pattern of mail and wire fraud. The RICO verdict against Defendants Vervent, Activate Financial, and Johnson is all that is necessary to meet the "unlawful" prong of the UCL as to those Defendants.

Defendants' participation and conduct (including Mr. Chiavaro's) in servicing the PEAKS loan program and perpetuating the fraudulent scheme independently constitute "unfair" business acts and practices within the meaning of the UCL. From the outset, and based on information known to Johnson and Chiavaro, the PEAKS loan program was designed to fail as a loan program—the predicted delinquency and default rates were astronomical, assuring losses instead of profits, and the loans were never properly documented, even according to the terms of the loan application itself, which reflected federal student loan requirements. But earning profits by making valid private education loans was never the purpose of the PEAKS program. Instead, its true purpose was to feign compliance with the 90/10 Rule, opening the floodgates to billions of dollars for ITT in federal financial aid. For nine years, the Defendants willingly aided and abetted this scheme, providing a façade of legitimacy to the program while collecting tens of millions of dollars and launching each Defendants' own financial success. Through "Payments on Behalf of Borrowers" Defendants even prolonged the PEAKS fraud, ensuring collections through the class period.

Meanwhile, the participants in the PEAKS scheme, including each of the Defendants, jeopardized the financial future of the student borrowers. Each knew ITT targeted financially distressed and vulnerable student borrowers – the pawns in the

BLOOD HURST & O' REARDON, LLP

PEAKS scheme. By the time Defendants agreed to service the loans, they knew this was not a normal loan program, that it was predatory even by the low standards of subprime lending. Defendants knew that most of the student borrowers would struggle to make payments and most would default. Defendants knew this was a loan program unlike any other, where a for-profit college not only guaranteed payments for investors, but 100% of the payments, making it effectively a loan to ITT. They knew the PEAKS loan program had no underwriting. They also knew it was ITT's loan program, and not "unaffiliated," as ITT claimed. They knew about the 90/10 Rule and the key role it played in ITT's business model. They even knew before their role as servicer began that they did not have documents constituting an enforceable agreement with basic terms of the loans. Nonetheless, Defendants willingly signed on, willingly reported delinquencies to credit bureaus and willingly—even enthusiastically with Activate Financial—collected $80 million from students based on a fraud.

Even as the PEAKS house of cards collapsed in the face of multiple governmental investigations and civil actions, causing ITT to declare bankruptcy, Defendants continued demanding and collecting payments from Plaintiffs and the Class, up until they were forced to stop when all remaining PEAKS loan balances were was cancelled for fraud in October 2020.

Throughout the life of the PEAKS program, Defendants knew the only loan documents they had did not provide verification of a valid debt. But like the other co-conspirators, they did not care, because making legally enforceable, collectible loans was not the point. When asked for proof of a loan, Defendants lied, claiming that the loan application—the only loan document they ever had—was a promissory note, even though it lacked essential terms and referenced the need for additional documentation. After misrepresenting the loan application to borrowers, Defendants

BLOOD HURST & O' REARDON, LLP

continued to demand payment, report delinquencies to credit agencies, and send defaulting borrowers to collections.

The Defendants' acts in support of the PEAKS fraud constitute unfair business practices for which each Defendant must be held accountable. The money Defendants collected from the Class after April 10, 2016, should be returned to Plaintiffs and the Class as restitution pursuant to Bus. & Prof. Code § 17203 along with prejudgment interest calculated under California law.

## II.    ARGUMENT

### A.    The Court Should Enter Judgment in Favor of Plaintiffs and the Class on their UCL Claim

The UCL prohibits "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200; *Zhang v. Super. Ct.*, 57 Cal. 4th 364, 370 (2013); *see also Epic Games, Inc. v. Apple, Inc*., 67 F.4th 946, 1000 (9th Cir. 2023). "By proscribing 'any unlawful' business act or practice, the UCL 'borrows' rules set out in other laws and makes violations of those rules independently actionable. However, a practice may violate the UCL even if it is not prohibited by another statute. Unfair and fraudulent practices are alternate grounds for relief." *Zhang*, 57 Cal. 4th at 370 (cleaned up) (quoting *Cel-Tech Comm., Inc. v. Los Angeles Cellular Telephone Co.*, 20 Cal. 4th 163, 180 (1999)). The UCL's "coverage is sweeping, embracing anything that can properly be called a business practice and that at the same time is forbidden by law." *Cel-Tech Comm., Inc.*, 20 Cal. 4th at 180 (quoting *Rubin v. Green*, 4 Cal. 4th 1187, 1200 (1993)).

Liability under the UCL is joint and several. *See People v. First Fed. Credit Corp.*, 104 Cal. App. 4th 721, 734 (2002) ("parties may be held jointly and severally liable for unfair competition"); *People v. Dollar Rent-A-Car Sys., Inc*., 211 Cal. App. 3d 119, 122 (1989) (affirming joint and several liability among defendants under the

BLOOD HURST & O' REARDON, LLP

00204700

PLAINTIFFS' MEMO. IN SUPPORT OF MOTION FOR ENTRY OF JUDGMENT ON CLAIM FOR VIOLATION OF UNFAIR COMPETITION LAW

UCL); *People v. Bestline Prods*., 61 Cal. App. 3d 879, 922 (1976) (same); *People v. Witzerman*, 29 Cal. App. 3d 169, 180-81 (1972) (same).

"Liability under the UCL may be imposed against those who aid and abet the violation … if the defendant 'knows the other's conduct constitutes a breach … and gives substantial assistance or encouragement to the other to so act.'" *People ex rel. Harris v. Sarpas*, 225 Cal. App. 4th 1539, 1563 (2014) (cleaned up); *People v. Toomey*, 157 Cal. App. 3d 1, 15 (1984) ("[I]f the evidence establishes defendant's participation in the unlawful practices, either directly or by aiding and abetting the principal, liability under sections 17200 and 17500 can be imposed."). A defendant who aids and abets is as equally liable as those who directly violate the UCL, even if that defendant takes only a small profit or leaves the actual unlawful acts to others. *Bestline Products, Inc.*, 61 Cal. App. 3d at 918-19.

Conspiracy liability also applies to UCL claims. *See Toomey*, 157 Cal. App. 3d at 15 (defendant who conspires to commit, or aids and abets the commission of, an unlawful practice is liable under section 17200). *Bestline Products, Inc.*, 61 Cal. App. 3d at 918-19 ("[A]nyone who conspires to engage in unfair competition is liable for the acts taken pursuant to that conspiracy.")

The UCL "'imposes strict liability. It is not necessary to show that the defendant intended to injure anyone.'" *South Bay Chevrolet v. General Motors Acceptance Corp.*, 72 Cal. App. 4th 861, 877 (1999) (quoting *Hewlett v. Squaw Valley Ski Corp.*, 54 Cal. App. 4th 499, 519 (1997). Proof of individualized injury, reliance, or deception is not required. *Bank of the West v. Super. Ct.*, 2 Cal. 4th 1265, 1267 (1992).

Here, Plaintiffs' and class members' UCL claim is premised on Defendants' violations of the "unlawful" and "unfair" prongs. Plaintiffs and the class seek restitution of the payments made on PEAKS loans during the class period.

### 1.    Plaintiffs' and Class Members' "Unlawful" UCL Claim

"Unlawful" practices prohibited by the UCL "are any practices forbidden by law, be it civil or criminal, federal, state, or municipal, statutory, regulatory, or court-made." *Saunders v. Super. Ct.*, 27 Cal. App. 4th 832, 838-839 (1994). Plaintiffs' "unlawful" UCL claim against Defendants Vervent, Activate Financial, and David Johnson is based on their violation of RICO, 18 U.S.C. § 1962(d).

On June 22, 2023, the jury returned a verdict finding that Plaintiffs proved by a preponderance of the evidence that Defendants Vervent, Activate Financial, and David Johnson violated RICO, 18 U.S.C. § 1962(d), by knowingly facilitating the PEAKS loan program which the jury found to constitute a RICO enterprise that was conducted through a pattern of mail or wire fraud.[1] A RICO violation may serve as "the basis for the 'unlawful' variety of their UCL claim." *In re Wells Fargo Ins. Mktg. & Sales Practices Litig.*, No. SAML 17-02797 AG (KESx), 2018 WL 9536803, at *12 (C.D. Cal. Dec. 14, 2018).

Here, the "jury's findings as to Defendant's violations of law are sufficient to demonstrate that Defendant's conduct was 'unlawful' under the UCL." *See Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, No. 5:16-cv-06370-EJD, 2020 WL 1812257 , at *5 (N.D. Cal. Apr. 9, 2020); *accord Drakeford v. Capital Ben., Inc.*, No. 20-cv-04161-WHO, 2022 WL 2643984, at *9 (N.D. Cal. July 8, 2022) (ruling that defendants committed "unlawful" "business acts and practices within the meaning of the UCL based on the predicate violations of RESPA and the Rosenthal Act identified by the jury verdict."); *Piccarreto v. Presstek, LLC*, No. CV 16-1862 DMG (JCx), 2017 WL 3671153, at *7 (C.D. Cal. Aug. 24, 2017) ("Since [Plaintiff's] UCL claim is based on the same underlying facts as the legal claim decided by the jury, it follows from the jury's explicit determination on the legal claim that [Plaintiff] satisfied his

BLOOD HURST & O' REARDON, LLP

---

[1]    ECF 300 (Jury Verdict).

00204700

burden of establishing by a preponderance of the evidence that [Defendant] engaged in an unlawful business practice.")

Accordingly, because the jury found that the Defendants (other than Mr. Chiavaro) violated RICO, 18 U.S.C. § 1962(d), the Court should likewise find in favor of Plaintiffs' and class members' "unlawful" UCL claim.

### 2. Plaintiffs' and Class Members' "Unfair" UCL Claim

A business practice may be "unfair" in violation of the UCL "even if not specifically proscribed by some other law." *Cel-Tech Comm., Inc.*, 20 Cal. 4th at 180. The unfair prong is "intentionally framed in its broad, sweeping language, precisely to enable judicial tribunals to deal with the innumerable 'new schemes which the fertility of man's invention would contrive.'" *Id.* (quoting *Am. Philatelic Soc. v. Claibourne*, 3 Cal. 2d 689, 698 (1935)); *see also Epic Games, Inc.*, 67 F.4th at 1000 (same).

For actions brought by consumers, courts have employed three tests under which a business practice can be found "unfair."

> One states an "unfair" business practice occurs when that practice "offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." [] A second rule provides the "public policy which is a predicate to the action must be 'tethered' to specific constitutional, statutory or regulatory provisions." [] A third holds "[a]n act or practice is unfair if the consumer injury is substantial, is not outweighed by any countervailing benefits to consumers or to competition, and is not an injury the consumers themselves could reasonably have avoided."

*Moran v. Prime Healthcare Management, Inc.*, 3 Cal. App. 5th 1131, 1150 (2016) (citations omitted).

The evidence here shows that under any of these tests, Defendants (including Mr. Chiavaro) engaged in conduct that was "unfair." That conduct was immoral, unethical, oppressive, unscrupulous; it violated public policy as set forth by statutory

BLOOD HURST & O' REARDON, LLP

and regulatory provisions; *and* it caused substantial injury to the Class that was not outweighed by any countervailing consumer benefit.

Defendants' acts and practices constituted unfair business acts and practices in a variety of ways. First, they engaged in an array of loan servicing activities—billing and collecting and reporting to credit agencies—on behalf of a private student loan program that was a sham. There was no outside lender expressing confidence in the bona fides of an ITT education, no expectation of substantial borrower repayments, and no fully formed loan agreements. Instead, as Defendants themselves understood, PEAKS was little more than a financial maneuver by ITT that Defendants chose to facilitate for profit, even after ITT collapsed under the weight of its fraud. Second, in addition to the fraudulent purposes underlying the PEAKS program, the program itself was predatory, involving loans targeted to vulnerable consumers that were made in coercive circumstances that concealed essential terms of the loans, including their origination fees and high-rate, compounding interest charges. Third, Defendants collected on loans for which they lacked adequate loan documentation and actively misrepresented the nature of that documentation to borrowers. These business acts and practices meet each of the three alternative tests for an unfair business practice: they were immoral, oppressive, and unscrupulous, and caused substantial consumer injury; they violated public policy as expressed in statutes, regulations, and case law; and the injury to borrowers was substantial, and not outweighed by any legitimate benefits to them or to competition. As such, Plaintiffs and the Class are entitled to full restitution.

### a. Defendants Serviced Loans They Knew Came from a Sham Private Student Loan Program

The PEAKS private student loan program was a fraud. Besides the factual predicates that demonstrate the fraud, further discussed below, both the bankruptcy settlement and the jury's verdict in this action confirm the fraud. The extraordinary

PLAINTIFFS' MEMO. IN SUPPORT OF MOTION FOR ENTRY OF JUDGMENT ON CLAIM FOR
VIOLATION OF UNFAIR COMPETITION LAW

BLOOD HURST & O' REARDON, LLP

joint settlement involving the ITT bankruptcy trustee, the CFPB and numerous state attorneys general, just months after this lawsuit was filed, cancelled all remaining loan balances on PEAKS loans based on allegations of the program's underlying fraudulent nature.[2] And the jury in this case unanimously found that the PEAKS program was an enterprise conducted through a pattern of mail and wire fraud, and that Defendants actively facilitated that fraud as the loan servicer for the PEAKS program. Defendants collected tens of millions of dollars of loan payments from April 2016 until the 2020 class-wide cancellation, after the fraud was exposed to regulators and investors, and ITT collapsed into bankruptcy. Facilitating a fraudulent loan program by servicing the loans is, on its own, an unfair business practice. In its Supervision and Examination Manual, the CFPB specifically identifies as an "unfair" business act and practice, "Processing payments for companies engaged in fraudulent activities."[3] During the class period, Defendants did precisely that. The record establishes the following facts:

- PEAKS was a financial maneuver to feign compliance with the 90/10 Rule by creating the appearance that an independent lender decided to make loans to ITT students. Defendants Johnson and Chiavaro, as sophisticated businesspeople with a combined decades of experience in subprime and student lending,[4] understood ITT's business model, including the importance of compliance with the 90/10 Rule.[5] The

---

[2] *See* Ex. 135 (Bankr. Settlement); Ex. 137 (Bankr. Adversary Complaint).

[3] *See* CFPB, CFPB Consumer Laws and Regulations, Unfair, Deceptive, or Abusive Acts or Practices (2022), https://files.consumerfinance.gov/f/documents/cfpb_unfair-deceptive-abusive-acts-practices-udaaps_procedures.pdf

[4] *See* Trial Tr., 51:8-13, 571:12-20.

[5] *Id.*, 578:15-578:1 (Chiavaro testifying that he understood "every one of my clients' business models," including in the case of ITT, the importance of 90/10 Rule compliance); *Id.*, 47:19-21, 51:8-13 (Johnson is a Stanford-educated MBA and self-described "experienced businessman"); 67:20-68:2 (Johnson testifying that he knows

8                           Case No. 3:20-cv-00697-DMS-AHG

BLOOD HURST & O' REARDON, LLP

Private Placement Memo for PEAKS expressly listed noncompliance with the 90/10 Rule among the Risk Factors disclosed to investors.[6] Defendants knew PEAKS was ITT's loan program,[7] and "unaffiliated" with ITT, as ITT represented to the federal government and investors.[8] In fact, ITT selected Vervent (then "First Associates") to service the loans, ITT had the power to fire Vervent, and ITT directed the servicing of the PEAKS loans.[9] As the bankruptcy trustee put it, "[t]he 'checks and balances' of the 90/10 Rule which anticipated that independent lenders would fund 10% of ITT's revenues was subverted."[10]

- PEAKS loans were made knowing they would mostly not be repaid. Ordinarily, in private student loan lending there are underwriting standards which, in order to balance students' lack of credit history, require co-signers.[11] But PEAKS did not require co-signers, nor did it have any other meaningful underwriting to assess a student's ability to repay.[12] Anyone with a Temporary Credit or anyone with no credit

---

the 90/10 Rule applies to ITT), 669:11-17 (Chiavaro testifying he understands the relationship of PEAKS to the 90/10 Rule); *see also*, *id.*, 1170:9-20 (Defendants' expert testifying that the 90/10 Rule was the "impetus for ITT to cause the PEAKS loan program to come into being.")

[6]   *See* Ex. 32 (PEAKS Private Placement Memo.) at 32-21 (explaining severe financial consequences if PEAKS found not compliant with 90/10 Rule).

[7]   *See*, *e.g.*, *id.*, 578:15-19 (Chiavaro referring to ITT as a "client.")

[8]   Ex. 50 (Chiavaro email to ITT executive re SEC investigations); Trial Tr., 668:2-669:10 (Chiavaro testimony regarding same).

[9]   *See* Trial Tr., 416:4-417:6 (Yu describing ITT's "extraordinary level of control").

[10]   Ex. 18 (Bankr. Adversary Complaint), ¶ 99; Trial Tr., 392:7-18 (Yu describing the 90/10 Rule).

[11]   *Id.*, 395:9-399:20 (explaining the rationale underlying the 90/10 Rule's dependence on private lenders making determination that students are good credit risks).

[12]   *Id.*, 406:6-9 (Ms. Yu testifying that PEAKS had "no underwriting").

00204700

BLOOD HURST & O' REARDON, LLP

history at all automatically qualified.[13] In Defendant Chiavaro's words, "they made loans to people that shouldn't have gotten loans," and "anybody with a pulse got a loan."[14]

- As expected, the default rates were extraordinary. Defendants knew, prior to signing the Servicing Agreement, that the default rate was already exorbitant – so much so that it already exceeded the trigger permitting ITT to fire Defendants at the outset.[15] As a result, ITT and Defendants entered into an unwritten side agreement that the termination provision in the Servicing Agreement for termination based on high default rates would not be enforced.[16]

- Defendants understood that, unlike an ordinary loan program that is built on the expectation of repayments by borrowers, PEAKS was built on ITT's unprecedented 100% guarantee to the investors.[17] It was this guarantee that, from the standpoint of the PEAKS investors, made the borrowers largely irrelevant. But to ITT, the looming guarantee was to be avoided, even if that meant creating the false appearance that borrowers were making payments that ITT itself was making. With the Payment on Behalf of Borrowers scheme, which lasted from October 2012 to January 2014, ITT and Defendants worked together to conceal

---

[13]   *See* Ex. 30 at 30-69 ("Borrower Credit Criteria" in Program Guidelines appended to Servicing Agreement).

[14]   Trial Tr., 595:3-14. Even Defendants' expert, Mr. Harmon, who claimed that there were at least some underwriting criteria listed in the Program Guidelines, nonetheless acknowledged that any ITT student with a pre-existing Temporary Credit obligation "automatically qualified" for a PEAKS loan. *Id.*, 1176:22-1177:2.

[15]   *Id.*, 587:13-23 (Chiavaro testifying that ITT had "the right to remove us" going into the contract).

[16]   *Id.*, 587:1-588:16 (Chiavaro describing context of side agreement with ITT).

[17]   *Id.*, 416:4-417:6; 1172:10-13, 1171:17-1172:6 (Defendants' expert describing normal student loan guarantee situations; admitting he was not familiar with a situation where the school was guaranteeing the loans); ECF 238, ¶ 24.

$16.1 million in payments reportedly made by borrowers, but actually made by ITT—all to prolong the PEAKS fraud.[18] Mr. Johnson's claim that this was all for the benefit of borrowers was false. First, it prolonged the fraud, allowing Defendants to continue billing and collecting. Second, borrowers whose accounts were credited with the ITT payments were not even notified of the payment.[19] If a borrower happened to notice and inquire, Defendants sent them a form letter to tell them they had "qualified" for a made-up "recovery program."[20]

- The CFPB's, SEC's, and state attorneys general investigations into the PEAKS program and the ensuing civil actions put Defendants on further notice that, in the view of regulators, PEAKS was ITT's instrument of fraud that harmed taxpayers, investors and borrowers.[21] Johnson and Chiavaro testified that the ensuing law enforcement investigations and lawsuits were of no concern to them, as long as no one took issue with the manner of servicing the loan program.[22] While Defendants' claim of disinterest lacked credibility, from the standpoint of the strict-liability "unfairness" test, their intentions and beliefs about their right to continue collecting is irrelevant. The fact that they continued collecting on a

---

[18]    *Id.*, ¶¶ 62-63.

[19]    Trial Tr., 206:9-13 (Johnson admitting borrowers were not notified unless they inquired); 790:22-25 (Palmerton, same).

[20]    *See* Ex. 35 (Ltr. to Borrower); Trial Tr., 111:24-113:2 (Johnson's testimony regarding form letter).

[21]    *See* Ex. 64 (CFPB Complaint); Ex. 9 (SEC Complaint); Trial Tr., 133:13-140:1.

[22]    *Id.*, 124:25-125:9 (Johnson testifying that he was "not curious" and "not concerned" about CFPB and SEC investigations); Trial Tr. 656:7-8 (Chiavaro minimizing importance of CFPB accusations against ITT in that its director "had a bad spot for trade schools"); *see* Exs. 60 (Email attaching SEC subpoena), 61 (CFPB Civil Investigative Demand), 9 (SEC Complaint), and 64 (CFPB Complaint).

BLOOD HURST & O' REARDON, LLP

00204700

fraudulent loan program is sufficient to find liability and require restitution.

- ITT's 2014 restatement of its earlier SEC filings, in which it admitted that the PEAKS loan program was not unaffiliated, was a confession of the earlier fraud on investors and the Department of Education.[23] Johnson falsely claimed the significance of this event as just a matter of "really arcane accounting rules."[24] Plaintiffs' expert, Thomas Cooper, explained that someone in the financial industry, like Johnson, would understand that a restatement like this is "a very big deal," signaling that "you can't rely on what I've given you in the past," and that investors "can't really trust what's going on here."[25]

- In late 2018, when it was clear that the PEAKS loans would be cancelled for fraud as the ITT CUSO loan program had, Defendants intensified collection activity by activating Activate Financial to squeeze what they could from the Class[26] and raise the valuation of the company in anticipation of selling it.[27] Mr. Chiavaro disagreed with the decision to send the PEAKS defaulted loans to Activate Financial, but Mr. Johnson wanted the revenue and enhanced business valuation.[28]

---

[23]   *See* Declaration of Timothy Blood, Ex. 1, (2014 SEC 10-KA, Ex. 77).

[24]   Trial Tr., 142:21-22.

[25]   *Id.*, 1025:18-1029:20.

[26]   *Id.*, 675:11-676:20.

[27]   *Id.*, 652:9-14 (Chiavaro testifying that Johnson "wanted to get into the collection business because he believed that it brought more enterprise value as we were going to market to sell the business).

[28]   *Id.*, 675:2-21 (Chiavaro testifying about his "misgivings" regarding collecting defaulted PEAKS loans).

BLOOD HURST & O' REARDON, LLP

00204700

BLOOD HURST & O' REARDON, LLP

- Once ITT declared bankruptcy in 2016,[29] Defendants were the main operating member of the PEAKS conspiracy, other than a small trustee operation at Deutsche Bank.[30] Despite all they knew about PEAKS as of then, they continued "business as usual" with PEAKS billing and collecting and reporting to credit agencies.[31] Defendants only slowed down once Plaintiffs filed this lawsuit and only stopped when the loans were cancelled for fraud.[32]

- By the time the PEAKS loans were cancelled, 76% of the PEAKS loans had defaulted.[33] In comparison, default rates for the private student loans are typically 4% to 8%. The worst default rates during the Great Recession of 2008 for subprime mortgage portfolios were 40 to 50%.[34] As the loan servicer, Defendants knew the default rates on the PEAKS loans throughout the nine-year period by virtue of its monthly calculations and reports sent to ITT and investors.[35]

Defendants had an ongoing choice whether or not to service this sham loan program and they continuously chose to do so. While proper business practice would have been to never agree to service the loans in the first instance, they also could have stopped servicing the loans long before the start of the Class Period, or they could have chosen to continue to service the loans but not collect payments, or collect

---

[29]   The bankruptcy trustee's complaint detailed the timeline for the events that occurred during the year leading up to the bankruptcy filing, including USED placing ITT under "heightened cash monitoring," ITT's accreditation being challenged, USED requiring ITT to post a massive surety, and, days before the bankruptcy, ITT suspending all academic operations. Ex. 18, ¶¶ 166-171.

[30]   Trial Tr., 1066:17-25 (Mr. Cooper explaining that First Associates was "the only entity left with people doing work").

[31]   *Id.*, 223:14-17.

[32]   *Id.*, 168:21-169:2.

[33]   *Id.*, 1036:4-1037:6.

[34]   *Id.*, 1037:24-1039:1.

[35]   *Id.*, 778:21-779:3 (Palmerton testifying about end-of-month reports).

00204700

payments but escrow it until loan repayment obligations were determined.[36] Instead, consistent with their role in assisting the scheme, Defendants kept the PEAKS fraud alive for as long as possible and kept billing and collecting and reporting to credit agencies.

At trial, Defendants claimed they had a contractual obligation to collect money and report delinquencies and defaults.[37] But this is inaccurate. First, the Loan Servicing Agreement required all parties to comply with all "applicable laws."[38] In creating and operating the fraudulent PEAKS enterprise, none of the parties followed applicable laws, relieving Defendants of any contractual obligations. And second, Defendants had a right to terminate the Loan Servicing Agreement on 180 days' notice.[39]

In addition, the loan application on which Defendants rely incorporates the FTC-mandated "Holder Rule," which provides that the holder of a consumer debt used to purchase goods or services can be held accountable for claims against the original seller.[40] This rule applies to consumer loans arranged by the seller of goods

---

[36]   *Id.*, 1183:3-14 (Defendants' expert's testimony about hypothetical involving and personal prior involvement in a loan servicing company that halted collections amid school's bankruptcy and allegations of fraud).

[37]   *See*, *e.g.*, *id.*, 154:20-155:4.

[38]   Ex. 30 (Servicing Agreement) at 30-5, 30-9.

[39]   ECF 238, ¶ 56.

[40]   The Holder Rule is found at 16 C.F.R. pt. 433. Also known as the Preservation of Claims Rule, it operates by requiring a notice to be placed in consumer credit agreements whereby, as a matter of the contract itself, the parties agree that the consumer can raise seller-related claims and defenses against the holder of the note or contract. The provision reads:

> ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.

BLOOD HURST & O' REARDON, LLP

00204700

or services to obviate the problem of consumers being told that the "debt obligation . . . is not to the seller but to a third party whose claim to payment is legally unrelated to any promises made about the product." *Lafferty v. Wells Fargo Bank*, 213 Cal. App. 4th 545, 559 (2013), *as modified on denial of reh'g* (Feb. 27, 2013). The upshot of this contract provision is that once the fraud underlying the PEAKS program was exposed, every PEAKS borrower had the right to stop paying and obtain refunds of the amounts already paid. *Lafferty*, 213 Cal. App. 4th at 562-563 (under the Holder Rule, an injured borrower is entitled to recover payments already made). In other words, borrowers' class-wide rights under the Holder Rule presented Defendants with a basis to stop PEAKS collections. Vervent's president and operational head, Ms. Jimenez, acknowledged she knew how the Holder Rule was supposed to function, but admitted the company did nothing to train its customer service representatives about the Rule.[41]

The borrower Complaint Logs reveal how Defendants ignored the Holder Rule internally and concealed it from borrowers. For example, in response to a borrower's assertion of fraud by ITT, one of Defendants' customer service representatives advised:

> First and foremost we would like to explain our involvement with respect to your Peaks Private Student Loan. We (First Associates) are the current third party loan servicer; we are not the holder nor do we own your loan. We had no involvement in the origination of your loan or the education that you received at ITT Technical Institute. We cannot address complaints against the ITT Technical Institute campus that you attended. We recommend you contact the school directly regarding any complaints about your education or loan origination.[42]

---

*See*, *e.g.*, Ex. 66 (Turrey Application), at 5.
[41] Blood Decl., Ex. 2, Jimenez Dep. Tr. 119:12-122:12.
[42] Ex. BE (2015 Complaint Log), line 122.

BLOOD HURST & O' REARDON, LLP

00204700

Even by 2019, as the CUSO loans were being canceled and Defendants knew that the PEAKS loans were likely to be canceled,[43] Defendants doubled down on their collections through Activate Financial and falsely told borrowers any fraud-related issues were for ITT, and not Defendants.[44]

> **b.     By the Start of the Class Period, Defendants Knew the PEAKS Loan Program Was Predatory and Targeted Financially Vulnerable Consumers with Coercive Marketing That Concealed the True Nature of the Loan Obligation and Did Not Consider Ability to Repay**

Federal regulators have long instructed the consumer credit industry that they are to be cautious about potentially predatory subprime lending programs.[45] "Subprime" refers to the credit characteristics of borrowers who exhibit weak credit histories or reduced capacity to repay, thereby creating a heightened risk of default.[46] Supervision guidance identifies predatory loan programs as those that make "unaffordable loans based on the assets of the borrower rather than on the borrower's ability to repay an obligation" or where any "fraud or deception conceal[ed] the true nature of the loan obligation … from an unsuspecting or unsophisticated borrower."[47]

---

[43]     Trial Tr., 150:19-23 (Johnson testifying that "at some point, particularly after the CUSO portfolio was shut down, I certainly believed that we would follow the same path with PEAKS").

[44]     *E.g.,* Ex. BG (AFL Complaint Log), Line 33 (responding to borrower seeking relief based on "attendance at ITT" as follows: "Advised that we are a private student loan servicer. Denied Debt forgiveness.").

[45]     *See* Office of the Comptroller of the Currency, et al., *Expanded Guidance for Subprime Lending Programs*, (Jan. 31, 2001), available at https://archive.fdic.gov/ view/fdic/1952/fdic_1952_DS3.pdf, at 2.

[46]     *Id.,* at 2-3. Defendant Chiavaro acknowledged PEAKS was a "subprime, high touch portfolio." Trial Tr., 600:19-22.

[47]     *Id.*, at 10-11; *see also*, CFPB Manual, UDAAP 14. *See also*, OCC, Comptroller's Handbook on Consumer Compliance, Unfair or Deceptive Acts or Practices 4 (Version 1.0, June 2020) (increased risk of unfair or deceptive practice if bank introduces a credit product targeting "financially unsophisticated" or "financially distressed" individuals).

Long before PEAKS, courts applying state unfairness standards similar to the UCL determined that predatory lending activity constitutes unfair business acts and practices. *See Commonwealth v. Fremont Inv. & Loan*, 897 N.E.2d 548, 556-57 (Mass. 2008) (loans made without regard to borrowers' repayment ability as "unfair"); *Williams v. First Gov't Mortg. & Invs. Corp.*, 225 F.3d 738, 744 (D.C. Cir. 2000) ("unfair and deceptive" where loan made without expectation of borrower's ability to repay); *City Fin. Servs. v. Smith*, 97 CVF 00679, 2000 WL 288469, at *2 (Ohio Mun. Jan. 4, 2000) (credit agreement unconscionable where lender knew borrower could not repay).

PEAKS targeted consumers who lacked the ability to pay and did so using coercive practices that obscured the true nature of the loan obligations. As explained by Plaintiff's expert, Ms. Yu, the 2012 Senate Report found that ITT's business model targeted low income and first generation students with predatory marketing and recruitment practices.[48] She described ITT's notorious "Pain Funnel" sales technique that misrepresented the value of an ITT education as a panacea to whatever life challenges a prospective student faced.[49] These coercive misrepresentations of the value of an ITT education despite an "overall lack of value in an ITT education" were the basis for the U.S. Department of Education's findings underlying its recent decision to forgive all federal loans issued to ITT students from 2005 onward[50] and to refund amounts paid on those loans.[51] Defendants were also aware that ITT was credibly alleged to have engaged in coercive and predatory techniques when issuing PEAKS loans, as detailed in the CFPB's 2014 Complaint and the evidence at trial.[52]

---

[48]    *Id.*, 379:8-380:2.
[49]    *Id.*, 390:22-391:10; *see also* Ex. 109 (U.S. Senate Report) at 573-574.
[50]    Trial Tr., 442:18-443:7; Blood Decl., Ex. 3, (USED – Borrower Defense Findings ITT Executive Summary, Ex. 110)
[51]    Trial Tr., 443: 8-25.
[52]    *Id.*, 133:17-23 and 136:22-137:18 ((Johnson testifying that he had seen the

BLOOD HURST & O' REARDON, LLP

00204700

This was borne out in the facts in the record, including the miniscule amount of time (if any) class members were given to look at loan documents;[53] the named Plaintiffs' testimony that they did not know what loans they were signing up for when they were pulled out of class by ITT's financial aid employees;[54] and that they knew nothing about PEAKS until Defendant started billing them.[55]

Defendants also knew that PEAKS loans were made without regard to borrowers' ability to repay the loans. Ordinarily, in private student loan lending there are underwriting standards which, in order to balance young adults' lack of credit history, require co-signers.[56] But PEAKS did not require co-signers or any other meaningful underwriting to assess a borrower's ability to repay.[57] Mr. Chiavaro

---

CFPB complaint); 438:20-439:13 (Yu's testimony regarding CFPB complaint); see Ex. 109 (U.S. Senate Report) at 573-574, Ex. 72 (ITT 2010 10-K) at 72-5.

[53]   ECF 238, ¶ 40 ("This data for Plaintiff Turrey indicates that the application process took approximately five minutes for Ms. Turrey to complete the application process.")

[54]   Trial Tr. 254:2-15 (Plaintiff Turrey testifying that she did not recall signing a PEAKS loan); 292:8-293:7 (Plaintiff Fiaty testifying about sign-up process); 727:24-729:22 (Plaintiff Sazon testifying he discovered he had a PEAKS loan after he graduated); 840:24-842:12 (Plaintiff Hernandez describing loan process with ITT financial aid office); see also, e.g., Ex. BE (2015 Complaint Log) at line 7 ("upset with ITT, they did not explain[ to] him about private loans."), line 9 ("disputing validation debt and credit reporting"), line 11 ("did not agree to loan or ITT in beginning"), line 18 ("claims does not have debt for private loans"), and line 34 ("advised borrower this was for a private loan").

[55]   Trial Tr. 251:8-252:7, 254:2-15 (Plaintiff Turrey testifying that she learned about PEAKS after graduating; not recalling signing up for a PEAKS loan and not recognizing the electronically signed PEAKS loan application document); 733:1-734:14, 735:18-737:10 (Plaintiff Sazon's testimony regarding unawareness of PEAKS loan); 842:6-12 (Plaintiff Hernandez testifying that he learned he had a PEAKS loan after he graduated).

[56]   Id., 395:9-399:20 (explaining the rationale underlying the 90/10 Rule's dependence on private lenders making determination that students are good credit risks).

[57]   Id., 406:6-9 (Ms. Yu testifying that PEAKS had "no underwriting").

00204700

admitted loans were made to those who should not have had them.[58] PEAKS' projected default rate was over 60%.[59] Repayment was not a key feature of the loan program. Meanwhile, the debt was especially harmful because an ITT education did not provide students with sufficient earning capacity to repay the loans, as acknowledged by ITT's own 2010 10-K report, conceding its students earned on average $31,600 after graduating.[60]

Defendants, and Defendants alone, continued to collect and to report delinquencies and defaults to credit agencies and were directly responsible for 100% of the continuing harm suffered by Plaintiffs and the Class.

### c.   Defendants Had No Documentary Basis to Collect on the Fraudulent PEAKS Program

Finally, Defendants demanded and collected payments from Plaintiffs and the Class while lacking a documentary basis establishing that that the PEAKS obligations were, in fact, fully formed loan agreements. This deficit is especially stark given all they knew before and after they started servicing this loan program. When asked for proof of complete loan documentation, Defendants chose to deceive, falsely claiming the application was a promissory note. This business practice is a separate and independent violation of the UCL's unfair prong.

Among the "unfair or unconscionable" practices defined by the Fair Debt Collection Practices Act is the "collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law." 15

---

[58]   *Id.*, 595:3-14. Even Defendants' expert, Mr. Harmon, who claimed that there were at least some underwriting criteria listed in the Program Guidelines, nonetheless acknowledged that any ITT student with a pre-existing Temporary Credit obligation "automatically qualified" for a PEAKS loan. *Id.*, 1176:22-1177:2.[59]   *Id.*,   556:17-23, 595:3-14.

[59]   *Id.*, 556:17-23, 595:3-14.

[60]   Ex. 72 (2010 SEC 10-K) at 72-5.

BLOOD HURST & O'REARDON, LLP

00204700

U.S.C. § 1962f(1). This definition is incorporated into the Rosenthal Fair Debt Collection Practices Act, Cal. Civ. Code § 1788.17, and is applicable to loan servicers, as well as debt collectors. *Davidson v. Seterus, Inc.*, 21 Cal. App. 5th 283, 300-05 (2018) (allowing UCL claim for violation of RFDCPA). In a 2013 Bulletin, the CFPB incorporated this same provision in its list of unfair or deceptive collection practices: "Collecting or assessing a debt and/or any additional amounts in connection with a debt (including interest, fees, and charges) not expressly authorized by the agreement creating the debt or permitted by law."[61]

Even Mr. Chiavaro admitted at trial that "you need to make sure that you have proper [loan] documentation," and that "you need to make sure that [loan] disclosures are complete."[62] Here the Defendants never had any agreements that authorized the debts, interest, or fees that Defendants collected. The form "Application and Loan Agreement for PEAKS Private Student Loan" was the only documentation that Defendants had for PEAKS borrowers.[63] That document, by its own terms, denied being an agreement to lend or borrow money.[64] Moreover, it did not have the terms necessary to form a valid loan agreement. The application listed only a requested amount, not the amount of any loan offered, accepted, or agreed to by the parties. It did not list the interest rate applicable to the students' loans, including interest that

---

[61]     CFPB Bulletin 2013-07, Prohibition of Unfair, Deceptive, or Abusive Acts or Practices in the Collection of Consumer Debts (July 10, 2013), https://files.consumerfinance.gov/f/201307_cfpb_bulletin_unfair-deceptive-abusive-practices.pdf

[62]     Trial Tr., 680:2-13. Moreover, Defendants' expert testified that a loan servicer should not collect on loans it knows are not valid debts. *Id.*, 1186:22-1187:2.

[63]     *Id.*, 201:19-203:18, 220:13-23 (Rodriguez' testimony regarding loan documentation); *see*, *e.g.*, Ex. 66 (Plaintiff Turrey's Loan Application)

[64]     *Id.*, ¶ B.1 ("When you receive my application, you are not agreeing to lend me money."), ¶ B.2 ("HOW I AGREE TO THE TERMS OF MY LOAN. If you agree to make a Loan to me, you will send me [a disclosure statement providing the essential terms of the loan]. If I decide to accept the Loan that you offer me, I must give you notice of my acceptance as described in [the disclosure statement].").

BLOOD HURST & O' REARDON, LLP

accrued during the payment grace period. Nor did it indicate the origination fees. And it did not list the loan duration or the monthly payment amount that the students supposedly agreed to. The loan application stated that these material loan terms would be disclosed in future "Approval" and "Final" disclosures.[65] Even though Defendants were contractually obligated to onboard and maintain in their possession the Approval and Final disclosures,[66] they did not.[67] And they never sought to locate the Approval or Final disclosure documents at any point during the life of the program or even during the discovery phase of the case.

Moreover, when students requested proof of the validity of the PEAKS loans, Defendants only provided the facially incomplete application, referring to it falsely as the "promissory note," despite, as discussed above, the application lacking essential terms and denying that that the application constituted a loan agreement.[68] Failing to properly validate loan terms and exploiting borrowers' lack of sophistication by falsely characterizing the loan application as a promissory note in order to pressure students into payment on loans that Defendants lacked the essential documentation of was itself patently "unfair." And it is a violation of the California Student Borrower Bill of Rights, Cal. Civ. Code § 1788.101, which prohibits "materially interfere[ing] with the ability of a borrower to understand a term or condition of a student loan." Cal. Civ. Code § 1788.101(a)(2)(A).

///

///

---

[65]     *Id.*, ¶ B(2).

[66]     *See* Ex. 30 at 30-30 (Servicing Agreement requiring First Associates to "Create and maintain electronic files and records pertaining to the Serviced Loans.")

[67]     Trial Tr., 202:2-203:8 (Rodriguez testifying that she was familiar with the so-called "promissory note," but not other loan documents).

[68]     *Id.*, 202:20-203:8 (Rodriguez referring to the "loan application" as a "promissory note"); *see, e.g.*, Ex. 175 at 175-24 (Loan Comment Report for Plaintiff Sazon; entries for 3/12/2013 indicate that, in response to him being "completely unaware of loan," First Associates sent him a copy of the "promissory note").

BLOOD HURST & O' REARDON, LLP

00204700

/// 

## B.   Plaintiffs and Class Members Are Entitled to Restitution to Return Them to the Status Quo

The UCL expressly authorizes courts to make such orders or judgments "as may be necessary to restore to any person in interest any money … which may have been acquired by means of such unfair competition." Bus. & Prof. Code § 17203. As the California Supreme Court explained: "The object of [UCL] restitution is to restore the status quo by returning to the plaintiff funds in which he or she has an ownership interest." *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1149 (2003); *see also Turrey v. Vervent, Inc.*, No. 20-CV-0697 DMS (AHG), 2023 WL 3028079, at *3 (S.D. Cal. Apr. 20, 2023) (quoting *Korea Supply Co.*).

Restitution under the UCL is "measured by what was taken from the plaintiff," not what was gained by Defendants. *Hahn v. Massage Envy Franchising, LLC*, No. 12cv153 DMS (BGS), 2014 WL 5100220, at *15-16 (S.D. Cal. Sept. 25, 2014) (Sabraw, J.) (citing *Clark v. Super. Ct.*, 50 Cal. 4th 605, 613 (2010)). *See also People ex rel. Harris v. Sarpas*, 225 Cal. App. 4th 1539, 1562 (2014) (noting that courts "are not concerned with restoring the [UCL] violator to the status quo ante"). Thus, the amount Defendants earned from servicing Plaintiffs' and class members' PEAKS loans is irrelevant to the measure of restitution.

Plaintiffs and the class seek restitution measured by the amount necessary to restore them to their status quo. *See Sarpas*, 225 Cal. App. 4th at 1562 ("The status quo ante to be achieved by the restitution order was to again place the victim in possession of that money. The object of [statutory] restitution is to restore the status quo by returning to the plaintiff funds in which he or she has an ownership interest.") (quoting *People ex rel. Kennedy v. Beaumont Inv., Ltd*., 111 Cal. App. 4th 102, 134 (2003)). Further, Defendants "may be ordered to restore what [Plaintiffs and the class] lost, even if the amount exceeds what the [Defendants] received." *Massage Envy*,

BLOOD HURST & O' REARDON, LLP

00204700

2014 WL 5100220, at *15-16; and *Vervent, Inc.*, 2023 WL 3028079, at *3 (quoting *Massage Envy* with approval).

Consistent with this authority and the Court's previous rulings in this case, the proper amount of restitution for Plaintiffs' and class members' UCL claim is $51,509,051. The remedies under the UCL, including restitution, are "cumulative to remedies available under other laws…" Bus. & Prof. Code § 17203; *see also Cortez v. Purolator Air Filtration Prods. Co.*, 23 Cal. 4th 163, 179 (2000); *Fowler v. Wells Fargo Bank, N.A.*, No. 17-cv-02092-HSG, 2017 WL 3977385, at *2 (N.D. Cal. Sep. 11, 2017) ("The remedies and penalties under the UCL are also cumulative to those under federal law.")

## III.   CONCLUSION

For the foregoing reasons, Plaintiffs request entry of judgment against Defendants on the UCL claim in the amount of $51,509,051 in restitution plus prejudgment interest at the rate of 7% per annum. *See* Cal Const, Art. XV § 1.

Respectfully submitted,

Dated: July 17, 2023

BLOOD HURST & O'REARDON, LLP
TIMOTHY G. BLOOD (149343)
LESLIE E. HURST (178432)
JAMES M. DAVIS (301636)

By:     *s/ Timothy G. Blood*
TIMOTHY G. BLOOD

501 West Broadway, Suite 1490
San Diego, CA 92101
Tel: 619/338-1100
619/338-1101 (fax)
tblood@bholaw.com
lhurst@bholaw.com
jdavis@bholaw.com

LANGER GROGAN & DIVER, PC
IRV ACKELSBERG (*pro hac vice*)
JOHN J. GROGAN (*pro hac vice*)
DAVID A. NAGDEMAN (*pro hac vice*)
1717 Arch Street, Suite 4020
Philadelphia, PA 19103
Tel: 215/320-5660

BLOOD HURST & O'REARDON, LLP

215/320-5703 (fax)
iackelsberg@langergrogan.com
jgrogan@langergrogan.com
dnagdeman@langergrogan.com

LAW OFFICE OF PAUL ARONS
PAUL ARONS (CA #84970)
175 Gretchen Way
Friday Harbor, WA 98250
Tel: 360/378-6496
360/359-7170 (fax)
lopa@rockisland.com

*Attorneys for Plaintiffs*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

BLOOD HURST & O' REARDON, LLP

**CERTIFICATE OF SERVICE**

I hereby certify that on July 17, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the Electronic Mail Notice List.

I certify under penalty of perjury that the foregoing is true and correct. Executed on July 17, 2023.

_s/ Timothy G. Blood_
TIMOTHY G. BLOOD

BLOOD HURST & O'REARDON, LLP
501 West Broadway, Suite 1490
San Diego, CA 92101
Tel: 619/338-1100
619/338-1101 (fax)
tblood@bholaw.com

PLAINTIFFS' MEMO. IN SUPPORT OF MOTION FOR ENTRY OF JUDGMENT ON CLAIM FOR VIOLATION OF UNFAIR COMPETITION LAW

00204700